**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF MARCO GOMEZ, | ) | |
| Deceased, by DAISY PEREZ, | ) | |
| Independent Administrator, | ) | Case No. 18-CV-910 |
| | ) | |
| Plaintiff, | ) | Hon. John F. Kness |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF FOREST PARK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT MILLERS' RULE 56.1 STATEMENT OF UNCONTESTED FACTS**

Defendant Daniel Miller ("Miller"), by his attorneys, Gail L. Reich, Julie A. Bruch, and Gerard W. Cook, of O'Halloran Kosoff Geitner & Cook, LLC, and pursuant to Rule 56.1 of the Rules of the United States District Court for the Northern District of Illinois herby submits his statement of uncontested facts in support of his motion for summary judgment. In support thereof, defendant states:

1. Plaintiff brought this action as administrator of the estate of Marco Gomez ("Gomez"), who was shot by Forest Park police officer Daniel Miller on the evening of February 3, 2017 around 6:00 p.m. Doc. 20, Amended Complaint ¶¶ 1, 5.

2. At the time of the shooting, Gomez was driving a stolen silver Volkswagen Jetta (the "Jetta"). Doc. 20, Amended Complaint ¶¶ 9, 15.

3. That day, Miller was driving a marked squad car and wearing a police uniform. Ex. 1, Miller Deposition at 56-58; Ex. 2, Miller Declaration at ¶¶9-13 & video.

4. As a part of his equipment, Miller was carrying his duty weapon—a Glock Model 21 .45 caliber semi-automatic pistol, which was loaded with 13 rounds in the magazine and one

round in the chamber. He was also carrying two additional magazines containing 26 rounds, for a total of 40. Exhibit 2, Miller Declaration, ¶3.

5. Officer Sullivan of the Chicago Police Department was on patrol that evening when he observed a gray VW disregarding stop signs, the first of which was at Laramie Avenue and Adams Street, heading westbound. So, Sullivan got behind the VW, activated his emergency equipment and asked dispatch to run the VW's plate #Z818805. Ex. 3, Sullivan Deposition at 9-11; Exhibit 4, OEMC Event Query.

6. The VW turned south on Central Avenue and Sullivan reported to the dispatcher he believed the VW was heading to I-290, the Eisenhower expressway. Ex. 3, Sullivan Dep. at 13, 19.

7. The Dispatcher advised Sullivan that the VW was stolen and provided the make, year, color and other information. Ex. 3, Sullivan Dep. at 13, 19-20 Exhibit 4, OEMC Event Query.

8. Sullivan observed the VW slam hard on the brakes due to traffic and thought the VW had struck another car. The VW then maneuvered around traffic, jumped the curb, drove on the parkway and sidewalk and headed west on Jackson. Ex. 3, Sullivan Dep. at 13-15.

9. Sullivan then turned west on Jackson, but no longer saw the VW. So, he alerted dispatch the VW was on Jackson traveling towards Oak Park and continued to tour the area to look for the VW. Another officer reported the driver of the VW was a male Hispanic. Ex. 3, Sullivan Dep. at 17-18, 20; Exhibit 4, OEMC Event Query.

10. Sullivan testified he was concerned for the safety of the public because the driver of the VW was driving dangerously and erratically, going through three stop signs and speeding. Ex. 3, Sullivan Dep. at 21-22.

11. While Sullivan was continuing to look for the VW [in Oak Park], he saw Oak Park officers traveling at a high rate of speed in the area of Austin Boulevard, south of Madison Avenue. Ex. 3, Sullivan Dep. at 18.

12. Sullivan followed the Oak Park officers because he thought it was a "10-1," which is a call sign for an officer in need of emergency assistance and since Oak Park is a small department, Sullivan wanted to make sure everything was okay. Ex. 3, Sullivan Dep. at 18, 25-28.

13. Chicago Police Officers cannot hear the Oak Park Police radio, but Oak Park officers can hear Chicago's Zone 12 police radio and often cross into Chicago to assist when Chicago officers call a "10-1." Ex. 3, Sullivan Dep. at 18, 25-27, 31-32.

14. Information was passed on by OEMC dispatchers to Oak Park, about the Jetta, its direction of travel and the fact that it may have been involved in a hit and run. Exhibit 4, OEMC Event Query.

15. A 911 caller also contacted the police because she believed they were looking for someone and reported seeing a car matching the Jetta's description "blow through" the stoplight at Ridgeland and Jackson [in Oak Park] and continue westbound on Jackson. Ex. 5, WESCOM 911 calls at 5:12-7:47.

16. Sullivan came in close proximity of a number of squad cars near the scene [of the shooting at Jackson and Harlem] and once he learned from another officer everything was okay, he went back to Chicago. Ex. 3, Sullivan Dep. at 27.

17. Miller heard a dispatch that a stolen vehicle was involved in a hit and run, had fled from Chicago Police, and was coming into Oak Park. Ex. 1, Miller deposition at 65-66; Attachment C to Exhibit 2, Miller Declaration ¶14.

18. Miller spoke with Officer McClintock on the side band, received the correct license plate number for the stolen vehicle, and learned it was a silver or gray Volkswagen Jetta reported stolen from Glendale Heights, Illinois, a suburb west of Chicago. Ex. 1, Miller deposition at 68-70.

19. Because Miller learned the stolen Volkswagen Jetta was last seen on Jackson Boulevard, he turned onto Jackson from Maple Avenue and pulled into the left turn lane on westbound Jackson at Harlem Avenue to look for the stolen Jetta. Ex. 1, Miller deposition at 76; Attachment B to Exhibit 2, Miller Declaration ¶¶4-6, 9-12 & video, Attachment C to Exhibit 2, Miller Declaration ¶14.

20. Miller decided to wait for the Jetta in a parking lot because Harlem Avenue was a main thoroughfare dividing the Villages of Oak Park and Forest Park and the intersection was a block from I-290, a major expressway and common escape route for individuals fleeing the police from the Chicago, Oak Park and Forest Park to the suburbs. Ex. 1, Miller deposition at 77; Exhibit 2, Declaration of Miller ¶¶4-6, Attachment C to Exhibit 2, Miller Declaration ¶14.

21. As Miller began to back up to go into the parking lot, he saw the headlights of a Jetta coming from behind him and noticed the car was gray. Ex. 1, Miller deposition at 79-80, 84-85; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

22. When Miller saw the Jetta pull up, he put his vehicle in park and exited his car because he believed the Jetta was going to be boxed in at the red light by heavy traffic at that time of day and he would be able to approach the vehicle; verify whether it was a stolen car; and, if so, make an arrest. Ex. 1, Miller deposition at 85-86; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

23. Miller approached the Jetta with his weapon in his hand and, as he did so, he made eye contact with the driver, Gomez, who immediately put the car in reverse and backed away. Ex. 1, Miller deposition at 87, 97-98; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

24. Miller ran toward Gomez as Gomez was reversing the Jetta, believing he would be able to apprehend Gomez when the vehicle became trapped in an S-turn in the road.  Ex. 1, Miller deposition at 94-96; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

25. Miller yelled commands at Gomez: "stop," "police," and "show me your hands." Ex. 1, deposition of Miller at 96.

26. While going in reverse, Gomez never looked back to see whether there were pedestrians or other vehicles behind him.  Ex. 1, deposition of Miller at 94-95, 97-98, 204; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

27. Miller believed Gomez showed complete disregard for the safety of the public by operating the vehicle in a reckless manner.  Ex. 1, deposition of Miller at 204; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

28. Other vehicles were in the area and risked being hit by the Jetta as Gomez backed up and at least one vehicle moved out of the way. Ex. 1, deposition of Miller at 95; Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

29. Miller testified that, although his attention was focused on the Jetta, he believed it would have been quite possible there were pedestrians in the area that time of day. Ex. 1, deposition of Miller at 94-95.

30. A stop for the CTA Blue Line public transit is located about a block away from the scene where the events took place. Ex. 1, deposition of Miller at 95.

31. After reversing and hitting or jumping the curb, Gomez stopped the car. Ex. 1, deposition of Miller at 98-100; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

32. Miller testified that, as he ran in front of the Jetta and shouted at Gomez to get out of the car and show his hands, Gomez looked directly at him. Ex. 1 Miller Deposition 101-103.

33. Miller testified he put himself in front of the vehicle driven by Gomez to prevent it from escaping. Ex. 1, Miller Deposition at 105; ¶¶ 9-13 & video.

34. Miller testified that when he got in front of the Jetta and told Gomez to stop, Gomez then put the car in "drive" and began driving toward Miller. Ex. 1, Miller Deposition at 97; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

35. Miller testified Gomez was looking at him when he was in front of the vehicle just before Gomez accelerated toward Miller. Ex. 1, Miller Deposition at 102-103, 106; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

36. Miller testified that, when the vehicle began coming toward him, he fired his weapon in self-defense and to protect the public. Ex. 1, Miller Deposition at 121, 123, 206, 207; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

37. Miller testified he stopped firing when his brain processed the fact he was no longer in front of the Jetta and the vehicle no longer posed a threat to him. Ex. 1, Miller Deposition at 121-22; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

38. Miller does not know whether he moved his feet to get out of the way of the Jetta as it was coming forward or if Gomez was able to make a sharp turn to avoid clipping Miller's

feet; he was not able to see because the incident happened too quickly. Ex. 1 Miller Deposition at 123.

39. The entire encounter—from the time Gomez stopped at the stoplight (timestamp 6:03:52) to the time the last shot was fired and the car had passed Miller (timestamp 6:04:12)— lasted no more than twenty seconds. Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

40. Miller fired two shots through the windshield of the car and two through the driver's side window. Ex. 1, deposition of Miller at 121, 193-94; Ex. 2, Miller Declaration at ¶8, 9 and attachment A thereto; Ex. 7, deposition of Meunier at 71.

41. Another vehicle was stopped on Jackson Blvd., blocking Maple Ave. and in the path of the Jetta when Gomez began going forward after having driven in reverse. Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

42. After passing defendant Miller, the Jetta continued forward and struck the vehicle, which was stopped on Jackson Blvd. Attachment B to Exhibit 2, declaration of Miller; Ex. 7, deposition of Meunier at 30; Ex. 1, Miller Deposition at 128-29; Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

43. Defendant Miller believed Marco Gomez presented a threat of great bodily harm to himself and the public because Gomez was involved in a hit and run, fled from police in Chicago, put his car in reverse without ever looking behind to see whether there were pedestrians and/or vehicles behind him, hit and went over the top of a curb, and attempted to run defendant Miller over with the vehicle. Ex. 1, deposition of Miller at 204; Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13 & video.

44. On February 3, 2017, eyewitness Eric Meunier, lived in a house at the corner of Jackson and Maple. Ex. 6, deposition of Meunier at 14-18.

45. That evening, when Meunier heard tires squealing and yelling coming from the south, he got up, stood on the couch and looked out the window, which faces south onto Jackson. Ex. 6, deposition of Meunier at 16-17.

46. Meunier initially saw Miller was in front of the Jetta, near the driver's side headlight and observed the Jetta accelerate toward Miller before shots were fired and Meunier was concerned the Jetta was going to hit Miller. Ex. 6, deposition of Meunier at 17-18, 30, 65; attachment B to Exhibit 2, Declaration of Miller (video).

47. Meunier saw the first two shots were fired from in front of the Jetta and the next two were fired from the front quarter panel; both Miller and the Jetta were moving as the shooting occurred. Ex. 6, deposition of Meunier at 71-72; attachment B to Exhibit 2, Declaration of Miller (video)

48. According to Dr. Jeremy Bauer, Plaintiff's human performance and biomechanics expert, who conducted an analysis and created a video simulation of the incident, it is not possible to determine Miller's exact positioning during the full sequence of events and one reason is because Miller's left leg is obstructed by the utility pole in the video. Ex. 7, 7/17/20 Bauer Deposition at 13, 80-81, 95-97; Attachment B to Exhibit 2, Declaration of Miller (video).

49. Therefore, in order to calculate the distance and render his opinions, Bauer had to make some assumptions. Ex. 7, 7/17/20 Bauer Deposition at 95-96, 100-101.

50.   Bauer estimated the distance between Miller and the front bumper of the Jetta to be about 6 inches at the time the Jetta began to move forward. Ex. 8, 2/12/21 Bauer Deposition at 12, 27-28, 114; Attachment B to Exhibit 2, Miller Declaration (video).

51.   Bauer testified it is possible that Miller's left foot or left leg was in front of the vehicle at some point prior to Gomez driving forward and that Miller was close enough to the Jetta that, had the vehicle moved forward, and Gomez turned the wheels to the left and Miller not moved laterally away from the vehicle, Miller could have been struck.  Ex. 7, 7/17/20 Bauer deposition at 94-96, 100-101; Ex. 8, 2/12/21 Bauer Deposition at 12; Attachment B to Exhibit 2, Miller Declaration (video).

52.   Bauer testified that Miller had very little time to react as the Jetta accelerated forward and that, from the time the Jetta began to move until the last shot of all four shots was fired, was approximately one second and the last shot was likely the fatal shot.  Ex. 7, 7/17/20 Bauer Deposition at 138-139; Ex. 8, 2/12/21 Bauer Deposition at 27, 30-31; Attachment B to Exhibit 2, Miller Declaration (video).

53.   Bauer opined that, from the time the Jetta first moved forward until the time Miller fired the first shot was likely 0.4 seconds and the last shot would have been fired about 0.6 seconds later, within a reasonable perception-response time.  Ex. 8, 2/12/21 Bauer Deposition at 27, 29-30; Attachment B to Exhibit 2, Miller Declaration (video).

54.   Perception-response time is the time it takes a person to perceive a hazard (or that a hazard no longer exists) and respond, which, in this case, means that there was lag time between the time that Miller first perceived a danger and the time he fired, as well as lag time once Miller perceived the danger had passed and he stopped firing.   Ex. 7, 7/17/20 Bauer Deposition at 125; Ex. 8, 2/12/21 Bauer Deposition at 24-27, 34, 108.

55. According to Bauer, Miller was positioned alongside the Jetta in the area of the driver's window when the fatal shot was fired. Ex. 7, 7/17/20 Bauer deposition at p. 150.

56. Bauer did not calculate how many feet per second the Jetta was traveling or where Miller was positioned in relation to the vehicle at the time he likely perceived the Jetta was no longer a danger to him and decided to stop firing. Ex. 8, 2/12/21 Bauer Deposition at 34.

Respectfully submitted,

**DANIEL MILLER**

By:     *s/Gail L. Reich*

One of His Attorneys

Gerard W. Cook, #3123800
Gail L. Reich, #6279564
Julie A. Bruch, #6215813
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone: 847/291-0200
Fax:    847/291-9230