**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ESTATE OF MARCO GOMEZ, deceased )
by DAISY PEREZ, Independent )
Administrator, )
          PLAINTIFF )
)
      VS )  NO. 18 CV 910
)
VILLAGE OF FOREST PARK, et al )
)
        DEFENDANT )

The deposition of BRIAN SULLIVAN, taken pursuant to the provisions of the Code of Civil Procedure and the Rules of the Supreme Court of the State of Illinois pertaining to the taking of depositions for the purpose of discovery, taken before Ms. Vernetta McCree, Notary Public and Certified Shorthand Reporter in the County of Will, State of Illinois at The Offices of the City of Chicago, 30 N. LaSalle Street, Suite 1720, Chicago, IL 60602 on the 22nd day of October, A.D., 2019 at 4:08 p.m.

**Page 2**

APPEARANCES:

ACTION INJURY LAW GROUP
MS. AMANDA YARUSSO
191 N. Wacker Dr - 2300
Chicago, IL 6060
Appeared on behalf of the Plaintiff;

O'HALLORAN, KOSOFF, GEITNER & COOK
BY MS. GAIL REICH
650 Dundee Road - 475
Northbrook, IL 60062
Appeared on behalf of the Defendant.

CITY OF CHICAGO LAW DEPARTMENT
BY MR. PHILLIP SANTELL
30 N. LaSalle St.
CHICAGO, IL 60602
Appeared on behalf of the Deponent

**Page 3**

INDEX

BRIAN SULLIVAN

Direct Examination............................4

Cross Examination...........................30

Redirect Examination.........................35

Recross Examination..........................36

EXHIBITS

Exhibit No. 4.................................7
Exhibit No. 5.................................6

**Page 4**

(Witness sworn)

BRIAN SULLIVAN after having been first duly sworn, on oath, deposes and testifies as follows:

DIRECT EXAMINATION

BY MS REICH:

Q. Please state and spell your name, please?

A. Brian Sullivan B-r-i-a-n, Sullivan, S-u-l-l-i-v-a-n.

Q. This is the deposition of Brian Sullivan. It's being taken pursuant to subpoena in the case of the Estates of Marco Gomez versus Village of Forest Park, et al. That is case number 18 CV 910, which is currently pending in the U.S. District Court for the Northern District of Illinois. This deposition is being taken pursuant to the Federal rules and local rules. Is it Officer Sullivan?

A. No, it's not.

Q. What is it?

A. I'm a Chicago Fire Fighter.

Q. Okay. Fire Fighter Sullivan, when did you transfer to the Fire Department?

A. First day on the Fire Department was March 1st of 2019.



Exhibit
3

800.211.DEPO (3376)
EsquireSolutions.com

BRIAN SULLIVAN
GOMEZ vs VILLAGE OF FOREST PARK

October 22, 2019
9–12

Page 9

Q. Do you know the name of the Plaintiff?

A. I don't remember.

Q. Are you the only Defendant in that lawsuit?

A. No.

Q. Who else is a Defendant?

A. A few officers, Officer Kanapsa, Officer Brezinsky and Needleman, there a few others, I can't remember who was exactly on it.

Q. Okay. Is that a federal court case?

A. Yes.

Q. Okay. Is that the only time you've been sued?

A. I was notified by corporation counsel about a traffic crash, but I've never been notified after.

Q. Just generally speaking, is the suit where you're named as a defendant, is that for excessive force?

A. Excessive force.

Q. Is that the only other deposition you've given?

A. Yes.

Q. So, drawing your attention to February

Page 10

3rd, 2017 at approximately 6:15 p.m. At that time, were you on routine patrol?

A. Yes, on that mission car.

Q. Okay. And, at some point you observed a gray Volvo, right?

A. Yes.

Q. And what drew your attention to the Volvo?

A. It was disregarding a stop signs. I think it was a Volkswagen.

Q. Oh, I'm sorry, did I say Volvo?

A. Yes. Okay, I apologize. When I said Volvo, I meant Volkswagen, thank you. You said it was disregarding stop signs?

A. Yes.

Q. Do you remember where you were when that occurred?

A. I believe we saw it at Laramie and Adams going westbound.

Q. And, where was your car in relation to the Volkswagen when you saw it at Laramie and Adams?

A. I don't recall.

Q. You were driving?

A. Yes.

Q. Officer Cuevas was the passenger?

Page 11

A. Yes.

Q. So, you saw it disregard a stop sign, or at least one?

A. Yes.

Q. And, what did you do in response?

A. Got behind the vehicle.

Q. Okay.

A. Ran his license plate.

Q. Over the radio?

A. Yes.

Q. So, you called into dispatch, asked for them to run the plates?

A. Yes.

Q. And, when you got behind the vehicle, did you activate your emergency equipment?

A. Yes.

Q. And, were you in a marked or unmarked car?

A. Unmarked car.

Q. So, you had lights on the interior, blue lights on the interior in the front or--

A. I don't know exactly because some of the unmarked Chicago police cars have lights on the exterior, too, like in the grill and under the rear view mirrors, on the sides of each door. I don't

Page 12

recall what the light configuration was on this particular vehicle.

Q. But, at least you had some blue lights flashing, and maybe your wig wags going?

A. Yes.

Q. When was the last time you listened to the audio?

A. Today.

Q. Oh. Prior to, earlier this morning?

A. Yes.

Q. This afternoon?

A. This afternoon, yes.

Q. All right. So, after you activated your emergency equipment and you radioed in to dispatch the plate, what happened next?

A. I'm not sure of the order. I believe you just said I put my emergency equipment on, then radioed to dispatch. I'm not sure of the order that, I don't know what happened, if I ran the plate first then put my emergency equipment on. That would probably be logically what I would think I would do. But, I do not remember if that was the order that that happened in.

Q. Okay. Tell me what happened next?

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

BRIAN SULLIVAN
GOMEZ vs VILLAGE OF FOREST PARK

October 22, 2019
13–16

Page 13

A. The vehicle proceeded to south on Central. Then, I alerted OEMC that the vehicle was on Central heading southbound, I believe I said, I believe it's heading towards the Eisenhower.

Q. So, it was going westbound on Adams then turned south on Central?

A. Yes.

Q. Made a left turn?

A. Yes.

Q. And you followed behind it?

A. Yes.

Q. And, how far did it travel on Central, if you recall?

A. Well, it ended up going westbound on Jackson. So, that's one city block because Adams is 200 and Jackson is 300.

Q. And, after you asked dispatch to run the plate, what information came back?

A. That the vehicle was stolen, and whatever else, the year of the vehicle, and it's color, and it's make, all the stuff associated with Secretary of State records.

Q. Okay. What happened next?

A. The vehicle had put it's brakes on very

Page 14

hard because it was cars stacked at the intersection. And then, it took a maneuver to get around those vehicles and proceeded westbound on Jackson.

Q. What intersection was that?

A. That would be Jackson and Central.

Q. So, when it, the car had been traveling southbound on Central. And, because there was traffic, it broke hard. Then, it's maneuvered around cars to go west on Jackson, is what you're telling me?

A. Yes.

Q. Is that right?

A. Yes.

Q. And, you said it did a maneuver to get around the cars to go west on Jackson, right?

A. Yes.

Q. Can you describe what the car did?

A. I believe it jumped the curb and drove on the parkway and sidewalk.

Q. So, it went to the right of traffic onto the--

A. Parkway and sidewalk.

Q. And sidewalk?

A. Yeah, that would be to the right of traffic, that would be to the right of southbound

Page 15

traffic if you were north of that southbound traffic. So, if you're looking at the tail lights, it would be to the right going west.

Q. And, what were you thinking when you saw that occur?

A. Well, when he slammed the brakes on, he tail ended a car, you seen the car brake extremely hard, the tail end of the car popped up in the air. I said I think, I believe I said when I was listening, he might have struck a vehicle, he might have hit a car. So, I believe he might have hit a car at that point.

Q. Because you saw the back end come up a bit, that's what led you to believe that he had struck another car, that he might have struck a car?

A. That he might have struck a car, yes.

Q. Did you hear a crash?

A. No.

Q. How far away were you when you saw the car hit the brakes or slam on the brakes, and then have the back end of the car go up?

A. I'm not exactly sure how far I was. I was, I'm pretty sure I was at Adams coming onto Central.

Page 16

Q. Were there any cars between you and the gray Volkswagen?

A. I don't remember.

Q. Did you see any pedestrians on the park way or walking on the sidewalk that had to avoid the Volkswagen after it jumped the curb and drove in that direction?

A. Not that I remember.

Q. So, you don't recall seeing anybody having to jump out of the way; for example?

A. Yeah, I don't recall if there were people on the sidewalk or not.

Q. And, so, when the car made the maneuver to get around, what were you thinking?

A. Well, I was thinking he might have hit, that car, I got to go up, make sure these people are okay.

Q. And, did you go and check?

A. Yes.

Q. And, had he hit a car?

A. I do not know.

Q. And, what did you do next?

A. I went up to see the car that I thought he had struck. And, I pulled up next to them, and they



BRIAN SULLIVAN
GOMEZ vs VILLAGE OF FOREST PARK

October 22, 2019
17–20

Page 17

drove away.

Q. And, at this time, you still had your emergency equipment on?

A. Yes.

Q. So, you pulled up alongside the car that you believed that he could have struck?

A. Yes.

Q. On the right side or the left side, if you recall?

A. I don't recall.

Q. And, you said that the car drove off?

A. Yes.

Q. Was traffic moving at that point?

A. Yes.

Q. And so, what did you do next?

A. I turned westbound on Jackson?

Q. Okay. And, what did you observe?

A. Nothing.

Q. Did you see the car, the Volkswagen?

A. Not that I recall.

Q. What did you do next?

A. I alerted OEMC that he was traveling towards Oak Park.

Q. You alerted OEMC?

Page 18

A. Yes.

Q. That he was traveling towards Oak Park?

A. Yes.

Q. And then what?

A. Then toured the immediate area.

Q. You toured the area because you were still looking for the car?

A. Yeah.

Q. What happened next?

A. I did not find the car.

Q. Okay. How long did you look?

A. I don't know, I don't remember.

Q. What's the next thing you remember?

A. I remember that we saw a few Oak Park squad cars traveling at a high rate of speed.

Q. At that point, where were you?

A. Somewhere in the area of Austin, and I don't know, south of Madison.

Q. Did you have radio contact with Oak Park?

A. No.

Q. You stayed on Zone 12?

A. Yes.

Q. And, do you have the ability to have radio contact with any cars on Westcom?

Page 19

A. I don't know what Westcom is.

Q. That's the band that Oak Park and River Forest uses to dispatch.

A. No, our OEMC has the ability to contact them, we don't.

Q. I'd like to play the audio for you?

A. Do you mind if I check my phone real quick? My kids got to get picked up from day care.

Q. Not at all.

(WHEREUPON, a short recess was taken)

MS. REICH: Back on the record.

(WHEREUPON, the audio recording was played.)

BY MS. REICH:

Q. Is that you?

A. Yes.

Q. And, you said what?

A. Squad plate in traffic, and I read the plate.

(WHEREUPON, the audio recording was played.)

Q. And, who is that speaking?

A. I do not know.

Q. Is that a dispatcher?

A. I don't know.

Q. Okay. And what did that person say?

Page 20

A. Car is coming back hot.

Q. And, what did that mean to you?

A. The car is stolen.

(WHEREUPON, the audio recording was played.)

Q. Is that you?

A. Yes.

Q. And, what did you say?

A. Central and Adams looks like it's making its way towards 290.

Q. What did you say?

A. I think he might have hit a car.

(WHEREUPON, the audio recording was played)

Q. Do you recognize that voice?

A. I'm not, I can't say with a hundred percent that's Officer Cuevas, I don't know who that is.

Q. And, do you recognize what that person said?

A. One occupant, male Hispanic.

(WHEREUPON, the audio recording was played.)

Q. Is that you?

A. Yes.

Q. What did you say?

A. He's on Jackson going towards Oak Park.



Page 21

(WHEREUPON, the audio recording was played.)

Q. Is that you?

A. Yes.

Q. What did you say?

A. Lost sight of him.

Q. Lost sight of him.

(WHEREUPON, the audio recording was played.)

Q. Do you recognize those voices?

A. One was definitely the dispatcher, I don't know what the other thing said, sounds like we were kind of talking over each other.

(WHEREUPON, the audio recording was played.)

Q. Was did driver of the Volkswagen speeding?

A. Yes.

Q. What's the speed limit in that area, if you recall?

A. I don't recall.

Q. Was he driving erratically?

A. Yes.

Q. Was he driving dangerously?

A. Yes.

Q. How many stop signs did he blow, if you recall?

A. I don't recall, probably in the area of

Page 22

three, I'm just trying to reconstruct the path in my head. I haven't worked in Austin for awhile, so my best guess would be three.

Q. Okay. I appreciate that. So, he blew through at least a couple, maybe 3 stop signs, right?

A. Yes.

Q. Did he blow any traffic lights?

A. Well, I guess if you call driving on the sidewalk parkway to get through the red light, but maybe you can take a right on red there, I don't know.

Q. Certainly, driving on the parkway and the sidewalk is not--

A. You know what, I don't know if he blew that light technically because he might have been able to take a right on red.

Q. Were you concerned for the safety of the public?

A. Yes. Especially when I thought he might have hit that car. Once I saw that, I was kind of, you know what, slow down.

Q. Have you ever seen a car jump the curb like that and drive on the sidewalk like that?

A. Yes.

Q. How many times have you seen that happen?

Page 23

A. Quite a few.

Q. Have you have ever encountered that when somebody was driving a stolen vehicle?

A. I couldn't say for certain that was always a stolen vehicle, or could be other things.

Q. Did it surprise you that the driver of the car did that, given they were driving a stolen vehicle?

A. No.

Q. Do you believe that the driver of the car was aware that you were attempting to stop him?

A. Yes.

Q. What makes you say that?

A. I had oscillating blue lights on with an audible siren.

Q. Did the driver of the car ever increase his speed after you activated your emergency equipment?

A. I don't remember.

Q. Do you recall whether you observed any damage to the car that you believe that he could have hit?

A. Not that I recall. I'll just say this, I pulled up next to the car. At first, my first thought

Page 24

is if the people in the car were okay before I would look at the car for damage.

Q. Okay. And, did the driver of that car look at you?

A. Yes.

Q. And sort of?

A. Yes.

Q. Okay. So, they indicated to you in some way that they were okay?

A. No, they just looked at me, and I put the car in park, and they drove off. I was thinking that was kind of odd myself.

Q. It does seem a little odd.

A. Yes.

Q. Did you have any belief as to whether the driver of the Volkswagen was under the influence?

MS. YARUSSO: Objection, calls for speculation, lack of foundation.

Q. You can answer.

A. I can still answer? I couldn't say.

Q. Did you ever come up close enough to get a look at the driver of the car?

A. No.

Q. Did you have probable cause to stop the



BRIAN SULLIVAN
GOMEZ vs VILLAGE OF FOREST PARK

October 22, 2019
25–28

Page 25

car?

A. Yes.

Q. Did you ever see that gray Volkswagen again?

A. We followed the Oak Park cars. I believe my thought was it was 10-1 because they were driving fast when we told them out there. And, we got to the scene. And, I don't know if I saw that car when we got to the scene. And, basically, the reason going out there was to make sure that the police, I don't know, didn't need more assistance, make sure they were under control. Once we talked to an officer, said it was under control, then we went back. So, I don't remember if I saw that car there or not.

Q. So, you actually -- strike that -- the next time you saw the car, you said you followed Oak Park cars, and you thought it was a 10-1?

A. Yes.

Q. Can you explain what a 10-1?

MS. YARUSSO: Objection, mischaracterizes his testimony. He testified he never saw the car again, or does not know if he did.

Q. Sorry. I apologize if I misstated your testimony.

Page 26

A. That's okay.

Q. And, if I ever do that, please correct me.

A. I will.

Q. Thank you.

A. You're welcome.

Q. You said you followed Oak Park cars?

A. Yes.

Q. And then, you said I thought it was a 10-1?

A. Yes.

Q. First of all, what's a 10-1?

A. Officer is in need of emergency assistance.

Q. Okay. And, what made you think that?

A. The way they were driving.

Q. The Oak Park officers?

A. Yes.

Q. Okay. So, in what way were they driving?

A. Driving very fast, and they were in a line for a few cars, I saw that. And, in Chicago we call 10-1, you know, everyone drops what they're doing and they go to the 10-1. Being we're on a different band than Oak Park, we can't hear them. I thought maybe they had a 10-1 and followed them, just because

Page 27

they're a smaller department, don't have as many officers, and we don't, I can't think of a time we've been notified of a suburban 10-1. I just saw this, I thought it was a 10-1. I wanted to make sure everything was okay.

Q. So, you said that you got to the scene, right?

A. I got in close proximity to a bunch of squad cars. I just said hey, is everything okay, and then, everything is fine. And, I went back to Chicago.

Q. So, you actually had a conversation with an officer that was near the scene?

A. Yes.

Q. Do you remember what jurisdiction that officer worked for?

A. No.

Q. Did you ever, at least on that night, come to know what occurred?

A. Yes.

Q. How?

A. I think on the news.

Q. What did you hear on the news?

A. That an officer was involved in a

Page 28

shooting.

Q. And, did you make a connection between the pursuit that you had -- or that you had been involved in?

A. The car that I had seen driving erratically in Austin, I don't know if I made a direct connection to that, but I thought it could have been it. I couldn't say for certain that hey, this is the car. I don't remember actually seeing the car at the scene, I just pulled up and talked to a guy, hey, you guys good? We're fine. Just like, you know, when we call 10-1's, they come over all the time, or they come by our traffic stops. I think they have the ability to listen to ours, we don't have any ability to listen to theirs. It's common courtesy, you guys okay? Fine. Okay.

Q. So as you sit her today, do you know more about that incident?

A. Yes.

Q. What do you know?

A. I know that vehicle was the vehicle that I saw in Austin.

Q. How do you know that?

A. From the media. And, because I'm here

BRIAN SULLIVAN
GOMEZ vs VILLAGE OF FOREST PARK

October 22, 2019
29–32

Page 29

today.

Q. Anything else you know about that Incident?

A. Yes.

Q. What?

A. That the officer used deadly force.

Q. So, you, once you were told by some officer near the scene that everything was okay?

A. Um hum.

Q. You guys returned back to Chicago?

A. Yes.

Q. Okay. Then, do you, have you ever--do you know a Forest Park police officer named Dan Miller?

A. I can't say I do.

Q. Do you know any Forest Park police officers?

A. I don't think so. I mean, we've met some Oak Park police officers. I couldn't even tell you their names, though.

Q. What about Marco Gomez, did you know who he was?

A. No.

Q. Do you believe you ever had any contact with him as a police officer?

Page 30

A. Not that I recall.

Q. Is there anything else that you observed about the Volkswagen on February 3rd of 2017 that we haven't already talked about that you can recall?

A. I can't think of anything.

MR. REICH: Okay. No further questions.

CROSS EXAMINATION

BY MS. YARUSSO:

Q. I just have a few. Have you talked to Ms. Reich or any attorney for the Defendants prior to today?

A. No.

Q. Did you, on February 3rd, 2017 communicate any Information to Oak Park or Forest Park police officers about your observations of the vehicle?

A. No, I personally did not. I think OEMC, they might have, I believe, on tape she said she's on the line with him.

Q. And, you don't know exactly what it was she communicates, or what that person communicated?

A. No, I have no idea.

Q. As far as you know, your partner didn't communicate anything to Oak Park, Forest Park police officers?

Page 31

A. No, no.

Q. And, as far as you know, the only communication about anything that you observed or any Chicago police officer observed about this vehicle was done through OEMC to Oak Park or Forest Park, correct?

A. Yes.

Q. Do you have any knowledge of what Oak Park or Forest Park police officers can hear as far as Chicago's radio dispatch traffic?

A. I know that Oak Park can listen to our band. I don't know about, I know that because I've been In Instances where I've been like, what are you guys doing here? Oh, we heard It on the band. So I know they can listen to ours, Oak Park, you asked about Forest Park?

Q. Yes.

A. I'm not sure what their radios are like.

Q. When you say they can listen to your band, when you're communicating with dispatch?

A. Yes.

Q. That's a band that, that only you can only hear communications within a certain Zone?

A. Yes, I wanted to clarify that what I meant by band would have been Zone 12. On Chicago's radios,

Page 32

Zone 12 is the 25th District and the 15th district. And, I am aware that they had the ability, Oak Park has the ability to listen to that Zone 12.

Q. Which are the adjoining districts?

A. Yes. I don't know how far North Oak Park goes, but in Austin, the entire west border of the 15th District In the neighborhood of Austin Is Oak Park.

Q. Right.

A. So, that would make sense as to why they can hear what's going on in the 15th district. I know the 25th district Is the district just north of us, and I know the 25th district does share some borders with the Village of Oak Park.

Q. But, part of the reason, for instance, even In Chicago, if you're In Zone 12 or in those districts that are using Zone 12, it's would be cacifying to have all the districts on one band with everybody that's going on in the of Chicago?

A. In that area, yes.

MS. REICH: Objection form, vague.

A. I can still answer?

Q. Yes.

A. No.



## OFFICE OF EMERGENCY MANAGEMENT AND COMMUNICATIONS

### Chicago Police Department Event Query Report

| Event Details | | | |
|---|---|---|---|
| Event Number: | 1703411584 | Type: | TS |
| Date : | 2017-02-03 18:15:41.0 | Pri : | 3D |
| DG : | 015 | Svc Beat : | |
| Disp : | 19B | Source : | R |
| Response Level : | | Caller : | |
| Phone : | | Occ Beat : | |
| Address Of Occurrence : | CENTRAL ADAMS | Location : | CENTRAL ADAMS |
| Init. Event Type : | TS | Loc Remarks : | |
| Anonymous : | | RDNumber : | -- |

| Event Chronology - 1703411584 | | | | |
|---|---|---|---|---|
| Date | Wkstn | Person | Activity | Text |
| Feb 03, 2017 18:15:41 | PD40 | D113749 | TSTOP | Type: TS |
| Feb 03, 2017 18:15:41 | PD40 | D113749 | DOS | 1567A |
| Feb 03, 2017 18:16:07 | PD40 | D113749 | MISC | 1 occua |
| Feb 03, 2017 18:16:28 | PD40 | D113749 | MISC | wb jackson towards oakpark |
| Feb 03, 2017 18:16:51 | PD40 | D113749 | MISC | oak park monitoring |
| Feb 03, 2017 18:28:26 | PMDT2081 | PC0AD23 | CLEAR | 1567A D/19B |
| Feb 03, 2017 18:28:26 | PMDT2081 | PC0AD23 | CLOSE | D/19B |
| | | | RMKS | 5HCX LDS/V17A6585 STOLEN DOT/012617 VCO/GRY VYR/01 VMA/VOLK VMO/JET VST/4D VIN/3VWRS29M51M068809 LIM/03 LIY/17 LIS/IL LIT/PC LIC/Z818805 MIS/KEYS IN VEH, OTX/630 458 4045 CONFIRM WITH CDC/JRE SFA/2264 SST/BLOOMINGDALE SFC/GLENDALE HEI OCA/17-1362 ORA/PD GLENDALE HEIGHTS IL ENT/JRE OPR/AP TME/1937 DTE/012617 NIC/V908984432 CONFIRM WITH ORA |
| | | | RMKS | SOS 02032017 1815 STA/VALID VAL/03052016 TTL/16070693475 Z818805 032017 ORIG PLT LIC STX/7CEZ20157 PALACIOS VANESSA A 204 GLADSTONE DR APT 301 GLENDALE HEIGHTS IL |

Exhibit 4

Page 1 of 2

Chicago P.D. 95

| Event Chronology - 1703411584 | | | | |
|---|---|---|---|---|
| Date | Wkstn | Person | Activity | Text |
| | | | | 60139-1802 3VWRS29M51M068809 GRY/GRY 2001 VOLKSWAGEN SEDAN STATUS UNAVAILABLE REGISTRATION IS FROM THE VEHICLE MASTER FILE |

| Unit Summary - 1703411584 | | |
|---|---|---|
| Unit | Dispatch | Clear |
| 1567A | Feb 03, 2017 18:15:41 | Feb 03, 2017 18:28:26 |

Page 2 of 2

Chicago P.D. 96