**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ESTATE OF MARCO GOMEZ, )
Deceased, by DAISY PEREZ, )
Independent Administrator, )
                                       )
                      Plaintiff, )
                                         )
    v. )
                                         )
VILLAGE OF FOREST PARK, et al., )
                                         )
                 Defendants. )

Case No. 18-CV-910

Hon. John F. Kness

**DEFENDANT MILLERS' RULE 56.1 STATEMENT OF UNCONTESTED FACTS**

# EXHIBIT 5

## WESCOM 911 CALL

ERIC MEUNIER
ESTATE OF MARCO GOMEZ vs FOREST PARK

June 19, 2019
1–4

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF ILLINOIS

ESTATE OF MARCO GOMEZ by )

DAISY PEREZ, )

        Plaintiff, ) No. 18-CV-00910

        vs. )

VILLAGE OF FOREST PARK, )

VILLAGE OF FOREST PARK )

OFFICER JOHN DOE, )

        Defendants. )

        The deposition of ERIC MEUNIER, called as a witness for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before LISA C. HAMALA, a Certified Shorthand Reporter of said state, CSR No. 84-3335, at the Village of Forest Park, 517 DesPlaines Avenue, Forest Park, Illinois, on the 19th day of June, A.D. 2019, at 9:10 a.m.

**Page 2**

PRESENT:

    ACTION INJURY LAW GROUP, LLC,
    (191 North Upper Wacker Drive, Suite 2300,
    Chicago, Illinois 60606,
    844-878-4529), by:
    MS. AMANDA YARUSSO,
        appeared on behalf of the Plaintiffs;

    O'HALLORAN KOSOFF GEITNER & COOK,
    (650 Dundee Road, Suite 475,
    Northbrook, Illinois 60062,
    847-291-0200), by:
    MS. GAIL L. REICH,
    greich@okgc.com,
        appeared on behalf of the Defendants.

REPORTED BY: LISA C. HAMALA, CSR.
        Illinois CSR No. 84-3335.

**Page 3**

(DEPOSITION START TIME: 9:10 a.m.)

    (WHEREUPON, the witness was duly sworn.)

    ERIC MEUNIER, called as a witness herein, having been first duly sworn, was examined and testified as follows:

    EXAMINATION

BY MS. REICH:

    Q.    Good morning. I'm Gail Reich, and I represent the Village of Forest Park and Officer Daniel Miller in this case.

    MS. REICH: Let the record reflect that this is the deposition of the Estate of Gomez, Case No. 18-CV-00910, currently pending in the United states District Court for the Southern District of Illinois.

    MS. YARUSSO: For the record, I'm Amanda Yarusso, and I represent the plaintiff in this matter.

BY MS. REICH:

    Q.    Okay. Can you state and spell your full name for the record.

    A.    Eric Meunier, M-e-u-n-i-e-r.

    Q.    Thank you. We are here today to take

**Page 4**

your deposition regarding your observations from an incident that occurred in February of 2017.

    You're here today pursuant to subpoena?

    A.    Yes.

    Q.    Have you ever given a deposition before?

    A.    I have not.

    Q.    So we are on the same page with the ground rules, everything that we are saying today is being taken down by a court reporter sitting to my right.

    A.    Understood.

    Q.    It is important that you give verbal answers to the questions asked of you.

    A.    Understood.

    Q.    She can't take down nods, shrugs, uh-huhs or uh-uhs.

    A.    Understood.

    Q.    If you do forget, somebody will remind you.

    A.    Okay.

    Q.    Additionally, keep your voice up so she can hear you.

    A.    Yes.

    Q.    I will ask you a series of questions



ESQUIRE
DEPOSITION SOLUTIONS

Exhibit
6

800.211.DEPO (3376)
EsquireSolutions.com

Page 13

A. Yes. Her first name is Michelle. I'm trying to remember the last name.

Q. If it comes to you, let me know.

A. Yes.

Q. Are you represented by counsel in either the civil lawsuit or criminal lawsuit?

A. Yes.

Q. Who is the name of your attorney?

A. For the civil case, the attorney's name -- I was represented by Schiff & Gorman in Chicago.

Q. Do you know the name of the attorney, or not off the top of your head?

A. Just his nickname. He goes by Bo. Brian McNaulty.

Q. In the civil case?

A. That's ended.

Q. Okay. Are you permitted to tell me if you were the plaintiff in that lawsuit?

A. I was.

Q. Do you have any friends who are law enforcement officers?

A. No, sir.

Q. Any family members that are law

Page 14

enforcement officers?

A. No.

Q. Have you ever been arrested?

A. No.

Q. What about any of your family members, have they been arrested, if you know?

A. To the best of my knowledge, no.

Q. Have you ever been present at any time when a friend of yours was arrested?

A. No.

Q. Do you know any Forest Park police officers personally?

A. No.

Q. You don't know Officer Miller?

A. No.

Q. I would like to talk about February 3, 2017.

On that day at around 6:15 or so, you were at home?

A. Yes.

Q. Had you gone to work that day?

A. Yes.

Q. What time did you get home from work?

A. Approximately 5:00.

Page 15

Q. Do you have an independent recollection of what occurred that night?

A. I do. Yes.

Q. What did you do when you got home that night?

A. Got home. Ate dinner with my wife. Sat down to watch some cartoons with our almost two-year old.

Q. Do you recall approximately what time you started that?

A. 6:00.

Q. What's the next thing you remember occurring after beginning to watch cartoons?

A. I heard what sounded like a car accident outside my window.

Q. Did you hear a male voice yelling?

A. Yes.

Q. Did you hear tires squealing?

A. Yes.

Q. When you heard these things, did you hear them coming -- from what direction did you hear them coming from?

A. South.

Q. Jackson Boulevard?

Page 16

A. Yes.

Q. Your house faces Maple?

A. Yes.

Q. The north side of your house faces Jackson?

A. No. South side.

Q. Yes. Sorry.
You heard yelling from the north?

A. South.

Q. Sorry. I'm getting my directions mixed up.

A. My house is on a corner lot on Maple and Jackson.

Q. It faces east?

A. My front door faces east.

Q. And yes. Correct me if I mistake the directions.
When you heard tires squealing -- sorry.
Let me ask this. Could you tell what the yelling was? Did you understand?

A. I did not.

Q. What did you do when you heard the yelling and tires squealing?

A. I got up from the couch and looked out



Page 17

my window, which faces south onto Jackson.

Q. Did you at that time see a light-colored Volkswagen Jetta?

A. I don't recall the make or model of the car.

Q. But did you see a light-colored car?

A. Yes.

Q. Did you see it accelerating towards someone?

A. Yes.

Q. Was that person on foot?

A. Yes.

Q. Was that person in the median area or the middle of Jackson Boulevard?

A. That person looked to be on the oncoming lane of traffic, to me.

They were in the north lane of Jackson.

Q. Which would be westbound traffic?

A. Yes.

Q. At the time did you realize that person was a police officer?

A. I did not.

Q. At what point did you realize that person was a police officer?

Page 18

A. Not until after the entire incident was over.

Q. When you saw the car accelerating toward that person, did you see the person fire a handgun at the car?

A. Yes.

Q. You believe four shots were fired?

A. Yes.

Q. Did you see the car hit another car?

A. I did.

Q. Was that car also on Jackson Boulevard on the north side of Jackson heading westbound?

A. Yes.

Q. After the car struck the other car, did you continue to watch?

A. No.

Q. Is that when you escorted your wife and son downstairs to the basement?

A. Yes.

Q. You went downstairs with them?

A. Yes.

Q. Do you have windows in your basement that allow you to see onto Jackson boulevard?

A. Frosted windows.

Page 19

Q. So you can't see out?

A. No. Bad shapes only.

Q. You just waited down there?

A. For a short period. Yes.

Q. While you were down there, did you call 911?

A. Yes.

Q. Did you report some of what you told me hear today?

A. Yes.

Q. At some point thereafter, did you come out from the basement?

A. Yes.

Q. What did you do?

A. I believe I went outside because of a lot of police. Asked what the situation was.

Q. Did you speak directly to a police officer?

A. Yes.

Q. Do you know whether that was a Forest Park police officer, Oak Park police officer?

A. I do not know.

MS. YARUSSO: Objection to the extent it assumes facts not in evidence.

Page 20

BY MS. REICH:

Q. But you know the person was a police officer?

A. Yes.

Q. How did you know that?

A. They were wearing a uniform.

Q. Is that a police officer you had ever seen before?

A. Not that I recall.

Q. What conversation did you have with that officer, to the best of your memory?

A. I asked the officer if the person firing the gun was apprehended.

At the time I didn't know it was an officer.

Q. What were you told by the officer?

A. It was an officer who fired his firearm.

Q. Did you ask any further questions of that officer?

A. I asked if everyone on the force was okay.

Q. What was the response?

A. He said everyone is physically okay.

Q. Are you able to give a physical



Page 29

Q. Did you hear the gunshots before you got up and looked out the window, or did you get up, look out the window, and see someone firing and hear the gunshots?

A. As I recall, I heard what I believed was a car accident. I got up to look after all the yelling and screeching tires, etcetera.

I saw a person firing. I also heard the gunshots.

Q. At what point did you observe someone accelerating for the officer?

I'm trying to understand the sequence of events.

MS. YARUSSO: Objection to form.

(WHEREUPON, the record was read by the reporter as requested.)

MS. REICH: I will rephrase it.

BY MS. REICH:

Q. I think you stated earlier you observed a car accelerate towards the person who today you know to be an officer?

A. Yes.

Q. SO I'm trying to understand the sequence of what occurred.

Page 30

You said you saw someone accelerating toward an officer.

A. Yes.

Q. At what point during those sequence of events that you talked about, the screeching tires, the yelling, the firing the weapon, did you see someone, that car accelerating towards the officer?

A. Before the weapon was fired is when I stood up to look at what was happening.

That's when I saw the person in front of the vehicle, and then the shots fired.

Q. When was the crash?

A. I believe after the shots. As I recall, there were multiple crashes.

I thought I heard a car accident, which is what the screeching tires and yelling was, which is why I looked in the first place.

Q. Okay. Now I understand.

A. After the shots were fired, I believe the car ran into the other car.

(WHEREUPON, a certain document was marked Meunier Deposition Exhibit No. 1, for identification, as of 6-19-19.)

Page 31

BY MS. REICH:

Q. Exhibit No. 1, that's a copy of the subpoena that you received yesterday concerning the details for your appearance today.

A. Yes.

Q. When you made this observation of the car accelerating toward the person, was anything obstructing your view?

A. Yes. I have privacy bushes between myself and Jackson.

Q. Did it affect your ability to see what was occurring?

A. No.

Q. When I say was it obstructing your view, did you have a clear view? Partially obstructed?

A. My windows are above the privacy bushes.

As I look out the window, I look down onto Jackson.

But a person on Jackson walking on the sidewalk cannot see up into my house, for example.

Q. Okay. Your window is elevated to a point where you could see out over the bushes onto Jackson?

A. Yes.

Page 32

Q. There was nothing -- there was not a bush compromising your view of what was occurring on Jackson at that time, is that correct?

A. I was able to tell what was happening.

Q. There is actually a street lamp right outside there?

A. Yes.

Q. So it was fully illuminated that night?

A. Yes. As far as I recall, the light was working.

MS. REICH: Mark these Group 2(A-H).

(WHEREUPON, certain documents were marked Meunier Group Exhibit No. 2(A-H), for identification, as of 6-19-19.)

BY MS. REICH:

Q. Turn to 2C.

Do you see your house in that photograph?

A. Yes.

Q. What do you recognize this photograph to be?

A. A picture taken of my house from Jackson Boulevard.



ERIC MEUNIER
ESTATE OF MARCO GOMEZ vs FOREST PARK

June 19, 2019
65–68

Page 65

A. Not on that window.

Q. How is the living room arranged? Where is the couch, TV?

A. TV is on the north wall.

A sectional sofa against the east and south wall.

Q. Is that the same way it was arranged on February 3, 2017?

A. Yes.

Q. When watching TV, is it true you and your family were seated on the couch facing north to the TV?

A. Yes.

Q. When you went to look out the window in response to the noises you were hearing, were you kind of kneeling on the couch? Standing on the floor? Standing on the couch?

A. I think I was standing on the couch.

Q. Is that what you recall, or is that assuming what you would have done?

A. That's what I would have done. Still do.

Q. But you don't have a memory one way or the other?

Page 66

A. No.

Q. In any event, the couch was right up to the window?

A. Yes.

Q. So you can't stand between the couch and window?

A. That's correct.

Q. Is that the only time in your life you have witnessed someone shooting somebody?

A. Yes.

Q. Have you noticed, read, observed any sort of -- there has been media coverage about police-involved shootings and misconduct in recent times, would you agree?

A. I am aware of news along those lines.

Q. Is it news that you follow?

A. Not particularly.

Q. Do you have any particular opinions one way or the other about the Black Lives Matter movement, Blue Lives matter? Media about police misconduct?

MS. REICH: Objection to form.

BY THE WITNESS:

A. I have no opinion.

Page 67

BY MS. YARUSSO:

Q. You consider yourself neutral on the topic?

A. Yes.

Q. Are you politically active?

A. No.

Q. Is your wife?

A. No.

Q. Does your wife work other than being a mom?

A. Yes.

Q. What does she do for a living?

A. She is a recruiter.

Q. For any particular business?

A. Yes. Miller Coors.

Q. Generally, what type of employee is she recruiting, if you know?

A. All levels at the company.

Q. From executive down to laborer?

A. I don't know if she goes up to the executive level, but she has hired very high-ups in the organization down to assembly line workers in different breweries.

Q. Is that something she has been doing for

Page 68

a while?

A. I believe almost three years.

Q. Did you meet her at Madison?

A. Middle school in Reedsburg, Wisconsin.

MS. YARUSSO: I don't have any further questions.

FURTHER EXAMINATION

BY MS. REICH:

Q. Just a few follow-up.

When you saw the car accelerating towards the person, were you afraid for the person standing in the road?

A. I don't know if "afraid" is the right term.

I didn't know who that person was, what they were doing.

Q. Were you concerned that person was getting hit by the car?

MS. YARUSSO: Objection. Asked and answered. Lack of foundation.

BY THE WITNESS:

A. That person definitely could have been hit by the car.



ERIC MEUNIER
ESTATE OF MARCO GOMEZ vs FOREST PARK

June 19, 2019
69–72

Page 69

BY MS. REICH:

Q. Sitting here today, do you know whether that person was hit by the car?

A. I don't know if they were hit by the car.

Q. When you were being interviewed by those two officers, did they ask to stand on your couch and look out the window?

MS. YARUSSO: Objection to the extent it states facts not in evidence.

BY THE WITNESS:

A. I don't recall.

BY MS. REICH:

Q. Did you describe to them how you stood up on the couch and looked out the window?

MS. YARUSSO: Objection. Misstates his testimony. Assumes facts not in evidence.

BY THE WITNESS:

A. I don't recall speaking to them about where I was standing.

MS. REICH: No further questions.

Page 70

FURTHER EXAMINATION

BY MS. YARUSSO:

Q. When you looked out your window, were you able to observe the shooter's approach to the vehicle he shot into?

A. Yes.

MS. REICH: Objection. Foundation.

BY MS. YARUSSO:

Q. You were able to observe the shooter get into the position he was in when he began shooting?

A. Yes.

Q. That person was on foot, is that correct?

A. Yes.

Q. You saw him run up to the car, is that correct?

A. I did not see him run up to the car.

Q. What did you see him do?

A. From what I recall, he was in front of the car when he started shooting.

Q. Right. When I asked about his approach, I'm asking if you saw how he got to be in front of the car.

A. I didn't see that.

Page 71

Q. You didn't observe how he got to be in a position where he could have possibly been hit by the car based on your observations?

MS. REICH: Objection. Form.

BY THE WITNESS:

A. Can you rephrase that.

MS. YARUSSO: Withdrawn.

BY MS. YARUSSO:

Q. When you observed the shooter, did you see that person change position in any way?

A. Yes.

Q. What did you see?

By that, you saw the person run or walk to a different spot, move around in some way?

A. Yes.

Q. Did you see that occur after the shooting, during?

A. During.

Q. What do you recall the person doing during the shooting?

A. First two shots were fired from in front of the vehicle.

The next two were from the driver's front quarter panel.

Page 72

Q. You saw the shooter moving around as far as those different positions?

A. The vehicle was also moving.

Q. Were you able to see where any bullets entered the vehicle?

A. From what I recall, two holes in the windshield.

Q. Do you recall where specifically in the windshield?

A. Driver's side.

Q. When did you observe two holes in the windshield of the vehicle?

A. During the shooting.

Q. Did you observe any other holes in the vehicle, bullet holes?

A. No.

Q. Did you observe the vehicle that was shot traveling eastbound at any point?

A. During the shooting it was traveling eastbound.

Q. Was the shooter between your home and the vehicle, from your perspective?

A. Initially, no. Then yes.

Q. Initially, was the shooter off to the



**JEREMY BAUER, PH.D.**
**Estate of Gomez vs Village of Forest Park**

July 17, 2020
1–4

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------

ESTATE OF MARCO GOMEZ,                    )
Deceased, by DAISY PEREZ,                 )
Independent Administrator,                )
                                          )
            Plaintiff,                    )
                                          )
v.                                        ) No. 18-cv-910
                                          )
VILLAGE OF FOREST PARK,                   )
et al.,                                   )
                                          )
            Defendants.                   )
                                          )

------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF
JEREMY BAUER, Ph.D.
July 17, 2020
Seattle, Washington

Reported by:
Gretchen Paletta, CCR
CCR No. 3326
Job No. J5785378

---

Page 2

APPEARANCES

FOR THE PLAINTIFF:

AMANDA YARUSSO (via videoconference)
Action Injury Law Group
Attorneys at Law
191 North Wacker Drive, Suite 2300
Chicago, Illinois 60606
844.878.4529
amanda@actioninjurylawgroup.com

FOR THE DEFENDANT:

GAIL REICH (via videoconference)
GERARD COOK   (via videoconference)
O'Halloran Kosoff Geitner & Cook, LLC
Attorneys at Law
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
847.291.0200     847.291.9230 FAX
greich@okgc.com
gcook@okgc.com

ALSO PRESENT VIA VIDEOCONFERENCE:
JASON BARBOSA, VIDEOGRAPHER
ETHAN MCNIFF, LAW CLERK, ACTION INJURY LAW GROUP, LLC
SAMANTHA ROTH, LAW CLERK, ACTION INJURY LAW GROUP, LLC
BLAKE KOLESA, LAW CLERK, O'HALLORAN KOSSOFF GEITNER &
COOK, LLC

---

Page 3

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Examination By Mr. Cook | 5 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit 1 | Curriculum Vitae | 11 |
| Exhibit 2 | Contract and Fee Schedule | 53 |
| Exhibit 3 | Testimony List | 41 |
| Exhibit 4 | Bauer Expert Report | 175 |
| Exhibit 5 | ISP CSI Photos 1-174 (from ISP Disc 5) | 175 |
| Exhibit 6 | November 2019 Video | 63 |
| Exhibit 7 | ISP PITF Report (P006-332 & 833-974) | 175 |
| Exhibit 8 | Autopsy Report & Photos | 175 |
| Exhibit 10 | May 2020 Final Video | 64 |
| Exhibit 11 | Deposition Transcript of Daniel Miller | 175 |
| Exhibit 12 | Deposition Transcript of Eric Meunier | 165 |

---

Page 4

BE IT REMEMBERED that on Friday, July 17, 2020, at Seattle, Washington, at 8:31 a.m., before Gretchen Paletta, CCR, appeared JEREMY BAUER, Ph.D., the witness herein;

WHEREUPON, the following proceedings were had, to wit:

THE VIDEOGRAPHER: Good morning. We're now on the video record. The time is 8:31 a.m. on July 17, 2020. This begins the videotaped deposition of Jeremy Bauer, Ph.D., taken in the matter of Marco Gomez, deceased, by Daisy Perez, independent administrator versus Village of Forest Park, et al., filed in the United States District Court for the Northern District of Illinois, Eastern Division, case number which is 18-CV-910.

My name is Jordan Barbosa. I am the videographer today. The court reporter is Gretchen Paletta. We were representing Esquire Deposition Services.

As a courtesy, will everyone who is not speaking please mute your audio, and please remember to unmute your audio when you are ready to speak.

Counsel, will you please state your name and whom you represent. Afterwards, the court

---



Exhibit
7

**800.211.DEPO (3376)**
*EsquireSolutions.com*

Page 13

laboratory equipment and testing devices, and then also in charge of -- I would write reports and produce all of the visualizations and forensic illustrations for demonstratives.

Q. Your Ph.D., you indicate in your CV, as having your degree in human performance, and then next to that, you have in parentheses, biomechanics. Do you use those two terms, human performance and biomechanics, interchangeably?

A. Not necessarily. They are one and the same, but they are also -- biomechanics is a more specific subset of global human performance.

Q. Do you know if degrees are awarded by any university in the field of biomechanics as opposed to human performance?

A. I don't know.

Q. Is biomechanics offered as a major at Oregon State University?

A. No. It is a specific concentration within a major.

Q. Did you have a concentration in biomechanics while at Oregon State?

A. Yes.

Q. But you don't know if other universities might offer any degrees in biomechanics specifically?

A. I don't know. I would need to look at each

Page 14

university's course catalog.

Q. Outside of the area of biomechanics, what other types of areas of study are included in a degree in human performance?

A. Human performance is, again, a pretty broad umbrella. So that could encompass anything from exercise physiology, anatomy and physiology, which also is covered with biomechanics. You also get sports psychology and pedagogy, which is testing. I worked in the skeletal biomechanics. I worked in the bone research laboratory, so doing experiments and studies specifically looking at the skeleton. Within the biomechanics concentration, I took courses specifically in mechanical engineering. So nearly half of my course work was in the field of mechanical engineering because biomechanics is essentially applying principles of physics and engineering to biological systems such as the human body, and then took courses in -- specifically in anatomy and physiology outside of that department, and courses in computer interfacing and electronics and mathematics and statistics.

Q. My understanding, you said your area of study while working on your Ph.D. was with respect to skeletal loading in children, correct?

Page 15

A. Correct.

Q. And essentially what that was was studying ways to help children develop their skeletal structure so that later in life they would have adequate bone mass; is that correct?

A. Yes. Correct.

Q. Does that encompass exercise programs for children?

A. Yes, it does.

Q. Does it also encompass diet?

A. Their diet is accounted for in that research. Yes.

Q. Would you agree that those areas of study don't have any application in the analysis that you've done in this case?

A. As far as the impact loading, that's correct, but as far as techniques learned while studying the field of biomechanics, I would not agree.

Q. Okay. It appears in your curriculum vitae that you -- while working at Hayes + Associates, you also worked at a company called Amadan. I'm not sure if I'm pronouncing that correctly.

A. That's Amadan.

Q. Amadan in Portland, Oregon; is that correct?

A. Yes.

Q. So was the job at Hayes + Associates a part-time position?

Page 16

A. It was for -- yes. Through '99 to 2006, when I graduated with my Ph.D.

Q. All right. And then after you graduated, you became employed full-time at Hayes + Associates?

A. Yes.

Q. All right. And it looks like you were also working up until 2007 at Amadan, correct?

A. Yes.

Q. So for at least one year, it looks like you were working both at Hayes and at Amadan; is that correct?

A. Yes.

Q. What type of work were you doing for Amadan?

A. Amadan is a -- is a band. So I was --

Q. What?

A. It's a band.

Q. A band?

A. Yes.

Q. So you played in a band?

A. I played in a band.

Q. Well, it says here you were a graphic designer and webmaster for Amadan.

A. That's correct.

Q. All right. So you played in a band. What instrument did you play?

A. I played percussion, and this is Irish music so I



Page 33

A. Yes.

Q. What was involved in that testing?

A. That testing involved the organization hiring a group to come out to put on staged vehicle collisions which were then observed by the membership of this organization. We were then, once the -- once the collisions happened, we as the membership were then tasked with observing the evidence, observing the scene, documenting the scene, and essentially calculating the pertinent variables of any accident reconstruction. How fast were the cars going when they collided? What was their principal direction of force? What angles did they hit? Essentially, it was -- it was practice to make sure that when you come up to evidence of a collision, we can see that these techniques we use are accurate. Because in the staged collisions, we actually know the answers to the vehicle speeds and the directions.

Q. In this case, did you undertake any accident reconstruction?

A. No.

Q. So you did not measure the speed of the Gomez vehicle at any point in time; is that correct?

A. No.

Q. Are you aware that the Gomez vehicle was involved in

Page 34

a collision at the end of the sequence of Mr. Gomez's travel in his car?

A. Yes.

Q. But you didn't undertake any analysis using any evidence from that collision to develop any opinions as to the speed of his vehicle; is that right?

A. Correct.

Q. Your CV indicates you were involved in iNPUT-ACE: video evidence work flow training; is that right?

A. Yes.

Q. What is that?

A. iNPUT-ACE is a forensic video analysis software package, and this specific training was put on -- the same facility with many of the same group from the Washington Association of Technical Accident Investigators teaching how to use their software to forensically analyze and handle video.

Q. Did you utilize that course in any way as part of your analysis in this case?

A. Yes.

Q. In what way?

A. I used the iNPUT-ACE forensic video analysis software to review the Jiffy Lube footage.

Q. And I assume -- are the opinions that you have rendered in this case, are they derived from that

Page 35

analysis?

A. Yes.

Q. Your CV also indicates involvement with the Institute of Police Technology and Management, the IPTM. It looks like Bosch CDR tool technician training; is that right?

A. Yes.

Q. What is that?

A. That's training on learning how to read, essentially, car black box data. I don't like to call it a black box, but it's essentiality the electronic data recorders that record vehicle states, so whether the accelerator is on, the brake is on, seat belts are fastened after a collision.

Q. That was not utilized in this case, correct?

A. Correct.

Q. Let's look at your certifications. You have a certification for remote pilot, small unmanned aircraft. I take it that's for operating a drone?

A. Yes.

Q. Did you use a drone in this case?

A. I did use a drone in this case.

Q. You took overhead aerial shots of the area?

A. Yes.

Q. Some of those aerial shots are produced in your

Page 36

report; is that correct?

A. I don't believe I did produce any of those shots in that report.

Q. Well, there's -- there's -- it looks like there's animations that show positions of vehicles and the officer from a height. I take it those are, what I said, animations, not actual photographs, correct?

A. Correct. One of the images that's overhead in my report early on is a Google Earth image, and --

Q. I'm sorry. What image?

A. From Google Earth.

Q. Oh, okay.

A. And then the only other shot that is a overhead shot that could be mistaken for a drone shot was actually derived from the laser scan data.

Q. Okay. What did you use the drone photography for then?

A. I ended up not needing the drone photography in this matter.

Q. You're also a certified forensic photographer from the International Association for Identification, the IAI. What is necessary in order to receive a certification as a certified forensic photographer?

A. That requires, again, an application to -- you first have to apply to be able to -- for the right to



Page 77

(Video stopped.)

Q.(MR. COOK continuing) Okay. I'm stopping the video again at 2 minutes and 52 seconds. Camera matching, you said create visual -- I'm sorry -- create virtual camera to match positioning and perspective of security camera using accurate 3-D geometry of the scene.

Did I read that correctly?

A. Yes.

Q. And would it be accurate to say that your use of camera matching is in part dependent upon the accuracy of the 3-D geometry that you created taking your FARO measurements?

A. Yes.

Q. All right. I'm going to resume the video.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) Stopping it again at 3 minutes and 1 second. The screen reads: Independent 3-D scene documentation.

What do you mean by that?

A. Just documentation not performed by law enforcement who are generally charged with documenting scenes and incidents.

Q. All right. I'm going to resume the video again.

Page 78

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) All right. In this sequence, at 3:18, it says, 3-D laser scanner data.

What do you mean by that?

A. So I'm showing you a screen recording of what the laser scanner recorded. So in this particular frame, what you're seeing is a stitching of photographs that was taken by the scanner in its current location. Common terminology is it's a 360 photo. So you can look 360s around you and up and down.

Q. What kind of equipment were you using to photograph or video what we see in this frame at 3:18?

A. So I was using screen recording software to record a navigation of the 3-D laser scanner data, and the software I used to process the data, which is called Autodesk ReCap, R-E-C-A-P.

Q. And I apologize. I know I asked you this question previously, but what was the date of the site inspection that we're seeing here?

A. I believe April 24, 2019.

Q. Are you sure of that?

A. Yes.

Q. The reason I ask is the trees and grass seem to be more than what we typically see in Chicago in April,

Page 79

in late April. If you say so.

All right. We'll move on with the video.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) What are we seeing here, Doctor, as we go through 3:29 through :30?

A. So now I transitioned away from the actual 360 series of photographs that was taken by the scanner, and now I'm navigating into the point cloud. Or these are all the raw distance measurements that were made by the laser scanner. The photographs are essentially used to colorize the points so they're a little bit more accessible to us as viewers. Normally, they would just be a series of black and white points. So the photographs helps colorize it. So now we're looking at the raw data from the scanner.

Q. Okay. But the colorization that we see here -- I'm pointing my cursor up into the trees -- that's visually enhanced, correct?

A. No.

Q. Is that -- is that created by the laser scanner?

A. Yes. And what we see with -- when you look at the pavement and the parking lot at Jiffy Lube or you look at the apron of -- between the parking lot and the roadway, those are generally accurate to what our

Page 80

human eyes would expect to see. The problem with laser scanners when you get up to hitting tree leaves, if you have any wind, they're generally not going to stay stationary. And so when you -- 3-D laser hits a leaf, it may not be there the next time it scans it, and when it takes a photograph, you may be applying a texture from the sky to a leaf and so it looks white and blue. So leaves are problematic.

Q. All right. I'll continue with the video display, starting at 3 minutes and 32 seconds.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) All right. I'm stopping it at 3 minutes and 38 seconds. The screen says: Superimposed video on 3-D geometry to determine relative positions of vehicle and Officer Miller.

Is that correct?

A. Yes.

Q. So what you're saying is that based upon your 3-D geometry, you can place the relative positions of the vehicle and Officer Miller accurately?

A. Yes.

Q. To what degree?

A. To -- at the distance that Officer Miller and the car were away from the camera, approximately half a foot.



JEREMY BAUER, PH.D.
Estate of Gomez vs Village of Forest Park

July 17, 2020
81–84

Page 81

Q. Can you accurately depict the distance between the car and Officer Miller?

A. That's more difficult. That's still in the same range.

Q. So what distance?

A. Half a foot, 6 inches.

Q. And I'm going to continue playing the video.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) I'm going to stop it here for just a second. What we're beginning to see now is a -- is it an enhancement or an animation of the Jiffy Lube video? Or is this just the display of the Jiffy Lube video?

A. This is the Jiffy Lube video. So it's not --

Q. I'm sorry. We're at 3:53 on the video.

A. Yeah. This is not an animation, but what has been done here as part of the camera matching process is the removal of distortion from the lens of the surveillance camera. So I think we've all seen fish eye lenses or GoPro lenses that you have this wide effect, and you get what's called either barrel distortion where the edges of the video frame seem to bow toward -- or, like, a straight line at the top of a video may actually look like it's bowing or bent

Page 82

instead of being a straight line, and most surveillance cameras have that type of distortion. However, to do the camera matching process, since our 3-D software doesn't have a distorted lens, you have to remove this distortion in order to overlay video on an undistorted 3-D background. So the key here is to look at the time code at the top of the Jiffy Lube video and notice that it seems to bow down. That's an affect of removing this barrel distortion so that when you look at the road stripe that's above the time code, it looks straight.

Q. One distortion that appears to me -- and correct me if I'm wrong. I'm pointing here to what I believe in the other photographs I've seen is a utility pole, correct?

A. I believe that's a tree.

Q. Well --

A. I don't recall if that's a utility pole.

Q. We'll go back and look later, but I think that's a utility pole.

A. You're right. You're right. That is a utility pole.

Q. Okay. In this photograph, would you agree -- I thought it was a tree when I first looked at it too. I can understand why you thought that. It appears to be distorted in that it bows or bends to the left a

Page 83

little bit. Am I right?

A. I --

Q. Is that the way it appears to you right here?

A. I would need to -- to do this, if we could back the video up? But we've also got -- I don't see the bowing. I can't tell from that aspect if we've got some light reflections that are hitting parts of it. So, you know, we've got the time code in there that can distort our perspective of this. So I can't answer specifically.

Q. You can't say whether it appears bowed to you or not or bent?

A. Right. I see what you are saying, but I believe that's an optical illusion.

Q. All right. We'll continue playing the video.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) I'm stopping the video at 4 minutes, 34 seconds. The caption above the animation there says: Officer Miller was never in front of the vehicle.

Did I read that correctly?

A. Yes.

Q. In the first video, the one created in November 2019, at this sequence, the caption above it says:

Page 84

Officer Miller was not in front of the vehicle when it started moving.

Do you recall that being the case?

A. Yes.

Q. So a change was made in this respect from the first video to the second video, correct?

A. I believe so.

Q. And you wanted to be as accurate as you could when you prepared the first video, correct?

A. Yes.

Q. And you then made a change in this video to say he was never in front of the vehicle, as opposed to him not being in front of the vehicle when it started moving, correct?

A. Yes.

Q. Did you develop any additional analysis or discover any new evidence that caused you to make that change?

A. We just don't see him move from his position that was consistent with this orientation here in the video.

Q. I'm not sure that answers my question.

Did you uncover any new evidence between your production of the first video and the second video --

A. No.

Q. -- that caused you, in the second video, to say that Officer Miller was never in front of the vehicle,



Page 93

other vehicles in your animation, are you?

A. Right. Correct.

Q. Is it true that Gomez's vehicle backed in a reckless manner, going into the eastbound lane of travel without being able to see or stop any vehicles in the lane?

MS. YARUSSO: Objection, vague, argumentative.

A. Yeah. You'll have to define reckless for me.

Q.(MR. COOK continuing) Well, how would you characterize Gomez's vehicle's movement as it went into reverse and began to make its three-point turn?

A. Well, he backed up and began to make a three-point turn, and the fact that he was able to back up without hitting any cars throughout that process would tell me, as a scientist, one of two things: either, A, he saw quite clearly that he was free to do so and had the room to do so; or, B, was extremely lucky.

Q. Was extremely what?

A. Lucky.

Q. Is it true that Gomez -- as Gomez's vehicle backed through the westbound lane, another vehicle going to the left-turn lane moved forward and steered to avoid being hit by Gomez's vehicle?

Page 94

A. I can't answer that. I recall seeing a vehicle moving forward, but I don't know what their actions were or their motivations for their actions.

Q. All right. But you agree if that vehicle had not moved, it would have been struck by Gomez's vehicle and hit if it had remained stationary?

A. No. I would need to see that portion of the video again to be able to make that claim.

Q. Okay. We'll go back at look at it again.

(Video played. No audio.)

(Video stopped.)

Q.(MR. COOK continuing) Based on the fact that Officer Miller's left leg was obscured by the utility pole, would you agree there's no objective scientific evidence that does not place Officer Miller at least partially in front of the Gomez vehicle at some point in time?

MS. YARUSSO: Objection, vague, confusing.

Q.(MR. COOK continuing) Do you understand the question, Doctor?

A. Yes. I agree at that some point, he could have stepped a foot over there, but he certainly wasn't there when the vehicle started moving or he would have been hit by the vehicle.

Page 95

Q. Well, if he was beginning to -- to move away from the vehicle, it's possible that when the vehicle first began moving, that part of his left leg or foot was in front of vehicle, would you agree?

A. No. No. Given the position of his right foot where we see it and given his own testimony that he's looking at Gomez in the driver's seat and given the evidence that we have the two bullet holes through the side, his position where he's standing, given his right foot and the way his body would have been oriented to look toward officer -- or to Mr. Gomez, when we see, frame by frame, that vehicle start to move forward and Officer Miller's right foot not moving at all, he would have -- his left knee or left foot would have been struck by the vehicle had he been -- had he had his left foot in front of the vehicle at the time it started --

Q. And the vehicle began moving, correct?

A. I'm sorry?

Q. At the time -- you're referring now to when the vehicle began to move forward, correct?

A. Correct.

Q. But you -- you acknowledge that he could have had his left foot or left leg in front of the vehicle at some point earlier in time, correct?

Page 96

A. For a very brief moment. Yes.

Q. Okay. Can you show the entire profile of Officer Miller in the sequence that you're displaying?

A. I don't understand. Can I show you? So this is what -- what you're seeing now when we zoom in is in 3-D. So you could -- and I've provided this file. You can certainly view it from any angle you want.

Q. You're not capable of showing Officer Miller's exact positioning, giving all sequences of events that occurred, correct?

A. Correct. There's some assumptions that were made.

Q. What assumptions are those?

A. Again, those that we were just talking about. His left foot, which is obstructed by the utility pole in the view of our camera. There are many objective points that we use to determine that position. First and foremost is the position of his right foot and right leg as we see it in the surveillance video. Second is that -- his own testimony describing that he's looking at Mr. Gomez, facing Mr. Gomez. We see the shots into the left side of the windshield. Third, had he been standing with his left foot anywhere overlapping the front of the car or the front of the headlight, given where his right foot



Page 97

is, he would have been struck immediately as the car began to move forward, which we know he was not struck by the vehicle. And, you know, oftentimes in biomechanics here, we can determine the position of the left foot because we see the position of the right foot, and a person has to stand on -- is standing on two legs and balanced. So we get a very good idea of how he's -- at least where his feet are positioned in this case because of all the information, both his testimony and the physical evidence.

Q. In the position you have Officer Miller displayed, what's currently on the screen, which is at 4 minutes and 24 seconds, does that correspond in your report to a photograph which I believe is labeled as figure 10 on page 13 of the report?

A. I don't know if it is the -- I don't believe that is the -- I don't know if that's the exact same frame that I -- that I chose here. Yes. There's a difference between what we're seeing in the video versus figure 10 in my report, and that figure 10 in my report actually contains the 3-D point cloud data. So you see the different colors. We see that point cloud that came from the laser scanner. The video, we're seeing a flat plane that the car is resting on

Page 98

with a map derived from an aerial photograph.

Q. I understand that they're two different photographs. Obviously, one's shown from above and one's shown from the side across the street from the -- from the Jiffy Lube camera. But does the position of Officer Miller, as shown in figure 10 on page 13 of your report, correspond to the position of Officer Miller as shown in the video that we have stopped at 4 minutes and 24 seconds?

A. Yes.

Q. All right. And in figure 10, would you agree that, depending upon which way the wheels were turned on the Gomez vehicle, that there was a potential for Officer Miller to be struck by that vehicle as it moved forward?

A. Depending on the turn angle of the front tires, yes.

Q. All right. And regardless of what the -- well, strike that.

Let me ask this question: Depending upon how the wheels were turned when Gomez began to move forward, it's possible he couldn't have struck Officer Miller when he was in the position as shown in figure 13, correct?

A. Yes.

Q. I'm sorry. Figure 10 on page 13 of your report.

Page 99

A. Yes. If the wheels were turned hard left.

Q. All right. And would you agree that even if the wheels were turned -- or not turned, were facing straight, that certainly, Mr. Gomez had the ability to turn the steering wheel to the left and strike Officer Miller when he was in that position?

A. He did have that ability to turn his wheels.

Q. All right. And you already testified that you were never given the deposition testimony of any witnesses, correct?

A. Correct. Other than Officer Miller.

Q. All right. In a minute, I'm going to let you look at the deposition testimony of an eyewitness, Eric Meunier, M-E-U-N-I-E-R, who lived across the street from this scene. And when he looked out the window, he saw the Gomez vehicle accelerating towards Officer Miller. You have no reason to disagree with him, correct?

A. I don't have a reason to disagree with his recollection. No.

Q. And you don't have any reason to disagree with the recollection of Officer Miller either, correct?

A. No. Not his mental recollection; only the objective evidence of what actually occurred.

Q. But even the objective evidence shows that this Gomez

Page 100

vehicle was close enough to Officer Miller that it had the potential to hit Officer Miller, correct?

A. Officer Miller certainly placed himself next to the left front wheel. Yes.

Q. But that wasn't my question. My question is: Given the position of Officer Miller when he was positioned at the left front of the vehicle, certainly could have perceived that the Gomez vehicle was -- was accelerating towards him, correct?

MS. YARUSSO: Calls for speculation.

A. I don't recall what Officer Miller -- or know what Officer Miller would have perceived. Given Mr. Gomez's tires were pointed straight and not pointed left, I don't see how he could have perceived that the car was turning toward him.

Q.(MR. COOK continuing) Sir, is it your testimony that you can tell from this Jiffy Lube video the direction that the wheels on Gomez's car were turned?

A. I can tell you which direction they were turned when he started moving. Yes.

Q. Okay.

A. Because of the movement of the car in subsequent frames.

Q. But Officer Miller was close enough to that vehicle that the potential was there at the beginning of the



JEREMY BAUER, PH.D.
Estate of Gomez vs Village of Forest Park

July 17, 2020
101–104

Page 101

sequence of the movement of Gomez's car forward that he could have been struck by that vehicle, correct?

A. Yes. Had the wheels been turned to the left.

Q. Okay. Isn't it true that as the Gomez vehicle was moving forward, that Officer Miller is moving laterally and away from the vehicle in order to avoid being struck?

MS. YARUSSO: Object to compound, lack of -- calls for speculation.

A. The video shows Officer Miller moving laterally and toward the camera. It doesn't describe his motivation for doing so.

Q.(MR. COOK continuing) But in any event, his movement does display he's moving away from the Gomez vehicle, correct?

A. Yes.

Well, sorry. Yes, in one respect that he seems to be moving toward the camera slightly, but he's also following the vehicle to another extent to stay closer to the vehicle.

Q. Okay. And would you agree that had Officer Miller stayed in his original position as the Gomez vehicle moved forward, even if it continued to move forward in a straight line, the potential was there for Officer Miller to be struck by the driver side mirror

Page 102

of the vehicle?

A. No.

Q. So you're opining that Officer Miller was far enough away from the Gomez vehicle when it began moving forward that had he not moved away from the vehicle, that he still could not have been struck by the driver side mirror?

A. Yes.

Q. And at that point in time, when Officer -- when -- strike.

When the vehicle began to move, do you have an opinion to a reasonable degree of scientific certainty in your field as to how far away Miller was from the Gomez vehicle?

A. Yeah. This is -- he would have been within a foot, 18 inches of the car.

Q. And I believe you testified earlier there was a range of variability in your --

A. Yeah. Half a foot, which is why I give you that 12- to 18-inch range.

Q. I'm sorry. I didn't quite catch what you said. Would you mind repeating it?

A. Sorry. Yes. Considering the half-a-foot margin of error there, I estimate a foot to 18 inches away from the car, which is also consistent with

Page 103

Officer Miller's testimony, I believe, at some extent, at some point when he testified to being about 18 inches away from the car.

Q. By the way, in the Jiffy Lube video, do you know how many frames per second that that video camera displays?

A. Yeah. There's an inconsistent frame rate. So not every frame has the same amount of time. It was average about 12 frames a second.

Q. How are you able to determine that?

A. The INPUT-ACE forensic video analysis software that I use lets you output the fine details of a video source such as this, and it will tell you frame by frame how long or the duration of each frame. And so we know that this video has a variable rate.

Q. So can you give me the range of the variation of the rate?

A. I will attempt to do that. There was a file that I produced in my analysis files under video analysis called -- let me make sure this is the one. CH10_20170203180344.xlsx which contains the frame-by-frame data from the video, and I calculated, using the frame duration data, the average and the range. So the range is -- the average is 12.5 frames a second with a range of 5.8 to 21.3.

Page 104

Q. And what causes that variation?

A. It's the nature of the recording system. So sometimes you can record at faster rates, depending on how many different cameras you have on the system. Sometimes motion will cause it to record faster. So to save file space, a camera may record less frames if there's nothing to record. However, another cause of a variation is processing or manipulation of the video. So if for some reason the video that I received from -- or that action received from discovery had been altered -- not necessarily maliciously altered, but just altered in the way it was saved -- that can also change frame rates. But usually, if something has been saved as a different format by someone, then its frame rate has changed into something more consistent.

Q. Did you attempt to determine the rate at which Mr. Gomez's vehicle accelerated?

A. I did look at that early on. Yes.

Q. What was the rate that you calculated?

A. I don't recall the number.

Q. Was it in the materials that were disclosed to us?

A. No. No. It wasn't ever recorded.

Q. Why not?

A. Because it wasn't pertinent to my analysis. I think



JEREMY BAUER, PH.D.
Estate of Gomez vs Village of Forest Park

July 17, 2020
125–128

Page 125

perception-reaction times, correct?

A. Yes.

Q. Perception-reaction times measures time that human beings are capable of perceiving a hazard and then reacting to it, correct?

A. Yes.

Q. And the -- in the genre of auto accident reconstruction, often accident reconstructionists are called upon to measure -- to utilize that perception-reaction time to measure where a vehicle was when a driver perceived a hazard and then where the vehicle was when the driver reacted to that hazard, correct?

A. Correct.

Q. There's a lag time between those two things, correct?

A. Correct.

Q. And part of that is dependent upon whether the -- the hazard that's perceived was an expected or unexpected hazard, correct?

A. Correct.

Q. In an expected hazard situation, the reaction time is shorter, and likewise, it's longer in a situation where the hazard is unexpected, correct?

A. Correct.

Q. An example that I've heard given by human factors

Page 126

experts in this realm is a car is driving at night on a long straightaway, light traffic, and the driver is approaching a green light from some distance. And as the driver gets closer and closer, the light's still green, and the driver starts to anticipate, Boy, this has been green a long time and it's about to turn yellow and then red any second. And so when, in fact, the light does turn from green to yellow, the driver is ready for that and can react fairly quickly to that changed stimuli of the light changing colors, correct?

A. Yes.

Q. In that situation, it still takes time from the time that the driver perceives that the light is turning from green to yellow to take whatever action is necessary, in this case, take his foot off the accelerator and put his foot onto the brake in order to begin braking the car, correct?

A. Yes.

Q. And are you aware of studies that have been undertaken to study how much time it takes for a person to react to that stimuli in such a situation?

A. Yes.

Q. You use those studies in the course, I would assume, in rendering accident reconstruction opinions when

Page 127

you're involved in an accident reconstruction case, correct?

A. Yes.

Q. To a perceived -- strike that.

To an expected hazard such as this, what is -- what do the studies say about reaction time?

A. That it's faster on the -- on the time frame of under a second to .7 seconds for an expected hazard.

Q. All right. And conversely, if a driver is traveling down the street and a kid darts out in between parked cars chasing a ball, it's going to take longer for a driver to react in that situation, correct?

A. Yeah. If it's unexpected, then you're looking into the one to two and a half seconds, generally the longer.

Q. All right. Are you familiar with any studies that measure the perception-reaction time of an officer in firing a weapon?

A. Yes, I am.

Q. What studies have you examined in this regard?

A. I don't have that on the top of my head, but I actually recently testified in a matter to that very topic and can't recall as we sit here but can certainly find that information.

Q. What case was it that you testified in that addressed

Page 128

perception-reaction time of the police officers firing weapons?

A. This is an ongoing matter in the city of LA. I was retained by the City of LA.

Q. Have you given testimony in that case?

A. Yes.

Q. Is that case on the case list that we have?

A. Yes. I believe it is. Let me give you the name. It is called Morgan v. City of Los Angeles. It was done earlier this year, March 12, 2020.

Q. What were the opinions that you gave in Morgan versus City of Los Angeles?

A. That an officer -- this was a case where a young man was allegedly aiming a weapon at a police officer. He had been documented on surveillance camera to have been holding a weapon and certainly had a weapon when he was found. He had -- he was shot in the back, and so the question was: How can someone be shot in the back but have also been a threat to the officer? And that is a very fundamental perception response question that an officer responding to the time it takes for an officer to draw a weapon and fire the weapon is about the same amount of time as it takes for someone that's aiming a weapon at an officer to turn and begin to run.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 137

front windshield. So that -- that period is about .7 seconds.

Q. Okay. And you would agree .7 seconds is a pretty accurate length of time, an expected length of time for a human being to react, perceive the hazard and react to it in a situation of an expected hazard, correct?

A. Yes.

Q. So whether or not you agree with Officer Miller's testimony that he perceived that this vehicle was going to strike him, you would agree that it's about .7 seconds from that point in time until he fired his first shot, correct?

A. Yes.

Q. And that's what one would expect in a situation of a perception-reaction to a perceived hazard, correct?

A. Yes. To an expected perceived hazard.

Q. Okay. And likewise, there's perception-reaction lag time at the back end of the sequence until -- strike that.

It's a lag time for perception-reaction for Officer Miller once he perceives that the vehicle is no longer a threat to him when he stops firing the weapon, correct?

A. Yes. But there's also the consideration that he is

Page 138

able to, during this process, actively track Mr. Gomez as the car is driving by and not driving through him, which complicates this PRT issue.

Q. Okay. So -- I'm sorry. What issue did you say?

A. I am so sorry. I just used an abbreviation, perception-response time. I said PRT. I apologize.

Q. Yeah. No problem. Right.

So if we assume Officer Miller believes that the vehicle is a threat to him and going to strike him, the first shots are fired in .7 seconds from the time the vehicle starts moving and would cause Officer Miller to think that it was a threat to him, correct?

A. Yeah. If we reverse that, he would have to think it was a threat to him to decide to respond by firing.

Q. Okay. And then how much time elapses from the time the first shot is fired until the last shot is fired?

A. So then we're looking at about a second.

Q. I'm sorry. Maybe I didn't hear. Was there a response or are you making a calculation?

A. No. I'm just waiting for you.

Q. Oh. Was there an answer to my last question? Because if there was, I didn't hear it.

A. Oh. Yeah. I had said, if I remember the question right now, I believe my answer was about one second.

Page 139

Q. One second from the time the first shot was fired until the last shot; is that right?

A. Yes.

Q. All right. And that's -- that's an approximation, correct?

A. Yes. Based on the positions, the relative positions of Officer Miller and the car as we see in the Jiffy Lube video combined with looking at the bullet evidence in the front and side windows.

Q. Okay. So if we assume in this case that Officer Miller believed that the car posed a threat to him when he began to move, the timing sequence here is perfectly logical and explainable by virtue of Officer Miller perceiving the car was a hazard, and taking him about .7 seconds to react to that hazard and fire the first shot, and then approximately another second to realize that the vehicle was no longer a threat to him and him being in front of the car and he stopped pulling the trigger; is that right?

A. The .7 seconds to respond and have an initial reaction, yes. I agree with. I don't necessarily agree from a perception-response time that -- being able to pivot. Because now he's already reacting by pivoting his body to aim his gun at the side of a car

Page 140

which is -- he's taking an action to shoot at the side of a car, which is clearly not in danger of running over him at this point.

Q. Would you agree that, earlier in the sequence of events before he fired the last shot, that even when the vehicle initially was to his side, that it still posed a potential threat to him, as Mr. Gomez could have turned his steering wheel to the left and hit him with the car?

A. I'm sorry. Would you repeat that, please.

Q. Yeah. During the sequence of events, initially it starts off where Officer Miller is almost in front of the car. He may or may not, according to you, have his leg or left leg or left foot in front of the car at the beginning of the sequence, correct?

A. Correct.

Q. You can't tell that, correct?

A. Correct.

Q. And until -- strike that.

And then as the car begins to move and Officer Miller has moved out of the way, as that car is, for example, next to him in the left quarter panel area, and at that point in time, the vehicle still posed a danger to Officer Miller because Mr. Gomez could have driven the car, turned the car



JEREMY BAUER, PH.D.
Estate of Gomez vs Village of Forest Park

Page 149

A. Had Mr. Gomez turned the wheel sharply to the left, yes.

Q. Sharply to the left?

A. Yes.

Q. Would you agree that if the wheels or the vehicle were turned to the left as Mr. Gomez started moving forward, that that could pose a threat to Officer Miller being struck by the Gomez vehicle?

A. I'm going to have look at the exact angle.

Q. Sorry. I didn't hear the answer.

A. You would have to look at the exact angle. You would have to be making a left turn, generally.
    Did you hear me?

Q. No. You broke up. It's just a bad connection. I'm getting a message saying my internet is unstable. I seem to hear you now okay though. So --

A. Okay. Yeah. No. He would -- he would have to be making a left turn or angling the wheels to the left. I don't have a specific degree for you.

Q. Okay. And it's possible that the wheels could have been turned to the left, even unintentionally, by Mr. Gomez as he began to move forward, correct?

A. It's possible but unlikely because we don't see that motion happening as he's trying to flee. We see his car, in fact, starting a right-hand turn as he pulls

Page 150

away.

Q. All right. And section 2 of that statement says, Was Officer Miller standing with respect -- where was Officer Miller standing with respect to Gomez when the fatal bullet was fired?
    And if I understand you correctly, basically, the best you can do in that regard is to say that he was standing alongside the vehicle in the area of the driver's side window, correct?

A. Correct.

Q. Can you hear me?

A. Yes. I said, Correct.

Q. Okay. And it's breaking up again. I'm sorry.

A. Are you waiting for a response again?

Q. No. No.
    In your analysis on page 5 of your report, reading from that same paragraph but further toward the top of paragraph 9, it says it is your understanding -- well, it says, It is my understanding -- I'm reading from your report -- that there are both constitutional and local state limitations on the use of deadly force.
    You're not giving any opinions in this case as to what constitutes the use of deadly force, are you?

A. No.

Page 151

Q. It says, There is a requirement to employ less than lethal methods of detention, especially for those individuals who appear to be suffering from mental illness, and to de-escalate police encounters from individuals who appear hostile, impaired emotionally, or mentally disturbed.
    Do you have any evidence in this case that that was the case here, one way or the other?

A. No.

Q. You also say, It is my understanding that officers must avoid use of deadly force unless necessary to protect against immediate danger or in serious injuries to officers or others.
    Did I read that correctly?

A. Yes.

Q. Would you agree that at least during a portion of the sequence of events here that occurred, that at least some point in time, Officer Miller could reasonably believe that the Gomez vehicle posed a threat to him of injury or death?

A. Potentially, yes, when Officer Miller positioned himself near the left front tire.

Q. Okay. I'm going to continue playing the video now so we can wrap this, the video observations up. We may go back to it again for certain portions.

Page 152

    (Video played. No audio.)
    (Video stopped.)

Q.(MR. COOK continuing) All right. Just stopping it here at 5:47. The statement says, Officer Miller was never in front of Marco Gomez's car.
    And where "never" is highlighted in yellow, and this is at 5:47 on the video. Did I read that correctly?

A. Yes.

Q. In the original video, you displayed some testimony in the November 2019 video that Officer Miller told State's Attorney Parker that he stopped firing when he was no longer in front of the car, and you quote from the police report, Miller could also not recall if he was moving or stationary when he had discharged his weapon, but advised he stopped discharging his weapon when the VW was no longer in front of him and posing a threat to his safety.
    You didn't put that in the May 2020 version of your video, correct?

A. Correct.

Q. Why not?

A. I don't recall why.

Q. But in any event, you'd agree that you don't know with certainty whether or not Miller was ever in

JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

February 12, 2021

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESTATE OF MARCO GOMEZ, Deceased,
by DAISY PEREZ, Independent
Administrator,

Plaintiff,

vs.                         Case No. 18-CV-910

VILLAGE OF FOREST PARK, et al.,

Defendants.

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
VIA ZOOM OF
JEREMY BAUER, Ph.D.

DATE: February 12, 2021
REPORTED BY: Holly J. Buckmaster, RPR
CSR No. 2859

## Page 2

APPEARANCES:

For Plaintiff:
AMANDA S. YARUSSO
ANDREW M. STROTH
Attorneys at Law
ACTION INJURY LAW GROUP, LLC
191 North Wacker Drive, Suite 2300
Chicago, Illinois 60606
amanda@actioninjurylawgroup.com
astroth@actioninjurylawgroup.com
Appeared on behalf of Gomez

For Defendant:
GERARD COOK
GAIL L. REICH
Attorneys at Law
O'HALLORAN KOSOFF GEITNER & COOK, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
gcook@okgc.com
greich@okgc.com
Appeared on behalf of Village of Forest Park

The Videographer:
Jeff Burton

## Page 3

INDEX OF EXAMINATIONS
                                                   PAGE LINE
By Mr. Cook........................................  5   13

INDEX OF EXHIBITS
                                                   PAGE LINE
Exhibit 1 Supplemental report of Jeremy Bauer,
    Ph.D., dated January 14, 2021...............  6   16

## Page 4

SEATTLE, WASHINGTON; FRIDAY, FEBRUARY 12, 2021
9:00 A.M.
--oOo--

JEREMY BAUER, Ph.D., being first duly sworn remotely, per agreement with counsel, testified as follows:

THE VIDEOGRAPHER: We are now on the record. The time is 9:05 a.m. on February 12th, 2021. This begins the video conference proceeding of Jeremy Bauer, Ph.D., in the matter of Perez, et al., versus Village of Forest Park, et al., filed in the US District Court for the Northern District of Illinois, Eastern Division, Case No. 18-CV 910.

My name is Jeff Burton, I am your remote videographer. The court reporter is Holly Buckmaster. We are representing Esquire Deposition Solutions. As a courtesy, will everybody who is not speaking please mute your audio and remember to unmute when you are ready to speak.

Counsel, will you please introduce yourselves and the witness will be sworn.

MS. YARUSSO: Good morning, Amanda Yarusso for the plaintiff.

Exhibit
8

JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

February 12, 2021

## Page 9

A. Yes, that is my understanding.

Q. Okay. And why didn't you consider that when you issued your first report?

A. I discussed this in my supplemental report, but initially I was tasked with essentially determining relative positions of Officer Miller and the vehicle at the time and performing a shooting reconstruction and not evaluating the timing.

Q. Do you have an understanding as to what the ultimate issues are in this case?

A. I do have an understanding but would also love to hear what you consider to be the ultimate issues in this case.

Q. Well, I don't normally answer questions, it's -- because it -- but I'm going to in this case -- but I'm going to first ask you to tell me what your understanding is of the ultimate issues?

MS. YARUSSO: And I'm just going to object, vague as to "ultimate issues."

Q. (BY MR. COOK) Do you understand what I mean by ultimate issue?

A. Yes and no. I guess the ultimate issue is going to be different for everyone, which is why I asked for some clarification.

Q. Well, what is your understanding?

## Page 10

A. That there are multiple --

MS. YARUSSO: Same objection.

THE WITNESS: There are multiple issues in this case, and first and foremost one is a use-of-force question and I believe that's the overlying big picture here from a -- from a biomechanics standpoint, that is -- that is where I focus. And the scientific standpoints. The issues of whether or not the testimony being described by Officer Miller and by witnesses at the scene is consistent with the objective evidence that is presented in this case from the video of the incidents and the evidence collected after the incident.

Q. (BY MR. COOK) Would you agree that at least one of the ultimate issues in this case, if not the ultimate issue is whether or not Officer Miller had an objective, reasonable belief that he was in danger of great bodily harm at the time he fired his weapon?

A. I agree that that is an issue in this case, yes.

Q. All right. What -- do you agree that at some point during the sequence of events here that Officer Miller was in a position that he would reasonably believe that he was in danger of death or great bodily harm?

A. Again, I can't put myself in Officer Miller's head. I do agree that there was a point in this incident

## Page 11

that he put himself in a position near a car being operated by Mr. Gomez.

Q. And by putting himself in that position, at least for some period of time, he was in danger of death or great bodily harm, would you agree with that?

A. Based on his belief or his testimony, I -- I believe --

MS. YARUSSO: Yeah, I'm going to object because object -- objective, reasonable belief is a legal question and ultimately the issue for the jury, and now I -- I -- it is not clear if you are asking about Miller's subjective belief or what an objective reasonable belief of a person in that position, so my objection is it's confusing and vague and also calls for a legal conclusion.

MR. COOK: Holly, could you read back the last question, please.

(Question read.)

THE WITNESS: I believe in my initial deposition I testified that by placing himself by the left front corner of the car, had the car turned to the left, he could have been struck by the car, but didn't provide any details as to whether or not that is great bodily harm at those speeds and given his center of mass is above the hood, whether or not he

## Page 12

would actually be run over or end up on top of the car.

Q. (BY MR. COOK) Would you agree that at some point during the sequence of -- of events, that Officer Miller could have been struck by this vehicle?

A. Again, that's a -- there's many circumstances to make that happen and in order for that to happen -- he could've been struck had he run directly in front of the vehicle, he could have been struck had Mr. Gomez instead turned the wheel sharp to the left and started moving toward Officer Miller, so that -- those are all possible things that could've happened but did not happen.

Q. Well, you acknowledged at your first deposition that it's possible that for some period of time, albeit brief, that Officer Miller's left leg and/or foot could have been directly in front of the vehicle, correct?

A. Yes, I testified that it was possible.

Q. All right. In your rebuttal report, you have your opinions summarized on the last page of that report, on page 8 under a header entitled "Opinions," correct?

A. Yes.

Q. And with respect to your first opinion, your report reads -- and I'm not reading the entire sentence but

JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

February 12, 2021

## Page 25

There's definitely a lag time from the time we see the car moving until we see a response from Officer Miller.

Q. (BY MR. COOK) Well, would you agree that whenever Officer Miller perceived he was in danger, that there would be a lag time between that time and the time that he begins to fire his weapon?

MS. YARUSSO: Objection; assumes facts not in evidence.

THE WITNESS: Yes, generally with humans, if you perceive a hazard and then react to it, there is a lag time.

Q. (BY MR. COOK) All right. And in light of the objection, let me rephrase the question. I'd like you to assume hypothetically that Officer Miller perceived that this vehicle posed a danger to him that might cause him death or great bodily harm, all right, are you with me?

A. Yes.

Q. All right. Would you agree that there is a lag time between the time that he first perceived that danger and the time that he began to fire his weapon?

A. Yes.

Q. And likewise, once the danger has passed, there is also a lag time between that point in time and the

## Page 26

time that Officer Miller stops firing his weapon, correct?

A. Yes.

Q. And that's also a part of the perception-reaction analysis, correct?

A. Yes.

Q. So the difference is in opinions, I take it, between you and the experts that the defense has retained is we're quibbling over tiny fractions of a second as to how long those perception-reaction times take; is -- is that accurate?

A. That's not my understanding.

Q. What is your understanding?

A. Well, first, to start, there's a -- a complex scenario going on here where during this initial perception of a hazard, a person is recognizing the hazard, is deciding to act and deciding what action to take to react and in this particular case, we see Officer Miller react by moving roughly in the direction the vehicle is moving and we also see, from the physical evidence of the bullet holes in the car and with Mr. Gomez's injuries, that Officer Miller is panning and rotating as the car is moving and turning right to follow officer -- or Mr. Miller -- I'm sorry, Mr. Gomez with his gun, so his -- his response isn't

## Page 27

necessarily to fire but he's already preplanned knowing and anticipated that this car is going to drive by him and not over him, and that is an issue that I've not seen discussed by Mr. Ryan, Mr. Martin or Mr. DiTallo.

Q. How much time elapsed from the time that the car began to move until the last shot was fired?

A. Approximately one second.

Q. Okay. Would you agree that's within the bounds of normal perception-reaction time?

A. One second? Certainly. But we see the first movement of Officer Miller approximately .4 seconds after the vehicle starts moving, so one of the aspects that's important about this evidence that we see in the video is that the car moves and .4 seconds later we see Officer Miller move. Both Mr. DiTallo and I calculate that the car would've moved over a foot in that time, so we know that Officer Miller was not in the path of the vehicle during this time that the car started moving forward.

Q. But you agree that even when Officer Miller was not in the path of the vehicle, he was, I think you said, what, about six inches or so away from the vehicle; is that right?

A. Yes.

## Page 28

Q. All right. And -- And at that point in time, when the vehicle initially began to move, he was in danger potentially of being struck by the vehicle, correct?

A. No.

Q. That opinion that you just gave, that statement that you just gave is based upon the actual path of the vehicle, right?

A. What specific statement are you referring to? I'm sorry.

Q. When the vehicle began to move and Officer Miller was, you say, six inches from the front bumper of the vehicle -- am I right about that?

MS. YARUSSO: Objection; misstates his testimony.

MR. COOK: Well, I don't mean to do that. I'm -- I'm not.

THE WITNESS: Yeah, approximately six inches away from the bumper, but the side of the bumper.

Q. (BY MR. COOK) Okay. And at that point in time, Officer Miller was potentially in danger of being struck by the vehicle?

MS. YARUSSO: Asked and answered, misstates his testimony.

THE WITNESS: And I disagree.

Q. (BY MR. COOK) If -- If Gomez had turned the wheel to

7 (Pages 25 to 28)

JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

## Page 29

the left, he could have been struck by the vehicle at that point in time, correct?

A. Yes.

Q. And he didn't have an insight into Gomez's mind, he didn't know what Gomez's intent was at that point, did he?

A. I don't know.

Q. But we do know -- and he didn't know either, correct? By "he," I mean Miller didn't.

MS. YARUSSO: Objection; lack of foundation.

THE WITNESS: He didn't know, but his response to the vehicle moving was to sidestep along with the vehicle and rotate to follow the vehicle, which suggests that his response upon detecting the car moving was that the car was going to run over him but instead was going to drive by him.

Q. (BY MR. COOK) Okay. That process all took place in -- in -- in a second or less, correct?

A. Less than a second, around .4 to .5 seconds.

Q. So in .4 seconds, was it your testimony that Officer Miller perceived, reacted and had made a conscious calculation that this vehicle was not a danger to him, is that your testimony?

A. Yeah, I can't --

MS. YARUSSO: Objection to the extent it

## Page 30

misstates his testimony.

THE WITNESS: I can't get inside of Officer Miller's head, but in .4 seconds, Officer Miller perceived and responded to the vehicle, and his response was consistent with responding to the vehicle that was going to drive by him and not over him.

Q. (BY MR. COOK) How long was it from the time that the vehicle first moved until the first shot was fired?

MS. YARUSSO: Asked and answered.

THE WITNESS: Well, likely right at the .4 second mark, so --

Q. (BY MR. COOK) Okay.

A. -- from .4 seconds, so it likely would have been around the same time that we see him also sidestep in the video.

Q. Would you agree that if Officer Miller believed that the vehicle was a hazard to him, might cause him death or great bodily harm, that .4 seconds to be -- to fire the first shot is within the bounds of reasonable perception-reaction time?

A. Yes.

Q. In fact, it was -- it's at the lower end of the perception-reaction time range, correct -- correct?

A. It's -- it's in the lower end -- let me back up really quick. It's specific to the task and specific

## Page 31

to the hazard. There are studies of officers being placed in simulated high-threat environments that report perception-response times within .4 seconds.

Q. Okay. But he's at the lower end of the range, he reacted very quickly?

A. He was at the average level based on a paper that I cited in my report.

Q. Okay. And then how much longer was it until the last shot was fired?

A. The last shot would've been fired .6 seconds later, if the entire incident from the car moving to the last shot being fired was for one second.

Q. Okay. So when Officer Miller fired the last shot, which I understand you believe to be the fatal shot, correct?

A. Correct.

Q. When he fired the last shot, how long was it from that point in time, working backwards, until the vehicle had passed the point where it was no longer potentially a danger to Officer Miller, in other words, even if Gomez turned the vehicle wheel to the left, he could not have struck Officer Miller at that point?

MS. YARUSSO: Objection; that misstates his testimony and assumes facts not in evidence.

## Page 32

Q. (BY MR. COOK) I'm asking hypothetically, just so we're clear.

A. I didn't perform that calculation.

Q. Officer Miller testified that he stopped firing his weapon when he perceived that the vehicle was no longer a danger to him, correct?

A. That's my understanding, yes.

Q. All right. But given perception-reaction times, that decision to stop firing his weapon would have been made earlier in the sequence of events prior to the time he actually did stop firing his weapon, correct?

A. I'm sorry, can you repeat that?

Q. Yeah, I -- I apologize. That was poorly phrased. Officer Miller testified that he stopped firing his weapon when he perceived that the vehicle was no longer a danger to him, correct?

A. Correct. That's my understanding.

Q. All right. But in reality, given perception-reaction times, when Officer Miller actually made the decision to stop firing was earlier in the sequence of events than when he actually did stop firing his weapon, correct?

A. I can't speak to that. It's inconsistent with his actions of following the vehicle and panning the vehicle with his gun.

JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

February 12, 2021

## Page 33

Q. Okay. Let's -- let's do this hypothetically. Hypothetically, if Officer Miller's testimony is accurate, that he stopped firing his weapon when he perceived the vehicle was no longer a danger to him, would you agree that the decision to stop firing his weapon was made at an earlier point in time during the sequence?

A. Yes, certainly just based on definitions here, perception-response time, his decision would've had to have been before the last shot was fired.

Q. And -- at -- at that point in time, officer -- at the point in time that Officer Miller made the decision to stop firing his weapon, he would've been positioned much further towards the front of the vehicle, correct?

A. Well, we're only talking a few feet here, so it depends on your definition of much further, but he would've been in between where he was when he fired the first shots and where he was when he fired the final two shots.

Q. Well, let's assume hypothetically that his perception lag time, you understand what I mean by "lag time," by that --

A. Yes.

Q. -- term?

## Page 34

A. Yes.

Q. So we're clear on this, perception lag time is from the time that Officer Miller made the decision to stop firing his weapon until he fired the last shot, agreed?

A. I'm sorry, what's the question?

Q. Yeah, would you agree that perception lag time would be the time measured from the point in time that Officer Miller made the decision to stop firing his weapon until he actually did fire the last shot?

A. It would be the time he perceived there was no longer a threat until the time he fired his last shot.

Q. Right. And how many feet per second was the vehicle traveling at the time the last shot was fired?

A. I don't know. I would have to make that calculation based on the acceleration.

Q. All right. If you made that calculation -- first of all, is it possible for you to make that calculation?

A. Yes. Not here and now, but yes.

Q. Okay. And if you made that calculation, you could tell where Officer Miller was standing relative to the vehicle at the time he made the decision to stop firing because the car no longer posed a danger to him, correct?

A. Correct.

## Page 35

MS. YARUSSO: Objection to the extent it assumes facts not in evidence.

THE WITNESS: Correct. But we also see that he's rotating his body to follow the vehicle at the same time.

Q. (BY MR. COOK) Yeah. Well, counsel objected on the basis that it assumes facts not in evidence, but in fact there is evidence that that's exactly what happened because that's what Officer Miller testified to, correct, he testified that he stopped shooting when he perceived the car was no longer a danger to him?

MS. YARUSSO: Well, my objection stands because that's not the only evidence in this case.

MR. COOK: Well, your objection was made on the basis there's no facts in evidence.

Q. (BY MR. COOK) And in fact there are facts in evidence that that's what happened here, correct?

A. I believe there's testimony to that extent, but I like to at least distinguish from the scientific standpoint here between objective, irrefutable, if you will, evidence and testimonial evidence.

Q. You agree that testimonial evidence is evidence, correct?

A. Yes.

## Page 36

Q. And testimonial evidence can in certain situations be quite valuable, correct?

A. Certainly, yes.

Q. You know, when John Wilkes Booth shot Abraham Lincoln, I don't think we had any video surveillance cameras or bullet analysis done, but there were several hundred people in the Ford Theater who witnessed that event and pointed to John Wilkes Booth as the shooter, you would agree that that was valuable evidence to convict him of the murder of Abraham Lincoln, wouldn't you?

A. I wasn't involved in the trial, but I would agree that that witness, especially multiple witnesses testifying as such would be valuable, yes.

Q. Well, if you were involved in the trial, on the defense side of John Wilkes Booth, would you have testified there was absolutely no evidence in this case that John Wilkes Booth shot Abraham Lincoln?

MS. YARUSSO: Objection; that's just completely irrelevant to the issues here.

THE WITNESS: I wish I could tell you.

Q. (BY MR. COOK) Okay. Now, isn't it your testimony that -- or your opinions that Officer Miller fired the fatal shot at Mr. Gomez at a point in time when he knew that he was no longer in danger?

800.211.DEPO (3376)
EsquireSolutions.com

Page 105

Q.   But he does know that Mr. Gomez has already exhibited -- exhibited behavior that indicates his intent is to flee, correct?

A.   He observed Mr. Gomez reversing, yes.

Q.   He has exhibited behavior that shows his intent to flee; is that correct?

A.   Yes, he observed --

MS. YARUSSO:  Asked and answered.

THE WITNESS:  -- Mr. Gomez reverse his car.

Q.   (BY MR. COOK) Well, he also observed Mr. Gomez drive his vehicle up into an apron area in attempt to get around parked vehicles, correct?

A.   I don't know --

MS. YARUSSO:  Objection; that assumes facts not in evidence, lack of foundation.

THE WITNESS:  Sorry.  Yes --

MS. YARUSSO:  That's okay.

THE WITNESS:  -- I don't know if that was his intent.

Q.   (BY MR. COOK) Okay.  If -- assuming -- well, strike that.

Are you aware that Mr. Gomez drove his vehicle off of Jackson Boulevard to the right into an apron area where he was blocked by a utility box?

A.   I don't have firsthand knowledge that he was blocked

Page 106

by the utility box, but do recognize that he was parked on that apron area.

Q.   Okay.  Are you aware now that Officer Miller had been given information by the Chicago police that Mr. Gomez was attempting to flee?

A.   I don't specifically recall the -- that information.

Q.   Were you ever given the deposition transcripts of the Chicago police officers?

A.   I do not believe so.

Q.   You never -- did you ever review their reports?

A.   I didn't review -- I don't recall the specific reports, but there were several investigative reports, if I recall, that would've been listed in my materials listed in my first report.

Q.   So if Officer Miller -- I would like you to assume that he had been given information by the Chicago police that Mr. Gomez was attempting to flee in a stolen vehicle and then he observed Mr. Gomez throw his car in reverse, cut across traffic into Jackson Boulevard, come to a stop, would you agree that Officer Miller had been given enough of a cue, both by way of information from Chicago police and his own observation, that it was the intent of Mr. Gomez to flee the scene?

MS. YARUSSO:  Objection; asked and answered.

Page 107

I think we've been over this, these questions and answers, before the break.

THE WITNESS:  Yeah, again, I can't opine specifically to what Officer Miller was thinking about Mr. Gomez's actions.

Q.   (BY MR. COOK) I just want to make sure I understand this.  I think you've already agreed with me that at some point during this sequence of events, Officer Miller could have reasonably believed that he was in danger from the go -- Gomez vehicle when it began to move, correct?

A.   Correct.

Q.   All I'm asking, sir, is have you calculated the time during the sequence of events when you believe Officer Miller would have known that the vehicle no longer presented a hazard?

A.   I testified that his response to the vehicle moving was a response that's consistent with him knowing the car is going to drive by him and not over him so that it would be consistent with him knowing he wasn't going to be harmed by the vehicle once it started moving.

Q.   Is it --

A.   Again -- sorry.

Q.   Is it your opinion that when Officer Miller fired the

Page 108

first shot, that he would have known if the vehicle was no longer a danger to him?

A.   I can't tell you what he would've or should have known.  I can only tell you that based on his actions, he was anticipating the car driving by him at the time he fired those shots.

Q.   Including the first shot?

A.   Yes.

Q.   At the time he fired the first shot, however -- strike that.

There is perception-reaction time involved from the time he made the decision to fire his weapon until he fired the first shot, correct?

A.   Correct.

Q.   His perception-reaction time involved from the time he made the decision to fire any of the shots until those shots were fired, correct?

A.   Yes.  And that again assumes that he's deciding to stop shooting after a certain unexpected stimulus.

Q.   Well, that -- that is what occurred, isn't it, at some point in time; is that correct?

MS. YARUSSO:  Objection --

THE WITNESS:  Based on the --

MS. YARUSSO:  -- misstates --

THE WITNESS:  -- physical evidence --



JEREMY BAUER, PH.D.
ESTATE OF MARCO GOMEZ vs VILLAGE OF FOREST PARK

February 12, 2021

## Page 113

MS. YARUSSO: Objection; calls for a legal conclusion, lack of foundation. Those are terms of art, legal terms of art.

Q. (BY MR. COOK) Do you understand the question?

A. Well, he could have perceived that he was in danger, but his actions demonstrate the opposite.

Q. Do you believe that a reasonable officer in that position could have believed he posed a danger to him when he began to move?

A. I can't testify to --

MS. YARUSSO: Same objection.

THE WITNESS: -- what a reasonable officer would believe.

Q. (BY MR. COOK) But you do agree that at some point in time when the vehicle was moving, it potentially posed a danger to Officer Miller?

A. No, I don't agree with that.

Q. But you think that if Gomez turned his wheel -- vehicle to the left, it could never have struck Officer Miller?

A. I didn't state that.

Q. So potentially it could have posed a danger to him, correct?

A. It could have. And Officer Miller would have observed the actions to have made the car steer left

## Page 114

before it started moving.

Q. Officer Miller was about six inches from the car at that point in time, correct?

A. Yes.

Q. It would've been a fraction of a second from the time that Mr. Gomez hypothetically made a decision to turn it -- wheels to the left before it would've struck Officer Miller, correct?

A. Again, Officer Miller would've seen the steering wheel turning toward him, if that was the case, before the car started moving.

Q. You're assuming that Officer Miller would've observed his hands at the wheel and observed the direction of -- of the position of the wheel inside the vehicle, right?

A. Yes. Because they were right in his line of sight within a few degrees of where he would've observed Mr. Gomez's --

Q. Right.

A. -- face.

Q. And -- and then there would be perception and reaction time between the time he observed that and his ability to move in order to avoid being struck by the vehicle, correct?

A. Correct.

## Page 115

Q. And so the vehicle could have struck him before he could've done anything about it had Mr. Gomez chose that path?

MS. YARUSSO: Objection; a hypothetical that assumes facts not in evidence and in contradiction of the evidence.

Q. (BY MR. COOK) I've asked you --

A. I dis --

Q. No.

A. I disagree.

Q. If he had turned his vehicle to the left, it could've struck Officer Miller, correct?

MS. YARUSSO: Same objection.

THE WITNESS: Yes.

Q. (BY MR. COOK) So all I'm asking you, sir, is as the car is moving, at some point in time did there -- did the car move into a position that even if Gomez turned to the left, it would no longer have been capable of striking Officer Miller?

A. There certainly is a point after the car moved where had Mr. Gomez turned to the left it would not have struck Officer Miller.

Q. Have you calculated where that occurs during the sequence of events?

A. No.

## Page 116

Q. When the car begins to move and then during the sequence of these events, would you agree the car is accelerating?

A. Yes.

Q. So for the first fraction of a second this car is moving, it's moving at a slower rate of speed than it is later in sequence?

A. Yes.

Q. And would you agree that the primary cue to Officer Miller as to the direction of travel of the vehicle is its -- its path of travel?

A. Would you mind asking that again, I'm sorry.

Q. Yeah. What I'm getting at here, maybe I'm not stating it clearly, the primary cue to Officer Miller as to the direction of travel of this vehicle is its path of travel, in other words, it's -- as it's -- it gets to move and then turns to the right, that's the primary cue that indicates to Officer Miller which direction of travel the vehicle is going to travel, correct?

A. Well, that's one cue. And we talked about two other cues earlier, which is the steering of the steering wheel either before or during that forward movement, as well as potentially observing the direction of the tire on the ground as Officer Miller was approaching

29 (Pages 113 to 116)