**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ESTATE OF MARCO GOMEZ,     )
Deceased, by DAISY PEREZ,     )
Independent Administrator,     )     Case No. 18-CV-910
     )
     Plaintiff,     )
     )     Hon. John F. Kness
     v.     )
     )
VILLAGE OF FOREST PARK, et al.,     )
     )
     Defendants.     )

**DEFENDANT FOREST PARK'S
RULE 56.1 STATEMENT OF UNCONTESTED FACTS**

Defendant, Village of Forest Park (the "Village"), by one of its attorneys, Gail L. Reich, Julie A. Bruch and Gerard W. Cook, of O'Halloran Kosoff Geitner & Cook, LLC, and pursuant to Rule 56.1 of the Rules of the United States District Court for the Northern District of Illinois herby submits its statement of uncontested facts in support of its motion for summary judgment. In support thereof, defendant states:

1. Plaintiff brought this action pursuant to 42 U.S.C. §1983 and Illinois State Law as administrator of the estate of Marco Gomez who was shot by Forest Park police officer Daniel Miller on February 3, 2017. (Doc. 20, amended complaint ¶¶1,3, 5.)

2. Jurisdiction is based upon 28 U.S.C. §1331 and 1343(a) and venue is proper under 28 U.S.C. §1391(b). (Doc. 20, amended complaint ¶¶3, 4.)

3. Plaintiff alleges Defendant Daniel Miller ("Officer Miller") unlawfully seized Gomez, a *Monell* claim against the Village of Forest Park for failure to train, supervise and discipline its officers, fails to investigate shootings and

indemnification, and battery, wrongful death, survival and funeral expenses claims under Illinois State Law. (Doc. 20, amended complaint ¶¶33-58.)

4. In February, 2017, Officer Miller was employed as a police officer by the Village of Forest Park, a municipality duly incorporated under the laws of the State of Illinois. (Doc. 20, amended complaint ¶¶7, 8.)

5. On February 3, 2017, at the time of shooting, Gomez was driving a stolen silver Volkswagen Jetta (the "Jetta"). (Doc. 20, Amended Complaint ¶¶ 1, 9, 15.)

6. That day, Miller was driving a marked squad car and wearing a police uniform. Ex. 1, Miller Deposition at 56-58; Ex. 2, Miller Declaration at ¶¶9-13.

7. Miller heard a dispatch that a stolen vehicle was involved in a hit and run, had fled from Chicago Police, and was coming into Oak Park. Ex. 1, Miller deposition at 65-66; Attachment C to Exhibit 2, Miller Declaration ¶14.

8. Miller spoke with Officer McClintock on the side band, received the correct license plate number for the stolen vehicle, and learned it was a silver or gray Volkswagen Jetta reported stolen from Glendale Heights, Illinois, a suburb west of Chicago. Ex. 1, Miller deposition at 68-70.

9. Because Miller learned the stolen Volkswagen Jetta was last seen on Jackson Boulevard, he turned onto Jackson from Maple Avenue and pulled into the left turn lane on westbound Jackson at Harlem Avenue to look for the stolen Jetta. Ex. 1, Miller deposition at 76; Attachment B to Exhibit 2, Miller Declaration ¶¶4-6, 9-12, Attachment C to Exhibit 2, Miller Declaration ¶14.

10. Miller decided to wait for the Jetta in a parking lot because Harlem Avenue was a main thoroughfare dividing the Villages of Oak Park and Forest Park and the

intersection was a block from I-290, a major expressway and common escape route for individuals fleeing the police from the Chicago, Oak Park and Forest Park to the suburbs.  Ex. 1, Miller deposition at 77; Exhibit 2, Declaration of Miller ¶¶4-6, Attachment C to Exhibit 2, Miller Declaration ¶14.

11. As Miller began to back up to go into the parking lot, he saw the headlights of a Jetta coming from behind him and noticed the car was gray. Ex. 1, Miller deposition at 79-80, 84-85; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

12. When Miller saw the Jetta pull up, he put his vehicle in park and exited his car because he believed the Jetta was going to be boxed in at the red light by heavy traffic at that time of day and he would be able to approach the vehicle; verify whether it was a stolen car; and, if so, make an arrest. Ex. 1, Miller deposition at 85-86; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

13. Miller approached the Jetta with his weapon in his hand and, as he did so, he made eye contact with the driver, Gomez, who immediately put the car in reverse and backed away.  Ex. 1, Miller deposition at 87, 97-98; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

14. Miller ran toward Gomez as Gomez was reversing the Jetta, believing he would be able to apprehend Gomez when the vehicle became trapped in an S-turn in the road.  Ex. 1, Miller deposition at 94-96; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

15. Miller yelled commands at Gomez: "stop," "police," and "show me your hands." Ex. 1, deposition of Miller at 96.

16. While going in reverse, Gomez never looked back to see whether there were pedestrians or other vehicles behind him. Ex. 1, deposition of Miller at 94-95, 97-98, 204; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

17. Miller believed Gomez showed complete disregard for the safety of the public by operating the vehicle in a reckless manner. Ex. 1, deposition of Miller at 204; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

18. Other vehicles were in the area and risked being hit by the Jetta as Gomez backed up and at least one vehicle moved out of the way. Ex. 1, deposition of Miller at 95; Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

19. Miller testified that, although his attention was focused on the Jetta, he believed it would have been quite possible there were pedestrians in the area that time of day. Ex. 1, deposition of Miller at 94-95.

20. After reversing and hitting or jumping the curb, Gomez stopped the car. Ex. 1, deposition of Miller at 98-100; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

21. Miller testified that, as he ran in front of the Jetta and shouted at Gomez to get out of the car and show his hands, Gomez looked directly at him. Ex. 1 Miller Deposition 101-103.

22. Miller testified he put himself in front of the vehicle driven by Gomez to prevent it from escaping. Ex. 1, Miller Deposition at 105; ¶¶ 9-13.

23. Miller testified that when he got in front of the Jetta and told Gomez to stop, Gomez then put the car in "drive" and began driving toward Miller. Ex. 1, Miller Deposition at 97; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

24. Miller testified Gomez was looking at him when he was in front of the vehicle just before Gomez accelerated toward Miller. Ex. 1, Miller Deposition at 102-103, 106; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

25. Miller testified that, when the vehicle began coming toward him, he fired his weapon in self-defense and to protect the public. Ex. 1, Miller Deposition at 121, 123, 206, 207; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

26. Miller testified he stopped firing when his brain processed the fact he was no longer in front of the Jetta and the vehicle no longer posed a threat to him. Ex. 1, Miller Deposition at 121-22; attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

27. Miller does not know whether he moved his feet to get out of the way of the Jetta as it was coming forward or if Gomez was able to make a sharp turn to avoid clipping Miller's feet; he was not able to see because the incident happened too quickly. Ex. 1 Miller Deposition at 123.

28. The entire encounter—from the time Gomez stopped at the stoplight (timestamp 6:03:52) to the time the last shot was fired and the car had passed Miller (timestamp 6:04:12)—lasted no more than twenty seconds. Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

29. Defendant Miller believed Marco Gomez presented a threat of great bodily harm to himself and the public because Gomez was involved in a hit and run, fled from police in Chicago, put his car in reverse without ever looking behind to see whether there were pedestrians and/or vehicles behind him, hit and went over the top of a curb, and attempted to run defendant Miller over with the vehicle. Ex. 1,

deposition of Miller at 204; Attachment B to Exhibit 2, Declaration of Miller, ¶¶ 9-13.

30. Tom Aftanas has worked at the Forest Park Police Department since 1991 and was appointed Chief of Police in June 2015 and reviews and approves all policies. (Exhibit 3, Aftanas deposition at 10-12, 28.)

31. General Order #104, effective during the relevant time period, sets forth the Village of Forest Park's Vehicular Pursuit Policy. (Exhibit 4, G.O. #104.)

32. GO #104 sets forth definitions, establishes rules and guidelines for the operation of police vehicles during pursuits, prohibits the discharge of a firearm at a moving vehicle unless absolutely necessary in self-defense or defense of others against a suspect's use of deadly force, as well as describing review and enforcement of the policy. (Exhibit 4, G.O. #104.)

33. General Order #105, effective during the relevant time period, sets forth the Village of Forest Park's Response to Resistance and Aggression ("Use of Force") Policy. (Exhibit 5, G.O. #105.)

34. GO #105 sets forth definitions and establishes rules and guidelines for the use of force, including standards, factors to consider and relevant case law, as well as proscribing the duty and procedures to report, investigate and review an officer's use of force, and the potential for disciplinary actions for any violations of the policy. (Exhibit 5, G.O. #105; Exhibit 3, Aftanas Deposition at 81-82, 125.)

35. The Use of Force Policy provides that lethal force may be used, if an officer believes it is objectively reasonable and necessary to prevent the officer, or

someone else, from being killed or suffering serious injury.  (Exhibit 3, Aftanas deposition at 105-106.)

36. According to Brian Landers, Plaintiff's police procedures expert, the purpose of polices are to guide an officer's performance, but law enforcement agencies can also articulate higher expectations.  (Exhibit 6, 2/28/21 Landers Dep at 92-93).

37. Landers testified use of force policies are typically based upon a combination of legal precedent, tactics, training expectation of the public and expectations of a reasonable officer.  (Exhibit 7, 7/28/20 Landers Dep. at 118.)

38. Landers acknowledges the Village had a use of force policy in place which addressed the objective reasonableness standard in Graham and a vehicle pursuit policy that restricted the circumstances under which vehicle pursuits were permitted and prohibited firing at or into a moving vehicle unless the officer can articulate deadly force was needed in defense of human life. (Exhibit 7, 7/28/20 Landers Dep. at 119, 163.)

39. Landers defined a foot pursuit as an officer pursing a subject on foot and a vehicle pursuit involving two vehicles. (Exhibit 7, 7/28/20 Landers dep at 120-121.)

40. Other than in his own department where he spent his career as a law enforcement officer, Landers could not identify a model policy that addresses an officer's pursuit of a vehicle on foot, did not include any in his report and was unable to identify any other law enforcement agency which had a policy that specifically addressed the issue prohibiting an officer pursuing a vehicle on foot. (Exhibit 7, 7/28/20 Landers dep at 120-123, 128.)

41.  Landers admitted that one cannot write a policy for every possible scenario. (Exhibit 7, 7/28/20 Landers Dep at 41.)

42.  Landers only reviewed summaries of Officer Miller's training, and admitted to knowing very little about the training provided by the Village to its officers. (Exhibit 7, 7/28/20 Landers Dep. at 149-150; Exhibit 6, 2/28/21 Landers Dep. at 99).

43.  According to Lt. Christopher Chin, who is in charge of training at FPPD, all FPPD officers are required to be certified by the State of Illinois (the "State") and meet certain additional training requirements during their career, including firearm qualification, use of force training and law updates. (Exhibit 8, Chin Declaration at ¶¶1-11.)

44.  In addition to the State requirements, the Department encourages officers to take additional, elective training and conducts its own mandated in-house training on a broad range of subjects, including use of force, where the trainers review and/or introduce Department policies, relevant case law, including *Graham v. Connor* and *Tennessee v. Garner* and also incorporate information from other resources in order to reinforce legal principles behind the policies. (Exhibit 8, Chin Declaration at ¶¶12-30.)

45.  At the time of the incident, Officer Miller was in compliance with State and FPPD requirements.  (Exhibit 8, Chin Declaration at ¶4.)

46.  Officers are also engaged in live and interactive use of force training, where officers are subjected to a variety of shoot/don't shoot scenarios—everything from vehicle stops where the officer may have to confront an uncooperative

subject, to domestic incidents, to bank robberies. (Exhibit 8, Chin Declaration at ¶¶12-30.)

47. The trainers train and evaluate officers in several areas, including weapon proficiency, safe, logical and legal methods of responding to threats, and safe and effective tactics. (Exhibit 8, Chin Declaration at ¶¶12-30.)

48. With respect to traffic stops and vehicle pursuits, as training and policy compliance mechanism, the Department requires officers who attempt effect traffic stops but end up in a vehicle pursuit to complete a Post Pursuit Analysis Report ("PPAR"). (Exhibit 8, Chin Declaration at ¶¶31-32.)

49. All PPAR's are reviewed by supervisors and Command staff, who evaluate the officer's conduct to ensure it complies with Department policy and, where policy is violated, implement discipline and take corrective action through training one-on-one. (Exhibit 8, Chin Declaration at ¶¶33-37.)

50. Between 2014 and 2016, FPPD officers completed 64 PPAR's and where it was determined the officer was not in compliance with Department policy, additional training, policy review with the officer and progressive discipline was imposed. (Exhibit 8, Chin Declaration at ¶38.)

51. Landers believes that training should be guided by the principles articulated in *Graham* and *Garner*, policies should be written based upon them and Supreme Court case law and scenario-based training is a very productive method to train officers. (Exhibit 6, 2/28/21 Landers Dep. at 90-92, 97.)

52.    While FPPD trainers utilize some of the very resources Landers suggests, he is unaware they form a part of FPPD's training. (Exhibit Chin Declaration at ¶¶ 8-38; Exhibit 6, 2/28/21 Landers Dep. at 100-101).

53.    Miller admits he was never trained to "box in" a vehicle while on foot (not in a vehicle). (Exhibit 1, Miller Dep. at 111-112).

54.    Landers himself admits that he has never utilized the totality of the circumstances in this incident in his training. (Exhibit 6, 2/26/21 Landers Dep. at 101-103.)

55.    General Order #535, effective during the relevant time period, sets forth the Village of Forest Park's Internal Affairs Policy. (Exhibit 9, G.O. #535.)

56.    GO #535 sets forth its purposes, which includes correction of procedural problems, establishes guidelines for the investigation of complaints or misconduct and discipline of officers.  (Exhibit 9, G.O. #535.)

57.    If a violation of policy is found, an officer can be disciplined.  Exhibit 2, Aftanas deposition at 105.

58.    When the Village conducts internal investigations, it is the Village's regular practice for the interviewer to record the interviews. (Exhibit 3, Aftanas Deposition at 90-93.)

59.    The Illinois State Police ("ISP") are notified of all Forest Park officer involved shootings.  (Exhibit 3, Aftanas deposition at 112-113.)

60.    The night of the Gomez shooting Aftanas personally notified an Illinois State Police Sergeant with the Public Integrity Unit and requested an investigation, in accordance with Village practice.  (Exhibit 3, Aftanas Deposition at 112-113.)

61.  The ISP did not record their interviews, but did permit a FPPD detective to sit in on some of the interviews. (Exhibit 3, Aftanas Deposition at 95-97).

62.  For the Internal Affairs investigation into this particular incident, interview summaries from the Illinois State Police Public Integrity Task Force ("ISP") and the criminal investigation into Mr. Gomez's conduct were utilized because many of the witnesses had been interviewed 2-3 times, but they were not recorded and the Village did not want to interfere in the State investigation. (Exhibit 3, Aftanas deposition at 96-98.)

63.  Aftanas also testified officers are obligated to report concerns of excessive force by other officers. (Exhibit 3, Aftanas Dep at 125.)

Respectfully submitted,

**VILLAGE OF FOREST PARK**

By:  *s/Gail L. Reich*

One of His Attorneys

Gerard W. Cook, #3123800
Gail L. Reich, #6279564
Julie A. Bruch, #6215813
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone:    847/291-0200
Fax:       847/291-9230