DANIEL MILLER                                    March 27, 2019

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESTATE OF MARCO GOMEZ,              )
Deceased, by DAISY PEREZ,          )
Independent Administrator,         )
                                   )
                Plaintiff,         )
                                   )
            -vs-                   ) No. 18 C 910
                                   )
VILLAGE OF FOREST PARK,            )
DANIEL MILLER,                     )
                                   )
                Defendants.        )

Videotape deposition of OFFICER DANIEL MILLER,

taken before NANCY DECOLA EATINGER, C.S.R., and

Notary Public, pursuant to the Federal Rules of Civil

Procedure for the United States Courts pertaining to

the taking of depositions for the purpose of

discovery, at Suite 2300, 191 North Wacker Drive,

Chicago, Illinois, commencing at 10:04 o'clock a.m.,

taken on March 27, 2019.

U.S                EXHIBIT              Inc.
                      1

DANIEL MILLER                                          March 27, 2019

Page 54

in February of 2017?

A   I had Diesel, my retired police dog; I had K-9 Killian, the active police dog, and then my wife had a dog named Rowan, R-o-w-a-n.

Q   Is Madison also trained to do any sort of narcotics detention or other kind of law enforcement work?

A   She's only trained in narcotics protection -- detection, I'm sorry.

Q   Do you wear glasses or contacts?

A   I had Lasix done.

Q   When did you have that done?

A   I don't recall.

Q   Prior to February, 2017?

A   Yes, I believe so, yes.

Q   Okay.  So in --

A   Yes, I had it prior, yes, definite yes.

Q   Okay.  So on the date of this incident, on February 3rd, 2017, you didn't need glasses or contacts?

A   That is correct.

Q   Okay.  Were you on any medications on February 3rd, 2017 that would have interfered with your ability to perceive things or to remember

Page 55

things?

A   I was on no medication.

Q   How tall are you?

A   Approximately 5'11.

Q   And how much do you weigh?

A   Approximately 275 pounds.

Q   Was that your approximate same height and weight back on February 3rd, 2017?

A   Height, yes.  Weight, I would say give or take ten pounds.

Q   And as we sit here today, you have a full beard and medium --

A   Spiky hair.

Q   Yeah, spiky hair.

        Was your facial hair and hairstyle the same on February 3rd, 2017 as it is today?

A   No.

Q   In what way was it different?

A   I only had a goatee on that date, and I was wearing a winter skull cap, but underneath I have done my hair the same way since high school, so.

Q   Okay.

A   It might be a little longer, a little shorter depending on when I got my hair cut.

Page 56

Q   Were you wearing the skull cap when you approached the vehicle that Marco Gomez was in?

A   Yes.

Q   You had pictures taken of you after the shooting, correct?

A   Yes, ma'am.

Q   Who took those pictures?

A   I believe an investigator from the State police, but I'm not a hundred percent sure on that.

Q   There were agents from the Illinois State Police and investigators from the Cook County State's Attorney's Office investigating the shooting that you were involved in, correct?

A   I'm not sure about Cook County.  I think -- I've been told that there is an investigator from the Cook County's Attorney's Office that is part of the State Police Integrity Unit, but I never met the person that I know of.

Q   Okay.

A   As far as I'm concerned, I only dealt with Forest Park officers and State police.

Q   Okay.  When those pictures were taken -- first of all, where were they taken?

A   At the Forest Park police station.

Page 57

Q   Were you ordered to allow those pictures to be taken?

A   I wasn't ordered to do anything.  They asked me if they could take pictures of how I looked at the time of the incident, and I allowed them to.

Q   And so that was your understanding, is the purpose was to document what you looked like at the time of the incident?

A   Yes, ma'am.

Q   And you were still wearing your same uniform that you were during the shooting when those pictures were taken, correct?

A   Yeah, I never took off my actual uniform. Did I take off my vest and hat when I was at the hospital, yes, but as far as the actual clothing, the full uniform clothing, those were on me from before the incident, during the incident and when those pictures were taken.

Q   Okay.  So that actually was my next question.

        So the pictures, the difference between what's depicted in the pictures that were taken of you and what you looked like during the active moments of this incident was, one, you took off your vest and hat for the pictures, is that right?

Page 58

A   No.

MS. REICH:  Objection.  That misstates his testimony.

MS. YARUSSO:  Q   Okay.

A   Yeah, that's not correct.

Q   Just tell me what's correct.

A   Yeah.

Q   What is the difference, if any, between what's depicted in the picture post incident to what you looked like and were wearing during the incident?

A   There is no difference.  That's exactly what I looked like when I exited my car during the incident.  I'm saying that I took my vest off and put it back on for the picture, but I had my vest off after the incident.  I didn't wear my vest from the time the incident occurred at the hospital, the whole time at the hospital, the whole time at the station until I was photographed.

Q   So you deliberately put yourself back in exactly the same condition more or less as you were during the incident on February 3rd, 2017 as far as your appearance, attire, et cetera?

A   With regards to the vest and the hat, yes.

Q   And post shooting you turned over your

Page 59

firearm right away, correct?

A   At the hospital.

Q   And then you were given somebody else's firearm instead?

A   Correct.

Q   And who -- whose firearm did you receive?

A   I believe it was Detective Pater's backup firearm.

Q   Did there come a time when you got your firearm back?

A   Yes.

Q   When was that?

A   I don't recall.  I know I worked the street -- I know that when I went back to work I still had not got my, my gun back from the Illinois State Police, so I had to carry Detective Pater's for a short period of time.

Q   Let's talk about the incident on February 3rd, 2017.

Would you say you have a very distinct memory of that incident?

A   I think distinct is a loaded word.  I have memory of the incident but not, not like a photographic memory of the incident.

Page 60

Q   Okay.  Let me ask this first.

Prior to your deposition today or even as part of the entire litigation, have you reviewed, first of all, any video footage of the incident?

A   Yes, I have.

Q   And have you reviewed more than one video?

A   Yes, I have.

Q   Please describe the videos that you've reviewed.

A   I've reviewed the Jiffy Lube video, and I have reviewed the video from Officer Spagnolo's in-car camera.

Q   Depicting what?

A   Him pulling up and me giving chest compressions to Mr. Gomez.

Q   And those are the two videos that you've reviewed throughout the course of this litigation and in preparation for today, correct?

A   That I can recall, yes, those are the only two videos.

Q   What about any photographs, have you reviewed any photographs?

A   Yes.

Q   What photographs?

Page 61

A   Photographs of the scene and of myself, what I was wearing.

Q   What was depicted in the photographs of the scene that you reviewed?

A   The stolen motor vehicle that Mr. Gomez was driving, where it ended up, my patrol vehicle, blood splatter on the car, blood splatter on the ground, shell casings.  Just overall crime scene photos.

Q   Okay.  Have you received -- I mean have you reviewed any audio footage?

A   Have I listened to any audio footage from the incident?

Q   Right, apart from what would already be part of a video?

MS. REICH:  You said footage.

MS. YARUSSO:  Q   Yeah, regarding.

A   Yes, I've read -- I've heard Forest Park and Oak Park dispatches.

Q   And what generally was the -- were the contents of those dispatches?

A   How the whole incident started from start to finish.

Q   Okay.  And you heard yourself on the dispatch as well?

DANIEL MILLER                                    March 27, 2019

Page 62

A   Yes.

Q   Have you reviewed any police reports?

A   I have reviewed the Forest Park police report I believe Detective Petrovic created, and I have skimmed through my statement to the State police, but I have not seen the entire State police report.

Q   And so the report by Officer -- it's Petrovic?

A   Petrovic.

Q   Petrovic.

Is it the report where he's documenting your interview or other reports that he authored?

A   No, the portion of where he's saying what I said when he was present at the State police interview.

Q   Okay. And those are other officers summarizing statements you made as part of that interview, correct?

A   Correct.

Q   Did you yourself ever author any report regarding February 3rd, 2017?

A   No.

Q   Was the interview you gave recorded in any fashion other than these reports summarizing what you

Page 63

stated?

A   I don't know.

Q   Where was the -- where did you give your statement?

A   In the basement of the Village Hall in the chambers office. Let me rephrase. There was definitely no camera. I don't know if one of them had a -- one of those little recorder things that people use to record.

Q   And why do you say there was definitely no camera?

A   Because I remember there not being a camera.

Q   Is it your understanding that if that interview were recorded, that you would have -- it would have been required that you be notified and consent?

A   To be honest with you --

MS. REICH: Objection, speculation.

You can answer.

THE WITNESS: I didn't know until I got down there. I was given an interview regardless if it was videotaped or not.

MS. YARUSSO: Q   But when you sat down to give it, no one said do we have your permission to record

Page 64

this interview?

A   I don't recall at this time.

Q   Okay. All right, we'll go back to that in a second.

So on February 3rd, 2017, prior to becoming engaged with Marco Gomez, what were you doing?

MS. REICH: I'm going to object, foundation, vague.

You can answer.

MS. YARUSSO: Q   Just earlier in the day?

A   Yeah, I don't have a recollection of anything that day until I'm ordering food at a Thai restaurant when the initial -- when I hear a portion of the initial call.

Q   And when you were at the Thai restaurant, that was part of you were working, you were getting food, like a dinner break or something like that, is that right?

A   I was going to go on dinner break, yes.

Q   Do you remember when your shift started or how long you had been working at that point?

A   I believe that day I started at 2:45. It's a normal shift. I usually work from third shift, which is 2:45 p.m. to 10:45 a.m. -- 10:45 p.m., I'm sorry.

Page 65

Q   What restaurant was it?

A   Yum Thai, which is located on Madison Street in Forest Park.

Q   Were you meeting anybody there?

A   I was ordering food to take home to my wife and my kid.

Q   Okay. Did -- and you abandoned that as a result of receiving this information, is that correct?

A   No. I finished ordering my food and then went into my patrol car to go look for Mr. Gomez in the vehicle.

Q   Okay. So you had the food with you?

A   No.

Q   Okay.

A   I was at the desk -- I was at the counter in the process of talking to the lady telling her what food I wanted when I started to hear the dispatch come out. As I'm listening to the dispatch, I'm also giving her the rest of the order, and then I told her I'd come back for the food, and I left.

Q   And you did that because you wanted to immediately respond to this information you were receiving over dispatch?

DANIEL MILLER                                    March 27, 2019

Page 66

A   I was, yeah, I wanted to go locate the vehicle.

Q   And do you remember independently what that information was that you received?

A   That there was a stolen motor vehicle that fled Chicago coming into Oak Park that was just involved in some type of hit and run.

Q   When you listened to the dispatch -- when is the last time you listened to the dispatch records, the audio dispatch records?

A   I believe Sunday was the last time I listened, this past Sunday was the last time I listened to dispatch.

Q   And did you hear on that dispatch the -- that information, that piece that you received while you were in the Thai restaurant?

A   Yes, from -- not from Chicago, but from our radio band.

Q   And did it differ from what you remembered it in any respect when you relistened to it?

A   Not that I could recall.

Q   Did you have -- did you receive any information about whether or not the individual in the vehicle was armed?

Page 67

A   I don't ever --

MS. REICH:  Objection, form.

You can answer.

THE WITNESS:  Yeah, I never was informed if he was armed or unarmed.

MS. YARUSSO:  Q   And is that true up until the time that you actually came to directly interact with Marco Gomez, that you never had any information one way or the other?

A   If he was armed with a weapon we're talking about, right?

Q   Yes.

A   Yes, correct.

Q   Did you have any background information about the individual in the vehicle prior to physically approaching the vehicle?

A   No.

Q   Okay.  So you get this information while you're in Yum Thai?

A   Yes.

Q   And what do you proceed to do next?

A   I finish -- I was in the process of ordering. I kept ordering, slash, finishing the order.  I get in my car.  I drive eastbound on Madison Street.

Page 68

Q   Did you activate your lights or sirens?

A   I don't believe so.

Q   Did you drive at a normal rate of speed or above the speed limit?

MS. REICH:  Objection, vague.

You can answer.

THE WITNESS:  I believe I drove at a normal rate of speed.

MS. YARUSSO:  Q   And where did you proceed?

A   I proceeded eastbound on Madison Street toward Oak Park.

Q   What happened next?

A   I was trying to get more information because the license plate that I ran in my in-car computer through the Illinois Secretary of State system came back to a Dodge, so I wasn't sure if I was provided the wrong license plate or sometimes I have a tendency to invert numbers, especially if there's a lot of the same number in the license plate, if I just typed in the wrong license plate.

Q   How were you going about this process?

A   I asked on our side band, which is Band 5, if anyone caught the right plate or if I -- you know, I said -- I believe I said somewhere along the lines of

Page 69

my car -- the car I ran comes back as a Dodge, you know, and then I was, then I was given the correct plate by Officer McClintock.

Q   And then you reran that correct plate, is that right?

A   That is correct.

Q   And what additional information, if any, did you receive?

A   It now came back to a silver or gray Volkswagen that was reported stolen out of Glendale Heights, Illinois.

Q   And that was the first moment that you had the actual description of the car?

A   No, that's not true.

Q   Okay.  So you actually already knew that it was a silver Volkswagen, and you were confirming it?

A   Correct.  That's why I knew I had -- I believe I had the wrong plate, so unless Mr. Gomez put a different plate on the car and that's the plate I was given, then I was running the wrong plate.

Q   And at some point you actually come to the area of Jackson and Harlem, correct?

A   Yes.  I -- yes.

Q   And prior to arriving at that location, did

U.S. Legal Support, Inc.
(312) 236-8352

DANIEL MILLER                                              March 27, 2019

Page 70

you receive any additional information regarding the vehicle or the occupant of the vehicle?

A    Yes.

Q    What information did you receive?

A    I learned through Officer McClintock's radio traffic that the vehicle was last seen on Jackson near or entering Oak Park, and I also received information from Oak Park that an officer cleared a section of Jackson saying that he did not see the vehicle, and he did not pass the vehicle.

Q    What was that section?

A    I'm sorry?

Q    What was the section that that officer cleared?

A    Somewhere from Austin to -- I don't recall what he said.  Possibly Ridgeland, but the far east section of Oak Park.

Q    Any other information that you received regarding the vehicle or the occupant of the vehicle prior to arriving at Jackson and Harlem?

A    Not that I can recall.  Just the gray Volkswagen with the -- a Jetta with the license plate that was last seen traveling down Jackson.  I knew that it was from Glendale Heights and that the car

Page 71

didn't pass the Oak Park officer from Austin to wherever he said and that it was involved in a hit and run in Chicago, some type of hit and run in Chicago.

Q    And when was it that you received the information that was involved in a hit and run?

A    I believe it was the initial, I believe it was the initial dispatch.

Q    And you remember having that information in your personal knowledge as you were responding to the area that you thought this vehicle might be in?

A    I do now, yes.

Q    Well, that's actually what I'm getting at.

Is that something that based on your review of the audio that you know because you've reviewed the audio you can hear that that information was contained in the audio?

A    Yes, that's true, but I also when I have been asked this a million times of going over the scenario and replaying it in my head, I remember hearing hit and run, stolen car, but as human nature, there's a lot of stolen cars -- a lot of hit and runs that we hear on the radio, and stolen car, fleeing from Chicago takes precedence in my brain over a car that

Page 72

just did a hit and run.

A stolen car is more important to me than a hit and run, so if I had to prioritize what I'm going to think about or focus on, it's going to be a stolen car and not the fact that it was a hit and run.

Q    Is that -- so that is something that you've specifically been asked about, that whether or not you remember the hit and run information?

MS. REICH:    So to the extent that you're getting into an area that might contemplate attorney-client communications, I'm going to object and instruct my client not to answer, but apart from that, any unprotected conversations you may testify to.

MS. YARUSSO:    Q    Have individuals --

A    Yeah, I'm sorry.

Q    -- other than your attorneys asked you about whether you received information that the vehicle was involved in a hit and run?

A    I have gone over that information with my counselor, the police counselor that I was instructed to see after the incident.

Q    Okay.  And in what context, what were you discussing with the police counselor when you were talking about whether you knew that the vehicle was

Page 73

in a hit and run or whether you had received that information?

A    Just going through the entire incident it has come up.

Q    And why was -- why is it -- why was that important, if you know?

MS. REICH:    Yeah, I'm going to object to speculation.

He can answer.

THE WITNESS:    Why is it important that someone was involved in a hit and run?

MS. YARUSSO:    Q    Right, for the purposes of your conversation with the police counselor?

A    I just went over the whole incident with the police counselor from start to finish.

Q    Were you asked to explain why you didn't mention that you received information that the vehicle was in a hit and run by anybody other than your attorney?

MS. REICH:    Sorry, I'm going to object, vague, foundation.

THE WITNESS:    I don't recall anyone asking me if -- I think I know where you're going.  I don't recall anyone asking me if I knew the vehicle was involved

DANIEL MILLER                                     March 27, 2019

Page 74

in a hit and run, and if they did, I'm -- I probably focused on the fact that the car was stolen and that I just shot and killed somebody than the fact that the car was involved in a hit and run because those two things take precedence over a hit and run because at that time I found out later that the car was involved in a property damage hit and run and not hitting and killing a pedestrian or killing another driver.

MS. YARUSSO: Q So as you're approaching Jackson and Harlem, what's foremost in your mind is that there's a stolen vehicle fleeing from Chicago, is that accurate to say?

A That was involved in a hit and run, right.

Q Well, I think you just testified that the hit and run was not at the top of your mind, you were just explaining that the most important fact to you was that it was a stolen vehicle fleeing out of Chicago, is that a fair understanding of what you're explaining?

MS. REICH: So I'm just going to object to the form of the question to the extent it mischaracterizes and misstates his previous testimony.

Page 75

You can answer.

THE WITNESS: When I articulate the incident to people, whether it be the State police, the State police, whoever asked questions, I don't focus on the fact, go out of my way to focus on that the vehicle was used in a hit and run, I went -- I focused on that the car was a stolen motor vehicle and fleeing Chicago.

But if you're asking me at the time of the incident did I have knowledge that the car was involved in a hit and run, the answer is yes. That was part of the initial dispatch and that I heard that part.

MS. YARUSSO: Q Why when you speak with the Illinois State Police and others that you've related this incident to do you focus on the fact that it was a stolen vehicle fleeing from Chicago and not that it was involved in a hit and run?

A I just, that's how I articulate, am articulating the most serious offense that in my opinion was involved at the time. A stolen car is a felony, and a hit and run is generally a misdemeanor, so in one's head, a stolen vehicle takes precedent over the fact that there was a hit and run.

Page 76

Q Please describe the route you took from -- and you began to do this, but the entire route that you took from the Thai restaurant to where you ultimately encountered the vehicle.

A I traveled eastbound on Madison Street from the Thai restaurant. I then was getting information. I received information that the vehicle was last seen on Jackson with the right license plate when I was at approximately Madison and Wisconsin, which is where the Oak Park Hospital entrance is, so there's no entrance to get to Jackson from there, so I proceeded to do a U-turn on Madison, chose to travel down Maple because that would be my quickest route than going on heavy traffic on Harlem, traveled southbound on Maple to Jackson.

When I arrived at the curb, I went right on Jackson, which means I was going westbound on Jackson, and I pulled into the left turn lane on westbound Jackson that would allow traffic to go southbound on Harlem Avenue.

Q And why did you take that route?

A Because I was going to wait for the -- see -- wait to see if the stolen vehicle came to Harlem and Jackson, the intersection of Harlem and Jackson.

Page 77

Q Where were you going to wait?

A So I was deciding between waiting at the Thornton gas station or the parking lot, the residential parking lot that is at the southeast corner of Jackson across from Jiffy Lube and the Oak Park side, and I chose, I chose that I was going to wait in the smaller parking lot.

Q What was your understanding regarding your duty to respond to this call?

MS. REICH: Objection, vague.

You can answer.

THE WITNESS: I was never dispatched to the call. I took it upon myself to respond to the call. If I never would have responded to the call, I never would have responded to the call unless someone gave out the information that the car was there and wanted more units.

MS. YARUSSO: Q Did you have any information that anybody else was responding to the call?

A As a police officer, from 12 years experience, I would assume that people that are not down on something would respond to that area because that is the thoroughfare that they're going to use to get away from the police.

DANIEL MILLER                                    March 27, 2019

Page 78

Q   So you took it upon yourself to respond to the call, and you thought that it's possible that other people might be responding as well?

A   Yes.

Q   Was there anything based on your training, experience and knowledge of the policies, procedures and orders of the Forest Park Police Department that prevented you from responding to the call?

A   No.

MS. REICH:  Objection.

THE WITNESS:  No.

MS. YARUSSO:  Q   Any particular reason why you took it upon yourself to respond to the call?

A   Because I feel I'm a good police officer, and my job is to catch criminals, and I was not on anything else, and I knew a stolen motor vehicle that was just involved in a crash was involved running from Chicago coming toward my jurisdiction.

Q   Would you -- would it have also been permissible for you to choose not to respond and continue with your dinner break?

A   I wasn't on dinner break.  I was not on a break because I was waiting for the food.  I wouldn't call if I was on a break because then I'm taking up

Page 79

all my time waiting for my food that I'm allowed to take a break on, so I was duty bound to work as a police officer at that time, and even when I'm on lunch I'm duty bound if there's a call.  You know, the safety of the public is more important than me eating my lunch or dinner.

Q   Okay.  That makes sense.

I'm just asking would it also have been okay for you to not respond to the call, was that a choice you had?

A   I would not have been disciplined if I didn't respond to the call.

Q   Okay.  Fair to say it was in your discretion of whether to respond or not?

A   Yes.  I chose to respond to the call.

Q   And then you came to a stop, and you're waiting at a red light at the intersection of Jackson and Harlem, correct?

A   That is correct.

Q   And what's the next thing that you notice or that happens?

A   Once I decide to -- I still haven't decided when I turn in that turn lane if I'm going to go to the Thornton lot or if I'm going to go to that

Page 80

smaller parking lot.

Once I decide that my best chance of capturing the vehicle if it does arrive is to go to that smaller lot, I decide I'm going to back into the lot because there was no car at that time behind me.

I put my car in reverse, and I begin to back up and start making my turn into the lot.  I don't want to go -- I don't want to do a U-turn and go face first into the lot.  That lots very -- I stopped cars there my entire career that decide to pull in there because of how the turn is at Jackson, and it doesn't make it really feasible to make a traffic stop right at that intersection, so a lot of cars do pull in there for the traffic stop, and it's a very tight parking lot that would require at least a three, if not a four-point turn in order to maneuver my car the way I wanted to be facing Jackson.

Q   So you were planning to do a three-point turn to get into the parking lot?

A   No.  I was plan -- I didn't want to, I didn't want to do a three-point turn in the parking lot.  I don't like -- I try to not back up my car as much as possible, especially in confined areas because of the dog cage.  I have limited view out the back window.

Page 81

I have to rely on my exterior side mirrors because of how the cage is set up, so my intention was to back into the parking lot, put the car in reverse from that lane, cross oncoming traffic where there was no traffic coming at that time and to just back into the lot so I'm facing Jackson.

MS. YARUSSO:  Okay.  I think it might be easiest to use an exhibit, so.  Wait a minute, where's my set for you, Gail?  I think -- do you have two sets?

MR. STROTH:  I don't think so.  I didn't mark any of these.  You can use these if you want.

MS. YARUSSO:  Bear with me a second.  I wonder if Carlton took a set.

(Whereupon, Miller Exhibit 6 was marked for identification.)

MS. YARUSSO:  Q   I am tendering you what's been previously marked Miller Exhibit No. 6, and it is --

MS. REICH:  So we're starting out with No. 6?

MS. YARUSSO:  They're pre-numbered.

MS. REICH:  Okay, all right.

MS. YARUSSO:  So this came up in whatever order it came up.

MS. REICH:  Okay.

MS. YARUSSO:  Q   It's a Google maps aerial view.

DANIEL MILLER                                                    March 27, 2019

Page 82

Is this -- do you recognize what's depicted in Miller Exhibit 6?

A    Yes.  This is an aerial view of the intersection of Harlem, Jackson, Maple and the border of Forest Park and Oak Park.

Q    This is the area that you've been talking about where you came to a stop and were deciding to back into a parking lot, correct?

A    Yes, ma'am.

Q    Do you see the parking lot you're talking about depicted in this -- in Exhibit 6?

A    Yes, ma'am.

Q    Let's see, let me get you -- can you put an "X" in the parking lot?

A    (Indicating).

Q    Okay.  And you circled it as well, right?

A    Yeah.  I just drew a big circle around the whole parking lot.

MS. REICH:  Turn it, show.

MS. YARUSSO:  Q   Thank you.

Where -- can you put an "M" where your vehicle was when it came to a stop when you were deciding to back into the --

A    I'm sorry, --

Page 83

MS. REICH:  I just held it up for the camera.

MS. YARUSSO:  Okay.

THE WITNESS:  You want me to put, I'm sorry, "M" you said?

MS. YARUSSO:  Q   Yes.

A    At what point?

Q    Where your vehicle was stopped when you were deciding what to do next.

MS. REICH:  I'm going to object to foundation, vague.

You can answer.

THE WITNESS:  I do not recall if I was the first car or there was a car in front of me at the light, so I'm going to draw a big "X" -- or a big "M" making -- covering both those spots.

MS YARUSSO:  Q   Okay.

A    Okay.  So I was either the first car or the second car in the turn lane, which is I circled an "M".  It looks like in this picture there actually is two vehicles at the spot that I was at, one of the two spots I was at.

Q    So you don't remember if you were right up at the white line or if there was a car in front of you?

A    Yeah, I can't recall if there was a car in

Page 84

front of me or not.

Q    And you know for certain there was not a car behind you?

A    Yeah, because I wouldn't have been able --

MS. REICH:  Objection, foundation.

MS. YARUSSO:  Q   You did not observe a car behind you in that lane, correct?

A    Correct.

Q    And the lane to the north of you is the lane that can either proceed straight or take a right on Harlem, correct?

A    Yes.

Q    And were there cars, if you remember, in that lane?

A    Yes.

Q    And then so then your decision was to try to back out of the area that you've marked with an "M" into the parking lot that you marked with a large "X"?

A    Yes.

Q    Then what happened?

A    I looked in my rear-view mirrors.  I saw that I was -- had no one behind me.  I started to back up.  As I started to back up, I'm unsure if I saw the

Page 85

Volkswagen in my mirror or when I'm turning my body because I have to turn my body to make the turn, I can't rely on the mirror, so I turn my body toward the passenger side, at which time as I'm backing I see headlights to a Volkswagen Jetta, which are very distinct, and I see that the car is gray.  I immediately put the car into park and exit my vehicle.

Q    In what way are the headlights very distinct?

A    They're square, and they don't wrap around -- Volkswagen Jetta older model headlights are more of a square type, and they don't wrap around the fenders as normal vehicles do which creates a different structure, silhouette, however you want to say it, when you look at the front of the vehicle.

I would say it would be similar to if you're driving at night and you know Jeep Wranglers are one of the only cars that have a circular light, you know usually when a Jeep Wrangler is coming at you, and a lot of people know when you see a Crown Victoria because they have distinctive headlights as well.

Q    So you made the -- did you know that that was the Volkswagen that you were looking for based on the dispatch information when you put your car in park

DANIEL MILLER                                    March 27, 2019

Page 86

and got out?

MS. REICH: Objection, foundation.

You can answer.

THE WITNESS: Not one-hundred percent sure, no.

MS. YARUSSO: Q   Did you ever consider staying in your vehicle?

A   No.

Q   What were you thinking when you put your car in park and got out of it?

A   I thought that the vehicle was in a lane of traffic, that it was going to be boxed in by heavy traffic since it was the time of day that it was, and that was my best opportunity to apprehend the offender since he wouldn't be able to move, we were at a red light, and he had cars in front of him and behind him.

Q   So your plan was to approach the vehicle on foot in order to effect a stop of the vehicle and take the occupant into custody?

A   My intention was to exit the vehicle, approach the vehicle and verify that it was a stolen motor vehicle, and if so, effectuate an arrest.

Q   Did you activate your lights or sirens prior to exiting your vehicle?

Page 87

A   No, I did not.

Q   Did you announce that you were a police officer as you approached the vehicle?

A   As I approached the vehicle, I immediately made eye contact with the driver, and he placed the car in reverse. I didn't have a chance until he started reversing I believe to announce my office. I announced my office as I approached the vehicle, and it happened so fast that he put the car in reverse.

Q   Okay. So as soon as you made eye contact with the occupant, the occupant started reversing to get away from you, correct?

A   Yes, Mr. Gomez started reversing.

Q   And you now know -- so you now know that person obviously to be Marco Gomez, correct?

A   Correct.

Q   When you exited your vehicle, did you draw your weapon?

A   I had my weapon -- I'm not sure at what point I drew my weapon, if it was when he started to put the car in reverse. I know for a fact that I would have my hand on my weapon when I exited the car believing it was a stolen motor vehicle, but I'm not exactly sure at what point I physically pointed my

Page 88

weapon at Mr. Gomez. I know I did. I just don't know if he had already started reversing or if he -- it was when we made eye contact and just second -- just a second before he put the car in reverse.

Q   Okay.

A   But my intention was to seize the vehicle and whoever was in the vehicle.

Q   So you know that you did have it drawn and pointed at him either just before he began reversing or as he began reversing, correct?

A   That is correct.

Q   And what was your response to him reversing his vehicle?

A   Well, once I was out of my car, I realized he wasn't in a lane of traffic, he was actually on the apron, slash, curb, slash, parkway of the Jiffy Lube, and he wasn't boxed in in traffic, and at first I was shocked that he was able to even put the car in reverse and reverse out because I -- the reason why I approached the way I did was I believed that the car was boxed in and had no exit.

Q   So was he not in the actual lane of traffic?

A   That's correct. He made his own lane, slash, he was on the parkway, slash, entrance to the Jiffy

Page 89

Lube --

Q   Can you --

A   -- which is depicted in this picture.

Q   Can you put a "G" where you first observed the vehicle and were able to actually figure out where it was located because initially you were unsure, correct, of how it was exactly situated in traffic?

A   I wasn't --

Q   Well, let me break down that question.

Is it true that when you first observed the vehicle you were unsure whether it was blocked in or in a lane of traffic?

A   No. I believed it was in a lane of traffic and boxed in. I believed at the time that I thought that the vehicle was in a lane of traffic, so in my head I'm thinking there's a third lane, that he's in the third lane. I didn't realize that he had jumped the curb and was sitting in this apron of the Jiffy Lube.

Q   How do you know --

A   So I thought he was boxed in.

Q   How do you know he was in the apron, how were you able to make that determination?

DANIEL MILLER

March 27, 2019

Page 94

A   That's accurate.  When I run -- when -- I'm trained when I run I don't run unless there's an imminent threat shooting at me.  I wouldn't run while shooting at a target unless there's an imminent danger to me at that point.

I put my gun toward the ground for the safety of the public so that way there's not an accidental discharge while I'm running from an involuntary trigger pull.

Q   And so when you're running towards Marco in the car, he's reversing, correct?

A   That's correct.

Q   And there is no imminent danger to you at that point?

A   To me as he's reversing, no.

Q   And there's other civilians in the area, correct?

A   Yes.

Q   You're aware that there are at least some other cars at that intersection, correct?

A   Correct.

Q   Were you aware whether there were any civilians outside of vehicles in that area?

A   At that time I'm not sure.  My focus was on

Page 95

the stolen motor vehicle that was fleeing from me, but that time of day it's quite possible that there was pedestrians there.  The CTA blue line exit is less than a block away, about a block away from there.

Q   As the vehicle is reversing away from you, what is your plan as far as effectuating a stop or pursuing the individual?

A   I know that that -- there's an S-turn there, that that vehicle is not going to be able to make the turn without maneuvering a bunch of times along with the traffic that was going to be coming in or coming, and my intention was to apprehend the offender once he got stuck by the S-turn.

It's a very distinctive turn.  The photograph that you provided me only shows the end of the turn.  It doesn't show it's a complete S, tight S-turn.

Q   So your plan was to continue to pursue the vehicle on foot because it would eventually slow down in trying to navigate the S-turn?

MS. REICH:  Objection, mischaracterizes and misstates his testimony.

You can answer.

Page 96

THE WITNESS:  My intention is that he is only going to have several options.  He's either going to have to reverse down the entire S-turn all the way past Wisconsin, which he will crash doing so, therefore, hopefully disabling the vehicle and him fleeing on foot.

Or he will have to -- my intention of running after him is to have him stop the car, which that's why I was screaming stop, and have him either surrender peacefully or flee on foot from the motor vehicle.

MS. YARUSSO:  Q   So you're screaming stop at him, is that correct?

A   Correct.

Q   Anything else that you're screaming or saying to him?

A   Police, stop, and then at some point I know I was telling him to show me his hands.

Q   And you -- have you heard audio recording of the dispatch where you can hear yourself saying the things that you're describing right now?

A   Yes.

Q   And in that audio dispatch, how would you describe your tone of voice?

Page 97

A   I'm yelling.

Q   Was your heart racing at this point?

A   I'm sure it was.

Q   And this is while you're pursuing Mr. Gomez and he's reversing, correct?

A   Correct.

Q   Were -- did you see any other sort of reaction from Marco Gomez during this time period other than what you've already described when you could tell that you initially made eye contact with him?

A   When we made eye contact, he looked like a deer in headlights, and the car immediately went into reverse, and then when I got in front of the car, I told him to stop, show me his hands, and the car became drive -- his car began drive -- he put the car in drive and started the car coming at me.

Q   Did you observe Marco Gomez trying to make a three-point turn?

MS. REICH:  Objection, argumentative.

You can answer.

THE WITNESS:  I'm assuming that that's what he was trying to do.  I observed him put the car in reverse recklessly, never looked back to see what was

DANIEL MILLER                                     March 27, 2019

Page 98

behind him, he was always front facing, put the car in reverse and went back on an angle.

I'm assuming that's what he was trying to do. My assumption is he was trying to flee by going back eastbound on Jackson.

MR. YARUSSO: Q   And a three-point turn to you is something where you're at a point, you back up, that's the second point, and then the third point is to pull away in a different direction, correct?

A   Correct, but I don't even believe that a three-point turn would be enough to make that turn.

Q   Okay.

A   He would need like a four-point turn or five-point turn.

Q   Just to make sure we're talking about the same thing there.

A   Yes.

Q   So as you're pursuing him, based on your observations, it looks to you like he's trying to reverse and then stop and turn to flee you, correct?

A   I realize that he has -- I believe that's what he's trying to do at the point when he hits the curb and jumps the curb and stops.

Q   Which curb did he hit or jump?

Page 99

A   The curb in front of the apartment building of the parking lot that I was going to go into where all these trees are.

Q   So we're talking about the south curb of Jackson Boulevard, right?

A   Yes.

Q   The curb that borders the eastbound lane of Jackson Boulevard, right?

A   Yes.

Q   East of the parking lot apron that leads into the parking lot of that that you've already marked as --

A   Actually, way east.

Q   Okay.

A   Somewhere between the first, somewhere past the first tree, by the first tree that you see, I would say the center of the tree to somewhere by where this big, the big, big tree is in the middle that is covering part of the building.

Q   If you could just draw like a line with, you know, two end points of the range that you think that he came to a stop and put a number two on it to represent kind of the second point in this attempted three-point turn?

Page 100

A   Well, that would be the first point.  It was full reverse, and then he hits the curb somewhere between -- do you want me to put a number two you said?

Q   Yes, please.

A   Somewhere between --

Q   Is it showing up because we could get a different color?

A   Yeah, you're putting green on green here.

MS. YARUSSO:  Gail, would you mind lending him your red pen to see if that shows up?

MS. REICH:  Sure.  Actually, this one might be better.

MS. YARUSSO:  Thank you.

THE WITNESS:  So the red Sharpie pen is going where I think the car hit the curb when he put the car in full reverse.  Not much better.

MS. YARUSSO:  Q   And you're able to kind of catch up to the car at that point, is that right?

A   Yeah.  We're talking short distance, a matter of a second, two seconds.  It's not -- I didn't run a quarter mile, I didn't run a half mile, I didn't run a hundred yards.  It's not a large distance.

Q   Do you stop running?

Page 101

A   Once I get to the vehicle I do.

Q   How far are you from the vehicle when you stop running?

A   I'm at the --

MS. REICH:  Objection, speculation.

THE WITNESS:  I'm at the vehicle.

MS. YARUSSO:  Q   So within five feet of it?

A   Within well within five feet of it.

Q   And you bring -- do you bring your gun back up?

A   Yes.

Q   And you're pointing it at the occupant of the vehicle?

A   Yes, saying show me your hands because he's at a stop.

Q   So are you physically plant -- with your feet planted?

A   I --

MS. REICH:  Objection, foundation.

You can answer.

THE WITNESS:  I physically put myself in harm's way by going in front of the vehicle pointing my gun at Mr. Gomez ordering him to show me his hands and get out of the car.

DANIEL MILLER                                        March 27, 2019

Page 102

MS. YARUSSO:  Q  Would you mind standing up and just demonstrating for us the actual physical stance you took as far as your body position as well as your arms raised holding the weapon?

MS. REICH:  Objection, foundation.

THE WITNESS:  Okay.  So I'm going to use the table as the front of the vehicle.  The piece of paper is going to be the center of the grille.  The pen and the court stenographer's pens are the headlights of the car.

I initially come up to the car.  I'm here pointing my gun.  I then blade myself in front of the front headlight with my body in front of the car pointing my gun at Mr. Gomez telling him to get out and show me his hands.

MS. YARUSSO:  Q  Okay.  And are your arms fully outstretched holding the gun?

A  Yeah, I have my gun pointing at him.  I don't know how, you know, if I'm full out or, but I'm definitely pointing my gun at Mr. Gomez at that point.

Q  And can you see Mr. Gomez at that point?

A  Yes.

Q  Can you see any reaction or make any

Page 103

observations about his demeanor at that point that you're standing there stopped bladed with your arms outstretched pointing the gun at him?

A  Just he's looking at me, he's just looking at me.  This happened in a matter of seconds.

Q  And at this point you -- your distance from the car is less than five feet, correct?

A  Yes.

Q  Less than three feet?

MS. REICH:  Objection, foundation, speculation.

THE WITNESS:  I'm approximately here.  That's the distance.

MS. YARUSSO:  Q  So I would say right now that looks like 18 inches, is that --

MS. REICH:  Objection.

MS. YARUSSO:  Q  This is how --

MS. REICH:  Speculation.

MS. YARUSSO:  Q  -- close you remember being to the vehicle, correct?

A  Yes.  I felt like I was -- there was a small gap between me and the vehicle but not much.  My intention was to stop his -- to make him get out of the car and run or surrender.

Q  And at -- and when you have your arm

Page 104

outstretched, is your gun pointed at Marco Gomez inside the vehicle?

A  Through the windshield, yes, ma'am.

Q  You can have a seat.

Were -- the windows were up in the vehicle, correct?

A  They were up.  I don't know if they were completely up, cracked, but they were definitely up.

Q  And were you speaking in a loud voice, correct?

A  Yeah, yes.

Q  Your intention was for him to be able to hear you inside the vehicle?

A  Yes.  My intention is for him to surrender or him to bail out on foot, and my intention was to try to get him to bail on foot if he does bail on foot toward my patrol car where my K-9 is waiting for me to hit a door popper and let him loose to apprehend the subject.

So I'm trained to make sure I can go to the passenger side if he runs that way, and I have my dog as a possibility of capturing him if he decides to go to the right, stay on the driver's side and run toward Harlem Avenue.

Page 105

Q  And you specifically put yourself in front of the vehicle in an attempt to prevent the vehicle's escape?

A  Absolutely.

Q  Did you see any indication that Marco had a weapon?

MS. REICH:  Objection, --

THE WITNESS:  Other than --

MS. REICH:  -- argumentative.

You can answer.

THE WITNESS:  Other than a moving vehicle, no.

MS. YARUSSO:  Q  So you didn't see him with any firearm or other personal weapon?

A  No, ma'am.

Q  And you, and you still had not received any other information over dispatch that he possessed any weapon, correct?

A  No, ma'am.

Q  And at the point that you put him in -- yourself in front of the vehicle, you did that because you understood that he was trying to get away, correct?

A  I did that -- I put myself in front of the vehicle to stop him from getting away and to make him

DANIEL MILLER

March 27, 2019

Page 106

either flee on foot or give up.

Q   At any point up until this point -- well, let me ask a different question.

What's the next thing that happens from this point forward while you're standing there bladed at what you've described as kind of the front left corner of the vehicle within less than two feet from the vehicle with your weapon drawn and pointed at Marco Gomez?

A   As I'm --

MS. REICH:  I'm going to object to the characterization.

You can answer.

THE WITNESS:  As I'm in front of the vehicle at the front driver headlight, I -- the vehicle begins, begins coming at me at which time I fired my weapon, and possibly I shifted my feet.  I'm not sure if I shifted my feet or if the vehicle when I started firing made -- was able to turn and avoid striking me.

MS. YARUSSO:  Q   Prior to your, to your putting yourself in front of the vehicle, you believed Marco Gomez was trying to make some kind of a three-point turn to reverse and then drive forward in a way,

Page 107

correct?

A   I believe --

MS. REICH:  Objection, vague.

You can answer.

THE WITNESS:  At the time I didn't know what he was doing other than trying to escape by going in reverse.

I just know the reason why I chose that parking lot is that he would be boxed in and that he would have a hard time escaping other than going on the apron that he was on and traveling through the Jiffy Lube parking lot, which he had an opportunity to do.

Instead he bypassed that and decided to put the car in reverse, hit the curb, at which point I positioned myself in front of the car, and he decided to put the car in drive and drive toward me.

MS. YARUSSO:  Q   Okay.  When you first approach, and I believe you gave a statement to this effect as well, you thought he was reversing so that he could attempt to make a three-point turn and flee, correct.

A   Yes, I believe he -- I believe his only intention -- I mean, where else can he go?  He's trying to flee the police to get away.  He doesn't

Page 108

want to be caught in a stolen car, so he's going to -- the only place he can flee is back on Jackson the opposite way.

Q   Right.  So putting aside -- so you, what you understood that it looked like this person was trying to do based on your observations was reverse as he did into the location that you've marked with two, correct, and then pull forward and proceed to attempt to go east on Jackson and around the curb of Maple, correct?

A   Right.  That would -- what I'm trying to say is that would require more than -- I call it a three-point turn, but that would require more than a three-point turn.

Q   Okay.

A   You would have to put the car in drive, put it in reverse, put it in drive, put it in reverse I would say at least two times in order to go the right way down Jackson, which would have been his only possibility because there was traffic going westbound on Jackson, and I believe there was traffic going -- coming off of Maple.

Q   I understand, so the -- but regardless, after he comes to a stop in the area you've marked as that

Page 109

two, his next move you thought was to pull forward, and whether or not it would require some back and forth to pull forward so that he could go east and around the curb on Maple, correct?

MS. REICH:  Objection, speculation.

You can answer.

MS. YARUSSO:  Q   That was what you observed that you anticipated his route of fleeing that he was attempting to flee?

A   I mean, I'm assuming that's what he was trying to do.  Again, I -- as soon as he hit that curb, I was in front -- I went in front of the car.

Q   Right.

A   So I don't know, you know, if he was going to put the car in drive and go -- try to go back to the Jiffy Lube, if he was going to put the car in drive and try to go into oncoming traffic on Jackson, but just the way the car ended up, my assumption is he was trying to do a three-point turn to get back onto Jackson going eastbound on Jackson back towards Chicago.

Q   Right, so your -- based on what you observed, his next move after coming to a stop at point two would be to pull forward in some manner to flee,

DANIEL MILLER                                    March 27, 2019

Page 110

correct?

A   No, that's not correct.  His next move should have been surrender to the police or get out of the car and run on foot, not try to run the police over.  That was my intention, that was my thought process.

Q   Okay.  But there's no running police over until you put yourself in front of the car, so what I'm asking is when you see him fleeing, he's reversing, and you -- and you've already given statements to this effect, you think he's going to try to make a three-point turn, and now you're saying it would probably require more than three points, but in any event, he's trying to reverse, which -- and then he'll come to a stop and then pull forward and pull away in his attempt to flee, that's what you thought was going to happen as you approached him on foot and started running after him, correct?

MS. REICH:  Objection, form, compound, argumentative.

You can answer.

THE WITNESS:  I believe that his intention was to do a three-point turn to go back eastbound onto Jackson.

MS. YARUSSO:  Q   Right, and so after, based on

Page 111

that belief, the next thing that you would have anticipated him to do after he came to the stop at two is then pull forward to attempt to travel eastbound on Jackson, that's what you thought his next move was going to be before or as you started chasing him, correct?

A   As I started chasing him --

MS. REICH:  Objection, --

THE WITNESS:  Yes, but not when I put myself in front of the car.

MS. REICH:  -- that mischaracterizes his previous testimony.

You can answer.

THE WITNESS:  As I put myself -- as I was running after the car, yes, I believed he was going to eventually put the car in drive or he was going to go the whole way and reverse down the S-curve, which I don't think is possible, and I think he knew that once he traveled the S-curve already, S-curve already, so I believe his intention as I was running toward the car was going to be to do a three-point turn.

My attention -- my point of putting myself in harm's way in front of the vehicle was to

Page 112

eliminate that option and only give him the two options of giving up or bailing out on foot and running from the stolen car, which from my training and experience the majority of the time when we have a car boxed in the people do.

MS. YARUSSO:  Q   When you have a car boxed in by a vehicle or even -- I mean, have you received any training about boxing a vehicle in when you're not in a vehicle, so you're on foot and you're boxing a vehicle in?

A   No, but I -- no.

Q   Have you received any training that that's something you shouldn't do?

A   No, not that I know.  I mean, no one has ever said don't run in front of a car and stop a car.  I mean, I've run in -- my intention is to box in stolen cars because I know I can't pursue a stolen car, so that's the only way I can capture people in stolen cars is for them to either crash their car and injure themselves or others or bail out of the car.

Q   Have you ever received any training in the form of -- well, let me ask individual questions so that's not overly compound.

Have you ever received any training about

Page 113

when it is and is not permissible to pursue a fleeing vehicle?

MS. REICH:  Objection, foundation.

You can answer.

THE WITNESS:  In a motor vehicle, yes.

MS. YARUSSO:  Q   And what generally is the training or how would you describe what you are and are not supposed to do or allowed to do to pursue a fleeing vehicle?

A   There's a vehicle policy -- when I say vehicle, I mean when I'm in a vehicle pursuing with my vehicle, there's a policy that dictates the considerations that need to be taken place -- that need to take place with regards to either pursuing a vehicle or not pursuing a vehicle.

Q   And what are those considerations?

A   There's several.  First of all, the offense the person has committed or is wanted for; the ability of the person -- for the police to identify the person so if the person has already been identified that we can capture him at a later time and date; or if the person has not been identified, I think I said the type of crime that it is, forcible felony, time of day, weather conditions, population,

DANIEL MILLER                                          March 27, 2019

Page 118

MS. YARUSSO: Q And just to put it another way, you're not going to pursue somebody for a crime such as driving on a suspended license in a vehicle pursuit because the risk of seriously -- serious bodily injury or death to either the offender or bystanders is not worth pursuing somebody for that kind of a crime, correct?

MS. REICH: Objection, incomplete hypothetical, foundation.

You can answer.

THE WITNESS: I believe that's the intention of the policy, yes.

MS. YARUSSO: What time is it? Let's take a five-minute break or ten-minute break.

THE VIDEOGRAPHER: Off the record at 12:26.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the record at 12:36 p.m.

MS. YARUSSO: Q We left off that you were as far as the series of events or the sequence of events with Marco Gomez, that you were planted, bladed with your gun drawn and pointed using both hands at Marco Gomez while you're positioned you've described at the front driver's headlight area, is that right, less

Page 119

than two feet from the car?

A Less than five feet from the car, but yes.

Q Okay. Well, and you also demonstrated the proximity when you stood up and put yourself in position in relation to the conference table, correct?

A That's correct.

Q And then at that point when you're in that position, you observe Marco pulling forward in his vehicle, correct?

A Once I'm bladed and have my gun pointing at him, yes.

Q And you've already testified that at the beginning of the incident you exit the vehicle, you make eye contact with him, you draw your gun, he's reversing, you put down your gun, you chase after him, and those things are kind of happening within a matter of seconds, correct?

A Seconds, yes.

Q And then you run over to him as he's reversing and comes to a stop at -- in front of the trees in that apartment building and plant yourself and pull your gun back out, and that's all happening in a matter of seconds, correct?

Page 120

A Yeah, the whole incident is happening in a matter of seconds --

Q Okay.

A -- from start to finish.

Q From start to finish?

A From start to -- I'm sorry, from start to shots fired, it happens in seconds.

Q Okay. And when we say start, we would say from the second you spot him and put your car -- what would you consider the start when we're saying it happened in a matter of seconds?

A When I exit my vehicle, make eye contact with him, I know, I know it's a stolen car once he puts the car in reverse and begins to flee me.

Q By just his reaction?

A Correct.

Q And all the information that you had received, it matches that information?

A Yeah, time span, route of travel, time of day. Everything combined together, the totality of the circumstances dictates to me that now I have the stolen car.

Q Okay. And so you -- from the moment you exit your vehicle and make eye contact to shots fired is a

Page 121

matter of seconds?

A Correct.

Q And when you observe Marco pulling the vehicle forward, you begin firing your weapon, is that correct?

A Once the vehicle starts coming at me, yes, that's correct.

Q How many shots did you fire?

A Total of four shots.

Q Were you aware in the moment that you shot four shots or is that something that you know because afterwards it was determined with certainty?

A I know I fired more than one shot. At the time I did not know until later that I shot four shots.

Q And why were you -- why did you fire four shots?

A I fired --

MS. REICH: Objection, speculation.

You can answer.

MS. YARUSSO: Q Okay, I'll rephrase.

Why did you fire as many shots as you did?

A I fired until my brain told me the threat was no longer a threat to me.

DANIEL MILLER                                                March 27, 2019

Page 122

Q   And what information or what observation did you make that made you perceive that there was no longer a threat?

A   Once my brain told me to stop pulling the trigger, I stopped pulling the trigger. I would assume that when my brain processed the fact that the car -- I was no longer in front of the car, I stopped pulling the trigger. That's why I only shot four shots.

Q   Did you see Marco react in any way to any of the shots you fired?

A   No. It happened too fast.

Q   Could you see him while you were shooting?

A   I was pointing my gun at him, so I was -- I mean, I'm sure I was seeing him. I don't have knowledge of what he was doing or I can't recall.

Q   But you were looking right at him and aiming your gun at him, correct?

A   Correct, and giving him commands.

Q   Were you aiming for a particular part of his body?

A   Not that I recall. Just the center mass, which would be the center of the chest.

Q   Did you observe Marco doing anything with the

Page 123

car, like steering in a certain direction as he's traveling forward?

MS. REICH: Objection, foundation.

You can answer.

THE WITNESS: I did not have a chance to. It was -- it happened too fast. If you're asking me if I saw him turn the wheel or, no, I don't recall any of that, seeing any of that.

MS. YARUSSO: Q   Did you observe the vehicle driving past you?

MS. REICH: Objection, foundation.

You can answer.

THE WITNESS: Yeah, I'm sort of -- I mean, I know the vehicle eventually went past me, so I guess, yeah, it drove past me at some point.

Again, I don't know, I think I stated earlier, I don't know if I moved my feet to get out of the way at the same time as firing and him coming forward or if he was able to do such a sharp turn to avoid clipping my feet.

I just know that as soon as the car came at me and I wasn't in the center -- I believe I -- I know I was in the front of the car that my brain told me to fire, and I fired my weapon in self defense.

Page 124

MS. YARUSSO: Q   If -- based on your training and experience as a police officer, in the use of excessive force and vehicle pursuits and use of deadly force, would you agree that it is prohibited to use deadly force purely to stop a fleeing suspect whether they're in a vehicle or on foot?

MS. REICH: I'm going to object to the form of the question, foundation and incomplete hypothetical.

You can answer.

THE WITNESS: I think the dic -- I think each situation dictates a certain response, and I have to abide by the policy, but more importantly, I have to abide by Court decisions that are made to set law.

MS. YARUSSO: Q   And what is your understanding of that -- those things, the Court decisions as well as the policy that -- on whether you're allowed to use deadly force on a fleeing suspect to prevent their escape?

A   So a way to prevent their escape?

Q   Yes.

MS. REICH: I'm going to object to the foundation as well --

THE WITNESS: Again, it depends --

MS. REICH: Incomplete hypothetical.

Page 125

You can answer.

THE WITNESS: Sorry.

Again, it would depend on the situation if anyone is in danger.

MS. YARUSSO: Q   So in what circumstance -- is there a circumstance that would be allowed to use deadly force to prevent a fleeing suspect from escaping?

A   Yes.

Q   In what situation?

A   I'll give you a court case. Guy is driving recklessly, speeding at high rates of speed on a highway, and a police sharp shooter sat on top of a bridge and shot through the windshield to stop the car, stop him from fleeing because of the manner he was driving the vehicle.

Q   Is that the reason that you shot Marco Gomez?

A   No. I shot Marco Gomez because he tried to run me over and kill me or maim me.

Q   And you base that claim that Marco Gomez was trying to run you over and kill you or maim you based on your observation that he moved the vehicle forward once you had placed yourself at the front --

A   That he changed the gear.

DANIEL MILLER                                          March 27, 2019

Page 126

Q  -- driver headlight, correct?

A  I apologize, I thought you were done.

I based my conclusion on the fact that he decided to do that based on him having to take the gear shifter and move it from reverse to drive, put his foot from the brake to the gas pedal as I'm giving commands, as I'm in front of the car, as I'm pointing my gun at him.  He only cared about escaping with a stolen vehicle at that time.

Q  At -- prior to -- let me ask this.

At the point that you're planted and bladed with your gun out, is your heart racing?

A  I am sure it is.  I just sprinted, and I'm involved in a critical incident, starting to become a critical incident at this point.  My heart races any time I'm involved in anything extraordinary for my duties.

Q  Did you make any attempt -- let me ask this.

You've already testified that you specifically put yourself in front of Marco Gomez's vehicle as part of your strategy to prevent his escape, correct?

A  That's correct.

Q  Did you ever attempt to get out of the way of

Page 127

Marco Gomez's vehicle?

A  Again, I don't know if once the vehicle was coming at me if I did move my feet or if I did not move my feet.

Q  You don't know one way or the other?

A  Correct.  I just know that I was close enough where I believed I was in danger of getting run over, dragged or lose a limb, and my brain told me as a response to that is to fire.

I need to, I need to take a minute break.  Sorry.

THE VIDEOGRAPHER:  Off the record at 12:49 p.m.

(Brief recess taken.)

THE VIDEOGRAPHER:  Back on the record at 1:05 p.m.

MS. YARUSSO:  Q  Okay.  So returning to the sequence of events, you fire a number of shots that you now know to be four shots, correct?

A  Correct.

Q  And you've testified that you stopped shooting when your brain registers that you're no longer in imminent danger, correct?

A  Correct.

Q  And what's the next thing that you do?

Page 128

A  I go around the vehicle still playing my -- I'm sorry, the vehicle comes it a stop.  At the time I believe that the vehicle came to a stop because it crashed into -- that intersection has traffic sticks, I guess you want to call them, some type of reflective stick that regulates the turn, the traffic turn.

At that time I didn't know if those were concreted in or I didn't know, so the way the car stopped, it looked like it stopped in the middle of the turn intersection.  I believed that it stopped due to being struck -- striking the pole.

Q  Okay.  You're -- I guess you're making a point or a distinction that you aren't sure the condition of the occupant, of the driver?

A  Correct, so I don't know if I've struck Mr. Gomez or if I have not struck Mr. Gomez.  I'm -- at the time I thought that the car stopped based on the fact that it hit some -- it hit the --

Q  And you now know it stopped because Marco Gomez was fatally shot and no longer operating the vehicle or not?  I mean, I'm trying -- you're saying at the time you knew this, and now you have a different understanding of why it stopped?

Page 129

A  Yes.

Q  And what is that understanding?

I think I fixed my form objection.

A  My understanding is the vehicle stopped because it hit another vehicle.

Q  Okay.  When you're shooting and aiming your gun at Marco Gomez in the vehicle, are you seeing how the shots are penetrating the vehicle?

A  No.  There's not time.  It happened too fast.

Q  And at the moment you stopped shooting, the vehicle is proceeding past you in some form, correct?

MS. REICH:  Objection, argumentative.

THE WITNESS:  As I stopped shooting, the vehicle is continuing to roll, travel in the street, yes.

MS. YARUSSO:  Q  Past you?  You remain here, and the vehicle goes on?

A  Yes.  At some point and somehow I end up on the passenger side of the vehicle, but yes, the vehicle -- I'm at the back end of the vehicle now, from the front to the back.

Q  So when you say somehow someway you end up on the passenger side of the vehicle, you don't know how you got to be in that position?

A  I moved --

DANIEL MILLER                                      March 27, 2019

Page 190

A   You're still on Exhibit 3, correct, the same exhibit?

Q   Yes.

A   Okay.  Page four you said?

Q   Yes.

A   Okay.

MS. REICH:  I'm sorry, did you say page four or --

MS. YARUSSO:  Q   Page 4, paragraph 13 where it says, Defendant Miller, continued to chase after Marco on foot with his gun drawn and pointed at Marco, you deny the allegations in that paragraph, is that right?

A   I mean, it's a broad statement, I chased after him, and I pointed my gun at him.  I didn't -- it's not broken, it's not broken up properly I guess you could say in the sentence.  I chased after him -- I pointed my gun at him, I then chased after him without pointing my gun at him, and then I repointed my gun at him.

Q   Okay.  And in paragraph 14 where it says, Marco turned the vehicle and attempted to drive the vehicle in drive rather than reverse away from Defendant Miller, and you along with the Village deny

Page 191

that paragraph, do you see that, paragraph 14?

A   Yes, I denied that.

Q   And on what basis do you deny that paragraph?

A   There was no -- he didn't have an opportunity to drive away from me.  If he had -- if he want -- if he put the car in park -- in drive, then his intention was to hit me.

Q   And that -- and you're saying that because by that point you had put yourself in front of his vehicle, is that correct?

A   Yes, I put myself in harm's way, correct.

Q   In paragraph 15, you deny that paragraph along with the Village.

Is there any part of that paragraph that's true?

MS. REICH:  I'm going to object, competence.

THE WITNESS:  The only part of that is true is that at some point Marco Gomez was driving away from me.

MS. YARUSSO:  Q   Okay.

A   So a portion of the first, I don't know, sentence or five words, six words.

Q   Is it true that at some point you fired into the Volkswagen hitting Marco's chest puncturing his

Page 192

lung and fatally killing him?

MS. REICH:  Objection, speculation, competence, foundation.

You can answer.

THE WITNESS:  That's what I was told the ME's office said what happened.

MS. YARUSSO:  Q   Okay.  So your denial of that paragraph is that those two things did not occur simultaneously, is that what's inaccurate about that paragraph as far as you're concerned?

MS. REICH:  Objection, mischaracterizes his testimony.

You can answer.

THE WITNESS:  I'm saying that without cause or provocation I think is false.  Him driving away from me is true at one point during the encounter.  That I fired into the Volkswagen is true once the car was put in drive and came toward me.  Hitting Marco's chest is true based on the ME's report.  Puncturing his lung is true based on the ME's report.  And fatally killing him is true based on the ME report.  When I say ME, I mean medical examiner.

MS. YARUSSO:  Q   In paragraph 16 it says, when Defendant Miller shot Marco, Defendant Miller was not

Page 193

in front of the vehicle.

On what basis do you deny that paragraph?

MS. REICH:  Objection, foundation, competence.

You may answer.

THE WITNESS:  I was in front of the vehicle.  It says when I was -- I was not in front of the vehicle.

MS. YARUSSO:  Q   Okay.  So is it -- do you maintain that when you shot Marco you were always in front of the vehicle?

MS. REICH:  Objection, foundation, speculation, competence.

THE WITNESS:  I maintain that I began firing into the front of the vehicle and continued firing simultaneously -- I can't say the word.  I continued firing as either I moved my legs and/or me firing into the vehicle caused Mr. Gomez to turn the wheel and not strike me.

MS. YARUSSO:  Q   So at some point do you agree that you were firing into the vehicle and you were no longer in front of the vehicle?

MS. REICH:  Objection, foundation, speculation, competence.

You can answer.

THE WITNESS:  In the moment, no, I disagree with

DANIEL MILLER                                           March 27, 2019

Page 194

that, but I would say that based on having two rounds go through the driver window, that I fired -- that the rounds were fired while I was not directly in front of the vehicle.

MS. YARUSSO: Q  And when you say go through the driver's window, you mean like the side window as opposed to the windshield, correct?

A  Correct, two in the windshield, two in the side -- two in the driver.

Q  When did you learn that two rounds went through the driver's window?

A  I knew that right away.  I knew that on scene.

Q  Because you -- when you approached the vehicle you saw that?

A  I saw that when I approached the vehicle, I saw that when I walked away from the vehicle.  I know it was identifiable that there was rounds in the driver window.

Q  So you observed that even before you pulled Marco from the vehicle?

A  That I don't recall.  I don't recall if I observed it when I was pieing the car, when I approached the car, when I opened the door, but at

Page 195

some point on scene, whether it was before or after the chest compressions and me stopping, I observed that there was two windows -- two shots that went through the window.

Q  Through the driver's side window?

A  Correct.

MS. YARUSSO: Okay.  I'm done with Exhibit 3.
        (Whereupon, Miller Exhibit 4 was marked for
        identification.)

MS. YARUSSO: Q  I'm tendering you Exhibit 4.

A  You want your 3 back?

Q  Sure.

A  You want 1 and 2 back too?

Q  Yes.  Thank you.

A  There you go.

Q  Miller Exhibit 4 is Daniel Miller's Response to Plaintiff's First Set of Interrogatories.

        Do you recognize this document?

A  Yes.

Q  Turning to page seven, is that your signature?

A  Yes, ma'am.

Q  And before signing this document, did you read and review it for accuracy and completeness?

Page 196

A  Yes, ma'am.

Q  Okay.  Let's turn to page two, paragraph three and the answer, page two, paragraph three and the answer.

A  I'm sorry, page two, paragraph three, answer, middle of the page?

Q  Uh-huh.

A  Defendant objects to?

Q  And then it -- defendant refers plaintiff to his statement to the Illinois State Police and the ISP investigative file, comma, and a YouTube video and an NBC Chicago News segment.

        Do you see that?

A  Yes.

Q  How were you aware of these two items that are referred to in answer to number three?

A  I've seen them on YouTube and NBC Chicago through -- go ahead.

Q  Did someone bring them to your attention or did you find them yourself?

A  No, I -- I don't recall.

Q  They both contain -- or they each contain a civilian talking about some aspect of the event that they witnessed or claim to have witnessed, correct?

Page 197

A  Yes.  I'm not sure.  There is two different -- of all the videos that I've seen, there's two different so-called witnesses that saw the incident take place.  I'm not sure which one's which.

        One of them is a guy who has no clue what he's talking about in my opinion, he wasn't there, he just made it up.  And the other one saw some of the incident just based on his comments and my belief.

Q  Okay.

A  The guy I'm talking to, the guy in the Cub's hat specifically was not there.

Q  Something doesn't make sense?

A  Yeah.

Q  Okay.  All right.  That's what I wanted to know on that one.

        Okay.  Number ten on page four, and the answer refers to the civil lawsuits that we talked a little bit about earlier in your deposition?

A  Yes, ma'am.

Q  So we see the Johnson V Becker case, and that's a case that you gave deposition testimony in, correct?

A  I believe so, yes.

Q  And then the Schmidt case we already talked

DANIEL MILLER                                      March 27, 2019

Page 202

about that incident and tell you how it should have been handled any differently?

A   Yeah, I was spoken to about how to handle him if he comes back or if someone else tries to do the same thing.

Q   And what were you told to do differently or what was -- what happened in that communication, what were you -- how were you counseled?

A   How did the incident happen you're asking or --

Q   No, how were you counseled as far as the personnel matter?

A   I was spoken to with -- by supervisors. I'm not sure which. I think Tom -- Chief Aftanas was one. Informed that I shouldn't have followed the subject around the station once he decided it was time for him -- once he decided to begin leaving the scene.

Q   Anything else?

A   Not that I can recall.

Q   And so there was no specific direction as far as verbally, your verbal interaction with him or things to say differently or do -- other than just not follow him around?

Page 203

MS. REICH: Objection, form.

THE WITNESS: Not that I can recall.

MS. YARUSSO: Q   In -- on page 5 in answer to question 14 -- well, first of all, question 14 is asking -- let's look at the answer. There's a sentence that begins, defendant further objects because the policies, procedures and orders are guidelines upon which Gomez forced defendant to make split-second decisions in order to prevent death or great bodily harm to himself and the public.

Do you see that sentence?

A   Yeah. Let me just read it real quick one more time, I'm sorry. Okay.

Q   Can you explain to me what that sentence means? What is that sentence saying?

A   So I object to the question, defendant objects because the policies, procedures and orders are guidelines, so the policies of the Forest Park Police Department is not law, it is guidelines.

So let's just use as an example the policy we've been talking about, the vehicle pursuit policy. There's a policy that says I'm not -- I should not engage in a pursuit which could lead to discipline and termination, but if I decided to do so, I would

Page 204

not be charged criminally because the Court says I can pursue a fleeing person, and I don't have to retreat, so that's that portion.

Gomez forced me to shoot because he put the car in drive, he put the car in drive.

Q   Okay.

A   So that made me make a split-second decision to fire my weapon.

Q   Was there anything that Gomez did that you shot him to prevent death or great bodily harm to the public?

A   Yes. He showed a complete disregard for traffic by doing -- being in a hit and run, fleeing from the police in Chicago, putting the car in reverse without ever looking behind him to see if there's any pedestrians and/or vehicles, hit a curb and/or went on top of the curb and then attempted to run me over inside the vehicle.

Q   Okay. But hitting a curb, so let's just take it apart, hitting a curb is not great bodily harm or death to the public, correct?

A   No, but --

MS. REICH: Objection. That mischaracterizes and misstates his answer.

Page 205

MS. YARUSSO: Q   I'm not. I'm asking a new question and answer, so it's not mischaracterizing anything. These are new questions and answers.

Gomez did not in hitting the curb, did not do anything that risked -- that required you to shoot him to prevent death or great bodily harm to the public, correct?

MS. REICH: Objection to the form and to the extent that it does not include all the facts in evidence.

You may answer.

THE WITNESS: No. It was the totality of the circumstance at the time.

MS. YARUSSO: Q   And I am never going to ask a question and it's impossible to include everything that's in evidence, so that's not what these questions are about, but anyway.

In the hit and run, you don't know what -- when you were apprehending or approaching Gomez and certainly when you shot him, you had no details about what, if anything, occurred in the hit and run that you had received information about over the dispatch prior to interacting with him, correct?

A   Not that I recall. I remember just hearing

DANIEL MILLER
March 27, 2019

Page 206

hit and run, stolen vehicle fleeing Chicago toward Oak Park.

Q  Okay.  When you shot Marco Gomez, was he doing anything in that moment that threatened death or great bodily harm to a member of the public?

MS. REICH:  Objection, speculation.

THE WITNESS:  At that moment, he was only -- at that exact moment, he was only putting me in harm's way.  If he would have escaped, he would possibly be putting the public at risk based on his driving.

MS. YARUSSO:  Q  Well, did you believe that you would have been justified in shooting him dead to prevent his escape?

MS. REICH:  Objection, mischaracterizes his testimony and argumentative.

You may answer.

THE WITNESS:  I'm not -- if I wasn't in front of the vehicle and I wasn't at risk, no, I probably would not have shot at the vehicle for him fleeing, but I believe that him fleeing would have put people at risk.

MS. YARUSSO:  Q  And separate question, whether you probably would or wouldn't have, do you believe you would have been justified in doing so?

Page 207

MS. REICH:  Objection, incomplete hypothetical.

MS. YARUSSO:  Q  Let me ask the question too because now my question doesn't have the information in it.

But for you -- your claim that you were in front of the vehicle and, therefore, Michael Gomez put you in fear of death or great bodily harm -- strike that.  Well, let's ask this.

If you hadn't put yourself in front of the vehicle and Marco had proceeded to start driving off, do you believe you would have been justified in shooting him?

MS. REICH:  Objection, incomplete hypothetical.

You can answer.

THE WITNESS:  I -- whether I'm justified or not, I wouldn't be able to make a determination.  I think that's a legal question.

Would I have shot him, my answer is no specifically, especially with the way that we police today, the answer is -- and the way the public is that I would say no, I would not have shot, and I would be way more concerned of the legalities of that shooting if I did, in fact, shoot him.

MS. YARUSSO:  Q  And putting aside legalities

Page 208

and whether something constitutes criminal conduct or constitutional law because actually, this interrogatory is about the policies and procedures of the police department, it would have been -- and you learn about excessive force in the police department, you're trained on it in the academy, you have various general orders and policies that tell you how to determine what reasonable force is in a given situation because you have to do that not only because of the constitution, but also to be in compliance with your police department's procedures, training and policy, correct?

MS. REICH:  Sorry, can you read that back, please?

MS. YARUSSO:  Q  I'm just going to have to do this the longer way.

Okay, you were trained, you were trained in the academy on the use of reasonable force and excessive force, correct?

A  That's correct.

Q  And you also -- there are also Forest Park Police Department general orders and policies and continued training on using reasonable force and not using excessive force, correct?

Page 209

A  That's correct.

Q  And they give you guidance along a use of force continuum about what sort of force is reasonable in certain circumstances from along a continuum from the lowest amount of force all the way up to deadly force, correct?

A  Yes, there's a policy that dictates -- or there's policies in place that talk about least -- less lethal force moving up to lethal force.

Q  And then there's also the constitution, the Fourth Amendment that requires officers not to commit an unreasonable seizure on a citizen which includes excessive force, which you know about?

A  Correct.

Q  Okay.  And then there's criminal law that has its own standard as to what could be the crime of murder or a policeman's conduct or a number of other things that could fall under some sort of criminal statute that could lead to a criminal charge, correct?

A  Correct.

Q  Okay.  Based on your training and experience as a police officer as to what constitutes excessive force, in particular the use of deadly force, would