Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ESTATE OF MARCO GOMEZ, Deceased,        )

by DAISY PEREZ, Independent             )

Administrator,                          )

                    Plaintiff,          )

    -vs-                                ) No. 18 C 910

VILLAGE OF FOREST PARK and              )

DANIEL MILLER,                          )

                    Defendants.         )

_____

        The FRCP 30(b)(6) deposition of the Village

of Forest Park, by CHIEF TOM AFTANAS, called by the

Plaintiff for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before Patricia M. Stone, a

Certified Shorthand Reporter of the State of

Illinois, at 517 Des Plaines Avenue, Forest Park,

Illinois, on the 15th day of October, 2019 at the

hour of 10:03 o'clock a.m.

REPORTED BY:  PATRICIA M. STONE, CSR
LICENSE NO:   084-002880
JOB NO:   846083

U.S.

**EXHIBIT**
**3**

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 10

30(b)(6) witness regarding the subjects that were noticed as part of the deposition in this case?

A. I -- I approve -- review and approve all of the policies of the police department.

Q. How long have you worked at the Village of Forest Park Police Department?

A. Just over 28 years.

Q. Prior to your employment with the police department, did you have other employment?

A. Yes.

Q. What was it?

A. I worked security at Chicago Ridge Mall. I was a reserve officer for the Village of Stickney and various part-time jobs as a teen.

Q. Is the prior employment as security at Chicago Ridge Mall and a reserve officer for Stickney, is that all of the sort of law enforcement or even security-type work that you've done other than your employment with the Village of Forest Park?

A. For a brief time, I worked for Pinkerton Security. I want to say that was at a UPS facility in Bedford Park.

Q. Did you know that you wanted to go into law

Page 11

enforcement from a young age?

A. I -- I would say probably around high school.

Q. And what was it that -- was there anything specifically that drew you to that career?

A. I grew up on the southwest side of Chicago, and the area I lived in has a lot of -- did have a lot of Chicago police and Chicago fire living in the neighborhood.

One of my dad's friends was a Chicago police officer, and just listening to his stories it just interested me.

Q. What was the neighborhood that you grew up in?

A. Garfield Ridge.

Q. Okay. When did you move away from Chicago?

A. Approximately '92 or '93.

Q. And what caused you to move away from Chicago?

A. I started working here in the Village of Forest Park in '91. And at that time, there was a residency requirement where we had to live in the Village of Forest Park.

Q. And you had a certain amount of time to move

Page 12

to establish residency?

A. Yes.

Q. Was your first job for Forest Park working as a police officer?

A. Yes.

Q. And then over your employment history with the Village of Forest Park, I assume you moved up from an entry level beat officer through the ranks to the position that you hold now?

A. Correct.

Q. And what is the position that you hold now?

A. I am the chief of police.

Q. How long have you been the chief of police?

A. Just over four years.

Q. What is the Village of Forest Park's chief of police's duties?

A. To oversee the overall operations of the police department, budgeting. As I said, I review and approve policy, some hiring and firing, discipline, any other things that come up on a day-to-day.

Q. What position did you hold prior to chief?

A. I was the deputy chief of police for nine years.

Page 13

Q. And how do the deputy chief's duties differ from the chief's duties?

A. In a lot of ways, they're similar. The deputy chief also oversees the Internal Affairs investigations.

Q. So that is something that the chief does not do?

A. Correct.

Q. Did you have to complete any special training to become deputy chief?

A. No.

Q. Did you have to complete any special training or education to become chief?

A. No.

Q. How did you become deputy chief?

A. The chief of police at that time came to me and told me he wanted me to be the deputy chief. I was a sergeant at that time. So it is an appointed position. So the chief of police eventually appointed me as the deputy chief.

Q. And who was that?

A. Jim Ryan.

Q. When you were -- when Chief Ryan told you that he wanted you to be deputy chief, were you --

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 26

BY THE WITNESS:

A. I'm sure there are some similarities. Exactly what, you know, what they are, I don't know.

BY MS. YARUSSO:

Q. Well, when you drafted it in the early 2000s, was it -- were you drafting it for the first time for the village meaning there wasn't an existing vehicle pursuit policy at that time?

A. I don't specifically recall. I would believe that there was a pursuit policy, but I -- I don't recall if it was a brand new policy. I think it was probably replacing an old policy.

Q. What materials or information did you use to draft the policy?

A. I obtained a policy from the Illinois State Police.

Q. Why did you do that?

A. To have some kind of template and idea on what their practices were so I can utilize it for Forest Park.

Q. And was that the only sort of information or resource that you accessed when you drafted that vehicle pursuit policy in the early 2000s?

A. I -- I may have gotten sample policy from

Page 27

another police department. Specifically I don't recall though.

Q. And then when you drafted the policy for the Forest Park Police Department on vehicle pursuit in the early 2000s, did you make changes to what you obtained from the Illinois State Police policy or did you adopt it wholesale?

A. I don't specifically recall if I changed anything. Well, yeah, I don't specifically recall.

Q. Does a deputy chief also have a role in reviewing and proving policy?

A. I have the deputy chief review policy.

Q. So is it fair to say that from the time that you were a deputy chief you were involved in reviewing policy for the Forest Park Police Department?

A. I -- I don't -- I don't recall reviewing every policy before Jim Ryan approved the policies.

Q. Do you recall reviewing some policies as deputy chief?

A. At times, the lieutenant would ask me to do -- just do a quick review for any typos and grammatical errors, but I can't say that I reviewed every single policy before Jim Ryan reviewed and

Page 28

approved.

Q. So when you were deputy chief, was Jim Ryan the chief?

A. Yes.

Q. For the entire time that you were deputy chief?

A. Yes.

Q. And then did he retire?

A. He did.

Q. And then did you subsequently become chief?

A. I did.

Q. And did that take place without gap, you know, directly in a timely fashion?

A. There was a little bit of a gap. I want to say Jim retired in May, and I was sworn in as chief in early June.

Q. Of what year?

A. 2015.

Q. Okay. But less than a month gap it sounds like?

A. That's fair to say.

Q. How did you become chief? What is the process?

A. Jim Ryan recommended me to the mayor at that

Page 29

time, and the mayor agreed and recommended me to the village council at that time.

Q. And is that something that the council votes on to your knowledge?

A. I believe it was voted on.

Q. So when you were deputy chief under Jim Ryan, did you ever review policy for any substantive content?

A. I don't understand what you mean by that.

Q. Well, you've testified that at times the lieutenant would have you review it for typos and grammatical errors. So that, to me, I would not characterize that as substantive content. You are more just making sure there is no small mistakes in the writing of it as opposed to reviewing it for whether the policy should be this, that, or the other in a substantive manner actual discussions about what the policy should dictate.

Do you understand my question or the distinction that I am making?

A. I do.

Q. So when you were deputy chief under Jim Ryan, did you ever review any Village of Forest Park policies for any substantive content?

CHIEF TOM AFTANAS                                              October 15, 2019
30(b)(6)

Page 78

possible, I would say yes.

Q. In other words, an officer should not deliberately when given the choice put themselves in front of a vehicle in order to stop it from fleeing?

A. I would say yes.

Q. And that is the policy, practice, and procedure today in the Village of Forest Park Police Department and it was the policy and practice back in January and February of 2017 at the Village of Forest Park Police Department, correct?

MS. REICH: Objection. That misstates and mischaracterizes his testimony. You can answer.

BY THE WITNESS:

A. It is current policy, but it was not policy in January or February -- beginning of February of 2017.

BY MS. YARUSSO:

Q. Okay. Was it the unwritten policy and the actual practice in January and February of 2017 that an officer, when given the choice, should not deliberately put themselves in the path of a vehicle to prevent its escape?

A. I would agree with that.

Q. And how was it that an officer was aware of

Page 79

that practice and unwritten policy back in January and February of 2017?

A. Again I would just go back to an officer's experience. I don't know of any specific training, you know, that touches on it. I think at some time training does touch on it, but I don't have specifics.

Q. Is it something that you've ever had occasion to instruct or inform or counsel officers on?

A. Not that I recall.

Q. Have you had occasion to instruct or counsel officers on actual vehicle pursuits that they have engaged in and whether they are in accordance with the village's policies and practices?

A. For vehicle pursuits, yes.

Q. Okay. And how is it that you have had occasion to do that?

Is that part of your regular duties?

A. The -- the majority of it falls on the lieutenant and the deputy chief; and if there is a question of whether or not the policy was violated, I also review the pursuit forms. And if there is a question, it's investigated a little further.

Page 80

Q. And so the occasions where you have been involved in, are those occasions when there was a question so there was a further investigation and referral to you?

A. Yes, but I also -- even the pursuits that are in compliance with the policy I do sign off. I review and sign off on the pursuit analysis forms.

Q. Can you give me an example of an instance where you've counseled an officer about something, a vehicular pursuit scenario, that there was a concern that it was not in accordance with the policy and practice?

A. Several years ago when I was the deputy chief I believe one of our TAC officers chased a car that was involved. I want to say for a hit and run. I think there was some form of discipline issued. I can't remember exactly what it was. That was years ago.

More recently I want to say maybe a year or two or something maybe the same thing. Another officer chased a car. It was not suspected of committing a forcible felony.

Q. Okay. So in the more-recent one, the main aspect of how it was not in line with the policy was

Page 81

that there was a pursuit of a car that was not suspected of a forcible felony or the individual inside, correct?

A. Correct.

Q. Do you recall what aspect of the other incident that you mentioned, the other example that you provided, in what aspect there was a concern that that was not in line with the policy?

A. Again it wasn't for a forcible felony.

Q. Okay. So the same issue.

How does -- so in those circumstances in vehicle pursuits, those instances are coming to your attention because the officer is always going to be reporting on a vehicle pursuit?

A. Correct.

Q. And then it is just a procedure of the police department to review all of those, and you are one of the individuals that reviews all of those as well as the lieutenant and deputy chief. Is that right?

A. Correct.

Q. Does the same hold true for use of force that an officer is always going to have to report on a use of force and then it is subject to that

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 82

chain-of-command review?

A. It is supposed to be documented in the report. If there is either a complaint or a question about the use of force, then it is investigated further.

Q. So with the vehicular pursuit, there is an actual separate form that the officer uses to report about the vehicular pursuit, correct?

A. Correct.

Q. In addition to the regular police report that they would do regarding the incident?

A. Yes.

Q. But with a use of force, it is just documented in their general report about the incident, and there is not a separate form that is used is my understanding, correct?

A. Partly, yes. There is a separate form that is filled out when an officer uses a TASER.

Q. Any other types of force that require a separate form to be filled out?

A. When we used to have the OC spray, there was a separate form for that as well.

Q. Is there a separate form for the use of a firearm?

Page 83

A. No.

Q. And do you have an understanding of whether not having a separate use-of-force form for uses of force such as a firearm or any other use of force except for the TASER whether that policy and practice of not requiring a separate use-of-force form comports with national policing standards regarding policies?

A. I -- I don't know.

Q. How does the village police department ensure, if it does, that all uses of force are being reviewed by the chain of command?

A. Well, on a daily basis, every report is reviewed by the chain of command. Lieutenants, the deputy chief, and myself review every single police report.

Q. And is there any sort of policy that requires that that review include specifically a review for whether the use of force was in compliance with policy and other standards?

A. No. There is nothing that requires every use of force to be investigated.

Q. I'm not asking about an investigation because I understand that that -- at least I would

Page 84

understand that that is a more involved process than simply reviewing something meaning looking it over and signing off on a report, for example.

So I am not asking about investigations. I'm asking whether when an officer's report is reviewed by the chain of command at the police department does that review necessarily include a review of the officer's reported use of force?

A. Well, I mean, it does just by reading the report. You know, if the sergeant doesn't bring any concern up the chain of command, nothing else is looked into unless there is some kind of a complaint filed. Otherwise, we would be doing an investigation on every use of force.

Q. At the police department, is it your understanding that the supervising officers know that when the reviewing officers report that they are, as part of their review, reviewing and approving the reported use of force?

A. Yes. If it is documented in the narrative that force was used, some type of force was used, they are taking the officer at his or her word.

If there is any question, then they may advise the lieutenant or ask the officer

Page 85

themselves.

Q. Right.

So if the supervisory officers are reviewing an officer's reported use of force and they have a concern that it somehow does not comport with policy or is otherwise a concern, they could and should use that opportunity, the review process, to bring the matter to your attention?

A. Correct.

Q. And they know to do that because that is the practice at the police department or because there is an actual written policy or some other way?

A. Both. It is practice and I believe it is stated in policy, yeah.

Q. And if a supervising officer does have a concern about an officer's reported use of force, what process do they follow?

Do they file something in writing?

A. Yes.

Q. What is that something?

A. They can either send an e-mail or a memorandum to the lieutenant.

Q. Have you, in your experience, seen that occur?

CHIEF TOM AFTANAS                                    October 15, 2019
30(b)(6)

Page 90

Q. If the lieutenant is the individual accused of a use-of-force violation or other misconduct, is the deputy chief still the one to do the -- lead the investigation and conduct interviews?

A. I would say yes.

Q. And then what about the patrol lieutenant? Why do you say those interviews are also done by the patrol lieutenant?

A. We usually have two people sit in on the interviews. So it's usually the deputy chief and the lieutenant.

Q. Okay. So together?

A. Correct.

Q. And what is the purpose for having two people?

A. I think just to have -- it is good to have a second person there in case somebody else, either the deputy chief or the lieutenant, thinks of another question that wasn't asked.

Q. Do both individuals document or otherwise record those interviews?

A. Most of the time, yes.

Q. Do they consult with each other to ensure that their documentation is similar or other

Page 91

recording of the interview is similar or do they do their reports and keep them separate from each other?

MS. REICH: Objection to the extent that it mischaracterizes his testimony. You can answer.

BY THE WITNESS:

A. There is one -- if it is recorded, there is one recording and only one does the report.

BY MS. YARUSSO:

Q. So they both might take notes?

A. Possibly.

Q. Well, if there is no recording, do both individuals attempt to make a record of the interview? Is that the practice or policy?

A. No. Usually one does the report.

Q. Is there a policy or practice dictating whether an interview -- an internal investigation is recorded?

A. No.

Q. And is that true regardless of who is being interviewed?

A. There is nothing that states that it has to be recorded.

Page 92

Q. Are interviews typically recorded during internal investigations of use of force?

MS. REICH: Can I clarify something? By recorded, do you mean like audio recording or memorialized in some way? I'm not sure.

BY MS. YARUSSO:

Q. I mean, in answer to my question, you made a distinction between a recording and a report. So I thought when we were talking about recording we were talking about actual real recording, a video or audio record. Is that what you understood?

A. I did.

Q. Okay. So when you have been answering that question, that's what you have been answering?

A. Yes.

MS. REICH: Okay. Thank you.

BY MS. YARUSSO:

Q. So there's nothing that says it has to be recorded meaning audio, video, or somehow actually saved rather than just summarized in a report. Typically are interviews recorded?

A. Yes.

Page 93

Q. And how is it that they are typically recorded?

A. Usually recorded on a digital recorder.

Q. And they are typically recorded because typically is it -- is it accurate to say that the preferred practice is to record them, and then you ask permission of the interviewee to do so. And if they consent, it's recorded?

A. That's generally how it goes, yes. They receive permission. They record it.

Q. So is it true that the practice is to record whenever possible?

MS. REICH: I'm going to object. That mischaracterizes his previous testimony. You can answer.

BY THE WITNESS:

A. In most cases, yes.

BY MS. YARUSSO:

Q. Can you think of any specific circumstances that would -- where it would not be recorded other than the person just not consenting? Like are there some sort of special circumstances that dictate that it cannot or won't be recorded?

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 94

A.  Well, in this case, it was not recorded.

Q.  In what case?

A.  The Gomez case.

Q.  What wasn't recorded?

A.  The investigation.

Q.  Oh, meaning all of the interviews?

A.  That's correct.

Q.  And that's unusual or atypical according to the practice.  Is that right?

A.  I wouldn't say unusual.  In most cases, they are recorded.

Q.  And when you say -- when we are talking about the interviews, are you talking about the interviews in this case that Detective Petrovic and any other Forest Park officers conducted or are you talking about the interviews that were conducted by the Public Integrity Task Force?

A.  Both.

Q.  But as far as what's typically done and what the preferred practices are, you are referring to Forest Park police officers I am assuming or you are also referring to the PITF which is comprised of the Illinois State Police and Cook County State's Attorney's Office agents?

Page 95

A.  I'm sorry.  You kind of confused me there.

Q.  Okay.  So you've testified that typically interviews are recorded on a digital recorder, that it is the practice to do it whenever possible for the most part, but that in this case that didn't happen.  The interviews were not recorded.

Now, I understood you to be talking about Internal Affairs investigations conducted by the Forest Park Police Department because that's how the questioning and answering began.

A.  Correct.

Q.  But in this case, obviously there was an investigation that also included the Public Integrity Task Force comprised of the Illinois State Police and Cook County State's Attorney's Office investigators.

So when you were saying that typically interviews are recorded on a digital recorder and that's the practice, you were talking about the Forest Park Police Department's internal investigations, right?

A.  Correct.

Q.  And that didn't happen in this case when Detective Petrovic and anybody else in the department

Page 96

conducted interviews, correct?

A.  I don't believe it was recorded.

Q.  Do you know why?

A.  I don't know why the Public Integrity Unit or Detective Petrovic did not record it.  I don't know.

Q.  So is it your experience that the Public Integrity Task Force agents also record interviews?

A.  I don't know what they do.

Q.  What role did you play in the investigation of Miller's fatal shooting of Marco Gomez?

A.  We based the outcome on the interviews that were conducted by Petrovic and the state police.  That's what we used in the Internal Affairs investigation.

Q.  But what would you say your role is as far as an internal investigation?

I mean, in this case, did you oversee it step by step?

A.  Yes.

Q.  And is that typical that that's the usual practice at the department?

A.  Yes.  This was an extremely severe case.  I mean, this is a shooting that involved a death.  So

Page 97

obviously I tried to pay attention every step of the way for this case.

Q.  And at some point during the process, did it come to your attention that the interviews were not being recorded?

A.  I don't know.  I don't know if the state did record them or not.  I don't believe they did, but I am not 100 percent sure.

Q.  Well, what about your own officers conducting interviews and not recording them?  When did that come to your attention?

A.  I believe they sat in with the state when Officer Miller was interrogated by the state investigators.

Q.  Oh, okay.

Other than Officer Miller, other individuals were interviewed as part of this investigation, correct?

A.  Correct.

Q.  And Forest Park police officers conducted interviews of other individuals, correct?

A.  Yes.

Q.  And they did not record those interviews, correct?

CHIEF TOM AFTANAS  
30(b)(6)

October 15, 2019

Page 98

A.   Correct.

Q.   When did it come to your attention that they were not recording the interviews of any of the witnesses in this incident?

A.   I don't remember exactly when, but the detectives wouldn't record every interrogation or questioning of witnesses.

Q.   I thought that you previously testified that typically interviews are recorded on a digital recorder and that is the typical practice whenever possible.

A.   When someone from Internal Affairs is doing the actual questioning, yes.

Q.   So why wasn't someone from Internal Affairs doing the questioning in this case?

A.   Like I said, we based our investigation on what was told to the detectives in this case because a lot of these witnesses were interviewed at least two, sometimes three times previously either by the state and then our detectives.  So we used their interviews.  Their summaries of those interviews we used for our Internal Affairs.

Q.   Why did the detectives do the interviewing?

A.   To basically do the -- even though Mr. Gomez

Page 99

was deceased, still to do a criminal investigation on what crimes were committed, if any, by Mr. Gomez.

Q.   So is it fair to say that the interviews that the detectives were investigating were for that purpose and not for the purpose of an internal investigation into the -- into whether the use of force was proper?

A.   That was their main purpose, yes.

Q.   Did anyone from the Forest Park Police Department conduct interviews for the purpose of determining whether Officer Miller's use of force was proper and in line with the department's policy and practice?

MS. REICH:  Can you read that back, please?

(WHEREUPON, the record was read as requested.)

BY THE WITNESS:

A.   I would say directly no.  But, as I said, we used what was told to the state and to the detectives in our internal.

BY MS. YARUSSO:

Q.   And has that happened in other officer-involved shootings that Internal Affairs didn't conduct separate interviews to determine

Page 100

whether use of force was justified and in line with department policy?

A.   Yes.  I believe so.

Q.   Can you give me an example?

A.   One of our detectives was involved in a shooting I believe in 2016, and we based the Internal Affairs results on the same, on interviews that were conducted by the state police and detectives.

Q.   So as a result of the fact that the outside agency is coming in to investigate the officer-involved shooting combined with the fact that the detectives are continuing to do a criminal investigation, there's these instances where Internal Affairs does not conduct recorded interviews?

A.   Correct.

Q.   And those are in these what you described as severe cases, a shooting that involved a death.  Is that right?

A.   Correct.

MS. REICH:  I would object to the form of the question.  Sorry.

BY MS. YARUSSO:

Q.   Other than officer-involved shootings, are

Page 101

there any other investigations into police conduct that involve an outside agency doing the investigation?

A.   Yes.

Q.   And what instances are those?

A.   Again severe or potentially criminal allegations made against an officer, more of the serious allegations.  Sometimes we may have someone from the outside do an internal.

Q.   Who makes the decision of whether to involve an outside agency in an internal investigation?

A.   I would say it starts with the chief of police and probably also involves the village administrator and possibly the mayor.

Q.   For officer-involved shootings, do you need to consult with the village administrator and the mayor about whether to involve an outside agency in the investigation?

A.   In an internal, no, no.

Q.   I didn't understand your answer.  So, okay, let me ask this.

We have been talking about internal investigations and Internal Affairs.

Is Internal Affairs the only way in

CHIEF TOM AFTANAS 30(b)(6)

October 15, 2019

Page 102

which the Forest Park Police Department or the Village of Forest Park investigates officer misconduct?

A.   It's not the only way, no. As I said, we can have an outside either agency or investigator conduct an internal.

Q.   When you say, "conduct an internal," what do you mean?

A.   Conduct an internal investigation to determine if policy was violated.

Q.   So you still call it an internal investigation even though you're involving an external agency?

A.   Yes.

Q.   But in a sense, there is just the one mechanism which is the Internal Affairs Department led by the deputy chief for investigating officer misconduct. Is that right?

A.   Yes.

Q.   Okay. Some police departments might have a certain procedure for some kind of officer misconduct and a certain procedure for misconduct involving force and so on, but the Forest Park Police Department it is just the one Internal Affairs

Page 103

Department headed by the deputy chief, correct?

A.   Yes.

Q.   And then there may be, in those investigations, there may be some times in which the department will enlist or refer an investigation to an external agency?

A.   Correct.

Q.   Okay. And those instances are instances where there are serious allegations such as potential criminal conduct and officer-involved shootings, correct?

A.   I wouldn't say the officer-involved shootings, no.

Q.   So officer-involved shootings do not necessarily involve an external agency to do the investigation?

A.   To do the internal investigation, no.

Q.   Well, what makes something an internal investigation?

A.   An internal investigation is done to try and verify whether an officer violated policy.

Q.   And what are the potential results of the internal investigation?

A.   The results can be unfounded where there is

Page 104

no evidence that policy was violated. There could be a policy failure. It can be sustained or a founded complaint where some type of violation did occur. I believe there's one other outcome that I can't remember right now.

Q.   So unfounded means there is no evidence, correct?

A.   Yes.

Q.   So as a result of the investigation, you couldn't find any evidence, and that would include witness statements that there was any kind of a policy violation?

A.   Correct.

Q.   And then what is a policy failure?

A.   A policy failure is where some kind of act did occur but a policy didn't prohibit it at the time.

Q.   So that might be an instance where this isn't desirable officer conduct but it was more the lack of a policy that guided the officer rather than the officer's violation of a policy?

MS. REICH:   Objection. That mischaracterizes his testimony. You can answer.

MS. YARUSSO:   That's my question.

Page 105

BY THE WITNESS:

A.   It can -- it can mean that the officer did do something, either did or did not do something, but because it wasn't in a policy or prohibited in a policy there is really no violation.

BY MS. YARUSSO:

Q.   And then if the outcome is sustained or founded that a violation occurred, what are the possible consequences or results of a violation?

A.   Some form of discipline.

Q.   What was the outcome of the investigation into Officer Miller's shooting of Marco Gomez?

A.   It was unfounded. There was no evidence to show that any violation of policy occurred.

Q.   And who made that decision?

A.   Well, the deputy chief and the lieutenant in their Internal Affairs report found nothing; and when I read it, I concurred with their findings.

Q.   Did you consider an outcome of policy failure?

A.   No.

Q.   Why not?

A.   Because our policy states that if the officer uses lethal force and feels that it was

Page 106

objectively reasonable and necessary to do so to either prevent someone from being killed or himself from being killed or seriously injured that it's justified.

Q. Did you only look at whether the deadly use of force was within the policy or did you look at any other conduct of Officer Miller in the incident?

A. Basically the use of force.

Q. So is it fair to say that Officer Miller's decision to attempt to block the path of Marco Gomez's vehicle with his body was not reviewed?

A. I don't believe --

MS. REICH: I'm going to object to the form of the question, argumentative.

You can answer.

BY THE WITNESS:

A. I don't believe he did do that to block him.

BY MS. YARUSSO:

Q. And what do you base that belief on?

A. On the interview of Miller as well as the video of the incident.

Q. Does the -- so in the instance where an

Page 107

external agency is used to do an internal investigation, that's different than what occurred in the investigation of this shooting by Officer Miller. Is that right?

A. Yes.

Q. How?

A. Can you repeat or read back the prior question?

Q. Well, I'll just try to ask some questions.

MS. REICH: I want to hear it back.

MS. YARUSSO: Okay.

(WHEREUPON, the record was read as requested.)

BY MS. YARUSSO:

Q. Do you need me to clarify?

A. No. I think I understand.

In some cases, an external -- I wouldn't even say an agency. We've had a private individual do -- conduct an internal investigation before.

Q. And in that circumstance, was it because there was potential criminal conduct?

A. Well, yes. There was a potential -- there was a criminal investigation as well going on.

Page 108

Q. And was that the reason to have the private individual conduct the internal investigation or were there other reasons as well?

A. I think there were other reasons as well.

Q. Do you remember what those other reasons were?

A. They involve criminal sexual assault allegations; and based on the severity of those allegations, we wanted someone from the outside to conduct the investigations so that if nothing was found that there wouldn't be any allegation against us of trying to cover anything up or a conflict of interest or anything like that.

Q. What title or professional experience did the private individual have?

A. I believe he was a retired lieutenant colonel with the state police.

Q. And when you say that person conducted the investigation, that means they conducted the interviews. Is that right?

A. Yes.

Q. Anything else?

A. If there was any video related to it, you know, that was also obtained.

Page 109

Q. So interviews and all evidence collection?

A. Correct.

Q. What about the actual review of the evidence collection and determination as far as an outcome?

A. I'm not sure I understand.

Q. Who did that?

A. Who obtained evidence?

Q. No.

It is my understanding that the private individual obtained the evidence, collected the evidence, and conducted the interviews.

A. Some, yes.

Q. Did the private individual do anything else besides collect evidence and conduct interviews?

A. Put it down in writing, wrote a report on it.

Q. Did the private individual have any involvement in the decision-making as to whether -- as to the outcome of the investigation?

A. Yes. From what I understand, they did put a recommendation whether or not policy was violated.

Q. Okay. So is that the distinction?

When you are saying an external individual conducts the internal investigation, is

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 110

it that they are actually involved in recommending an outcome in addition to conducting evidence collection and witness interviews as opposed to what occurred in the instance with Miller where an outside agency was involved in interviews and evidence collection but not in any ultimate recommendation or finding?

A. Right. The outside agency -- the state police did not give a recommendation based, you know, on policy.

Q. So in that respect, you don't consider them to be involved in the internal investigation even though the internal investigation relied on their interviews and evidence collection?

MS. REICH: Objection.

BY MS. YARUSSO:

Q. Is that an accurate summary?

A. Not entirely.

MS. REICH: Sorry. Let me object. Mischaracterizes his testimony, argumentative. You can answer.

BY THE WITNESS:

A. Not entirely because they did do interviews. We used those interviews, but they -- they weren't

Page 111

doing it. The purpose for their interviews were for their criminal investigation, but they served the same purpose for us as well.

BY MS. YARUSSO:

Q. Do you have to notify an external agency in the event of an officer-involved shooting?

A. Yes.

Q. Who do you have to notify?

A. The state police.

Q. Okay. And did you do that in this instance?

A. Yes.

Q. Did you personally do it or did you direct somebody to do it?

A. No. I believe Lieutenant Gross did it.

Q. Did you instruct Lieutenant Gross to do it or did he do it because he knew that that was something that needed to be done if you know?

A. I'm not 100 percent sure. I don't think I instructed him. I think he just knew.

Q. Before he notified the Illinois State Police, did you speak to him about what to tell the Illinois State Police?

A. No.

Q. What communications did you have with anyone

Page 112

from the PTTF regarding the investigation of Miller's shooting of Marco Gomez?

MS. REICH: We are going off topic again. This doesn't talk about the policies. It doesn't talk about the practices. It doesn't talk about the procedures.

BY THE WITNESS:

A. Do you want me to answer?

MS. REICH: You can answer it, but then we're going to move on.

BY THE WITNESS:

A. I believe that the night of that incident I spoke to a sergeant from the state police and formally put it in writing requesting that they investigate this incident.

BY MS. YARUSSO:

Q. And is that something that you do in any investigation involving an officer-involved shooting?

A. Yes.

Q. Is there a specific policy dictating that you do that or is it the practice and procedure of the Forest Park Police Department?

A. It is in policy. It leaves it open to the

Page 113

possibility of having an outside agency such as the state police conducting it, but we have practiced it in the past.

Q. Did you say it is in policy or isn't a policy?

A. It is in the policy now. That leaves it open. I don't believe it specifically requires it, but it says that -- it leaves it open that they can be called.

Q. But in any event, the practice has been that that's always happened. You've always contacted the Illinois State Police when there is an officer-involved shooting?

A. Yes.

Q. And in that practice and procedure, you do what you did in this instance which is to speak to a high-ranking officer of the state police and put it in writing, the request for their involvement?

A. It was a sergeant with the Integrity Unit. That's who I spoke with.

Q. Right.

And that's part of the usual practice?

A. I don't know if it has to be a high-ranking

CHIEF TOM AFTANAS
30(b)(6)

October 15, 2019

Page 122

Attorney?

A. Yes.

Q. So from your perspective, you were waiting on the State's Attorney's decision?

A. Correct.

Q. And is the typical practice that at some point the State's Attorney communicates to you their decision or that they communicate that to the Illinois State Police who in turn communicate it to you?

A. In the past, we received a letter from the State's Attorney's Office.

Q. Was that same procedure barring the kind of atypical time that it took and apparently a lapse in communicating to you but is that typical practice the same practice that was followed in the instance of the criminal -- potentially criminal sexual assault allegations?

A. Yes. We did get letters from the State's Attorney's Office for the sexual assault.

Q. In an internal investigation of an officer-involved shooting, is there any policy, practice, or procedure that you notify any individuals of the officer-involved shooting whether

Page 123

they be Forest Park employees or individuals from other agencies?

A. Yes.

Q. And what -- first of all, what is the policy, procedure, or practice?

A. In the policy, I believe it lists specific individuals including the State's Attorney's Office. I believe it mentions the village administrator, the ME's office. It may list a couple others as well.

In practice, we notify the mayor as well. I don't go as far as to notify all of the elected officials but, yeah, definitely the village administrator and the mayor. And also if it is an officer-involved shooting, it is going to be the Public Integrity Unit.

Q. And that's what was done in the officer-involved shooting with Officer Miller --

A. Yes.

Q. -- as well?

A. Yes.

Q. It followed the policy and practice?

A. Yes.

Q. Does anything in the department's policy

Page 124

prohibit direct supervisors from conducting an investigation into their -- into the officer -- let me rephrase this.

Does the department policy prohibit a direct supervisor from being involved in the internal investigation of a subordinate officer when that officer is the subject of the investigation?

A. Can you state the question one more time, please.

Q. When an officer is the subject of an investigation, does department policy prohibit that officer's direct supervisor from being involved in the internal investigation as an investigating officer?

A. Not if the sergeant is not involved in it. I don't believe there is anything in the policy that prohibits him and/or her from being involved.

Q. And is it the practice of the department that direct supervisors are involved in investigating direct subordinates for misconduct in internal investigations?

A. In some cases, yes.

Q. Well, when you say in some cases, are there any sort of policies, practices, or procedures that

Page 125

dictate when those -- what those cases would be?

A. Usually if like a patrol sergeant is conducting an internal it could be a more minor use of force that obviously doesn't involve deadly force. It could be, you know, policy related to either attendance. It's something that is usually not as serious.

Q. Are there any policies, practices, or procedures at the police department that are designed to facilitate or encourage officers to be forthcoming when they have concerns that another officer has violated a policy?

A. Yes and no. Yes, not every little policy violation, you know, like I said, an attendance policy. They're not -- there's nothing in there that says that they have to run to a supervisor and say that.

But if there's a -- I believe it does state in policy if there is a question about excessive force or something they are obligated to report that.

Q. And is there anything that is put in practice or any procedures that the department follows to kind of emphasize that, encourage that, or

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #104 | Page 1 |
|---|---|---|
| | VEHICULAR PURSUIT | |

**PURPOSE:** To establish rules and guidelines for the operation of police vehicles during pursuits.

**POLICY:** Vehicular pursuit of fleeing suspects can present a danger to the lives of the public, officers, and suspects involved in the pursuit. It is the responsibility of this Police Department to assist its officers in the safe performance of their duties. To fulfill these obligations, it shall be the policy of the Forest Park Police Department to regulate the manner in which vehicular pursuits are undertaken and performed.

## 104.1    DEFINITIONS

**Vehicular Pursuit:** An active attempt, by an officer in an authorized emergency vehicle equipped with operable emergency equipment (lights & siren), to apprehend an actual or suspected law violator who is attempting to avoid apprehension through evasive tactics (or otherwise is actively attempting to elude the police).

**Police Vehicle:** Any vehicle authorized by the Forest Park Police Department for use by an officer in the performance of his/her duties.

**Marked Car:** A fully identifiable Forest Park Police Department vehicle equipped with roof lights and a siren.

**Semi-Marked:** A Forest Park Police Department vehicle equipped with a siren and emergency lights other than roof lights, but without exterior markings (i.e. "slick-top").

**Unmarked Car:** A vehicle with no distinctive marking, but equipped with a portable flashing light and siren

**Primary Unit:** The police unit that initiates a pursuit, or any unit that assumes control of the pursuit.

**Secondary Unit:** Any police vehicle that becomes involved as a backup to the primary unit and follows the primary unit at a safe distance.



**EXHIBIT**

*4*

Case: 1:18-cv-00910 Document #: 141-3 Filed: 04/29/21 Page 14 of 76 PageID #:653

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #104 | Page 2 |
|---|---|---|
| | VEHICULAR PURSUIT | |

## 104.2    WHEN YOU MAY PURSUE

The Police Department recognizes that vehicle pursuits are one of the most dangerous activities performed by officers in their official duties.

Pursuits may be initiated only when an officer has an articulable reason to believe that the occupant(s) of a fleeing vehicle have committed, or attempted to commit, a forcible felony which involves the infliction, or threatened infliction, of great bodily harm, or is attempting to escape by use of a deadly weapon, or otherwise indicates they will endanger human life or inflict great bodily harm unless arrested without delay.

Pursuits may also be initiated by officers under articulable exigent circumstances only after being authorized by the Watch Commander.

Officers involved in a pursuit shall not proceed in a direction opposite to the flow of traffic on a divided highway unless authorized by the Watch Commander.

## 104.3    FACTORS TO CONSIDER

When initiating a pursuit situation, and at all times during the course of a pursuit, the pursuing officer must take into consideration the following factors:

- The traffic density (volume of traffic)
- Road and weather conditions
- Time of the day
- Reasons for the pursuit
- What speed is required to maintain the pursuit
- Other area factors may include, but not limited to; school zones, business district and special event areas

## 104.4    OTHER POLICE VEHICLES

Officers operating unmarked or semi-marked police vehicles will immediately request the assistance of a marked vehicle when they are involved in a pursuit and will relinquish primary unit status immediately upon the presence of a marked vehicle. Officers operating unmarked vehicles will terminate active involvement unless their involvement is needed or necessary to fulfill the secondary unit responsibilities or are otherwise directed to continue by a watch commander.

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #104 | Page 3 |
|---|---|---|
| | VEHICULAR PURSUIT | |

Marked police motorcycles may be used for pursuit in exigent circumstances and when weather related conditions allow. They shall immediately disengage when support from marked patrol units becomes available.

## 11.01.5    RAMMING & FIREARMS DISCHARGE

The use of Police Department vehicles for ramming or blocking a fleeing vehicle will not be permitted without the direct approval of the Watch Commander, and only under those conditions which would warrant the use of deadly force.

The discharge of any firearm at, or from a moving vehicle, unless absolutely necessary in self defense, or defense of others against a suspect's use of deadly force, is prohibited by this Police Department.

## 104.6    OUTSIDE AGENCY PURSUITS

Pursuits initiated by an outside agency traveling through the jurisdiction of the Village of Forest Park will be the responsibility of the initiating agency. Forest Park Police units may participate only when criteria for pursuit is consistent with this guideline and approved by the Watch Commander. Forest Park Police units shall cease the pursuit of a vehicle pursued by another agency when the suspect's vehicle leaves the Village limits, unless requested by that agency and when authorized by the Watch Commander.

## 104.7    PURSUIT PROCEDURES

The following procedures shall apply when an officer of this Police Department becomes involved in a pursuit situation:

- The Officer will notify the Communications Center of:

  ○ The location of the pursuit
  ○ Direction of travel
  ○ The description of the fleeing vehicle
  ○ Occupant information
  ○ Speeds of travel
  ○ Reason for the pursuit

- Communicate directly with Illinois State Police District Chicago via ISPERN in those instances where the pursuit extends beyond the jurisdiction of the Village of Forest Park.

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #104 | Page 4 |
|---|---|---|
| | VEHICULAR PURSUIT | |

- The Watch Commander will be notified of the pursuit by the Communications Center.
- The Watch Commander shall take control of the pursuit and assign additional units to assist in the pursuit, or terminate additional unit response.
- The Watch Commander or pursuing officer has the authority to terminate a pursuit.

## 104.8    ROLE OF PRIMARY AND SECONDARY UNITS

- Unless otherwise directed by the Watch Commander, no more than two (2) units shall be actively involved in a pursuit.
- When two (2) units are involved in a pursuit, the lead vehicle, or primary, will be directly responsible for maintaining concentration on the pursued vehicle.
- The second unit, or secondary, will be responsible for reporting to the Communications operator the location of the pursuit, and any other relevant information.

- The primary unit behind the suspect vehicle shall never be passed by another unit unless requested by the primary unit, or by a shift supervisor.

## 104.9   SUPERVISORY RESPONSIBILITIES

Upon notification that a pursuit is in progress, the Patrol Operation Supervisor or in their absence, the Watch Commander, shall assume responsibility for the monitoring and control of the pursuit as it progresses. The supervisor will immediately determine whether the pursuit was initiated in accordance with the provisions of this order and shall permit the pursuit to be continued only if this order has been fully complied with to the best of the supervisor's knowledge. The supervisor shall continuously review the incoming information to determine whether the pursuit should be continued or terminated, and whether the provisions of this General Order are being obeyed.

In controlling the pursuit, the supervisor shall be responsible for the coordination of the pursuit as follows:

- Directing pursuit or support units into or out of the pursuit;
- The assignment of a Secondary Unit to the pursuit;
- The re-designation of Primary, Secondary, or other support units as necessary;
- The approval, disapproval, and coordination of pursuit tactics;
- The approval or disapproval to cross-jurisdictional boundaries in the continuation of the pursuit;

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #104 | Page 5 |
|---|---|---|
| | VEHICULAR PURSUIT | |

- Ensure compliance with inter-jurisdictional pursuit agreements.
- The supervisor may approve and assign additional backup or support units to assist the Primary and Secondary Units based upon their analysis of the totality of the circumstances of the pursuit.

## 104.10 MANDATORY PURSUIT TERMINATION

Pursuits shall be terminated by the Watch Commander or by the pursuing officer under the following conditions:

- When it has been determined that the level of danger created by the pursuit outweighs the necessity for immediate apprehension.
- The identity of the suspect has been established to the point that a later apprehension can be accomplished, and there is no longer any need for immediate apprehension.
- Whenever the weather, road or traffic conditions substantially increase the danger to the public posed by the pursuit beyond the need for immediate apprehension.
- Whenever the distance between the pursuing and fleeing vehicles is so great that further pursuit is futile.
- The location of the pursued vehicle is no longer known.

## 104.11 PURSUIT TERMINATION PROCEDURES

When a pursuit has ended, a pursuit officer will notify the Communications Center of the termination point of the pursuit. Terminated pursuits will be announced and repeated on any radio frequency which was used for the pursuit.

The Watch Commander will respond to the termination point of all pursuits, when an apprehension is made, to insure that all necessary assistance is rendered.

For those incidents where a pursuit does not meet the criteria consistent with this guideline, the following options are available to assist in the eventual apprehension of the driver:

- License plate information obtained through the Secretary of State's office,
- Vehicle/Driver description.

# Forest Park Police Department

| Issued: July 2010 | General Order #104 | Page 6 |
|---|---|---|
| | VEHICULAR PURSUIT | |

## 104.12 PURSUIT CRITIQUE AND REVIEW

After each pursuit in which a member of this Police Department has been involved, the officer who initiated the pursuit will complete a Post Pursuit Analysis Report as soon as possible, and forward it to the Watch Commander.

Upon receipt of the Post Pursuit Analysis Report, the Deputy Chief will schedule a meeting with the involved officer(s) and Watch Commander to review the actions of the pursuit.

Any vehicle that has been involved in a pursuit shall be written up for service and downed until it has been cleared for use by the Village mechanics.

## 104.13 DEPARTMENT DRIVER TRAINING

The Administrative Supervisor will annually evaluate the need for Driver Training to address driving skills of all members of the Department, to include Pursuit Driver Education and Training for sworn officers.

This Order supersedes all previous written and unwritten policies of the Forest Park Police Department.

| Issued: July 2010 | CALEA REF# | |
|---|---|---|
| Authority | | |

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 1 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

**Indexed:**    Use of Force
Less-than-lethal Force
Deadly Force
Shooting Review Board
Use of Force Model

**Policy:**    The Forest Park Police Department recognizes and respects the value and special integrity of human life. In vesting sworn officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interest is required. Therefore, it is the policy of the Forest Park Police Department to restrict the use of physical force to circumstances authorized by law and that that is objectively reasonable to accomplish a lawful police task.

**DEFINTIONS**

1. Deadly Force- Any use of force that is likely to cause death or great bodily harm.
2. Less-than-lethal Force- An amount of force that under normal circumstances might cause bodily harm but would not be expected to result in great bodily harm or death.
3. Electronic control device- A less lethal force weapon utilized by trained personnel that causes Neuro Muscular Incapacitation (NMI)) to a combative/actively resisting or potentially combative/resisting subject.
4. Reasonable Belief- What an ordinary and prudent officer in the same or similar circumstances would believe, based upon his/her knowledge of the facts surrounding the event as they existed at the time of the event.
5. Objective Reasonableness Standard- The Standard established by the U.S. Supreme Court in *Graham v. Connor* 490 U.S. 386 (1989) that states reasonableness should be judged under the totality of the circumstances from the perspective of a reasonable officer at the scene with similar training and experience.
6. Great Bodily Harm- Bodily injury that creates a substantial risk of death, causes serious permanent disfigurement, or results in long-term loss or impairment of the function of any bodily member or organ.
7. Forcible Felony- Treason, first and second degree murder, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual.



EXHIBIT
5

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 2 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

8. Generally- when generally is used throughout this policy, the intent is not to limit any employee's use of identified weapons as weapons of necessity in exigent circumstances.

9. Shooting Review Board- a board selected by the Chief of Police consisting of Two Lieutenants, One Sergeant, and one police officer. The board may be activated by the Chief of Police to review training needs, policy compliance and changes, and equipment needs arising from the discharge of a firearm by a department member.

## I. LEVELS OF FORCE

A. When the use of force is objectively reasonable, personnel shall, to the extent possible, utilize an escalating scale of options and shall not employ a more forceful measure, unless it is determined that a lower level of force would not be adequate, or such a level of force is attempted and actually found to be inadequate. Refer to the Use of Force Model (Appendix A).

B. The scale of options, as described in the Use of Force model (Appendix A) is set forth below:
   1. Social control (presence)/Verbal persuasion
   2. Physical control (e.g., holding, direct mechanical control, etc.)
   3. Electronic control devices
   4. Control Instruments (e.g., handcuffs, PR-24 baton, expandable batons, straight batons)
   5. Chemical Agents
   6. Impact Weapons
   7. K-9
   8. Firearm

C. It is not the intent of this order to direct officers to try each of these options before escalating to the next. The use of good judgment, dictated by each situation, will determine where an officer will start on the use of force paradigm. Officers using any type of force are accountable for articulating its reasonableness and necessity.

## II. REASONABLE FORCE

A. Police officers must frequently employ the use of force to effect arrests and ensure the public safety. It is not intended that any suspect should ever be allowed to be the first to exercise force, thus gaining an advantage in a physical confrontation. Nothing in this policy should be interpreted to mean that an officer is required to

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 3 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

engage in prolonged physical combat (with all its risks) before resorting to the use of force that will more quickly, humanely, and safely bring an arrestee under physical control.

B. An officer may use deadly force only when the officer reasonably believes that such action is in defense of human life, including the officer's own life, or in defense of any person in immediate danger of serious physical injury. Deadly force may only be used against a "fleeing felon" when the officer reasonably believes that the action is in defense of human life, including the officer's own life, or in defense of any person in immediate danger of serious physical injury.

C. The escalating scale of options does not change the standards that guide the use of discretion in the field. Options range from social presence/verbal persuasion to the use of deadly force.

D. Justification for the use of force is limited to what is reasonably known or perceived by the officer at the time of the event, based on the officer's training and experience. Facts discovered after the event, no matter how compelling, cannot be considered in later determining whether the force was justified. In addition, justification for the use of force is based on the officer's perception of the totality of risk of injury to the officer, another person, or threat to public safety as a result of the subject's illegal action, if the action is not stopped in a timely manner.

## III. USE OF FORCE

A. Members of the Department may use reasonable force in the performance of their duties in the following circumstances:
   1. To prevent the commission of a public offense.
   2. To prevent a person from injuring himself/herself.
   3. To effect the lawful arrest of persons resisting or attempting to flee from custody.

B. Before using force, an officer shall consider whether the force to be employed is objectively reasonable and necessary to obtain control of the subject and, if force is employed, the officer shall also provide verbal direction to the subject, whenever possible.

C. Whenever possible, when an officer decides to employ deadly force, the officer should first identify him/herself and provide verbal direction (e.g. "stop-police", "police officer-drop it", etc.)

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 4 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

D. Reasonable care shall be used by the officer to protect innocent bystanders in all use of force confrontations.

E. As soon as practical and with consideration given to officer safety, it is the arresting officer's responsibility to ensure that appropriate first aid is administered to a person(s) in custody and/or to a bystander(s) when injury is alleged to have resulted from the officer's actions utilized to obtain custody.

F. Officers are permitted to use **only** that force which is objectively reasonable and necessary to protect himself or herself or other from bodily harm.

## IV. VERBAL PERSUASION AS A MEANS OF EFFECTING CUSTODY

A. The practice of courtesy in all public contacts encourages understanding and cooperation; lack of courtesy arouses resentment, and often physical resistance.

B. Simple directions, which are complied with while merely accompanying the subject, are by far the most desirable methods of dealing with an arrest situation. Control may be achieved through advice, persuasion, and/or warnings before resorting to actual physical force.

C. The above should **NOT** be construed to suggest that an officer should ever relax and lose control of a situation, thus endangering his/her personal safety or the safety of others.

## V. CONTROL MODES TO ACCOMPLISH CUSTODY

A. Frequently, subjects are reluctant to be taken into custody and offer some degree of physical resistance. Generally, all that is required to overcome the resistance is physical strength and skill in control tactics (holding, stunning, direct mechanical control).

B. Control tactics are those physical techniques intended for use when weapons are not available or their use is unadvisable or unreasonable under the circumstances. An officer must be capable of utilizing the physical skills chosen to subdue a person. Good judgment is extremely important in deciding which tactics to use and how much force to apply. The force used must be objectively reasonable. Control modes without weapons may be employed in a manner consistent with the Use of Force model (Appendix A).

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 5 |
|---|---|---|

## RESPONSE TO RESISTANCE AND AGGRESSION

C. When confronted with a situation which may necessitate the use of physical force, consideration should be given to requesting additional cover officers prior to the application of force, whenever possible.

### VI. USE OF ELECTRONIC CONTROL DEVICE (ECD)

A. The use of this device is intended to incapacitate the subject with minimal potential for causing death or great bodily harm.

    1. Passive resistance without posing an articulable threat of harm to officers, others or the subject themselves does not permit the use of electronic control device.

    2. Officers may also include in the decision to use this force option information known to the officer at the time of the incident, including conduct or statements of the subject or prior history of resistive or assaultive behavior.

B. Officers must successfully complete the approved training program prior to carrying or deploying the electronic control device.



C. Electronic Control Devices should not be used as an alternative to deadly force when use of deadly force is the only viable solution to an incident. Electronic control devices may be used in a situation that would otherwise justify deadly force or one that appears likely to escalate to that level, only under circumstances where the presence of another officer allows the deadly force option to be immediately available.

D. Department personnel who use a electronic control device against a person shall ensure the person is monitored for injury as soon as practical after the person is under control.

E. If probes are embedded in non-sensitive tissue areas, a trained officer may remove them according to the trained procedures. If the probes are embedded in sensitive tissue areas, i.e. neck, face, groin, or the breast of a female, officers will arrange for medical attention for probe removable.

F. If an adverse reaction to the electronic control device occurs, or if there is a secondary injury due to falling which requires medical attention, or if medical attention is requested by the subject, officers will arrange for transport to a medical facility.

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 6 |
|---|---|---|

## RESPONSE TO RESISTANCE AND AGGRESSION

G. After the probes have been removed, they shall be handled as a biohazard and packaged according to trained procedures.

### VII.    USE OF THE BATON TO ACCOMPLISH CUSTODY

A.  Only batons authorized by the Office of the Chief of Police may be used.

B.  Authorized batons shall be used in accordance with the Use of Force Model (Appendix A).

C.  Generally, only those officers trained and/or certified in the use of the baton shall be authorized to use batons.
1.  While on duty, the baton shall be carried at all times, except when the officer is out of service in the police building.
2.  Department issued batons shall not be altered in any way unless authorized by the Office of the Chief of Police.

### VIII.    CHEMICAL AGENTS

A.  Only those chemical agents authorized by the Office of the Chief of Police and issued by the Forest Park Police Department may be used.

B.  The authorized chemical agents shall be used in a manner consistent with the Use of Force Model (Appendix A).

C.  Generally, only those personnel who have been properly trained and certified in the use of chemical agents may utilize them.

D.  Personnel shall carry the authorized chemical agent in the prescribed manner.

E.  It is the arresting officer's responsibility to ensure that appropriate neutralizing steps are taken for a person in custody or person affected by the chemical discharge, as soon as practical, with consideration given to officer safety.

F.  When chemical agents are discharged, except for training purposes, the appropriate oleoresin capsicum (OC) form and offense/incident report shall be submitted to the Chief of Police, through the chain of command.

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 7 |
|---|---|---|
| RESPONSE TO RESISTANCE AND AGGRESSION | | |

IX. **USE OF FIREARMS**
Personnel shall not draw or display his/her firearm except for legal use or official inspection.

A. Officers, in the performance of official police duty, shall utilize only authorized firearms (in accordance with General Order #501) in accordance with the Use of Force model (Appendix A).

B. In accordance with 720ILCS Section 5/7-5, **AN OFFICER MAY USE DEADLY FORCE ONLY WHEN THE OFFICER REASONABLY BELIEVES THAT SUCH ACTION IS IN DEFENSE OF HUMAN LIFE, INCLUDING THE OFFICER'S OWN LIFE, OR IN DEFENSE OF ANY PERSON IN IMMEDIATE DANGER OF SERIOUS PHYSICAL INJURY.**

C. Warning shots are not permitted.

D. Officers may use deadly force to destroy an animal that represents a threat to public safety, or as a humanitarian measure when the animal is seriously injured and when the officer reasonably believes that deadly force can be used without harm to the officer, officers, or public.

E. No Department-issued firearm shall be used for any purpose not described in this general order.

F. Report and investigation of use:
1. An officer who discharges a firearm on or off-duty within or outside his/her jurisdiction, accidentally or intentionally, except for training or practice at the range, or while involved in hunting or sporting events, shall complete a written memorandum to his/her immediate supervisor as soon as circumstances shall permit.
2. Investigation procedures for firearm discharges:
   a. The Office of the Chief of Police shall be notified of the circumstances as soon as practical, but in every case within twenty-four (24) hours of the incident.
   b. The Chief of Police or his designee shall immediately review the officer's duty status. The officer involved in the shooting shall wear a firearm unless his/her emotional state indicates he/she should be relieved of the weapon, at which time the weapon shall then be confiscated by a supervisor and placed in the Department armory for safekeeping.
   c. The Office of Internal Affairs shall complete an investigation of all the circumstances of the incident and forward the written results

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 8 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

of the investigation, along with all written documentation, to the Chief of Police, upon completion.

d. Upon receipt and review of the investigation by the Chief of Police, he/she may, as soon as practical, convene a Shooting Review Board if he/she believes the circumstances involved with the discharge require further review.

e. If the investigation and/or review reveals there was no violation of this Policy or no negligence involved, the officer shall be notified as soon as practical.

f. If the investigation and/or review determines there was a violation of the Policy or negligence involved, appropriate disciplinary action shall be imposed by the Chief of Police, based upon the recommendation of the involved member's Watch Commander, and the officer shall be notified of the decision as soon as practical.

**Department procedures and investigations are independent of any criminal or civil prosecution which may be initiated by the State's Attorney's Office or other outside agency or individual.**

3. Notifications

Whenever a firearm is discharged, whether accidentally or intentionally, resulting in an injury or death, the Watch Commander shall, after notification to the Office of the Chief of Police or his/her designee, notify the following:

a. Personnel listed in the Forest Park Police Department's Notification Matrix (General Order #301, Appendix A).

b. State's Attorney's Office

c. Medical Examiner, when applicable.

d. Village Administrator

## X.     UNNECESSARY FORCE DEFINED

A. Unnecessary force occurs when physical abuse of a person being arrested or detained is exacted or when it is apparent that the type or degree of force employed was not objectively reasonable and necessary. When any degree of force is utilized as summary punishment or for vengeance, it is clearly improper and unlawful.

B. Any peace officer who, under the color of authority, without lawful necessity, assaults or beats any person, is guilty of gross and unlawful misconduct, a felony.

C. When the use of force is applied indiscriminately, an officer will be subject to Departmental disciplinary action and possible civil and/or criminal prosecution.

# Forest Park Police Department

| Issued:<br>July 2010 | GENERAL ORDER #105 | Page 9 |
|---|---|---|
| | RESPONSE TO RESISTANCE AND AGGRESSION | |

XI.   **USE OF FORCE REPORTING PROCEDURE**

An offense/incident report shall be submitted whenever an officer takes an action that results in, or is alleged to result in, injury or death of another person and/or when control of a non-compliant subject is obtained using:

1. Empty hands control
2. Electronic control device
3. Control instruments/impact weapons
4. Discharged authorized chemical agents
5. Discharged firearm
6. Weapons of necessity under exigent circumstances (object/s not normally authorized as a weapon by the department).

XII.   **COUNSELING**

A. Any officer using deadly force that results in injury or death shall be required to attend a minimum of one session of professional counseling as selected by the Police Department.

B. The Police Department may recommend additional professional counseling/therapy that may be warranted or recommended as a result of the original counseling session or is requested by the involved officer.

C. Supervisors may recommend, and employees may request counseling through Employee Assistance Programs for other incidents involving the use of force NOT resulting in injury or death.

D. Counseling and therapy are means for helping a member through a crises and/or a means of reducing stress resulting from the performance of certain duties required of a police officer.

This Order supersedes all previous written and unwritten policies of the Forest Park Police Department on the above subject.

| Issued:<br>July 2010 | **CALEA REF#**1.3.1; 1.3.2; 1.3.3;<br>1.3.4; 1.3.5; 1.3.6; 1.3.7; 1.3.8 | |
|---|---|---|
| **Authority:** | CHIEF | |

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

Estate of Marco Gomez, )
deceased, by DAISY PEREZ, )
Independent Administrator, )
)
            Plaintiff, )
)
      v. ) Case No.: 18-cv-910
)
VILLAGE OF FOREST PARK, )
et al., )
)
            Defendant. )

The videotaped deposition of BRIAN L. LANDERS, taken via videoconference before Jennifer Seastrom, Notary Public of the State of Wisconsin, taken in the above-entitled cause, on the 26th day of February, 2021, at the hour of 10:05 a.m.

**Page 2**

APPEARANCES (VIA VIDEOCONFERENCE):

ACTION INJURY LAW GROUP LLC
AMANDA S. YARUSSO
191 North Wacker Drive
Suite 2300
Chicago, Illinois 60606
Phone:  773.510.6188
E-mail:  amanda@actioninjurylawgroup.com
      On behalf of the Plaintiff,

O'HALLORAN KOSOFF GEITNER & COOK
GAIL L. REICH
GERARD W. COOK
650 Dundee Road
Suite 475
Northbrook, Illinois 60062
Phone:  847.291.0200
E-mail:  greich@okgc.com
      gcook@okgc.com
      On behalf of the Defendant,
VIDEOGRAPHER:  Ken Miller

**Page 3**

                  I N D E X
WITNESS:                            PAGE
      BRIAN L. LANDERS
Examination by Ms. Reich              5


            E X H I B I T S

                                   PAGE
Exhibit No. 1  Notice of deposition    6
Exhibit No. 3  Rebuttal report        10
Exhibit No. 6  Dr. Bauer report       77

**Page 4**

THE VIDEOGRAPHER:  I will now start the recording.

The time is 10:05 Central Standard Time.  Today's date is February 26, 2021.  This begins the videoconference deposition of Brian L. Landers, taken in the matter of Estate of Marco Gomez, deceased, by Daisy Perez, independent administrator versus Village of Forest Park, et al.  Case Number 18-C, Charlie, V, Victor, hyphen, 910.

My name is Ken Miller, and I'm your remote videographer today.  The court reporter today is Jennifer Seastrom.  We are representing Esquire Deposition Solutions.

As a courtesy, when you're not speaking, please mute your audio and remember to unmute your audio when you're ready to speak.

Will everyone present please identify themselves and whom you represent.

MS. REICH:  Sorry.  Go ahead, Amanda.

MS. YARUSSO:  Amanda Yarusso, attorney for the plaintiff.

MS. REICH:  Gail Reich for the





EXHIBIT
6

Page 89

"a risk to the public."

Q. Okay. When is it appropriate for an officer to unholster his weapon?

A. Well, when the officer is preparing for a situation in which they're about to use or potentially use deadly force.

Q. And that can happen in circumstances where the officer is unsure of how a suspect is going to respond, right?

A. I think that's kind of a vague situation --

Q. Um-hum.

A. -- or a vague question to ask.

Q. Okay.

A. Again, you know, an officer has a lot of tools on -- in their arsenal, so to speak, and that is the ultimate tool to use. So when they are drawing the weapon, again, they are preparing for a deadly force encounter.

Q. And by "draw," do you mean unholster, or do you mean direct the -- the gun in the -- in the direction of a person?

A. Yeah, I -- I'll clarify that.

Q. Thank you.

Page 90

A. The drawing procedures used, I think, probably uniformly across the United States is that the first stage of the draw is to unholster your weapon.

Q. And that's why you used --

A. That's why I used the term "draw." So I wanted to clarify that. Thank you.

Q. Okay. So draw -- by "draw," you mean unholster, right?

A. Yes.

Q. Okay. And then -- and then in terms of when an officer is allowed to point his gun in the direction of a subject, what are the circumstances when that is permitted?

A. The circumstances would be when the officer feels that there's an imminent threat upon their life or the life of another of death or great bodily harm.

Q. Now, on page 8 of your report, you state that, "Nowhere under Graham does it permit an officer to create their own jeopardy under the imminence or fleeing factor," right?

A. Right.

Q. What does "Graham" stand for?

Page 91

A. Graham v. Connor?

Q. Yes. And what's -- what's the principle in that case that brings you to cite it here?

A. The principle in that case is that it's the landmark case which provides us guidance of the reasonableness of force for law enforcement officers in the United States.

Q. Okay. And it's your opinion -- and I'm -- I'm taking some out of your -- your next opinion -- your -- your third opinion as well -- but training this day should be guided by the principles articulated in both Graham and Garner, right?

A. Yes. They have for quite some time.

Q. Okay. And sorry. When I'm talking about Garner and you're talking about Garner, we're talking about Tennessee versus Garner?

A. That's what I understood, yes.

Q. Okay. And that stands for what principle?

A. That stands for the principle of using deadly force, specifically upon a person who might be fleeing an officer.

Q. Okay. Because an officer's conduct is

Page 92

guided by that controlling law, because those are Supreme Court cases, right?

A. Correct.

Q. Okay. And when we're talking about policies that are implemented -- written and implemented by agencies, they're based on Supreme Court precedent, correct?

A. They should be.

Q. Okay. I mean, at its fundamental level?

A. Yes.

Q. Okay. Can we -- can we agree on that, that at -- at the -- at the base level that police policies should be -- should be based on the constitutional standards or the standards set by the Supreme Court and case law, right?

A. Correct.

Q. Okay. And then -- well, let me ask you this: The purpose of police policies, then, is?

A. To guide an officer's performance.

Q. Okay. In addition to case law?

A. Well, not -- I mean, regarding use of force?

Q. Yes.

A. Case law should support that in -- in my



Page 93

opinion, should be explained in the policy to give -- to give an officer a very clear sense of what they are expected to do.

Q. Okay. And then the policies, like we said, at least have to meet that standard, and then, you know, departments, at their discretion, can increase the standard or increase -- what's the word I'm fishing for? Maybe you can complete it for me.

A. Expectations?

Q. Okay. They can increase their expectations, have -- have different or higher expectations. And that would be -- those would be policies, I guess, that they would then be more restrictive than what's dictated by the case law; is that fair to say?

A. I would say that's fair that an agency has that option, yes.

Q. Okay. All right.

And the option -- I'm sorry. The agency that you came from, Wisconsin Dells, and the policies that you helped write, they were more restrictive -- along the more restrictive lines, right?

Page 94

A. I wouldn't say more restrictive. I would say more descriptive to provide officers with stronger guidance of their -- of their expectation of performance.

Q. Okay. To -- is that to guide or to eliminate some areas of discretion to keep it more narrow for them?

MS. YARUSSO: Objection to the form.

THE WITNESS: Yeah, I don't know if I'm -- I don't know if our -- our -- the policies that I'm a part of authoring were looking at restricting the officers' options.

BY MS. REICH:

Q. Okay. And they're typically reflective of a -- of a department's policy -- or philosophy on how they want their officers to perform certain tasks, right?

A. I think they're reflective of not only the department's expectations, but also social expectations and professional standards.

Q. Okay. And you are critical of some of the -- what you think is lack of training that Mr. Ryan thinks was done appropriately and Mr. Ryan's training methods as well, right?

Page 95

A. Yes.

Q. Okay. And you think -- sorry.

You told me before that you had written policies for departments in Wisconsin but not in other states, right?

A. Not specifically for any other states, no.

Q. Right. Okay.

Are you aware as to how many departments Mr. Ryan has written policies for?

A. No.

Q. Okay. You said you've done training in 30 -- approximately 30 other department -- department-wide training in approximately 30 other departments in Wisconsin.

How many other agencies have the same policies regarding the use of force as the Wisconsin Dells?

A. I don't know that.

Q. Okay. Do you even have a -- a guess?

A. I think it's -- I guess if your intent is clarifying my -- my influence on policy, again, my service to the state of Wisconsin -- Wisconsin has a requirement, a legal requirement, that every

Page 96

agency must have a use of force policy.

Q. Okay.

A. And in my service to the Department of Training and Standards, which is a division of the Wisconsin Department of Justice, our committee wrote policies on use of force as well as training on use of force that every agency was expected to adhere to.

Q. Okay. Do you know if Illinois has that same requirement that departments have a policy on the use of force?

A. I believe, ever since last year of August, a federal mandate by the Trump administration required all agencies to have a policy on use of force now.

Q. Okay. What about in 2017?

A. I don't know. I don't know specifically if it's a legal requirement in Illinois or not.

Q. Now, Graham and Garner were both decided in the '80s, right?

A. Yes.

Q. Okay. I -- I have Graham being decided in 1989 and Garner in 1985. Does that sound about right?



BRIAN LANDERS
GOMEZ, V. VILLAGE OF FOREST PARK

Page 97

A.   Correct.

Q.   Okay.  And since you say that -- that to be the standard, at least the use of force standard, under Graham, that officers are to be in compliance with in terms of their policies and training, you say that that -- that is to be supplemented by training, right?

A.   I think my -- I think my understanding or the foundation on establishing that Graham is the foundation -- national foundation of reasonableness for officers' force, so training ideally should include that -- that foundation.

Q.   Okay.  And then the scenarios -- you think officers should be trained based on the scenarios, right?

A.   I think scenario-based training is a -- a very productive method to train officers.

Q.   Okay.  And that's how you believe officers should be -- or one way you believe officers should be trained on the use of force?

A.   It's one way, yes.

Q.   Okay.  And how many other ways should the officers be trained on use of force besides scenario-based training?

Page 98

A.   I think there's many other ways.  I think that there's hands-on ways.  I think there's -- you know, there's, you know, a mix -- case material.  There's policy material that they should be trained on.  I think use of force is a -- is an area that has a -- a multitude of training.

Q.   And does -- are you familiar Meggitt?

A.   I think it's a company training.  I think it's a private training.

MS. YARUSSO:  I'm just going to object.  At this point, I don't see how this is limited -- this isn't an opportunity to redepose Mr. Landers on his original expert opinion report.  This is a deposition being taken about his rebuttal report.  So this just seems like a general line of questioning about use of force training, and I'm not sure how that is -- pertains -- is appropriate for the scope of what this deposition is going to be.  So -- and we've been going for -- for, you know, two hours, 20 minutes.  Obviously, you need -- you know, you're not limited in the time you need to take.  But the scope of the deposition should be about the rebuttal opinion report.

Page 99

I don't know how much longer you have, but...

BY MS. REICH:

Q.   You -- you reviewed information regarding Officer Miller's training, right, by the Village?

A.   I believe I reviewed a summary of his training records.

Q.   Okay.  And did that training include Meggitt training?

A.   I would have to look at those records again to determine whether or not it did or not.

Q.   Okay.  Is Meggitt training concerning use of force?

A.   I did not see the curriculum of what Meggitt training -- or what their specific course is.

Q.   All right.  So you only know Meggitt training to be scenario-based or not even that?

A.   I have not seen any curriculum of what Meggitt training is.

MS. YARUSSO:  What does this line of questioning have to do with the rebuttal opinion report?

Page 100

MS. REICH:  I'm getting there.

MS. YARUSSO:  Okay.

BY MS. REICH:

Q.   So had you never heard of Meggitt training before you saw Officer Miller's training records?

A.   I might have.  I don't know, there's a lot of different trainings out there, so...

Q.   Okay.  And one of the -- the police executive research forum, I recall in your prior opinion, you cited to that with the 30 guiding principles, right?

A.   Yes.

Q.   And do you believe that's an important part of training?

MS. YARUSSO:  Objection to the form.

BY MS. REICH:

Q.   In terms of use of force?

A.   Those 30 guiding principles?

Q.   Yes.

A.   I think it's -- some of them are.  I think that it's -- those are guided principles --

Q.   Um-hum.

A.   -- that an agency can review and



Page 101

determine whether or not they would want to implement some of those standards.

Q. Okay. And do you have any idea whether that was a part of Forest Park's training?

A. I don't.

Q. Okay. Now, when you've trained -- I mean, you use scenario-based training in your training of individuals, right? Which is --

A. Correct.

Q. Right. And when you train them, have you ever used a situation that mirrors this case, the facts of this case?

A. Can you be more specific to that?

Q. Have you ever given a training scenario that mirrored the -- the facts of this case?

A. Well, I think there's a lot of facts in this case. Are you saying -- I guess I'll -- I'll -- I'll try to get to the point.

Have I ever done training specific to, you have a stolen vehicle boxed in, and you run at it with your firearm? No, I have never done anything like that.

Q. What about the totality of the facts of this case?

Page 102

A. That you have a stolen vehicle, that you have knowledge of a stolen vehicle, and you run at it? No, I would never train an officer to do that.

Q. What about that a stolen vehicle had fled from officers in a neighboring jurisdiction? I mean -- I mean the totality of the circumstances of this case?

MS. YARUSSO: Well, that's vague, because, first of all, the totality of the circumstances of this case are, at least in part, disputed. And it's not clear what specific circumstances you want the witness to assume for the purpose of your question.

So I would either ask a specific hypothetical, or the question is just so vague that it's objectionable and meaningless --

MS. REICH: -- I would ask that you --

MS. YARUSSO: -- as far as the answer.

MS. REICH: I would ask that you limit your objections to not include speaking objections.

BY MS. REICH:

Q. Let's suffice it for the purposes of the

Page 103

question I'm going to ask you now, the totality of the circumstances, from the moment that Mr. Gomez was first observed by Chicago Police officers to the time that Officer Miller fired shots at Mr. Gomez, had you ever taught that scenario?

MS. YARUSSO: Objection. Vague. Incomplete hypothetical. Assumes facts not in evidence --

THE WITNESS: No.

MS. YARUSSO: -- or disputed facts.

BY MS. REICH:

Q. No?

A. Have I taught -- have I taught portions of that scenario? Yes.

Q. Okay. All right.

And so in your 30 years of experience, you've never come across this whole entire scenario?

MS. YARUSSO: Same objection. Vague. Incomplete hypothetical. Assumes facts not in evidence. Calls for speculation. Assumes disputed facts.

THE WITNESS: No. I never served in Forest Park.

Page 104

BY MS. REICH:

Q. You never served in Forest Park, you said?

A. Well, this -- I mean, you want me to -- to be specific to the scenario. The scenario occurred in Forest Parked. So I never trained about a scenario in Forest Park that led -- that resulted from an incident in Chicago.

Q. Did you ever train -- do you ever use training or scenario-based training you create based on factual scenarios that occur in other jurisdictions?

A. Yes.

Q. Okay.

MS. REICH: I'm going to take a quick break to look at my notes.

MS. YARUSSO: Okay. So should we come back in five minutes?

MS. REICH: Yeah.

THE VIDEOGRAPHER: Are we all in agreement, then, to go off the record?

MS. YARUSSO: Yes.

MS. REICH: Yes.

THE VIDEOGRAPHER: We are all in



**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Estate of Marco A. Gomez, Deceased by Daisy Perez, Independent Administrator,

Plaintiff,

v.                          Case No.: 18 CV 910

Village of Forest Park, et al.

Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Deposition of BRIAN L. LANDERS, taken in the above-entitled matter before Deborah D. Dreawves, Court Reporter and Notary Public, by way of video conference proceedings, on Tuesday, July 28, 2020, commencing at approximately 9:54 a.m.

**Page 2**

APPEARANCES:

Gail Reich, Attorney at Law
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, #475
Northbook, IL  60062
    On behalf of the Defendants.
Gerard Cook, Attorney at Law
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, #475
Northbook, IL  60062
    On behalf of the Defendants.
Amanda Yarusso, Attorney at Law
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL  60606
    On behalf of the Plaintiff.
ALSO PRESENT:
Ethan McNiff, Law Clerk, Action Injury Law Group, LLC
Sammi Roth, Law Clerk, Action Injury Law Group, LLC
Blake Kolesa, Law Clerk, O'Halloran Kosoff Geitner & Cook, LLC

Juanita Yumana, Videographer

**Page 3**

Index

Examination:
Examination by Ms. Reich...................... 4-191

Objections:  6, 65, 66, 67, 73, 77, 81, 83, 86,
    88, 89, 94, 98, 102, 103, 104, 105, 106, 107
    108, 111, 112, 113, 114, 115, 116, 117, 118
    122, 127, 129, 131, 132, 138, 139, 140, 150
    151, 154, 155, 156, 163, 165, 168, 181, 186
    187

Exhibits:
Exhibit Number 2:............................... 7
Landers CV

Exhibit Number 3:............................... 57
Landers Expert Report
Exhibit Number 5:............................... 63
Deposition of Daniel Miller

Exhibit Number 6:............................... 138
Forest Park 4293-4298 (GO# 104 Vehicular Pursuit)
Exhibit Number 7:............................... 157
Forest Park 4299-4314 (GO# 118 Patrol Operations)

Exhibit Number 8:............................... 55
Landers Invoice
Exhibit Number 9:............................... 133
Deposition Transcript of Eric Meunier

Exhibit Number 10:............................. 94
Key Video

**Page 4**

PROCEEDINGS

THE VIDEOGRAPHER: Okay, good morning. We are now on the record. The time is 9:54 a.m. on July 28, 2020. This begins a videotape deposition of Brian Landers taken in the matter of the Estate of Marco Gomez, deceased by Daisy Perez, Independent Administrator, versus Village of Forest Park, et al. Filed in the district court for the Northern District of Illinois Eastern Division, case number, which is, 18-CV-910. My name is Juanita Yumana. I am your remote videographer for today. The court reporter is Deborah Dreawves. We're representing Esquire Deposition Solutions. As a courtesy, will everyone who is not speaking, please mute your audio, and when you're ready to speak, please unmute yourself.

Counsel, will you please state your name and who you represent, after which, the court reporter will swear in the witness.

MS. YARUSSO: My name is Amanda Yarusso. I represent the Plaintiff. Also attending with the Plaintiff is one of our law clerks, Ethan McNiff, and another law clerk, Sammi Roth, should be joining shortly. Samantha Roth, R-O-T-H. And I do anticipate that Andrew Stroth, my co-counsel, may join at some point, as well, when he's out of another meeting, so

ESQUIRE
DEPOSITION SOLUTIONS

EXHIBIT
tabbies
7

800.211.DEPO (3376)
EsquireSolutions.com

Page 41

You know, they very well could have seven new policies in place that were not there by the time I, you know, left office.

Q As new incidents occur, or -- I mean, you can't -- you can't set a policy for every scenario; right?

A Exactly, exactly --

Q And that's why policies are meant -- I'm sorry, I don't mean to -- policies are meant to be guidelines that an officer, to which an officer can hopefully refer to to get some general guidance on how to conduct themselves?

A Sure, or if there's a legal standard that has changed, you know, there's -- you know, when there's been changes in like OWI laws and the policies have to be changed to reflect the legal standard to guide the officers to compliance of the new law.

Q And how quickly would you say that the department responded to, for example, changes in legal standards?

A I would say very quickly. I mean, if it became a standard that, you know, that our attorney general in the State of Wisconsin or the attorney general for the United States mandated a legal change, then we would typically change that relatively soon. If there cannot

Page 42

be a new meaning to adopt a policy's change, then there usually was a directive from a supervisor saying that even though that the policy is in place, until the policy is changed, these are our new directives.

Q Okay, so there were separate directives, separate and apart from the policies for those gap times?

A Until the policy could be changed officially, yes.

Q All right. Did the department use any type of service or entity to help form these policies?

A Yes, they did.

Q What?

A The IACP, or the International Association of Chiefs of Police, the Wisconsin Attorney General's Office, or the Wisconsin Department of Justice would also provide input on model policies. CVMIC, our insurance carrier, not so much specific to law enforcement actions, but general policies on, like, sexual harassment, so, discrimination, you know, FMLA policies, things like that. We relied a lot on other sources, but we were also -- make sure that the policy was customized to our agency, so, you know, if there were specific jurisdictional issues that needed to be put into our policy, chain of command put into our

Page 43

policy regarding, you know -- or using some of those other model policies, then you would make those adjustments.

Q So -- right, some of these agencies that had recommendations, you had to necessarily adapt them to your jurisdiction, because just by the nature of, I don't know, topography, or, you know, whatever the case may be, the population -- okay.

A Correct.

Q Okay. Have you ever heard of a company called Lexipol?

A Yes, I have.

Q What is Lexipol?

A It's an accreditation company.

Q And are you aware of any services they provide concerning development of policies or recommendations of policies?

A Yes, I'm aware that they do offer their members access to model policies and procedure recommendations.

Q Okay, and do you think that that is an appropriate source to use for model policies to be adapted?

A I think it's one source to be used. I think because of this, a national organization, for instance, you know, the policies or procedures in Wisconsin might

Page 44

differ legally than the policies in Alaska or Florida, so I think that there's -- they offer some foundations that are good, but, again, I still think that the agency has to customize that policy to their, you know, needs of policing.

Q So the Lexipol, you said it's one source, it's a national organization, are those -- considering the fact that, obviously, policies would need to be adapted appropriately, do you think that that is a good source considering it's a national organization?

A I don't know enough about their current policies to know whether or not that they're good. I know that a lot of different law enforcement agencies rely upon them or do use them, so I would say, from, you know, word-of-mouth, it seems like they have a good reputation, but I cannot opine or comment on my personal views whether those policies are good or not.

Q You're not familiar with their policies?

A No, I've reviewed some of their policies, but, again, I haven't reviewed all of their policies, so.

Q Sure. Have you ever seen their use of force policies?

A Probably a couple of years ago. I haven't seen anything recently, though.

Q You said that there are a lot of law



Page 117

he would have been in danger of being struck; right?

MS. YARUSSO: And objection to the extent that it misstates Dr. Bauer's testimony and assumes facts not in evidence.

A   Based upon my observation of the video, I do not feel that Officer Miller was an imminent threat of death or great bodily harm.

Q   And you would have been willing to put yourself in that position; right?

A   No, I would not.

Q   Okay, let me ask you a question. You're required to be apprised of the current status of the law, right, with regards to use of force?

A   Can you rephrase that, ma'am?

Q   You're required to be apprised of the current status of the law with the respect to use of force; right?

MS. YARUSSO: Objection; vague.

BY MS. REICH:

Q   You need to know the law, don't you?

MS. YARUSSO: Objection; vague, argumentative.

A   Well, I guess I -- again, I'm not trying to be argumentative, but who -- is there a requirement, a legal requirement of me?

In what law regarding use of force specifically?

Page 118

Q   Well, in terms of rendering your opinions on whether the conduct of an officer is reasonable, right, you need to be apprised of the current status of the law.

MS. YARUSSO: Same objection.

A   I would think that's up to a judge to determine my qualifications to be an expert in a courtroom.

Q   All right, let me ask you this. What's the purpose of a police policy?

A   To provide a guidance for performance.

Q   And what are policies typically based upon?

A   Well, there's discretionary policies and there's ministerial policies.

Q   In terms of -- in terms of the use of force, what are the policies typically based upon?

A   I think that the policies are based upon a combination of some legal precedent. I think they're also based upon tactics, training, expectation of the public, expectation of a reasonable officer.

Q   And the idea is to ensure, at least at a minimum, that the officers are in compliance of the law; right?

MS. YARUSSO: I'm just going to keep objecting to when you say "the law," what you mean by that. Criminal law, constitutional laws, civil rights law,

Page 119

tort law; all law?

BY MS. REICH:

Q   When we're talking about the use of force, the policies are typically written to ensure that officers are compliance -- or in compliant -- in compliance with case law; right?

A   Well, there's, as you know, there's different forms of case law. I mean, different parts of the country might have certain precedence in a circuit setting that might be varying to other precedences.

Q   Okay.

A   So, again, a policy, and that law can change, those precedences can change, so --

Q   Right. Exactly. Are you familiar with -- you need to be familiar with Supreme Court precedent when you're rendering your opinions; right?

A   I think that's for the -- to the court to provide instructions to the jury.

Q   Well, I mean, you considered -- you considered some case law in rendering your opinion; right? You cite to Graham v Connor.

A   Correct.

Q   Then why do you cite to that?

A   Well, that's one of the cases that were echoed in Forest Park's policy.

Page 120

Q   Mm-hmm.

A   And it's the primary case that's used to determine the reasonableness of force.

Q   And you're aware that there are several cases where the Supreme Court has examined an officer's use of deadly force by shooting into a vehicle and the officer has not been found liable; isn't that correct?

A   Correct.

Q   You're familiar with the Plumhoff case; right?

A   Vaguely, yes.

Q   And you're familiar with the Brosseau case; right?

A   Yes.

Q   Okay. I mean, some of these articles -- some of these articles that you've mentioned analyze these cases; right?

A   Correct.

Q   And they speak to -- strike that.

I want to ask you a question about what constitutes a foot pursuit. What constitutes a foot pursuit?

A   I guess -- in general?

Q   Yes, define what a foot pursuit is.

A   An officer pursuing somebody with their feet.

Q   Okay, and does that mean the officer is on



Page 121

foot or the subject is on foot or both?

A   Typically, I guess -- well, I guess that's -- that's -- that's a decision of the officer and of the agency how they define it. In my, I guess, background, a foot pursuit is there's no vehicles involved. The officer and the subject are on foot.

Q   And in a vehicle pursuit, we're talking about two vehicles involved; right?

A   Yes, typically, yes.

Q   Okay. Have you ever seen a policy that addressed an officer on foot of a vehicle?

A   Yes.

Q   Did you identify that in your report?

A   If I did, I might have vaguely mentioned that Forest Park's need for such policy.

Q   Okay, so, now I'm asking you if you've ever seen a policy that existed?

A   Yes.

Q   Okay; where?

A   I believe the IACP has a model policy on that. I know that -- well, in Wisconsin Dells, we had a policy on it. I think that there might be a subsection of a policy in deadly force policies, use of force policies, vehicle contacts policies, that touch on that, and vehicle -- a general vehicle contact or traffic stop

Page 122

policies would have language to that.

Q   You said you had a policy on it in Wisconsin Dells?

A   At a point in time we did.

Q   What did that policy say?

A   That officers are not allowed to pursue vehicles on foot.

Q   And when did you have that policy?

A   I believe it was created in the late '90s.

Q   Was that still in place when you left?

A   I believe so. If -- if -- there were times that a chief would issue -- issue a directive and attach it as an addendum to the policy, so, I mean, I believe it was there because we prohibited it. I mean, as a supervisor we train that we don't do that.

Q   Okay, and you said the IACP had something on it?

A   I believe there is a -- there is a portion of their vehicle contacts policy that discusses it.

Q   Did you include that in your report?

A   No, I don't believe I did.

Q   Can you name any other department besides the city of Wisconsin Dells that has a policy addressing or prohibiting an officer from pursuing a vehicle on foot?

MS. YARUSSO: Objection based on it's asked and

Page 123

answered.

A   Yeah, I can't -- no, I can't specifically know all the policies, no.

Q   You can't know all the policies of all the law enforcement agencies in the country, is that what you mean?

A   Right. I can tell you that it's part of our state training in Wisconsin.

Q   Okay.

A   It's a portion of our vehicle contacts training.

Q   Okay. Is it -- are you aware as to whether that's part of the training in any other jurisdiction?

A   I believe it is. I don't remember the exact states. I do recall discussions on it in my time as an adviser -- practitioner adviser to the state of Wisconsin on these issues; but, again, historically, I can't recall which states had it and which states didn't.

Q   Okay, can you tell me how many states had it?

A   No, I can't.

Q   You can't tell me whether it's two or 22?

A   No.

Q   So other than Wisconsin, for certain, you can't name any other state, right, that has this type

Page 124

of training?

A   No.

Q   Have you ever consulted in any other state other than Wisconsin?

A   Yes.

Q   What other state?

A   Illinois, Pennsylvania, Colorado, and Minnesota.

Q   What jurisdictions have you consulted for in Illinois?

A   It was for an attorney in a case regarding a case in Caseyville, Illinois. I have consulted for the railroad police -- I'm sorry, it was not Colorado, it was California -- railroad police in California and in Pennsylvania.

Q   And when I say consult, I mean about policies, not about your, like for your professional opinion for a case.

A   Yeah, these are about policies.

Q   Okay.

A   These were about policies and training issues --

Q   Okay, all right.

A   (Indiscernible.)

Q   Okay.



Page 149

Q   Okay, well, you must know that expert discovery is ongoing; right?

A   Ongoing, correct.

Q   So the fact that you are -- have been told that you would be given, may be given, more material, that new material may affect your opinions; right?

A   My understanding is that there could be other depositions provided to me. I don't think that anything would change my opinion at this point, no.

Q   Okay. Well, I think I asked you before, and forgive me, you're aware that the chief of police gave a deposition in this case; right?

A   Yes.

Q   And you were not given a copy of that deposition transcript; right?

A   No.

MS. YARUSSO:  In deed, this is asked and answered, word for word.

BY MS. REICH:

Q   Were you given any materials concerning the police department's in-house training on use of force?

A   I believe I was given a summary of Officer Miller's training record.

Q   Okay, so you have -- are not aware as to whether Officer Miller participated in yearly ongoing

Page 150

training put on by the Village -- the Village's police department, are you?

MS. YARUSSO:  Objection; it's argumentative, and it states and assumes facts not in evidence.

A   I am only aware of the documents that were provided of his -- of his overview of his training records.

Q   So if I told you that there were documents that existed showing ongoing training that was given, in which Officer Miller participated, you would have like to have seen that; right?

A   Yes.

MS. YARUSSO:  Objection; calls for speculation.

BY MS. REICH:

Q   How many agencies, law enforcement agencies, can you -- actually, how many law enforcement agencies are there in the United States; do you know?

A   I think it was over 18,000.

Q   And do you know how many law enforcement agencies train on, let's just call it, foot pursuit of a vehicle?

A   No.

Q   Do you know how many in the state of Wisconsin train on that?

A   No.

Page 151

Q   Do you know how many in the state of Illinois train on that?

A   No.

Q   And the only policy, the only department that you could identify that, had a policy on that, was yours?

MS. YARUSSO:  Objection; misstates his testimony.

A   Well, again, regarding specific policy, but regarding training, well, I would guess that every person that goes through the recruiting academy in Wisconsin is trained on that.

Q   Is it possible that Mr. Gomez, even if Officer Miller had not fired his weapon at the car, could have hit the other car on the other side of Jackson?

MS. YARUSSO:  Objection; lack of foundation, callings for speculation, and not what this expert is tendered to testify about or necessarily qualified to testify about. Sounds like you're asking for a biomechanical scene reconstruction possibility, what motions --

MS. REICH:  Not at all.

MS. YARUSSO:  -- could have resulted in if things had happened other than how they actually happened.

Page 152

BY MS. REICH:

Q   How many depositions have you given, Mr. Landers, in your career?

A   I'd like to say, probably -- in regarding use of force cases?

Q   Depositions.

A   I don't know, 10 or 12.

Q   Now that I think about it today, I skipped the beginning of the deposition to state your name and spell it for the record. Would you, please?

A   Yes. Brian Landers, B-R-I-A-N, L-A-N-D-E-R-S.

Q   I think I made my introduction and completely skipped that. Thank you.

A   You're welcome.

Q   All right. I want to ask you, you were not asked to opine in this case on the -- well, let me ask you a different question first.

Your second opinion in this case, right, issue number 2, "Were the policies and training in place by the Village of Forest Park sufficient to guide police actions on force decisions on occupants inside a motor vehicle," and your answer to that is "no." Can you explain, generally, the reasoning -- I know we have your opinion before us, but can you explain, generally, your reasoning for coming to that conclusion?



Page 161

major part of, you know, this -- of any officer. So do I take issues specifically with this policy? I think that this is a policy that was not adhered to in this case.

Q   And your testimony is that it's -- it was not adhered to because of what's in 118, 1?

A   I think this general patrol policy, at least for the Forest Park Police Department is -- is just telling officers, you know, when you're going out there on patrol, these are the things that we expect from you.

Q   Okay.

A   And one of the first things is that, you know, is to preserve life.

Q   Okay, so you don't take issue with the policy that says life should be preserved, if possible; right?

A   No.

Q   You're taking issue -- you're saying that you believe Officer Miller violated the policy?

A   Correct.

Q   Okay, so not that there's a -- something lacking in the patrol operations policy itself?

A   Well, I think that the patrol operations policy should have been more clear about working in and around the vehicles in traffic. There seems to be a, you know, the policy has language in there about bicycle patrol,

Page 162

motorcycle patrol, foot patrol. I think the policy could have provided better direction to their officers on conduct and safety concerns when working in and around traffic in motor vehicles.

Q   Okay, well, there's a vehicle pursuit policy; right?

A   Correct.

Q   Okay, and wouldn't those things be addressed in the vehicle pursuit policy?

A   Not necessarily, I mean, a lot of time vehicle pursuit policies are very specific to pursuits.

Q   Are those things that you articulated addressed in the vehicular pursuit policy?

A   I don't believe so.

Q   Did you have a chance to review it in order to determine that?

A   I reviewed it for my report. I think that was one of my criticisms is that it should have been highlighted in the vehicle pursuit policy about not pursuing vehicles -- not pursuing vehicles on foot, or approaching a potential vehicle that's going to flee.

Q   Well, in one of your criticisms about the policies -- or, I'm sorry, as to Miller's conduct, is that he didn't wait for another officer to show up; right?

Page 163

A   Correct.

Q   Okay. And in terms of the number of officers available in departments and the size of certain jurisdictions, that's not always possible, is it?

A   Correct.

Q   You say that the Forest Park policy on pursuits, in your report, and I'm looking at page 13, clearly states that, "The firing at or into a moving vehicle is prohibited unless the officer can articulate deadly force was needed in defense of a human life."

If Miller believed that deadly force was needed in order to preserve his life, and that was reasonable, would the shooting be justified?

MS. YARUSSO: Objection; assumes facts not in evidence, argumentative, and asked and answered.

A   Officer's statements of beliefs still has to be supported by the facts and the evidence.

Q   It has to be objectively reasonable; right?

A   Yes.

Q   This article that you cite by Sharon Fairley, that was authored in 2018; right?

A   Correct.

Q   The Police Executive Research Forum, how many law enforcement agencies follow those guidelines?

A   The 30 Guiding Principles.

Page 164

Q   Yes, per guidelines.

A   Hundreds of law enforcement agencies will follow all of their guidelines. I would say there's probably thousands of agency that follow a good percentage of those guidelines.

Q   Do you know which ones do?

A   Well, I guess you'd need to be specific as far as the -- I mean, some of their guidelines are already established practices by law enforcement officers as far as the, you know, the sanctity of human life, you know, the pursuing vehicles, pursing for dangerous felonies or dangerous actions. Like I said, some of those are already in place, and, like I said, a large percentage of agencies follow some of those already.

Q   So in -- in your report, you criticize some of Forest Park's policies, but then you also say the policies existed to guide Officer Miller were purportedly violated by Office Miller; right?

A   Correct.

Q   So there are some policies in place that would guide Officer Miller in this circumstance; right?

A   Yes.

Q   Now, some of the things that you say that an officer should be guided on, considering with support and training, are that, "Officers need to be aware of



BRIAN L. LANDERS
GOMEZ V. VILLAGE OF FOREST PARK

July 28, 2020
125–128

Page 125

A  And so -- and I cannot remember the name of the agency in Minnesota. It was an issue regarding a taser, a policy advisement on a taser.

Q  You cite an article by Reaves; right?

A  Yes.

Q  This article was published after this accident occurred; is that correct?

A  Yes.

Q  Okay.

A  A couple months after.

Q  And you cite an article by De Lucca?

A  Correct.

Q  And that was published after this incident occurred; right?

A  Yes.

Q  You cited to the US Department of Justice Investigation of Chicago Police Department; didn't you?

A  Yes.

Q  And that was completed on January 13th of 2017; right?

A  I believe so.

Q  That was when it was published?

A  Yes.

Q  And that's roughly three weeks before this incident; right?

Page 126

A  Yes.

Q  Okay, and that -- that was critical of some of the policies of the City of Chicago, right, regarding use of force?

A  Yes.

Q  And that prompted the City of Chicago to modify their policy; didn't it?

A  Yes.

Q  Do you know how long it took for that to happen?

A  I still believe they're modifying some of their policies still to this day.

Q  Okay, what about the one concerning the use of force?

A  I don't know exactly.

Q  Do you know whether -- sorry. You know that the Village of Forest Park modified their use of force police too; right?

A  Yes, I was provided a copy.

Q  And you just don't know when that policy was modified; right?

A  I believe it was after this incident sometime.

Q  Okay. Were you provided the deposition testimony of Chief Aftanas?

A  No.

Page 127

Q  Okay. Did you know that Chief Aftanas of the Forest Park Police Department gave a deposition regarding policies and training in this case?

A  I believe I was made aware of that after my report.

Q  When were you made aware of that?

A  I don't remember, exactly, several weeks ago maybe.

Q  And that was told to you by Plaintiff's counsel; right?

A  Yes.

MS. YARUSSO: Objection to the extent that you're asking --

MS. REICH: I'm not going to get any further.

BY MS. REICH:

Q  You learned that from Plaintiff's counsel?

A  Yes.

Q  Are you familiar with the concept of perception reaction?

MS. YARUSSO: I don't mean to -- Gail, I have to get on that 2:00 thing, so if you're switching subjects, maybe it's a good time to break or -- unless you think this is a real short line of questioning, because I have to do that test thing at 2:00 and I probably should log on at 1:55 to make sure. Up to you.

Page 128

MS. REICH: Okay. Then let's go ahead and take a break.

(A break was taken at 1:53 p.m.)

(The proceedings resumed at 2:19 p.m.)

EXAMINATION BY MS. REICH CONTINUED

BY MS. REICH:

Q  Mr. Landers, you testified that there was a policy in the Wisconsin Dells Police Department prohibiting an officer from pursuing a vehicle on foot; right?

A  Yeah, I believe I corrected myself that it was a directive from the chief added to some of our policies that that was a forbidden practice.

Q  Okay, and can you -- do you have that directive, do you have a copy of it?

A  No, it's 20-something years old, I think. I don't have a copy, I don't have any -- I don't have any copies of any policies from the department.

Q  Are you able to tell me, like, does it have a directive number, for example?

A  I don't recall.

Q  Okay.

A  It's three chiefs ago, I believe.

Q  Okay, well, then it would still be there; right?



## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF MARCO GOMEZ, Deceased, by DAISY PEREZ, Independent Administrator, | ) ) ) | |
| | ) | Case No. 18-CV-910 |
| Plaintiff, | ) ) | Hon. John F. Kness |
| v. | ) ) | |
| VILLAGE OF FOREST PARK, et al., | ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF CHRISTOPHER CHIN

I, Christopher Chin, under penalty of perjury, do declare the following facts are true and correct to the best of my knowledge:

1. I have been a police officer with the Village of Forest Park Police Department ("FPPD" or the "Department") since 2008.

2. I have been the Administrative Lieutenant since January, 2019.

3. Among my responsibilities as Administrative Lieutenant, I ensure officers complete Department training and are in compliance with Illinois State mandated training.

4. Officer Daniel Miller was employed by the Village of Forest Park as a full time police officer and was subject to, and had completed all the training requirements listed below at the time of the occurrence which is the subject of this lawsuit.

## STATE OF ILLINOIS MANDATED TRAINING

5. In the State of Illinois, full time police officers are required to have undergone and completed basic law enforcement training.

1



6. The State of Illinois also requires firearm qualification, law updates, use of force training, hazmat training, among others, on an annual basis.

7. The State of Illinois also requires officers to complete training on subjects such as constitutional and proper use of authority and civil rights, among others every three years.

FOREST PARK USE OF FORCE TRAINING

8. All full-time police officers employed by the Village must complete the minimum Basic training requirements by the State of Illinois (the "State") and possess a State Certification to become a law enforcement officer in the State.

9. Once officers are fully-certified, the State requires and the Village ensures that all officers receive yearly training in: firearm qualification, law updates, use of force, hazmat, and the Prison Rape Elimination Act ("PREA"), among others.

10. Officers in specialized positions, such as Chiefs and Deputy Chiefs and K-9 Narcotic Detection Officers, are required to receive additional, specialized training, which the Village ensures is completed.

11. The State also requires, and the Village ensures training in specific areas occurs every three years, which includes constitutional and proper use of authority, procedural justice, and civil rights, among others.

12. FPPD conducts year-round training including mandated in-house training, which supplements the Illinois State requirements, in addition to training provided by the North East Multi-Regional Training ("NEMRT") training and online training.

13. The in-house training covers a broad range of subjects and includes everything from first aid to active shooter training.

2

14. For each Departmental training program, a Lesson Plan is prepared.

15. Trainers also incorporate information into the training that comes from other sources, such as the Force Science Institute, PoliceOne.com, and the Police Executive Research Forum Critical Issues in Policing Series, Use of Force: Taking Policing to a Higher Standard.

16. In-house trainings may include a classroom portion, where the instructors present information and discuss it with the officers.

17. Where applicable, there is also live, interactive, hands-on training, for example in training first aid, taser usage, self-defense, firearms, as well as Meggitt Judgmental Use of Force training, where officers are subjected to shoot/don't shoot scenarios.

18. FPPD officers are also encouraged to take additional, elective training pursuant to their interests or upon request will be sent for additional training.

19. The Department's use of force training contains a classroom component where instructors review FPPD policy and policy updates, as well as case law including US supreme Court cases *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989).

2015 LESSON PLAN

20. Attachment 1 to this Declaration is a copy of the 2015 Lesson Plan for the In-House Training (the "2015 Training"). Att.1.

21. The 2015 Training was coordinated and instructed by several FPPD instructors and intended to instruct the officers on how to exercise good judgment in utilizing tactics necessary to control violent confrontations in accordance with legal and FPPD guidelines. Att. 1.

3

22. During the 2015 Training, officers were trained, among other things, on:

    a. Proper draws and holstering techniques;

    b. Proficiency with a variety of weapons under tactical conditions, including: (a) stress and combat shooting conditions, (b) discretionary shoot/don't shoot conditions, (c) hostage situations, and (d) terrorist simulations;

    c. Safe, logical and legal method of responding to threat or possible threat situations according to FPPD policies and procedures;

    d. Safe and effective tactics, according to legal and FPPD guidelines, in various threat situations;

    e. Identification of critical officer safety skills, procedures, and actions at each stage of potentially violent situations;

    f. How the supreme court ruling in *Tennessee v. Garner* relates to deadly force;

    g. How to select the appropriate level of force to use, when given various scenarios, pursuant to *Graham v. Conner*

    h. The need for accurate documentation when use of force is involved

23. During the 2015 Training, officers were also trained that:

    a. firing their weapon in the line of duty is the thing that would occur least frequently in their careers, but it was one of the most important decisions they would ever have to make and errors in judgment could result in criminal prosecution or civil penalties;

    b. while they have learned the legal and tactical considerations involved and textbook or classroom learning or tactical exercises on a firing range prepare them for some of the considerations in decision-making, an interactive shooting

4

simulator offers an opportunity to reinforce their training and expose them to simulated experiences at deadly-force encounters without actual danger.

24. As a part of the annual required in-house training, the Department utilizes a Meggitt Training Systems Machine—a virtual use of force training simulator.

25. The Meggitt System, allows the operator (trainers) to put officers through simulated shoot/don't shoot scenarios that are based on a variety of real-world scenarios including patrol encounters, first responder scenarios, real world scenarios, home invasion scenarios, use of force scenarios, and "lessons learned" scenarios based on actual situations which police officers have encountered in the past.

26. The simulated scenarios include situations such as:

   a. active-shooters, shots-fired call at a school

   b. a vehicle stop for expired tags

   c. a disgruntled employee returning to his place of business to enact retribution

   d. a shots-fired call at a housing complex

   e. a domestic abuse call

   f. a vehicle stop of a sovereign citizen

   g. a vehicle stop of a suicidal driver

   h. a call of a man pointing a gun at people in the neighborhood

   i. a shots-fired call at a hospital

   j. a possible bank robbery in progress

27. Officers are encouraged to respond to the scenarios as if they were real by using verbal commands, drawing and using the appropriate weapon based on the situation, taking cover, and use of necessary level of force.

5

28. During the scenarios, officers are taught and evaluated on a number of things including:

   a. Verbal Commands—good and bad commands

   b. Threat Recognition—including a subject's ability and opportunity to cause serious bodily injury or death and that the officer or an innocent third party must be in jeopardy

   c. Threat Response—cover if possible, appropriate level of force

   d. Use of Cover—when and how to use cover effectively

   e. Weapon Handling—proper positioning based on threat level

   f. Timing of Response—quick response, attempt to deter further aggression, protect yourself, use time if available

   g. Observation—by trainers

   h. Judgment—when not to fire to ensure public safety, a subject's potential response to effect his escape.

   i. Application of law and policy—deadly force is a last resort to protect the officer or an innocent third person from death or serious bodily injury or to prevent escape of a fleeing dangerous felon.

   j. Marksmanship/Shooting Tactics—shoot to stop the threat, stop shooting immediately when the threat ceases.

## 2016 LESSON PLAN

29. Attachment 2 to this Declaration is a copy of the 2016 Lesson Plan for use of force scenario-based training by the FPPD.

30. The 2016 Lesson Plan is similar to the 2015 Lesson Plan.

6

VEHICLE PURSUITS

31. The Department requires officers who attempt to (but may unsuccessfully) effect traffic stops and/or end up engaged in pursuit of a vehicle for a period of time to complete a Post Pursuit Analysis Report ("PPAR").

32. The PPAR requires the officer to provide information concerning the pursuit, along with a copy of the incident report and, if appropriate, other relevant materials.

33. The purpose of the PPAR is for supervisors, the Deputy Chief and Chief to review an officer's conduct and ensure the pursuit was in compliance with Department policy.

34. Every PPAR is reviewed in conjunction with the incident report and, when available, squad car video, and dispatch audio transmissions by a watch commander or patrol commander and subsequently by the Deputy Chief and the Chief, where a determination is made as to whether the officer's conduct was in compliance with Department policy.

35. Where an officer is found to be in compliance with Department policy, it is noted and the officer is commended.

36. If it is determined that Department policy was violated, there is space on the PPAR to describe the violation and corrective action taken by the Department.

37. Corrective action may include additional training, a counseling session and/or policy review with the reviewer, and, where appropriate, progressive discipline is imposed.

38. Between 2014 and 2016, FPPD officers completed 64 PPAR's. On the occasions where it was determined the officer was not in compliance with Department policy, additional training, policy review with the officer and progressive discipline was imposed.

7

I declare under penalty of perjury that the foregoing statements are true and correct.

04/27/2021
Executed on this date

Signature

8

# JUDGEMENTAL USE OF FORCE LESSON PLAN

| DATE: **Spring 2015** | LESSON NO. **2015/1** | UNIT: **All FPPD Full Time Officers and FPPD Part Time Police Officers, Auxiliary officers,Explorers, Neighborhood Watch, Elected Officials, Press.** |
|---|---|---|
| COURSE: **In-House Training** | | TOPIC: MEGGITT JUDGEMENTAL USE OF FORCE |

INSTRUCTORS: **CMDR.KEATING, OFC.LEE, OFC.FREY, FPPD**

SUBJECT OF LESSON: **The officer/student will demonstrate good judgment in utilizing tactics necessary to control violent confrontations in accordance with legal and agency guidelines.**

The officer/student will:

Demonstrate proper draws and holstering techniques.
Demonstrate proficiency with a variety of weapons under tactical conditions, to include: (a) stress and combat shooting conditions; (b) discretionary, shoot don't shoot conditions; (c) hostage situations; and (i) terrorist simulations.
Demonstrate safe, logical, and legal methods of responding to threat or possible threat situations according to agency policies and procedures.
Demonstrate safe and effective tactics, according to legal and agency guidelines, in various threat situations.
Identify critical officer safety skills, procedures, and actions at each stage of a potentially violent situation.
Explain how the Supreme Court ruling in Tennessee v. Garner relates to deadly force.
Select the appropriate level of force to use, when given various scenarios. Supreme Court case GRAHAM v. CONNOR.
Explain why accurate documentation is necessary when use of force is involved.

INSTRUCTIONAL AIDS, MATERIALS, OR TOOLS NEEDED:
**Classroom**
**Computer w/speakers**
**MEGGITT Projector Machine**
**Two Glock firearms rendered inoperable/retrofitted with a laser**
**Numerous scenarios hand-picked by the instructor**
**Air tank to fill magazines**
**Screen**
**Cover for the officers**
**Scenario sheet**
**Evaluation sheet**

REFERENCES:
TENNESSEE v. GARNER, 471 U.S. 1 (1985) Police use of deadly force. Law enforcement officers pursuing an unarmed suspect may use deadly force to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers of others.

GRAHAM v. CONNOR 490 U.S. (1989) reasonableness of a seizure. Seizure of a citizen is properly analyzed

 ATT.1

Forest Park 1156

# JUDGEMENTAL USE OF FORCE LESSON PLAN

under the fourth amendment's "objective reasonableness" standard, rather than a due process standard.

LESSON OUTLINE:

## I. Introduction

A. Firing your weapon in the line of duty is the thing you will do the least in your career, but it is one of the most important decisions you will ever have to make. Err on one side, and you may be prosecuted for a criminal offense and/or be held liable for civil penalties that can ruin your life.

B. You have learned the legal and tactical considerations necessary when deciding whether to use deadly force. But neither textbook learning in a classroom, nor tactical exercises on a firing range can adequately prepare you for a sudden violent confrontation. Only an interactive judgmental shooting simulator can reinforce your training and give you the experience at handling deadly force situations without exposing yourself or others to actual danger

## II. Simulator Training Preparation
A. Purpose.

1. Prevent "Screen Shock."
2. Enhances training value of the simulator
3. Briefs you on how you need to react to learn the most.

## B. How the judgmental shooting simulator works.

1. Projects life-sized video scenarios of situations you may encounter as law enforcement officers.
2. Records, by means of a laser insert in your weapon, exactly when you fired each shot, and where each shot hit.
3. Provides feedback during the debriefing, showing what you were firing at, and where you hit for each shot fired.
4. May change the outcome of scenarios based on when and where you shot, and the tactics you used to de-escalate the situation.

## C. How to react during MEGGITT training.

1. Listen carefully to the briefing you will receive from the simulator "dispatcher" or from your instructor before each scenario. This will explain the situation you are about to encounter.
2. Treat what happens on the screen as if it were really happening.
    a. Talk to the characters on the screen. Use verbal commands.
    b. Draw and deploy your weapons as you would if the situation were real.
    c. Take cover as you would if the situation were real. Choose your cover based on the tactical situation. Remember, *no matter what you see on the screen, always have cover available.*
    d. Shoot if you would shoot in a real situation, or use your OC or baton – whichever you would choose in a real situation.
    e. Continue reacting to the screen until the action stops.
        Remember, "It ain't over 'till it's over!"
3. If you see an officer on the screen, that is your partner, not you. You are always seeing what is on the screen.
4. There will be no "surprise" threats developing behind you or off of the screen. Likewise, if a character leaves the screen, he or she will not suddenly jump back in and shoot at you.
5. Don't move forward towards the screen. If you need to advance, the view on the screen will advance just as if you were walking forward. Similarly, don't "charge" the screen. You needn't attempt to physically grapple with the characters.

**Forest Park 1157**

# JUDGEMENTAL USE OF FORCE LESSON PLAN

6. Don't attempt to "second-guess" the scenario. You might not handle the situation

D. Your actions during and after each scenario will be evaluated based on the following criteria:
  1. Verbal Commands
  2. Threat Recognition
  3. Threat Response
  4. Use of Cover
  5. Weapon Handling
  6. Timing of Response
  7. Observation
  8. Judgment
  9. Application of Law and Policy
  10. Marksmanship

## III. Simulator Practical Exercise

A. Prepare the participating officer/student's weapon by placing a air-charged magazine into it, and racking the slide..
  1. Double-check to ensure the officer's duty weapon has been removed from the officer's holster before each training session!
  2. Ensure the officer doesn't have a live back-up weapon!
B. Darken the room and ensure that the weapon has been properly calibrated/bore sighted.
C. Run a scenario.
D. Debrief the officer/student on the scenario.
  1. Ask why the student shot (or didn't shoot, used a Taser or baton, etc.)
    a. Did the officer/student think before speaking?
    (1) Did the officer/student articulate the elements that justify use of deadly force, and apply them to the scenario?
    (2) Did the officer/student avoid using equivocal language?  (Words having several   different meanings, purposely vague or ambiguous).
    (3) Was the student influenced by subsequent events?
1. Verbal Commands
    a. Good commands -- inform the offender what you require him to do, and induce him to comply.
    (1) Elements of good commands.
      (a) Clear, concise, and use simple non-colloquial English. (Contractions or profanity)
      (b) Given in a firm, authoritarian "command" voice.
      (c) Clearly articulated and audible.
    (2) These four basic commands allow you to control almost any violent confrontation with an armed offender.
      (a) Police! Don't Move!
        (1) *Always* identify yourself! Use "Police!" regardless of your agency, since "police" is universally understood and is similar to the English word in any languages.
        (2) Any movement the offender makes violates your command and increases the threat level.
        (3) "Stop!" and "Halt!" are both good commands, but both imply the offender may do something after he stops.
      (b) Turn Around! (Don't Turn Around!)
        (1) Get or keep the offender turned away from you.
        (2) When possible, move so you aren't where the offender last saw you.
      (c) Put Your Hands In The Air! (Put Your Hands Up!)
        (1) Allows you to clearly see the offender's hands.
        (2) Instant evidence of compliance.

# JUDGEMENTAL USE OF FORCE LESSON PLAN

(3) Non-threatening movement.

(4) When clearing a building, modify this command to, "Police! Come out with your hands in the air!"

(d) **Put The Weapon Down!** (If weapon observed.)

(1) Using the term, "weapon" means you don't have to see and recognize exactly what the offender has.

(2) It lets everyone within earshot know that you consider it a weapon.

(3) Prevents accidental discharge of dropped firearm.

(a) You will be responsible for any damage the bullet does, because *you* gave the command!

(b) It may cause you to reflexively fire, and have to justify shooting an unarmed man in the back!

(3) Repeat the command until the offender complies, then immediately issue another command, until the situation is under control.

(a) If the offender is mentally challenged, or speaks English as a second language, he may be trying to comprehend the command. Another command may just confuse him. One other command – Do It Now! – may be used if the offender appears hesitant to obey.

(b) Don't give the offender time to think. Keep him reacting to your commands in order to maintain control of the situation.

b. **Bad commands** – may produce undesirable results.

(1) Taunting (Go ahead, punk – Make my day!) may, through rage or fear, precipitate the very reactions we seek to avoid. It also convinces witnesses the shooting was intentional and malicious.

(2) Profanity may enrage the offender being "dissed" and provoke him into reacting. Again, witnesses will react unfavorably.

(3) "Cute" commands are likely to be confusing and are unprofessional. (You even blink, you'll die in the dark!)

c. **Dangerous commands** – greatly increase the risk to you or other officers, or that an innocent person will be shot.

(1) Freeze!

(a) Colloquial English – the literal meaning of the word isn't what we're trying to get across. Foreigners or people who speak English as a second language may not understand slang or colloquial English

(b) Use "Don't Move!" or "Stop!"

(2) **Show Me Your Hands!** (Let Me See Your Hands!)

(a) Imprecise – You must deal with the offender's interpretation of what you want.

(b) You may shoot an innocent civilian who turns towards you with a weapon in obedience to that command.

(c) The offender has the opportunity to swing a weapon towards you, and you won't know his intent.

(d) Use "Put Your Hands In The Air!"

(3) **Take Your Hands Out Of Your Pockets!**

(a) The dangers in this command are similar to "Show Me Your Hands!"

(b) If the suspect has gone into his pockets to draw a weapon, you have given him permission to draw it!

(c) Have him turn away, and then put his hands in the air.

## 2. Threat Recognition

a. There are three elements of a threat: Ability, Opportunity, and Jeopardy. All must be present for a threat to exist. Take away any one element, and there is no threat.

(1) **Ability:** To justify the use of deadly force, the offender must have the ability to cause death or serious bodily injury (generally defined as the breaking of bones).

(a) Weapon (gun, knife, or club).

(b) Overwhelming physical force.

**Forest Park 1159**

# JUDGEMENTAL USE OF FORCE LESSON PLAN

(c) The ability must ordinarily be seen, but sometimes may be inferred, (offender makes a sudden, furtive, drawing motion).

(2) **Opportunity:** The offender must have the opportunity (proximity) to use the weapon or overwhelming force.

(a) Different weapons have different effective ranges.

(b) Reactionary gap.

(1) If an offender is within 21 feet of you with an edged or blunt-force weapon, he can hit you before you can draw and fire.

(2) If the offender is within 15 feet, even with your weapon aimed at him, he can hit you before you can stop him.

(3) **Jeopardy:** You, or an innocent third party, must be in jeopardy to complete the threat.

(a) Jeopardy exists when the offender intends to do harm.

(b) Intent may be inferred from the offender's behavior.

(1) The threat must be imminent to justify the use of deadly force. Imminent means *right now!*

**3. Threat Response**

a. Move to cover as appropriate.

b. Use the appropriate level of force.

**4. Use of Cover**

a. When to use cover.

(1) Move towards cover the instant you become aware of a potential threat.

(2) Don't appear fearful by obviously taking cover when the threat level is low.

b. Using cover effectively.

(1) Don't crowd your cover. The muzzle should be at least six inches to a foot behind the cover.

(a) Allows you to quickly turn to face a threat on the weak side.

(b) Allows you to get deeper behind cover, and prevents incoming fire from skipping off the surface of your cover and being deflected into you.

(c) Prevents an unseen offender on the other side of your cover (doorway) from grabbing your weapon.

**5. Weapon Handling**

a. Although departmental policies vary, generally, you should draw your weapon in any situation where you are, or are likely to be, faced with deadly force. "When in doubt, whip it out!" Drawing the weapon serves two purposes:

(1) It protects you by enabling you to shoot much more quickly and accurately.

(2) It deters aggression by the offender.

b. There are basically only three positions your weapon should be in. Which position you choose should be based on the threat level.

(1) Secured in the holster.

(2) In your hand, low ready.

(3) Pointed at the subject.

(3) At "Low Ready" pointed towards the ground about half way between yourself and the offender. Do not use the "Sabrina" position (Gun pointed in the air) ~~unduly~~ *mobley language*

(a) The weapon will be less noticeable to the public held low.

(b) A premature discharge will not blind or deafen you.

(c) You can shoot more quickly and accurately coming up with the weapon.

(a) Finger off trigger until ready to shoot!

(b) Look over the sights – keep your attention focused on the offender(s).

**6. Timing of Response**

a. Respond quickly.

(1) Deter further aggression.

(2) Protect yourself.

b. Shooting first isn't essential, if you have used good tactics in time.

**Forest Park 1160**

# JUDGEMENTAL USE OF FORCE LESSON PLAN

**7. Observation**
a. During the debriefing, quiz the officer/student on such things as:
(1) The description of a witness or bystander.
(2) What words the offender used.
(3) The description of a vehicle or building in the scene.
(4) The weather conditions at the scene.
b. Ask leading questions to see if the student's recollection is influenced by them.

**8. Judgment**
a. You are responsible for every bullet you fire.
(1) Hold your fire if innocent bystanders are directly in the line of fire.
(2) Try to maneuver to a position where bystanders aren't threatened.
b. You are also responsible for the public safety.
(1) If he sees you, the offender is likely to shoot at you to effect his escape. There may be innocent bystanders behind you, as well.
(2) Criminals bent on escaping may perceive threats and shoot at bystanders, or shoot merely to cause confusion.
(3) Armed offenders are likely to take hostages or commit further violent crimes (carjacking) to affect their escape.

**9. Application of Law and Policy**
a. Legally, you are never *required* to use deadly force.
b. Deadly force may be used only as a last resort:
(1) To protect you or an innocent third person from death or serious bodily injury.
(2) To prevent the escape of a fleeing dangerous felon (Tennessee V. Garner).

**10. Shooting tactics.** ― *MARKSMANSHIP*
a. Shoot to stop.
(1) Pelvic girdle hits.
(2) Chest hits (Center of Body Mass).
(3) Head shots.
b. Shoot until it stops.
(1) ~~Observe the offender throughout the engagement.~~
(2) ~~Don't just fire one or two shots and wait to see what happens.~~
(3) Don't stop firing unless the offender drops his weapon, or lowers it to the point that it is no longer an imminent threat.
c. Stop shooting immediately when the threat ceases.
(1) ~~Don't turn a justifiable shoot into a grand jury indictment for excessive force.~~
(2) Conserve your ammunition. "It ain't over 'till it's over!"
d. Maintain your cover, if possible.
(1) Don't leave cover until the offender is secured.
(2) If possible, have a backup officer secure the offender and his weapon.

**\*\*\*\*\*\*\*\*\*\*\*END OF LESSON PLAN\*\*\*\*\*\*\*\*\*\*\*\***

I.

**NOTES.**

Forest Park 1161

# RISK ASSESSMENT WORKSHEET/RECORD (RAWR)

Purpose: To determine human health hazards associated to a task identified to be trained. Depending upon the task, and risk factors associated with training the task, control measures should be developed to reduce or eliminate risk.

| A. **TASK:** MEGGITT JUDGEMENTAL USE OF FORCE | B. DATE: June 2015    TIME: Varies LOCATION:  FPPD | | C. DATE PREPARED:  June 2015 | |
|---|---|---|---|---|
| D. PREPARED BY: CMDR. KEATING, OFC. LEE, OFC. FREY FPPD | | | E. ENDORSED BY: | |

| F. TASKS | G. IDENTIFY HAZARDS | H. ASSESS HAZARDS | I. DEVELOP CONTROL MEASURES | J. DETERMINE RESIDUAL RISK | K. IMPLEMENT CONTROLS & SUPERVISE | M.* EFFECTIVENESS OF CONTROL MEASURES |
|---|---|---|---|---|---|---|
| I. Classroom Introduction | -Tripping Hazards<br>-Fire | L | -Safety briefing including building layout and exits | L | -Make sure walk and exit areas stay clear | |
| II. Simulator Training Presentation | -Cramps<br>-Fatigue<br>-Dehydration<br>-Poking of eys | L | -Warm up body prior<br>-Eye protection<br>-Demonstrate proper holding techniques<br>-Proper shooting stand<br>-Use command/ authoritative voice | L | -Have Paramedics Notified and prepared to respond<br>-Have Instructors give safety briefing<br>-Clear area of any non-participating persons | |
| III. Simulator Practical Exercise | -Injury from exercise and running<br>-Injury from taking cover<br>-Injury from tripping/falling<br>-Accidental dropping of weapon/magazine on foot<br>-Injury from reloading weapon<br>-Hand injury from Weapon's slide sliding back/forth | H | -Safety brief with shooters and instructors.<br>-Eye protection<br>-Instructors monitor each shooter carefully at each station | H | -Safety checks for firearms<br>-Check for other weapons.<br>-Move to extreme distance from shooters.<br>-Have instructors give safety briefing to shooters<br>-Have Paramedics notified and prepared to respond | |

**Forest Park 1168**

Case: 1:18-cv-00910 Document #: 141-3 Filed: 04/29/21 Page 54 of 76 PageID #:693

**L. Determine overall mission/task risk level after controls are implemented (circle one)**

LOW (L)      MODERATE (M)   HIGH (H)        EXTREMELY HIGH (EH)

*To be completed after exercise/mission/task and gauge effectiveness of control measures for future reference. It will help in providing more effective control measures.

Forest Park 1169

# FOREST PARK POLICE DEPARTMENT
# MEGGITT TRAINING SYSTEM
### JULY OF 2015

Firing your weapon in the line of duty is the thing you will do the least in your career, but it is one of the most important decisions you will ever have to make. Err on one side, and you may be prosecuted for a criminal offense and/or be held liable for civil penalties that can ruin your life.

In effort to training the Forest Park police officers with the important decision making, the MEGGITT Training System was employed. The MEGGITT Training Systems was developed by the MEGGITT Training Systems Inc. The MEGGITT Training Systems is high quality virtual and live fire training system. In 2007, following the acquisition of FATS by MEGGITT, MEGGITT Training Systems, Inc. was formed. MEGGITT Training Systems, Inc. provides turnkey, full spectrum virtual and live fire training capabilities, judgmental training and situational awareness tools.

Upon completion of the MEGGITT Training Systems, the police officers/students will demonstrate good judgment in utilizing tactics necessary to control violent confrontations in accordance with legal and agency guidelines, which includes the following:

1.     Demonstrate proper draws and holstering techniques.
2.     Demonstrate proficiency with a variety of weapons under tactical conditions, to include: (a) stress and combat shooting conditions; (b) discretionary, shoot don't shoot conditions; (c) hostage situations; and (l) terrorist simulations.
3.     Demonstrate safe, logical, and legal methods of responding to threat or possible threat situations according to agency policies and procedures.
4.     Demonstrate safe and effective tactics, according to legal and agency guidelines, in various threat situations.
5.     Identify critical officer safety skills, procedures, and actions at each stage of a potentially violent situation.
6.     Explain how the Supreme Court ruling in Tennessee v. Garner relates to deadly force.
7.     Select the appropriate level of force to use, when given various scenarios. Supreme Court case GRAHAM v. CONNOR.
8.     Explain why accurate documentation is necessary when use of force is involved.

Forest Park 1170

The following Sworn, Part-Time and Auxiliary Officers and Civilians attended the MEGGITT Training Systems:

## SWORN OFFICERS

Battistoni, Lauren
Becker, Richard
Bell, Eric
Caines, Andrea
Cannon, Tom
Chin, Christopher
Defors, Nicholas
Diano, Justin
Flores, Jose
Grimes, Harold
Gross, Kenneth
Harrison, Mike
Hickey, George
Kendall, Robert
McClintock, Scott
Mike O'Connor
Miller, Dan
Morrissette, Pete
Petrovic, Nick
Reilly, Jack
Spagnolo, Michael
Stasinopoulos, Adam
Weiler, Stephen

## AUXILIARY OFFICERS

Balingit, Peter
Biscaglio, Anthony
Bolten, Donald
Cogley, James
Curtis, Luther
Davis, Nicholas
Dillon, Gerald
Fluker, Michael
Giovanni, Ronald
Graham, Tim
Griffin, Clifford
Guzman, Cara
Howard, Cory
Jennett, Joshua
Knack, Kenneth
Koch, Karl
O'Mara, Sean
Plum, Jonathan
Plum, William
Pusavc, Briana
Scott, Debra
Sinisi, Michael
Zavala, Joel

## PART-TIME OFFICERS

Savas, Dean
Tierney, Patrick

## CIVILIANS

Boykin, Richard
Entler, Eric
Entler, Rachel
Glinke, Steve
Martinez, Ester
Murphy, Kathryn
Riggins, Lashan
Volgel, Thomas
Members of the Junior Police Academy
Six members of Neighborhood Watch

Forest Park 1171

# JUDGEMENTAL USE OF FORCE LESSON PLAN

| | | |
|---|---|---|
| DATE: **Spring 2016** 04/12/2016 04/25/2016 | LESSON NO. **#2016/1** | UNIT: **All FPPD Full Time Police Officers, Part Time Police Officers, Auxiliary Officers, Explorers, Neighborhood Watch, Elected Officials, Press.** |
| COURSE: **F.P.P.D. In-House Training** | | TOPIC: MEGGITT JUDGEMENTAL USE OF FORCE |

INSTRUCTORS: **D.C. KEATING, OFC.LEE, OFC.FREY, FPPD**

SUBJECT OF LESSON: **The officer/student will demonstrate good judgment in utilizing tactics necessary to control violent confrontations in accordance with legal and agency guidelines.**

The officer/student will:

Demonstrate proper draws and holstering techniques.
Demonstrate proficiency with a variety of weapons under tactical conditions, to include: (a) stress and combat shooting conditions; (b) discretionary, shoot don't shoot conditions; (c) hostage situations; and (i) terrorist simulations.
Demonstrate safe, logical, and legal methods of responding to threat or possible threat situations according to agency policies and procedures.
Demonstrate safe and effective tactics, according to legal and agency guidelines, in various threat situations.
Identify critical officer safety skills, procedures, and actions at each stage of a potentially violent situation.
Explain how the Supreme Court ruling in Tennessee v. Garner relates to deadly force.
Select the appropriate level of force to use, when given various scenarios. Supreme Court case GRAHAM v. CONNOR.
Explain why accurate documentation is necessary when use of force is involved.

INSTRUCTIONAL AIDS, MATERIALS, OR TOOLS NEEDED:
**Classroom
Computer w/speakers
MEGGITT Projector Machine
Two Glock firearms rendered inoperable/retrofitted with a laser
Numerous scenarios hand-picked by the instructor
Air tank to fill magazines
Screen
Cover for the officers
Scenario sheet
Evaluation sheet**

REFERENCES:
TENNESSEE v. GARNER, 471 U.S. 1 (1985) Police use of deadly force. Law enforcement officers pursuing an unarmed suspect may use deadly force to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers of others.

GRAHAM v. CONNOR 490 U.S. (1989) reasonableness of a seizure. Seizure of a citizen is properly analyzed

ATT.2

**Forest Park 1238**

# JUDGEMENTAL USE OF FORCE LESSON PLAN



under the fourth amendment's "objective reasonableness" standard, rather than a due process standard.

LESSON OUTLINE:

## I. Introduction

A. Firing your weapon in the line of duty is the thing you will do the least in your career, but it is one of the most important decisions you will ever have to make. Err on one side, and you may be prosecuted for a criminal offense and/or be held liable for civil penalties that can ruin your life.

B. You have learned the legal and tactical considerations necessary when deciding whether to use deadly force. But neither textbook learning in a classroom, nor tactical exercises on a firing range can adequately prepare you for a sudden violent confrontation. Only an interactive judgmental shooting simulator can reinforce your training and give you the experience at handling deadly force situations without exposing yourself or others to actual danger

## II. Simulator Training Preparation
A. Purpose.

1. Prevent "Screen Shock."
2. Enhances training value of the simulator
3. Briefs you on how you need to react to learn the most.



B. How the judgmental shooting simulator works.

1. Projects life-sized video scenarios of situations you may encounter as law enforcement officers.
2. Records, by means of a laser insert in your weapon, exactly when you fired each shot, and where each shot hit.
3. Provides feedback during the debriefing, showing what you were firing at, and where you hit for each shot fired.
4. May change the outcome of scenarios based on when and where you shot, and the tactics you used to de-escalate the situation.

C. How to react during MEGGITT training.

1. Listen carefully to the briefing you will receive from the simulator "dispatcher" or from your instructor before each scenario. This will explain the situation you are about to encounter.
2. Treat what happens on the screen as if it were really happening.
    a. Talk to the characters on the screen. Use verbal commands.
    b. Draw and deploy your weapons as you would if the situation were real.
    c. Take cover as you would if the situation were real. Choose your cover based on the tactical situation. Remember, *no matter what you see on the screen, always have cover available.*
    d. Shoot if you would shoot in a real situation, or use your OC or baton – whichever you would choose in a real situation.
    e. Continue reacting to the screen until the action stops.
       Remember, "It ain't over 'till it's over!"
3. If you see an officer on the screen, that is your partner, not you. You are always seeing what is on the screen.
4. There will be no "surprise" threats developing behind you or off of the screen. Likewise, if a character leaves the screen, he or she will not suddenly jump back in and shoot at you.
5. Don't move forward towards the screen. If you need to advance, the view on the screen will advance just as if you were walking forward. Similarly, don't "charge" the screen. You needn't attempt to physically grapple with the characters.

**Forest Park 1239**

# JUDGEMENTAL USE OF FORCE LESSON PLAN



6. Don't attempt to "second-guess" the scenario. You might not handle the situation

D. Your actions during and after each scenario will be evaluated based on the following criteria:
1. Verbal Commands
2. Threat Recognition
3. Threat Response
4. Use of Cover
5. Weapon Handling
6. Timing of Response
7. Observation
8. Judgment
9. Application of Law and Policy
10. Marksmanship

## III. Simulator Practical Exercise

A. Prepare the participating officer/student's weapon by placing a air-charged magazine into it, and racking the slide..
1. Double-check to ensure the officer's duty weapon has been removed from the officer's holster before each training session!
2. Ensure the officer doesn't have a live back-up weapon!
B. Darken the room and ensure that the weapon has been properly calibrated/bore sighted.
C. Run a scenario.
D. Debrief the officer/student on the scenario.
1. Ask why the student shot (or didn't shoot, used a Taser or baton, etc.)
a. Did the officer/student think before speaking?
(1) Did the officer/student articulate the elements that justify use of deadly force, and apply them to the scenario?
(2) Did the officer/student avoid using equivocal language? (Words having several    different meanings, purposely vague or ambiguous).
(3) Was the student influenced by subsequent events?
1. Verbal Commands
a. Good commands – inform the offender what you require him to do, and induce him to comply.
(1) Elements of good commands.
(a) Clear, concise, and use simple non-colloquial English. (Contractions or profanity)
(b) Given in a firm, authoritarian "command" voice.
(c) Clearly articulated and audible.
(2) These four basic commands allow you to control almost any violent confrontation with an armed offender.
(a) Police! Don't Move!
(1) *Always* identify yourself! Use "Police!" regardless of your agency, since "police" is universally understood and is similar to the English word in
any languages.
(2) Any movement the offender makes violates your command and increases the threat level.
(3) "Stop!" and "Halt!" are both good commands, but both imply the offender may do something after he stops.
(b) Turn Around! (Don't Turn Around!)
(1) Get or keep the offender turned away from you.
(2) When possible, move so you aren't where the offender last saw you.
(c) Put Your Hands In The Air! (Put Your Hands Up!)
(1) Allows you to clearly see the offender's hands.
(2) Instant evidence of compliance.

**Forest Park 1240**

# JUDGEMENTAL USE OF FORCE LESSON PLAN



(3) Non-threatening movement.

(4) When clearing a building, modify this command to, "Police! Come out with your hands in the air!"

(d) **Put The Weapon Down!** (If weapon observed.)

(1) Using the term, "weapon" means you don't have to see and recognize exactly what the offender has.

(2) It lets everyone within earshot know that you consider it a weapon.

(3) Prevents accidental discharge of dropped firearm.

(a) You will be responsible for any damage the bullet does, because *you* gave the command!

(b) It may cause you to reflexively fire, and have to justify shooting an unarmed man in the back!

(3) Repeat the command until the offender complies, then immediately issue another command, until the situation is under control.

(a) If the offender is mentally challenged, or speaks English as a second language, he may be trying to comprehend the command. Another command may just confuse him. One other command – **Do It Now!** – may be used if the offender appears hesitant to obey.

(b) Don't give the offender time to think. Keep him reacting to your commands in order to maintain control of the situation.

**b. Bad commands** – may produce undesirable results.

(1) Taunting (Go ahead, punk – Make my day!) may, through rage or fear, precipitate the very reactions we seek to avoid. It also convinces witnesses the shooting was intentional and malicious.

(2) Profanity may enrage the offender being "dissed" and provoke him into reacting. Again, witnesses will react unfavorably.

(3) "Cute" commands are likely to be confusing and are unprofessional. (You even blink, you'll die in the dark!)

**c. Dangerous commands** – greatly increase the risk to you or other officers, or that an innocent person will be shot.

**(1) Freeze!**

(a) Colloquial English – the literal meaning of the word isn't what we're trying to get across. Foreigners or people who speak English as a second language may not understand slang or colloquial English

(b) Use "Don't Move!" or "Stop!"

**(2) Show Me Your Hands! (Let Me See Your Hands!)**

(a) Imprecise – You must deal with the offender's interpretation of what you want.

(b) You may shoot an innocent civilian who turns towards you with a weapon in obedience to that command.

(c) The offender has the opportunity to swing a weapon towards you, and you won't know his intent.

(d) Use "Put Your Hands In The Air!"

**(3) Take Your Hands Out Of Your Pockets!**

(a) The dangers in this command are similar to "Show Me Your Hands!"

(b) If the suspect has gone into his pockets to draw a weapon, you have given him permission to draw it!

(c) Have him turn away, and then put his hands in the air.

## 2. Threat Recognition

a. There are three elements of a threat: Ability, Opportunity, and Jeopardy. All must be present for a threat to exist. Take away any one element, and there is no threat.

(1) **Ability:** To justify the use of deadly force, the offender must have the ability to cause death or serious bodily injury (generally defined as the breaking of bones).

(a) Weapon (gun, knife, or club).

(b) Overwhelming physical force.

# JUDGEMENTAL USE OF FORCE LESSON PLAN



**(c)** The ability must ordinarily be seen, but sometimes may be inferred, (offender makes a sudden, furtive, drawing motion).

**(2) Opportunity:** The offender must have the opportunity (proximity) to use the weapon or overwhelming force.

**(a)** Different weapons have different effective ranges.

**(b)** Reactionary gap.

**(1)** If an offender is within 21 feet of you with an edged or blunt-force weapon, he can hit you before you can draw and fire.

**(2)** If the offender is within 15 feet, even with your weapon aimed at him, he can hit you before you can stop him.

**(3) Jeopardy:** You, or an innocent third party, must be in jeopardy to complete the threat.

**(a)** Jeopardy exists when the offender intends to do harm.

**(b)** Intent may be inferred from the offender's behavior.

**(1)** The threat must be imminent to justify the use of deadly force. Imminent means *right now!*

**3. Threat Response**

**a.** Move to cover as appropriate.

**b.** Use the appropriate level of force.

**4. Use of Cover**

**a.** When to use cover.

**(1)** Move towards cover the instant you become aware of a potential threat.

**(2)** Don't appear fearful by obviously taking cover when the threat level is low.

**b.** Using cover effectively.

**(1)** Don't crowd your cover. The muzzle should be at least six inches to a foot behind the cover.

**(a)** Allows you to quickly turn to face a threat on the weak side.

**(b)** Allows you to get deeper behind cover, and prevents incoming fire from skipping off the surface of your cover and being deflected into you.

**(c)** Prevents an unseen offender on the other side of your cover (doorway) from grabbing your weapon.

**5. Weapon Handling**

**a.** Although departmental policies vary, generally, you should draw your weapon in any situation where you are, or are likely to be, faced with deadly force. "When in doubt, whip it out!" Drawing the weapon serves two purposes:

**(1)** It protects you by enabling you to shoot much more quickly and accurately.

**(2)** It deters aggression by the offender.

**b.** There are basically only three positions your weapon should be in. Which position you choose should be based on the threat level.

**(1)** Secured in the holster.

**(2)** In your hand, low ready.

**(3)** Pointed at the subject.

**(3)** At "Low Ready" pointed towards the ground about half way between yourself and the offender. Do not use the "Sabrina" position (Gun pointed in the air).

**(a)** The weapon will be less noticeable to the public held low.

**(b)** A premature discharge will not blind or deafen you.

**(c)** You can shoot more quickly and accurately coming up with the weapon.

**(a)** Finger off trigger until ready to shoot!

**(b)** Look over the sights – keep your attention focused on the offender(s).

**6. Timing of Response**

**a.** Respond quickly.

**(1)** Deter further aggression.

**(2)** Protect yourself.

**b.** Shooting first isn't essential, if you have used good tactics in time.

# JUDGEMENTAL USE OF FORCE LESSON PLAN



### 7. Observation
a. During the debriefing, quiz the officer/student on such things as:
(1) The description of a witness or bystander.
(2) What words the offender used.
(3) The description of a vehicle or building in the scene.
(4) The weather conditions at the scene.
b. Ask leading questions to see if the student's recollection is influenced by them.

### 8. Judgment
a. You are responsible for every bullet you fire.
(1) Hold your fire if innocent bystanders are directly in the line of fire.
(2) Try to maneuver to a position where bystanders aren't threatened.
b. You are also responsible for the public safety.
(1) If he sees you, the offender is likely to shoot at you to effect his escape. There may be innocent bystanders behind you, as well.
(2) Criminals bent on escaping may perceive threats and shoot at bystanders, or shoot merely to cause confusion.
(3) Armed offenders are likely to take hostages or commit further violent crimes (carjacking) to affect their escape.

### 9. Application of Law and Policy
a. Legally, you are never *required* to use deadly force.
b. Deadly force may be used only as a last resort:
(1) To protect you or an innocent third person from death or serious bodily injury.
(2) To prevent the escape of a fleeing dangerous felon (Tennessee V. Garner).

### 10. Shooting tactics.
a. Shoot to stop.
(1) Pelvic girdle hits.
(2) Chest hits (Center of Body Mass).
(3) Head shots.
b. Shoot until it stops.
(1) Observe the offender throughout the engagement.
(2) Don't just fire one or two shots and wait to see what happens.
(3) Don't stop firing unless the offender drops his weapon, or lowers it to the point that it is no longer an imminent threat.
c. Stop shooting immediately when the threat ceases.
(1) Don't turn a justifiable shoot into a grand jury indictment for excessive force.
(2) Conserve your ammunition. "It ain't over 'till it's over!"
d. Maintain your cover, if possible.
(1) Don't leave cover until the offender is secured.
(2) If possible, have a backup officer secure the offender and his weapon.

***********END OF LESSON PLAN***********

I.

**NOTES.**

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 1 |
|---|---|---|
| | INTERNAL AFFAIRS | |

**Indexed**    Citizen Complaint
Employee Misconduct
Internal Affairs
Internal Affairs Informational Brochure

**Policy**    The goal of Internal Affairs in the Forest Park Police Department is to ensure that the integrity of the Agency is maintained through an internal system where objectivity, fairness and justice are assured by intensive impartial investigation and review.

**Purpose**    Protection of the Public. The public image of the Department is determined by the quality of the Internal Affairs function in response to allegations of misconduct against the Department and its employees.

Protection of the Employee. It is the belief of the Department that all employees must be protected against false allegations of misconduct. It is believed that this can only be accomplished through a consistently thorough investigative process.

Removal of Unfit Personnel. Personnel who engage in serious acts of misconduct or who have demonsrated they are unfit for Police Department employment must be removed for the protection of the public and the Department and it's employees.

Correction of Procedural Problems. In an effort to constantly seek and improve the efficiency and effectiveness of personnel, the Internal Affairs investigative system allows the opportunity to disclose faulty procedures that may otherwise have gone undetected. These procedures can then be improved or corrected as needed.

## I. RESPONSIBILITY

A. The Deputy Chief is responsible for the Internal Affairs function of the Department.

B. The Deputy Chief will report directly to the Chief of Police.

## II. PROCESS

A. The process of Internal Investigations includes the following:
1. Recording, registering, and controlling the investigation of complaints against members.
2. Supervising and controlling the investigation of alleged suspected misconduct within the agency, and



**EXHIBIT**
**9**

Forest Park 1279

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 2 |
|---|---|---|
| | INTERNAL AFFAIRS | |

3.  Safeguarding the confidentiality of Internal Affairs investigations and records.

## III. AUTHORITY

A.  Each supervisor will continually examine all areas of police personnel action under his/her purview in an effort to discover any misconduct at its earliest stages.

B.  Each supervising officer will assume the duties and obligations of his or her rank during the investigation of a complaint against a member or employee of the Police Department.

C.  A supervisor will not look to any higher authority to initiate an investigation when the complaint or misconduct is within the scope of his or her own authority and responsibility, or is otherwise minor in nature. Examples of complaints to be handled by an immediate supervisor will include, but not be limited to, the following:
   1.  Rudeness on the part of a Department member,
   2.  Tardiness,
   3.  Insubordination

D.  The Chief of Police will be notified, as soon as possible, under the following circumstances:
   1.  Allegations based on an alleged violation of the law, or serious misconduct which could result in dismissal from the Department.
   2.  Allegations or complaints that are likely to be confidential in nature, or potentially damaging to innocent persons.
   3.  Allegations or complaints which appear complex and extensive in nature.
   4.  When an immediate Emergency Suspension is warranted for the protection of the public or the Police Department.

E.  Examples of complaints requiring an Internal Affairs investigation will include, but not be limited to, the following allegations:
   1.  Corruption,
   2.  Brutality,
   3.  Misuse of force,
   4.  Civil rights violations,
   5.  Criminal misconduct.

F.  The Chief of Police may require an employee to submit to a medical or laboratory examination, to be photographed, participate in a lineup, or submit financial disclosure statements when such information or actions are specifically directed and narrowly related to a particular Internal Affairs investigation and in accordance with existing labor agreements. Failure to follow a direct order of this nature shall constitute a separate infraction and may result in termination.

**Forest Park 1280**

# Forest Park Police Department

| Issued: July 2010 | General Order #535 | Page 3 |
|---|---|---|
| | INTERNAL AFFAIRS | |

G. The Supervising States Attorney of the Fourth Municipal District of the Cook County States Attorney's Office will be contacted when investigations concern possible violations of criminal law. This contact may be for notification and/or legal advice or assistance in case preparation.

## IV. SCOPE OF COMPLAINTS

A. The Forest Park Police Department will adhere to a policy of investigating all reports of allegations against the Department and/or any member of the Department. All instances of employee inefficiency and misconduct are to be revealed and investigated. It is only by this process the Department will project an image of being responsive to all citizen complaints.

B. A complaint may be filed against a Department member either in person, by letter, e-mail, or telephone.

C. Complaints in the form of anonymous tips about criminal activity, whether the subject of the complaint is a citizen or department member, will be investigated by the Department.

D. All complaints, regardless of the nature, scope, or reasonableness will be documented by filling out Appendix 535-A, even if the complainant wishes to remain anonymous, **or** refuses to fill out the form, in which case it will be completed by the supervisor. The Chief of Police will maintain a written record of all complaints against the Police Department or its personnel.

E. It will be at the discretion of the Chief of Police to initiate an internal investigation based on the nature of the complaint.

F. The supervisor receiving the initial complaint will have the following responsibilities:
   1. Conduct a preliminary examination of the complaint or allegation.
   2. Provide the complainant with a copy of the information brochure, Appendix 535-A, regarding Internal Investigations. Have the complainant complete Appendix 535-C, which will then be dated and signed by the supervisor. The supervisor will then furnish the complainant with a copy of the complaint.
   3. Immediately foward the original complaint to the Chief of Police, where it will then be assigned a Internal Affairs Complaint Number, for tracking purposes. The supervisor investigating the complaint or allegation has the authority and responsibility to resolve the complaint if it is minor and within the scope of that person's authority. In this instance, a report of the conclusions and results shall then be fowarded to the Chief of Police, via memorandum, along with a copy of the original complaint form.

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 4 |
|---|---|---|
| | INTERNAL AFFAIRS | |

G. If an incident is major in scope, the Chief of Police is responsible for notifying the accused member, when practical, within 72 hours of the receipt of the complaint as to the fact that a complaint has been made and an investigation has been initiated.

H. Unless the complaint and allegation is of such magnitude that it requires additional time, all complaints will be resolved within 30 days of the receipt of the initial complaint. It is the responsibility of the investigating supervisor to provide the Chief of Police with status reports every 7 days until the situation has been resolved.

I. During the course of an investigation, the Chief, or his designee, shall notify the complainant concerning the status of complaints lodged against the Department, or its employees.

J. If a complaint is made against the Chief of Police, the Village Mayor or his designee shall be notified and shall be responsible for conducting the investigation in accordance with the Village of Forest Park Personnel Handbook and this Order.

## V. INVESTIGATIVE PROCEDURES

A. The investigative procedures of the Forest Park Police Department will be in accordance with the Uniform Peace Officers Disciplinary Act. The rights afforded to a member of the Police Department under the Uniform Peace Officers Disciplinary Act are in addition to those rights guaranteed to all citizens under the Constitution and Laws of the United States and the State of Illinois.

B. The Uniform Peace Officers Disciplinary Act does not apply to any officer charged with violating any provision of the Criminal Code of 1961 or any of the Federal, State or Local Criminal Laws. The provisions of the Uniform Peace Officers Disciplinary Act applies to all ranks, from probationary officers through the Chief of Police.

C. The rights granted by the Act are guaranteed in connection with a formal investigation, as opposed to an informal inquiry.

D. A Formal Investigation is an investigation ordered by the Chief of Police which is intended to gather evidence of misconduct which may be the basis for filing charges seeking the officer's removal, discharge or suspension in excess of 3 days.

E. An Informal Inquiry is a meeting by supervisory or command personnel with an officer concerning an allegation of misconduct, the purpose of which is to mediate a citizen complaint or discuss the facts to determine whether a formal investigation should be commenced.

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 5 |
|---|---|---|
| | INTERNAL AFFAIRS | |

F. The rights provided in the Act do not apply to questioning which is part of an "informal inquiry" or relating to minor infractions of Department and/or Village of Forest Park rules, which may be noted on the Officer's record, but which may not in themselves result in removal, discharge or a suspension in excess of 3 days.

G. Rights guaranteed to members of the Department being interrogated as part of a formal investigation include notice rights, and substantive rights.
   1. Notice rights, as described by Statute, include the following:
      a. The nature of the investigation
      b. The names of all complainants
      c. Written warnings that admissions made in the course of the interrogation may be used as evidence of misconduct or for the basis of charges seeking suspension, removal or discharge.
      d. The right to have counsel of the officer's choosing present to advise him/her at any stage of the interrogation.
      e. The right to have a collective bargaining representative present during investigations.
      f. The Forest Park Police Department Formal Investigation Notification Form may be used for the purpose of notifying an officer of a complaint. (see Appendix 535-B)
      g. The notice rights are part of the notification and waiver, and must be completed and returned to the investigating officer prior to interrogation.
      h. The Uniform Peace Officers Disciplinary Act, ILCS Ch. 50, Sections 725/1 to 725/7, also provides the members of the Department with certain substantive rights.
   2. Substantive Rights, as described by Statute, include the following:
      a. Interrogation shall be conducted at a reasonable time of the day, and if possible, when the officer is on duty.
      b. The officer under investigation shall be informed of the name, rank, and unit or command of the officer in charge of the investigation, the interrogators, and all persons present during any interrogation, except at a public administrative meeting.
      c. The interrogation session will be of a reasonable duration, and shall permit the officer interrogated reasonable periods for rest and personal necessities.
      d. The officer being interrogated will not be subjected to professional or personal abuse, including offensive language.
      e. A complete record of any interrogation shall be made, such recordings may be electronically recorded, and a complete transcript or copy made available to the officer under investigation without charge and without undue delay.

**Forest Park 1283**

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 6 |
|---|---|---|
| | INTERNAL AFFAIRS | |

    f.   The officer under investigation shall have the right to be represented by counsel of his or her choosing, as well as having a collective bargaining representative present.

    g.   Admissions or confessions obtained during the course of an interrogation, not conducted in accordance with this Act, may not be utilized in any subsequent disciplinary proceeding against the officer.

    h.   No officer shall be required to submit to a polygraph test or other test, questioning by means of any chemical substance except at the officer's express written consent and in accordance with existing labor agreements. Refusal to submit for such tests will not result in any disciplinary action, and shall not be part of the officer's record, and no officer shall be disciplined or otherwise discriminated against or be threatened with any such treatment as retaliation for his or her exercising their rights granted by this Act.

H.   The officer conducting an internal investigation shall conduct the investigation fairly and impartially for both the complainant and the member of the Department.

K.   Interviews will be conducted as deemed necessary to accumulate all necessary evidence and facts pertaining to the complaint.

L.   These guidelines will also apply to all civilian employees.

## VI. DISPOSITION

A.   Upon completion of the investigation, the report will be forwarded to the Chief of Police. The report of the findings will classify the case into one of the following categories:

    1.   Improper Conduct – The Internal Investigation revealed the allegation is true, and the action of the Department or the member was inconsistent with Department and/or Village of Forest Park policy.

    2.   Policy Failure - The Internal Investigation revealed that the allegation was true, and the action of the Department or the member was consistent with Department and/or Village of Forest Park policy.

    3.   Insufficient Evidence - The Internal Investigation revealed that there is insufficient proof to confirm or refute the allegation.

    4.   Unfounded Complaint - Either the allegation is demonstrably false, or there is no credible evidence to support it.

B.   When the complaint or allegation is of a criminal offense, and evidence is such that the action, if it had been committed by a private person would have resulted in an arrest, the investigating source will meet with the Chief of Police.

**Forest Park 1284**

# Forest Park Police Department

| Issued: July 2010 | General Order #535 | Page 7 |
|---|---|---|
| | INTERNAL AFFAIRS | |

      1. The supervising States Attorney of the Fourth Municipal District should be contacted for advise and information. It will then be determined:
        a. Whether the accused member should be arrested.
        b. Whether a warrant should be issued for the member's arrest, or
        c. Whether criminal action should be delayed pending further investigation.

C. All reports emanating from the investigating source will be submitted directly to the Chief of Police for his review and approval, and be made part of the permanent record for this investigation.

D. The Deputy Chief shall notify a complainant of the findings of the investigation conducted by the Police Department. After receiving the results of the internal investigation, the officer may appeal the findings to the Chief of Police. Additional appeals may be granted through the Board of Fire and Police Commissioners, if it is within the scope of their duties, under their Rules and Regulations.

E. Complaints that are classified as Improper Conduct will be filed in the officer's personnel file. All reports that result in Proper Conduct, Policy Failure, Insufficient Evidence or Unfounded Complaint finding will be filed in the internal investigation file, of the Chief of Police. Reports of this nature shall not be entered in the officer's personnel file.
      1. Ninety (90) days after classifying an incident as Proper Conduct, Policy Failure, Insufficient Evidence, or Unfounded Complaint, and with no knowledge of any other investigation or action relative to the investigated incident, member name(s) will be removed from all reports filed in the Chief's Internal Investigation File.

F. Records pertaining to internal affairs investigations will be maintained in a secure area by the Chief.

G. Improper Conduct cases and the disciplinary actions taken may be a matter of public information in accordance with the Freedom of Information Act. All other cases will be regarded as confidential and records of such cases will be maintained in the internal investigation file in the Chief of Police's office and filed with the Office of the Village Clerk.

## VII. DISSEMINATION

A. Copies of general orders relating to the administration of the Internal Affairs function will be related to all Department personnel according to the dissemination process.

# Forest Park Police Department

| Issued:<br>July 2010 | General Order #535 | Page 8 |
|---|---|---|
| | INTERNAL AFFAIRS | |

B. The Deputy Chief will complete an annual statistical summary which will be forwarded to the Chief of Police. This report will also be made available to the public and Department employees

This Order supersedes all previous written and unwritten policies of the Forest Park Police Department on the above subject.

| Issued:<br>July 2010 | 52 | CALEA REF# | |
|---|---|---|---|
| Authority: | | | |

## Forest Park Police Department
517 Desplaines Ave. Forest Park, IL 60130/ (708)-366-2425

*Jim Ryan- Chief of Police*

## PERSONNEL COMPLAINT INFORMATION

This pamphlet provides information on how to file a personnel complaint against a member of the Forest Park Police Department.

It is the policy of the Department to investigate every allegation of wrongdoing by members of the Department in order to determine the charge's substance, or lack thereof.

Q. – How do I file a complaint against an officer?
A. – A complaint may be filed against a Department member either in person at the Police Department, by letter, or by telephone. The supervisor you speak with will fill out a written complaint form, and forward it for investigation.

Q. – Do I have to give my name in order to file the complaint?
A. – No. However, anonymous complaints can be very difficult to investigative, and thus, the conclusion may not be what the complainant expected.

Q. – Will the complaint be published in the newspaper?
A. – No. All complaints against a Department member are treated as confidential personnel matters.

Q. – Will the Police Officer know that I have made a complaint against them?
A. – Yes. The Officer has a right to know the charge made against them, and identify the person making the allegation.

Q. – Who is responsible for investigating the complaint?
A. – The Deputy Chief is responsible for the administration of the Internal Investigations Function. Other members might be assigned to gather information, or evidence.

Q. – What will happen to the Police Officer?
A. – After a thorough investigation, if it is determined that the complaint is sustained, the discipline will be determined by the seriousness of the infraction. Disciplinary actions range from verbal reprimand, to re-training, suspension, or in extreme cases, termination.

Q. – Will the Police Department retaliate against me for making a complaint against an officer?
A. – Absolutely not. It is essential that public confidence be maintained in the ability of the Department to investigate complaints against its members.

Q. – How long will the investigation take?
A. – As a general rule, the investigation should be concluded within 30 days , unless extenuating circumstances necessitate extension.

535-A

# Forest Park Police Department

*517 Desplaines Ave. Forest Park, IL 60130/ (708)-366-2425*

*Jim Ryan- Chief of Police*

**Q.** – Will I be notified of the results of the investigation?
**A.** – Once the investigation has concluded, the Deputy Chief will notify you of the results.

**Q.** – What if I am not satisfied with the results of the Department's investigation?
**A.** – You may contact the Chief of Police to discuss the matter, or in case of possible criminal violations, contact the Cook County States Attorney's Office.

535-A

# Forest Park Police Department
517 Desplaines Ave. Forest Park, IL 60130/ (708)-366-2425
*Jim Ryan- Chief of Police*

## PERSONNEL COMPLAINT INFORMATION

This pamphlet provides information on how to file a personnel complaint against a member of the Forest Park Police Department.

It is the policy of the Department to investigate every allegation of wrongdoing by members of the Department in order to determine the charge's substance, or lack thereof.

**Q.** – How do I file a complaint against an officer?

**A.** – A complaint may be filed against a Department member either in person at the Police Department, by letter, or by telephone. The supervisor you speak with will fill out a written complaint form, and forward it for investigation.

**Q.** – Do I have to give my name in order to file the complaint?

**A.** – No. However, anonymous complaints can be very difficult to investigative, and thus, the conclusion may not be what the complainant expected.

**Q.** – Will the complaint be published in the newspaper?

**A.** – No. All complaints against a Department member are treated as confidential personnel matters.

**Q.** – Will the Police Officer know that I have made a complaint against them?

**A.** – Yes. The Officer has a right to know the charge made against them, and identify the person making the allegation.

**Q.** – Who is responsible for investigating the complaint?

**A.** – The Deputy Chief is responsible for the administration of the Internal Investigations Function. Other members might be assigned to gather information, or evidence.

**Q.** – What will happen to the Police Officer?

**A.** – After a thorough investigation, if it is determined that the complaint is sustained, the discipline will be determined by the seriousness of the infraction. Disciplinary actions range from verbal reprimand, to re-training, suspension, or in extreme cases, termination.

**Q.** – Will the Police Department retaliate against me for making a complaint against an officer?

**A.** – Absolutely not. It is essential that public confidence be maintained in the ability of the Department to investigate complaints against its members.

**Q.** – How long will the investigation take?

**A.** – As a general rule, the investigation should be concluded within 30 days , unless extenuating circumstances necessitate extension.

**Q.** – Will I be notified of the results of the investigation?

**A.** – Once the investigation has concluded, the Deputy Chief will notify you of the results.

**Q.** – What if I am not satisfied with the results of the Department's investigation?

**A.** – You may contact the Chief of Police to discuss the matter, or in case of possible criminal violations, contact the Cook County States Attorney's Office.

535-A

**Forest Park 1289**

# Forest Park Police Department
### 517 Desplaines Ave. Forest Park, IL 60130/ (708)-366-2425
*Jim Ryan- Chief of Police*

### FORMAL INVESTIGATION NOTIFICATION

Officer: _____ Badge #: _____ Date: ___/___/___

Be advised that a formal investigation regarding the attached complaint is in progress. You are hereby ordered to fully cooperate with the investigating officer whose name appears below. Pursuant to State law, City policy, and Department procedure, you are informed that you have the following rights during this investigation:

1. You have the right to be informed of the nature of the investigation (see attached).
2. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office.
3. Admissions made in the course of any interrogation may be used as evidence of misconduct or as the basis for administrative charges seeking suspension, removal, or discharge. Such admissions cannot be used against you in any criminal proceeding.
4. If you refuse to testify or to answer questions relating to the performance of your official duties, or fitness for duty, you will be subject to Departmental charges which could result in your dismissal.
5. You have the right to be represented by counsel of your choosing who may be present to advise you at any stage of any interrogation. You may request counsel at any time before or during interrogation.
6. You have the right to have a collective bargaining representative present at this interview as disciplinary action may result.
7. Your rights as exercised in disciplinary procedures shall not diminish the rights and privileges that are guaranteed to all citizens by the Constitution and Laws of the United States and the State of Illinois.

Investigating Officer: _____ Date of Interrogation: _____

**Waiver: (Must be completed and returned to Investigating Officer prior to interrogation).**

I have read the above rights notification and received the formal complaint.

Date _____/_____/_____    Signature _____

I hereby waive my right to counsel and wish to make a statement regarding my actions in this case.

Date _____/_____/_____    Signature _____

I hereby waive my right to collective bargaining representation and wish to make a statement regarding my actions in this case.

Date _____/_____/_____    Signature _____

535

**Forest Park 1290**

# Forest Park Police Department
### 517 Desplaines Ave. Forest Park, IL 60130/ (708)-366-2425
*Jim Ryan- Chief of Police*

## PERSONNEL COMPLAINT FORM

If you have a complaint against a member of the Department, ask to speak to a supervisor. The supervisor will discuss the circumstances with you and may ask you to prepare a written statement concerning the incident. Interviews will be conducted to accumulate all necessary information and facts concerning the complaint.

The Police Department adheres to the policy of investigating all allegations against members of the Department.

The goal of the Police Department is to insure that objectivity, fairness, and justice are assured by intensive impartial investigation and review.

Unless the complaint and allegation is of such magnitude that it requires additional time, all complaints will be resolved within 30 days of the receipt of the initial complaint.

During the course of an investigation, the Deputy Chief, or his/her designee shall notify you concerning the status of the complaint and will notify you of the findings of the investigation conducted by the Police Department.

I further understand that if no basis for this complaint is found in fact, and no evidence can be obtained, or produced to sustain this complaint, I may be subject to civil prosecution by the accused employee for slander, defamation of character, or other applicable remedies under the laws of the United States or State of Illinois. Upon verification of said complaint, I understand that proper disciplinary action will be disseminated to said responsible police employee.

To the best of my knowledge and belief, the statements I have made below are true and correct.

Your Name:_____Signature_____

Your Address/Phone Number:_____

Date and Time of the Incident:_____

Reason for the complaint:_____

_____

_____

_____

_____

Supervisor receiving the complaint:

Name:_____Rank:_____Badge #_____

CR Number: _____ Date this report received ____/____/____

535-C

**Forest Park 1291**