# EXHIBIT 1

DANIEL MILLER                                    March 27, 2019

Page 1

1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3
      ESTATE OF MARCO GOMEZ,          )
4     Deceased, by DAISY PEREZ,       )
      Independent Administrator,      )
5                                     )
                       Plaintiff,     )
6                                     )
               -vs-                   ) No. 18 C 910
7                                     )
      VILLAGE OF FOREST PARK,         )
8     DANIEL MILLER,                  )
                                      )
9                    Defendants.      )

10

11          Videotape deposition of OFFICER DANIEL MILLER,

12    taken before NANCY DECOLA EATINGER, C.S.R., and

13    Notary Public, pursuant to the Federal Rules of Civil

14    Procedure for the United States Courts pertaining to

15    the taking of depositions for the purpose of

16    discovery, at Suite 2300, 191 North Wacker Drive,

17    Chicago, Illinois, commencing at 10:04 o'clock a.m.,

18    taken on March 27, 2019.

19

20

21

22

23

24

DANIEL MILLER                                           March 27, 2019

Page 66

1    A    I was, yeah, I wanted to go locate the
2  vehicle.
3    Q    And do you remember independently what that
4  information was that you received?
5    A    That there was a stolen motor vehicle that
6  fled Chicago coming into Oak Park that was just
7  involved in some type of hit and run.
8    Q    When you listened to the dispatch -- when is
9  the last time you listened to the dispatch records,
10 the audio dispatch records?
11   A    I believe Sunday was the last time I
12 listened, this past Sunday was the last time I
13 listened to dispatch.
14   Q    And did you hear on that dispatch the -- that
15 information, that piece that you received while you
16 were in the Thai restaurant?
17   A    Yes, from -- not from Chicago, but from our
18 radio band.
19   Q    And did it differ from what you remembered it
20 in any respect when you relistened to it?
21   A    Not that I could recall.
22   Q    Did you have -- did you receive any
23 information about whether or not the individual in
24 the vehicle was armed?

Page 67

1    A    I don't ever --
2  MS. REICH:  Objection, form.
3        You can answer.
4  THE WITNESS:  Yeah, I never was informed if he
5  was armed or unarmed.
6  MS. YARUSSO:  Q    And is that true up until the
7  time that you actually came to directly interact with
8  Marco Gomez, that you never had any information one
9  way or the other?
10   A    If he was armed with a weapon we're talking
11 about, right?
12   Q    Yes.
13   A    Yes, correct.
14   Q    Did you have any background information about
15 the individual in the vehicle prior to physically
16 approaching the vehicle?
17   A    No.
18   Q    Okay.  So you get this information while
19 you're in Yum Thai?
20   A    Yes.
21   Q    And what do you proceed to do next?
22   A    I finish -- I was in the process of ordering.
23 I kept ordering, slash, finishing the order.  I get
24 in my car.  I drive eastbound on Madison Street.

Page 68

1    Q    Did you activate your lights or sirens?
2    A    I don't believe so.
3    Q    Did you drive at a normal rate of speed or
4  above the speed limit?
5  MS. REICH:  Objection, vague.
6        You can answer.
7  THE WITNESS:  I believe I drove at a normal rate
8  of speed.
9  MS. YARUSSO:  Q    And where did you proceed?
10   A    I proceeded eastbound on Madison Street
11 toward Oak Park.
12   Q    What happened next?
13   A    I was trying to get more information because
14 the license plate that I ran in my in-car computer
15 through the Illinois Secretary of State system came
16 back to a Dodge, so I wasn't sure if I was provided
17 the wrong license plate or sometimes I have a
18 tendency to invert numbers, especially if there's a
19 lot of the same number in the license plate, if I
20 just typed in the wrong license plate.
21   Q    How were you going about this process?
22   A    I asked on our side band, which is Band 5, if
23 anyone caught the right plate or if I -- you know, I
24 said -- I believe I said somewhere along the lines of

Page 69

1  my car -- the car I ran comes back as a Dodge, you
2  know, and then I was, then I was given the correct
3  plate by Officer McClintock.
4    Q    And then you reran that correct plate, is
5  that right?
6    A    That is correct.
7    Q    And what additional information, if any, did
8  you receive?
9    A    It now came back to a silver or gray
10 Volkswagen that was reported stolen out of Glendale
11 Heights, Illinois.
12   Q    And that was the first moment that you had
13 the actual description of the car?
14   A    No, that's not true.
15   Q    Okay.  So you actually already knew that it
16 was a silver Volkswagen, and you were confirming it?
17   A    Correct.  That's why I knew I had -- I
18 believe I had the wrong plate, so unless Mr. Gomez
19 put a different plate on the car and that's the plate
20 I was given, then I was running the wrong plate.
21   Q    And at some point you actually come to the
22 area of Jackson and Harlem, correct?
23   A    Yes.  I -- yes.
24   Q    And prior to arriving at that location, did

DANIEL MILLER                                          March 27, 2019

Page 70

1  you receive any additional information regarding the
2  vehicle or the occupant of the vehicle?
3      A   Yes.
4      Q   What information did you receive?
5      A   I learned through Officer McClintock's radio
6  traffic that the vehicle was last seen on Jackson
7  near or entering Oak Park, and I also received
8  information from Oak Park that an officer cleared a
9  section of Jackson saying that he did not see the
10 vehicle, and he did not pass the vehicle.
11     Q   What was that section?
12     A   I'm sorry?
13     Q   What was the section that that officer
14 cleared?
15     A   Somewhere from Austin to -- I don't recall
16 what he said.  Possibly Ridgeland, but the far east
17 section of Oak Park.
18     Q   Any other information that you received
19 regarding the vehicle or the occupant of the vehicle
20 prior to arriving at Jackson and Harlem?
21     A   Not that I can recall.  Just the gray
22 Volkswagen with the -- a Jetta with the license plate
23 that was last seen traveling down Jackson.  I knew
24 that it was from Glendale Heights and that the car

Page 71

1  didn't pass the Oak Park officer from Austin to
2  wherever he said and that it was involved in a hit
3  and run in Chicago, some type of hit and run in
4  Chicago.
5      Q   And when was it that you received the
6  information that was involved in a hit and run?
7      A   I believe it was the initial, I believe it
8  was the initial dispatch.
9      Q   And you remember having that information in
10 your personal knowledge as you were responding to the
11 area that you thought this vehicle might be in?
12     A   I do now, yes.
13     Q   Well, that's actually what I'm getting at.
14         Is that something that based on your review
15 of the audio that you know because you've reviewed
16 the audio you can hear that that information was
17 contained in the audio?
18     A   Yes, that's true, but I also when I have been
19 asked this a million times of going over the scenario
20 and replaying it in my head, I remember hearing hit
21 and run, stolen car, but as human nature, there's a
22 lot of stolen cars -- a lot of hit and runs that we
23 hear on the radio, and stolen car, fleeing from
24 Chicago takes precedence in my brain over a car that

Page 72

1  just did a hit and run.
2          A stolen car is more important to me than a
3  hit and run, so if I had to prioritize what I'm going
4  to think about or focus on, it's going to be a stolen
5  car and not the fact that it was a hit and run.
6      Q   Is that -- so that is something that you've
7  specifically been asked about, that whether or not
8  you remember the hit and run information?
9      MS. REICH:  So to the extent that you're getting
10 into an area that might contemplate attorney-client
11 communications, I'm going to object and instruct my
12 client not to answer, but apart from that, any
13 unprotected conversations you may testify to.
14     MS. YARUSSO:  Q   Have individuals --
15     A   Yeah, I'm sorry.
16     Q   -- other than your attorneys asked you about
17 whether you received information that the vehicle was
18 involved in a hit and run?
19     A   I have gone over that information with my
20 counselor, the police counselor that I was instructed
21 to see after the incident.
22     Q   Okay.  And in what context, what were you
23 discussing with the police counselor when you were
24 talking about whether you knew that the vehicle was

Page 73

1  in a hit and run or whether you had received that
2  information?
3      A   Just going through the entire incident it has
4  come up.
5      Q   And why was -- why is it -- why was that
6  important, if you know?
7      MS. REICH:  Yeah, I'm going to object to
8  speculation.
9          He can answer.
10     THE WITNESS:  Why is it important that someone
11 was involved in a hit and run?
12     MS. YARUSSO:  Q   Right, for the purposes of your
13 conversation with the police counselor?
14     A   I just went over the whole incident with the
15 police counselor from start to finish.
16     Q   Were you asked to explain why you didn't
17 mention that you received information that the
18 vehicle was in a hit and run by anybody other than
19 your attorney?
20     MS. REICH:  Sorry, I'm going to object, vague,
21 foundation.
22     THE WITNESS:  I don't recall anyone asking me if
23 -- I think I know where you're going.  I don't recall
24 anyone asking me if I knew the vehicle was involved

DANIEL MILLER                                    March 27, 2019

Page 74

1  in a hit and run, and if they did, I'm -- I probably
2  focused on the fact that the car was stolen and that
3  I just shot and killed somebody than the fact that
4  the car was involved in a hit and run because those
5  two things take precedence over a hit and run because
6  at that time I found out later that the car was
7  involved in a property damage hit and run and not
8  hitting and killing a pedestrian or killing another
9  driver.
10     MS. YARUSSO:  Q   So as you're approaching
11  Jackson and Harlem, what's foremost in your mind is
12  that there's a stolen vehicle fleeing from Chicago,
13  is that accurate to say?
14     A   That was involved in a hit and run, right.
15     Q   Well, I think you just testified that the hit
16  and run was not at the top of your mind, you were
17  just explaining that the most important fact to you
18  was that it was a stolen vehicle fleeing out of
19  Chicago, is that a fair understanding of what you're
20  explaining?
21     MS. REICH:  So I'm just going to object to the
22  form of the question to the extent it
23  mischaracterizes and misstates his previous
24  testimony.

Page 75

1     You can answer.
2     THE WITNESS:  When I articulate the incident to
3  people, whether it be the State police, the State
4  police, whoever asked questions, I don't focus on the
5  fact, go out of my way to focus on that the vehicle
6  was used in a hit and run, I went -- I focused on
7  that the car was a stolen motor vehicle and fleeing
8  Chicago.
9     But if you're asking me at the time of the
10  incident did I have knowledge that the car was
11  involved in a hit and run, the answer is yes.  That
12  was part of the initial dispatch and that I heard
13  that part.
14     MS. YARUSSO:  Q   Why when you speak with the
15  Illinois State Police and others that you've related
16  this incident to do you focus on the fact that it was
17  a stolen vehicle fleeing from Chicago and not that it
18  was involved in a hit and run?
19     A   I just, that's how I articulate, am
20  articulating the most serious offense that in my
21  opinion was involved at the time.  A stolen car is a
22  felony, and a hit and run is generally a misdemeanor,
23  so in one's head, a stolen vehicle takes precedent
24  over the fact that there was a hit and run.

Page 76

1     Q   Please describe the route you took from --
2  and you began to do this, but the entire route that
3  you took from the Thai restaurant to where you
4  ultimately encountered the vehicle.
5     A   I traveled eastbound on Madison Street from
6  the Thai restaurant.  I then was getting information.
7  I received information that the vehicle was last seen
8  on Jackson with the right license plate when I was at
9  approximately Madison and Wisconsin, which is where
10  the Oak Park Hospital entrance is, so there's no
11  entrance to get to Jackson from there, so I proceeded
12  to do a U-turn on Madison, chose to travel down Maple
13  because that would be my quickest route than going on
14  heavy traffic on Harlem, traveled southbound on Maple
15  to Jackson.
16     When I arrived at the curb, I went right on
17  Jackson, which means I was going westbound on
18  Jackson, and I pulled into the left turn lane on
19  westbound Jackson that would allow traffic to go
20  southbound on Harlem Avenue.
21     Q   And why did you take that route?
22     A   Because I was going to wait for the -- see --
23  wait to see if the stolen vehicle came to Harlem and
24  Jackson, the intersection of Harlem and Jackson.

Page 77

1     Q   Where were you going to wait?
2     A   So I was deciding between waiting at the
3  Thornton gas station or the parking lot, the
4  residential parking lot that is at the southeast
5  corner of Jackson across from Jiffy Lube and the Oak
6  Park side, and I chose, I chose that I was going to
7  wait in the smaller parking lot.
8     Q   What was your understanding regarding your
9  duty to respond to this call?
10     MS. REICH:  Objection, vague.
11     You can answer.
12     THE WITNESS:  I was never dispatched to the call.
13  I took it upon myself to respond to the call.  If I
14  never would have responded to the call, I never would
15  have responded to the call unless someone gave out
16  the information that the car was there and wanted
17  more units.
18     MS. YARUSSO:  Q   Did you have any information
19  that anybody else was responding to the call?
20     A   As a police officer, from 12 years
21  experience, I would assume that people that are not
22  down on something would respond to that area because
23  that is the thoroughfare that they're going to use to
24  get away from the police.

DANIEL MILLER                                              March 27, 2019

---

Page 82

1      Is this -- do you recognize what's depicted
2 in Miller Exhibit 6?
3      A    Yes.  This is an aerial view of the
4 intersection of Harlem, Jackson, Maple and the border
5 of Forest Park and Oak Park.
6      Q    This is the area that you've been talking
7 about where you came to a stop and were deciding to
8 back into a parking lot, correct?
9      A    Yes, ma'am.
10     Q    Do you see the parking lot you're talking
11 about depicted in this -- in Exhibit 6?
12     A    Yes, ma'am.
13     Q    Let's see, let me get you -- can you put an
14 "X" in the parking lot?
15     A    (Indicating).
16     Q    Okay.  And you circled it as well, right?
17     A    Yeah.  I just drew a big circle around the
18 whole parking lot.
19     MS. REICH:  Turn it, show.
20     MS. YARUSSO:  Q    Thank you.
21          Where -- can you put an "M" where your
22 vehicle was when it came to a stop when you were
23 deciding to back into the --
24     A    I'm sorry, --

---

Page 83

1      MS. REICH:  I just held it up for the camera.
2      MS. YARUSSO:  Okay.
3      THE WITNESS:  You want me to put, I'm sorry, "M"
4 you said?
5      MS. YARUSSO:  Q    Yes.
6      A    At what point?
7      Q    Where your vehicle was stopped when you were
8 deciding what to do next.
9      MS. REICH:  I'm going to object to foundation,
10 vague.
11          You can answer.
12     THE WITNESS:  I do not recall if I was the first
13 car or there was a car in front of me at the light,
14 so I'm going to draw a big "X" -- or a big "M" making
15 -- covering both those spots.
16     MS YARUSSO:  Q    Okay.
17     A    Okay.  So I was either the first car or the
18 second car in the turn lane, which is I circled an
19 "M".  It looks like in this picture there actually is
20 two vehicles at the spot that I was at, one of the
21 two spots I was at.
22     Q    So you don't remember if you were right up at
23 the white line or if there was a car in front of you?
24     A    Yeah, I can't recall if there was a car in

---

Page 84

1 front of me or not.
2      Q    And you know for certain there was not a car
3 behind you?
4      A    Yeah, because I wouldn't have been able --
5      MS. REICH:  Objection, foundation.
6      MS. YARUSSO:  Q    You did not observe a car
7 behind you in that lane, correct?
8      A    Correct.
9      Q    And the lane to the north of you is the lane
10 that can either proceed straight or take a right on
11 Harlem, correct?
12     A    Yes.
13     Q    And were there cars, if you remember, in that
14 lane?
15     A    Yes.
16     Q    And then so then your decision was to try to
17 back out of the area that you've marked with an "M"
18 into the parking lot that you marked with a large
19 "X"?
20     A    Yes.
21     Q    Then what happened?
22     A    I looked in my rear-view mirrors.  I saw that
23 I was -- had no one behind me.  I started to back up.
24 As I started to back up, I'm unsure if I saw the

---

Page 85

1 Volkswagen in my mirror or when I'm turning my body
2 because I have to turn my body to make the turn, I
3 can't rely on the mirror, so I turn my body toward
4 the passenger side, at which time as I'm backing I
5 see headlights to a Volkswagen Jetta, which are very
6 distinct, and I see that the car is gray.  I
7 immediately put the car into park and exit my
8 vehicle.
9      Q    In what way are the headlights very distinct?
10     A    They're square, and they don't wrap around --
11 Volkswagen Jetta older model headlights are more of a
12 square type, and they don't wrap around the fenders
13 as normal vehicles do which creates a different
14 structure, silhouette, however you want to say it,
15 when you look at the front of the vehicle.
16          I would say it would be similar to if you're
17 driving at night and you know Jeep Wranglers are one
18 of the only cars that have a circular light, you know
19 usually when a Jeep Wrangler is coming at you, and a
20 lot of people know when you see a Crown Victoria
21 because they have distinctive headlights as well.
22     Q    So you made the -- did you know that that was
23 the Volkswagen that you were looking for based on the
24 dispatch information when you put your car in park

---

DANIEL MILLER                                    March 27, 2019

Page 86

1  and got out?
2       MS. REICH:  Objection, foundation.
3           You can answer.
4       THE WITNESS:  Not one-hundred percent sure, no.
5       MS. YARUSSO:  Q  Did you ever consider staying
6  in your vehicle?
7       A   No.
8       Q   What were you thinking when you put your car
9  in park and got out of it?
10      A   I thought that the vehicle was in a lane of
11 traffic, that it was going to be boxed in by heavy
12 traffic since it was the time of day that it was, and
13 that was my best opportunity to apprehend the
14 offender since he wouldn't be able to move, we were
15 at a red light, and he had cars in front of him and
16 behind him.
17      Q   So your plan was to approach the vehicle on
18 foot in order to effect a stop of the vehicle and
19 take the occupant into custody?
20      A   My intention was to exit the vehicle,
21 approach the vehicle and verify that it was a stolen
22 motor vehicle, and if so, effectuate an arrest.
23      Q   Did you activate your lights or sirens prior
24 to exiting your vehicle?

Page 87

1       A   No, I did not.
2       Q   Did you announce that you were a police
3  officer as you approached the vehicle?
4       A   As I approached the vehicle, I immediately
5  made eye contact with the driver, and he placed the
6  car in reverse.  I didn't have a chance until he
7  started reversing I believe to announce my office.  I
8  announced my office as I approached the vehicle, and
9  it happened so fast that he put the car in reverse.
10      Q   Okay.  So as soon as you made eye contact
11 with the occupant, the occupant started reversing to
12 get away from you, correct?
13      A   Yes, Mr. Gomez started reversing.
14      Q   And you now know -- so you now know that
15 person obviously to be Marco Gomez, correct?
16      A   Correct.
17      Q   When you exited your vehicle, did you draw
18 your weapon?
19      A   I had my weapon -- I'm not sure at what point
20 I drew my weapon, if it was when he started to put
21 the car in reverse.  I know for a fact that I would
22 have my hand on my weapon when I exited the car
23 believing it was a stolen motor vehicle, but I'm not
24 exactly sure at what point I physically pointed my

Page 88

1  weapon at Mr. Gomez.  I know I did.  I just don't
2  know if he had already started reversing or if he --
3  it was when we made eye contact and just second --
4  just a second before he put the car in reverse.
5       Q   Okay.
6       A   But my intention was to seize the vehicle and
7  whoever was in the vehicle.
8       Q   So you know that you did have it drawn and
9  pointed at him either just before he began reversing
10 or as he began reversing, correct?
11      A   That is correct.
12      Q   And what was your response to him reversing
13 his vehicle?
14      A   Well, once I was out of my car, I realized he
15 wasn't in a lane of traffic, he was actually on the
16 apron, slash, curb, slash, parkway of the Jiffy Lube,
17 and he wasn't boxed in in traffic, and at first I was
18 shocked that he was able to even put the car in
19 reverse and reverse out because I -- the reason why I
20 approached the way I did was I believed that the car
21 was boxed in and had no exit.
22      Q   So was he not in the actual lane of traffic?
23      A   That's correct.  He made his own lane, slash,
24 he was on the parkway, slash, entrance to the Jiffy

Page 89

1  Lube --
2       Q   Can you --
3       A   -- which is depicted in this picture.
4       Q   Can you put a "G" where you first observed
5  the vehicle and were able to actually figure out
6  where it was located because initially you were
7  unsure, correct, of how it was exactly situated in
8  traffic?
9       A   I wasn't --
10      Q   Well, let me break down that question.
11          Is it true that when you first observed the
12 vehicle you were unsure whether it was blocked in or
13 in a lane of traffic?
14      A   No.  I believed it was in a lane of traffic
15 and boxed in.  I believed at the time that I thought
16 that the vehicle was in a lane of traffic, so in my
17 head I'm thinking there's a third lane, that he's in
18 the third lane.  I didn't realize that he had jumped
19 the curb and was sitting in this apron of the Jiffy
20 Lube.
21      Q   How do you know --
22      A   So I thought he was boxed in.
23      Q   How do you know he was in the apron, how were
24 you able to make that determination?

DANIEL MILLER                                        March 27, 2019

Page 90

1    A   When I jumped out of the car and began to
2    approach the car.
3    **Q   Okay.  So when you jumped out of the car and**
4    **began to approach the car and were able to what you**
5    **now know to be accurately observe where the vehicle**
6    **was, please indicate with a "G" that location of the**
7    **vehicle.**
8    A   So somewhere between the front end of the
9    apron and the grass area before the electrical box.
10   **Q   So not in this driveway, in front of -- to**
11   **the west of the driveway?**
12   A   The driveway of Jiffy Lube or private
13   residence are you talking about?  There's two
14   driveways.
15   **Q   Jiffy Lube.**
16   A   No, he's -- a portion of -
17   MS. REICH:  I'm going to object to the extent it
18   mischaracterizes what he stated what he --
19   MS. YARUSSO:  He's testifying, he was clarifying
20   it, and the exhibit speaks for itself.
21   THE WITNESS:  He's somewhere between the west
22   half of the driveway or park area, whatever you want
23   to call it, of Jiffy Lube, the entrance to Jiffy
24   Lube, and there's an electrical box, which you can

Page 91

1    see is a blur on here that would prevent him from
2    traveling through the parkway onto Jackson Boulevard
3    -- to Harlem Boulevard, I'm sorry.
4    MS. YARUSSO:  Q   So when you're able to observe
5    the vehicle clearly and accurately understand where
6    it's situated, it's partly on the Jiffy Lube driveway
7    and partly on the grass?
8    A   I'm not sure if it was on the grass or I just
9    know that he was on the front half of -- he was on
10   the apron, slash, grass area.  He was not in a lane
11   of traffic, and he was, he was at a position where I
12   could see him when I put the car in reverse.
13   **Q   And there's a lane of traffic to the south of**
14   **that location where you've put the "G", correct?**
15   A   There's a lane in between, yes.
16   **Q   And are there cars in that lane?**
17   A   There's a car that's pulling up or was offset
18   in that lane that I had to run past the front of to
19   get to Mr. Gomez's car but not blocking my view.
20   **Q   Before you observed the car going in reverse,**
21   **was the car stationary?**
22   A   Yes.  That's why I thought it was boxed in.
23   **Q   And when you first observed the car it**
24   **appeared to be stationary?**

Page 92

1    A   I don't recall if when I first observed the
2    car it was pulling up and I saw the headlights or I
3    was, I was completely stopped and was more parallel
4    to him, so I'm not sure if I was more parallel to him
5    or if I saw headlights approaching and then we both
6    came to a stop as -- we both came to a stop almost
7    parallel to each other.
8    **Q   And you do have your weapon drawn and pointed**
9    **at Mr. Gomez as you're making your approach to the**
10   **vehicle, correct?**
11   MS. REICH:  Objection, misstates his previous
12   testimony.
13   You can answer.
14   THE WITNESS:  I'm not sure at which point I point
15   my gun at Mr. Gomez.  I know that when he's in
16   reverse, my car -- my gun is out, and I know that
17   once he's completed his reverse, my gun is pointed at
18   him, but I -- and I did point my gun at him at some
19   point during the interaction of this where we're
20   circling right now, but I'm not sure of the exact
21   point.
22   I don't want to testify to the exact point
23   because I don't want to be wrong of when I physically
24   pointed my weapon at him.

Page 93

1    MS. YARUSSO:  Q   Okay.
2    A   But I can tell you that my hand was -- at the
3    very least my hand was on my weapon as I approached
4    if not out of my holster and pointing to the ground
5    because I believed it was a stolen motor vehicle --
6    **Q   Okay.**
7    A   -- boxed in traffic.
8    **Q   When you were pointing your weapon at Marco**
9    **Gomez, did you have both hands on the gun?**
10   A   I don't recall.
11   **Q   When you began to -- at some point you**
12   **actually are pursuing the vehicle on foot, is that**
13   **right?**
14   A   Yes.
15   **Q   Are you running?**
16   A   Yeah, I'm -- yes.
17   **Q   Are you running with your gun pointed at the**
18   **vehicle?**
19   A   No, no, I am not.  I'm running with my gun
20   pointing at the ground.
21   **Q   So either just before or as Marco begins to**
22   **reverse, your gun is out and pointed at him, but then**
23   **when you begin running after it, the gun is pointed**
24   **down at the ground, is that accurate?**

DANIEL MILLER                                          March 27, 2019

Page 94

1    A    That's accurate.  When I run -- when -- I'm
2    trained when I run I don't run unless there's an
3    imminent threat shooting at me.  I wouldn't run while
4    shooting at a target unless there's an imminent
5    danger to me at that point.
6         I put my gun toward the ground for the
7    safety of the public so that way there's not an
8    accidental discharge while I'm running from an
9    involuntary trigger pull.
10   Q    And so when you're running towards Marco in
11   the car, he's reversing, correct?
12   A    That's correct.
13   Q    And there is no imminent danger to you at
14   that point?
15   A    To me as he's reversing, no.
16   Q    And there's other civilians in the area,
17   correct?
18   A    Yes.
19   Q    You're aware that there are at least some
20   other cars at that intersection, correct?
21   A    Correct.
22   Q    Were you aware whether there were any
23   civilians outside of vehicles in that area?
24   A    At that time I'm not sure.  My focus was on

Page 95

1    the stolen motor vehicle that was fleeing from me,
2    but that time of day it's quite possible that there
3    was pedestrians there.  The CTA blue line exit is
4    less than a block away, about a block away from
5    there.
6    Q    As the vehicle is reversing away from you,
7    what is your plan as far as effectuating a stop or
8    pursuing the individual?
9    A    I know that that -- there's an S-turn there,
10   that that vehicle is not going to be able to make the
11   turn without maneuvering a bunch of times along with
12   the traffic that was going to be coming in or coming,
13   and my intention was to apprehend the offender once
14   he got stuck by the S-turn.
15        It's a very distinctive turn.  The
16   photograph that you provided me only shows the end of
17   the turn.  It doesn't show it's a complete S, tight
18   S-turn.
19   Q    So your plan was to continue to pursue the
20   vehicle on foot because it would eventually slow down
21   in trying to navigate the S-turn?
22   MS. REICH:  Objection, mischaracterizes and
23   misstates his testimony.
24        You can answer.

Page 96

1    THE WITNESS:  My intention is that he is only
2    going to have several options.  He's either going to
3    have to reverse down the entire S-turn all the way
4    past Wisconsin, which he will crash doing so,
5    therefore, hopefully disabling the vehicle and him
6    fleeing on foot.
7         Or he will have to -- my intention of
8    running after him is to have him stop the car, which
9    that's why I was screaming stop, and have him either
10   surrender peacefully or flee on foot from the motor
11   vehicle.
12   MS. YARUSSO:  Q   So you're screaming stop at
13   him, is that correct?
14   A    Correct.
15   Q    Anything else that you're screaming or saying
16   to him?
17   A    Police, stop, and then at some point I know I
18   was telling him to show me his hands.
19   Q    And you -- have you heard audio recording of
20   the dispatch where you can hear yourself saying the
21   things that you're describing right now?
22   A    Yes.
23   Q    And in that audio dispatch, how would you
24   describe your tone of voice?

Page 97

1    A    I'm yelling.
2    Q    Was your heart racing at this point?
3    A    I'm sure it was.
4    Q    And this is while you're pursuing Mr. Gomez
5    and he's reversing, correct?
6    A    Correct.
7    Q    Were -- did you see any other sort of
8    reaction from Marco Gomez during this time period
9    other than what you've already described when you
10   could tell that you initially made eye contact with
11   him?
12   A    When we made eye contact, he looked like a
13   deer in headlights, and the car immediately went into
14   reverse, and then when I got in front of the car, I
15   told him to stop, show me his hands, and the car
16   became drive -- his car began drive -- he put the car
17   in drive and started the car coming at me.
18   Q    Did you observe Marco Gomez trying to make a
19   three-point turn?
20   MS. REICH:  Objection, argumentative.
21        You can answer.
22   THE WITNESS:  I'm assuming that that's what he
23   was trying to do.  I observed him put the car in
24   reverse recklessly, never looked back to see what was

DANIEL MILLER                                          March 27, 2019

Page 98

1  behind him, he was always front facing, put the car
2  in reverse and went back on an angle.
3        I'm assuming that's what he was trying to
4  do.  My assumption is he was trying to flee by going
5  back eastbound on Jackson.
6     MR. YARUSSO:  Q  And a three-point turn to you
7  is something where you're at a point, you back up,
8  that's the second point, and then the third point is
9  to pull away in a different direction, correct?
10    A   Correct, but I don't even believe that a
11 three-point turn would be enough to make that turn.
12    Q   Okay.
13    A   He would need like a four-point turn or
14 five-point turn.
15    Q   Just to make sure we're talking about the
16 same thing there.
17    A   Yes.
18    Q   So as you're pursuing him, based on your
19 observations, it looks to you like he's trying to
20 reverse and then stop and turn to flee you, correct?
21    A   I realize that he has -- I believe that's
22 what he's trying to do at the point when he hits the
23 curb and jumps the curb and stops.
24    Q   Which curb did he hit or jump?

Page 99

1     A   The curb in front of the apartment building
2  of the parking lot that I was going to go into where
3  all these trees are.
4     Q   So we're talking about the south curb of
5  Jackson Boulevard, right?
6     A   Yes.
7     Q   The curb that borders the eastbound lane of
8  Jackson Boulevard, right?
9     A   Yes.
10    Q   East of the parking lot apron that leads into
11 the parking lot of that that you've already marked
12 as --
13    A   Actually, way east.
14    Q   Okay.
15    A   Somewhere between the first, somewhere past
16 the first tree, by the first tree that you see, I
17 would say the center of the tree to somewhere by
18 where this big, the big, big tree is in the middle
19 that is covering part of the building.
20    Q   If you could just draw like a line with, you
21 know, two end points of the range that you think that
22 he came to a stop and put a number two on it to
23 represent kind of the second point in this attempted
24 three-point turn?

Page 100

1     A   Well, that would be the first point.  It was
2  full reverse, and then he hits the curb somewhere
3  between -- do you want me to put a number two you
4  said?
5     Q   Yes, please.
6     A   Somewhere between --
7     Q   Is it showing up because we could get a
8  different color?
9     A   Yeah, you're putting green on green here.
10    MR. YARUSSO:  Gail, would you mind lending him
11 your red pen to see if that shows up?
12    MS. REICH:  Sure.  Actually, this one might be
13 better.
14    MS. YARUSSO:  Thank you.
15    THE WITNESS:  So the red Sharpie pen is going
16 where I think the car hit the curb when he put the
17 car in full reverse.  Not much better.
18    MS. YARUSSO:  Q  And you're able to kind of
19 catch up to the car at that point, is that right?
20    A   Yeah.  We're talking short distance, a matter
21 of a second, two seconds.  It's not -- I didn't run a
22 quarter mile, I didn't run a half mile, I didn't run
23 a hundred yards.  It's not a large distance.
24    Q   Do you stop running?

Page 101

1     A   Once I get to the vehicle I do.
2     Q   How far are you from the vehicle when you
3  stop running?
4     A   I'm at the --
5     MS. REICH:  Objection, speculation.
6     THE WITNESS:  I'm at the vehicle.
7     MS. YARUSSO:  Q  So within five feet of it?
8     A   Within well within five feet of it.
9     Q   And you bring -- do you bring your gun back
10 up?
11    A   Yes.
12    Q   And you're pointing it at the occupant of the
13 vehicle?
14    A   Yes, saying show me your hands because he's
15 at a stop.
16    Q   So are you physically plant -- with your feet
17 planted?
18    A   I --
19    MS. REICH:  Objection, foundation.
20       You can answer.
21    THE WITNESS:  I physically put myself in harm's
22 way by going in front of the vehicle pointing my gun
23 at Mr. Gomez ordering him to show me his hands and
24 get out of the car.

DANIEL MILLER                                        March 27, 2019

Page 102

1   MS. YARUSSO:  Q   Would you mind standing up and
2   just demonstrating for us the actual physical stance
3   you took as far as your body position as well as your
4   arms raised holding the weapon?
5       MS. REICH:  Objection, foundation.
6       THE WITNESS:  Okay.  So I'm going to use the
7   table as the front of the vehicle.  The piece of
8   paper is going to be the center of the grille.  The
9   pen and the court stenographer's pens are the
10  headlights of the car.
11      I initially come up to the car.  I'm here
12  pointing my gun.  I then blade myself in front of the
13  front headlight with my body in front of the car
14  pointing my gun at Mr. Gomez telling him to get out
15  and show me his hands.
16      MS. YARUSSO:  Q   Okay.  And are your arms fully
17  outstretched holding the gun?
18      A   Yeah, I have my gun pointing at him.  I don't
19  know how, you know, if I'm full out or but I'm
20  definitely pointing my gun at Mr. Gomez at that
21  point.
22      **Q   And can you see Mr. Gomez at that point?**
23      A   Yes.
24      **Q   Can you see any reaction or make any**

Page 103

1   observations about his demeanor at that point that
2   you're standing there stopped bladed with your arms
3   outstretched pointing the gun at him?
4       A   Just he's looking at me, he's just looking at
5   me.  This happened in a matter of seconds.
6       **Q   And at this point you -- your distance from**
7   **the car is less than five feet, correct?**
8       A   Yes.
9       **Q   Less than three feet?**
10      MS. REICH:  Objection, foundation, speculation.
11      THE WITNESS:  I'm approximately here.  That's the
12  distance.
13      MS. YARUSSO:  Q   So I would say right now that
14  looks like 18 inches, is that --
15      MS. REICH:  Objection.
16      MS. YARUSSO:  Q   This is how --
17      MS. REICH:  Speculation.
18      MS. YARUSSO:  Q   -- close you remember being to
19  the vehicle, correct?
20      A   Yes.  I felt like I was -- there was a small
21  gap between me and the vehicle but not much.  My
22  intention was to stop his -- to make him get out of
23  the car and run or surrender.
24      **Q   And at -- and when you have your arm**

Page 104

1   outstretched, is your gun pointed at Marco Gomez
2   inside the vehicle?
3       A   Through the windshield, yes, ma'am.
4       **Q   You can have a seat.**
5       **Were -- the windows were up in the vehicle,**
6   **correct?**
7       A   They were up.  I don't know if they were
8   completely up, cracked, but they were definitely up.
9       **Q   And were you speaking in a loud voice,**
10  **correct?**
11      A   Yeah, yes.
12      **Q   Your intention was for him to be able to hear**
13  **you inside the vehicle?**
14      A   Yes.  My intention is for him to surrender or
15  him to bail out on foot, and my intention was to try
16  to get him to bail on foot if he does bail on foot
17  toward my patrol car where my K-9 is waiting for me
18  to hit a door popper and let him loose to apprehend
19  the subject.
20      So I'm trained to make sure I can go to the
21  passenger side if he runs that way, and I have my dog
22  as a possibility of capturing him if he decides to go
23  to the right, stay on the driver's side and run
24  toward Harlem Avenue.

Page 105

1       **Q   And you specifically put yourself in front of**
2   **the vehicle in an attempt to prevent the vehicle's**
3   **escape?**
4       A   Absolutely.
5       **Q   Did you see any indication that Marco had a**
6   **weapon?**
7       MS. REICH:  Objection, --
8       THE WITNESS:  Other than --
9       MS. REICH:  -- argumentative.
10      You can answer.
11      THE WITNESS:  Other than a moving vehicle, no.
12      MS. YARUSSO:  Q   So you didn't see him with any
13  firearm or other personal weapon?
14      A   No, ma'am.
15      **Q   And you, and you still had not received any**
16  **other information over dispatch that he possessed any**
17  **weapon, correct?**
18      A   No, ma'am.
19      **Q   And at the point that you put him in --**
20  **yourself in front of the vehicle, you did that**
21  **because you understood that he was trying to get**
22  **away, correct?**
23      A   I did that -- I put myself in front of the
24  vehicle to stop him from getting away and to make him

DANIEL MILLER                                    March 27, 2019

Page 106

1    either flee on foot or give up.

2        Q    At any point up until this point -- well, let
3    me ask a different question.

4            What's the next thing that happens from this
5    point forward while you're standing there bladed at
6    what you've described as kind of the front left
7    corner of the vehicle within less than two feet from
8    the vehicle with your weapon drawn and pointed at
9    Marco Gomez?

10       A    As I'm --

11   MS. REICH:  I'm going to object to the
12   characterization.

13           You can answer.

14   THE WITNESS:  As I'm in front of the vehicle at
15   the front driver headlight, I -- the vehicle begins,
16   begins coming at me at which time I fired my weapon,
17   and possibly I shifted my feet.  I'm not sure if I
18   shifted my feet or if the vehicle when I started
19   firing made -- was able to turn and avoid striking
20   me.

21   MS. YARUSSO:  Q    Prior to your, to your putting
22   yourself in front of the vehicle, you believed Marco
23   Gomez was trying to make some kind of a three-point
24   turn to reverse and then drive forward in a way,

Page 107

1    correct?

2        A    I believe --

3    MS. REICH:  Objection, vague.

4            You can answer.

5    THE WITNESS:  At the time I didn't know what he
6    was doing other than trying to escape by going in
7    reverse.

8            I just know the reason why I chose that
9    parking lot is that he would be boxed in and that he
10   would have a hard time escaping other than going on
11   the apron that he was on and traveling through the
12   Jiffy Lube parking lot, which he had an opportunity
13   to do.

14           Instead he bypassed that and decided to put
15   the car in reverse, hit the curb, at which point I
16   positioned myself in front of the car, and he decided
17   to put the car in drive and drive toward me.

18   MS. YARUSSO:  Q    Okay.  When you first approach,
19   and I believe you gave a statement to this effect as
20   well, you thought he was reversing so that he could
21   attempt to make a three-point turn and flee, correct.

22       A    Yes, I believe he -- I believe his only
23   intention -- I mean, where else can he go?  He's
24   trying to flee the police to get away.  He doesn't

Page 108

1    want to be caught in a stolen car, so he's going to
2    -- the only place he can flee is back on Jackson the
3    opposite way.

4        Q    Right.  So putting aside -- so you, what you
5    understood that it looked like this person was trying
6    to do based on your observations was reverse as he
7    did into the location that you've marked with two,
8    correct, and then pull forward and proceed to attempt
9    to go east on Jackson and around the curb of Maple,
10   correct?

11       A    Right.  That would -- what I'm trying to say
12   is that would require more than -- I call it a
13   three-point turn, but that would require more than a
14   three-point turn.

15       Q    Okay.

16       A    You would have to put the car in drive, put
17   it in reverse, put it in drive, put it in reverse I
18   would say at least two times in order to go the right
19   way down Jackson, which would have been his only
20   possibility because there was traffic going westbound
21   on Jackson, and I believe there was traffic going --
22   coming off of Maple.

23       Q    I understand, so the -- but regardless, after
24   he comes to a stop in the area you've marked as that

Page 109

1    two, his next move you thought was to pull forward,
2    and whether or not it would require some back and
3    forth to pull forward so that he could go east and
4    around the curb on Maple, correct?

5    MS. REICH:  Objection, speculation.

6            You can answer.

7    MS. YARUSSO:  Q    That was what you observed that
8    you anticipated his route of fleeing that he was
9    attempting to flee?

10       A    I mean, I'm assuming that's what he was
11   trying to do.  Again, I -- as soon as he hit that
12   curb, I was in front -- I went in front of the car.

13       Q    Right.

14       A    So I don't know, you know, if he was going to
15   put the car in drive and go -- try to go back to the
16   Jiffy Lube, if he was going to put the car in drive
17   and try to go into oncoming traffic on Jackson, but
18   just the way the car ended up, my assumption is he
19   was trying to do a three-point turn to get back onto
20   Jackson going eastbound on Jackson back towards
21   Chicago.

22       Q    Right, so your -- based on what you observed,
23   his next move after coming to a stop at point two
24   would be to pull forward in some manner to flee,

DANIEL MILLER                                                    March 27, 2019

Page 110

1   correct?
2       A   No, that's not correct.  His next move should
3   have been surrender to the police or get out of the
4   car and run on foot, not try to run the police over.
5   That was my intention, that was my thought process.
6       **Q   Okay.  But there's no running police over**
7   **until you put yourself in front of the car, so what**
8   **I'm asking is when you see him fleeing, he's**
9   **reversing, and you -- and you've already given**
10  **statements to this effect, you think he's going to**
11  **try to make a three-point turn, and now you're saying**
12  **it would probably require more than three points, but**
13  **in any event, he's trying to reverse, which -- and**
14  **then he'll come to a stop and then pull forward and**
15  **pull away in his attempt to flee, that's what you**
16  **thought was going to happen as you approached him on**
17  **foot and started running after him, correct?**
18      MS. REICH:  Objection, form, compound,
19  argumentative.
20          You can answer.
21      THE WITNESS:  I believe that his intention was to
22  do a three-point turn to go back eastbound onto
23  Jackson.
24      MS. YARUSSO:  Q   Right, and so after, based on

Page 111

1   that belief, the next thing that you would have
2   anticipated him to do after he came to the stop at
3   two is then pull forward to attempt to travel
4   eastbound on Jackson, that's what you thought his
5   next move was going to be before or as you started
6   chasing him, correct?
7       A   As I started chasing him --
8       MS. REICH:  Objection, --
9       THE WITNESS:  Yes, but not when I put myself in
10  front of the car.
11      MS. REICH:  -- that mischaracterizes his previous
12  testimony.
13          You can answer.
14      THE WITNESS:  As I put myself -- as I was running
15  after the car, yes, I believed he was going to
16  eventually put the car in drive or he was going to go
17  the whole way and reverse down the S-curve, which I
18  don't think is possible, and I think he knew that
19  once he traveled the S-curve already, S-curve
20  already, so I believe his intention as I was running
21  toward the car was going to be to do a three-point
22  turn.
23          My attention -- my point of putting myself
24  in harm's way in front of the vehicle was to

Page 112

1   eliminate that option and only give him the two
2   options of giving up or bailing out on foot and
3   running from the stolen car, which from my training
4   and experience the majority of the time when we have
5   a car boxed in the people do.
6       MS. YARUSSO:  Q   When you have a car boxed in by
7   a vehicle or even -- I mean, have you received any
8   training about boxing a vehicle in when you're not in
9   a vehicle, so you're on foot and you're boxing a
10  vehicle in?
11      A   No, but I -- no.
12      **Q   Have you received any training that that's**
13  **something you shouldn't do?**
14      A   No, not that I know.  I mean, no one has ever
15  said don't run in front of a car and stop a car.  I
16  mean, I've run in -- my intention is to box in stolen
17  cars because I know I can't pursue a stolen car, so
18  that's the only way I can capture people in stolen
19  cars is for them to either crash their car and injure
20  themselves or others or bail out of the car.
21      **Q   Have you ever received any training in the**
22  **form of -- well, let me ask individual questions so**
23  **that's not overly compound.**
24          **Have you ever received any training about**

Page 113

1   **when it is and is not permissible to pursue a fleeing**
2   **vehicle?**
3       MS. REICH:  Objection, foundation.
4           You can answer.
5       THE WITNESS:  In a motor vehicle, yes.
6       MS. YARUSSO:  Q   And what generally is the
7   training or how would you describe what you are and
8   are not supposed to do or allowed to do to pursue a
9   fleeing vehicle?
10      A   There's a vehicle policy -- when I say
11  vehicle, I mean when I'm in a vehicle pursuing with
12  my vehicle, there's a policy that dictates the
13  considerations that need to be taken place -- that
14  need to take place with regards to either pursuing a
15  vehicle or not pursuing a vehicle.
16      **Q   And what are those considerations?**
17      A   There's several.  First of all, the offense
18  the person has committed or is wanted for; the
19  ability of the person -- for the police to identify
20  the person so if the person has already been
21  identified that we can capture him at a later time
22  and date; or if the person has not been identified, I
23  think I said the type of crime that it is, forcible
24  felony, time of day, weather conditions, population,

DANIEL MILLER                                      March 27, 2019

Page 118

1    MS. YARUSSO:  Q   And just to put it another way,
2    you're not going to pursue somebody for a crime such
3    as driving on a suspended license in a vehicle
4    pursuit because the risk of seriously -- serious
5    bodily injury or death to either the offender or
6    bystanders is not worth pursuing somebody for that
7    kind of a crime, correct?
8        MS. REICH:  Objection, incomplete hypothetical,
9    foundation.
10           You can answer.
11       THE WITNESS:  I believe that's the intention of
12   the policy, yes.
13       MS. YARUSSO:  What time is it?  Let's take a
14   five-minute break or ten-minute break.
15       THE VIDEOGRAPHER:  Off the record at 12:26.
16           (Brief recess taken.)
17       THE VIDEOGRAPHER:  Back on the record at 12:36
18   p.m.
19       MS. YARUSSO:  Q   We left off that you were as
20   far as the series of events or the sequence of events
21   with Marco Gomez, that you were planted, bladed with
22   your gun drawn and pointed using both hands at Marco
23   Gomez while you're positioned you've described at the
24   front driver's headlight area, is that right, less

Page 119

1    than two feet from the car?
2        A   Less than five feet from the car, but yes.
3        Q   Okay.  Well, and you also demonstrated the
4    proximity when you stood up and put yourself in
5    position in relation to the conference table,
6    correct?
7        A   That's correct.
8        Q   And then at that point when you're in that
9    position, you observe Marco pulling forward in his
10   vehicle, correct?
11       A   Once I'm bladed and have my gun pointing at
12   him, yes.
13       Q   And you've already testified that at the
14   beginning of the incident you exit the vehicle, you
15   make eye contact with him, you draw your gun, he's
16   reversing, you put down your gun, you chase after
17   him, and those things are kind of happening within a
18   matter of seconds, correct?
19       A   Seconds, yes.
20       Q   And then you run over to him as he's
21   reversing and comes to a stop at -- in front of the
22   trees in that apartment building and plant yourself
23   and pull your gun back out, and that's all happening
24   in a matter of seconds, correct?

Page 120

1        A   Yeah, the whole incident is happening in a
2    matter of seconds --
3        Q   Okay.
4        A   -- from start to finish.
5        Q   From start to finish?
6        A   From start to -- I'm sorry, from start to
7    shots fired, it happens in seconds.
8        Q   Okay.  And when we say start, we would say
9    from the second you spot him and put your car -- what
10   would you consider the start when we're saying it
11   happened in a matter of seconds?
12       A   When I exit my vehicle, make eye contact with
13   him, I know, I know it's a stolen car once he puts
14   the car in reverse and begins to flee me.
15       Q   By just his reaction?
16       A   Correct.
17       Q   And all the information that you had
18   received, it matches that information?
19       A   Yeah, time span, route of travel, time of
20   day.  Everything combined together, the totality of
21   the circumstances dictates to me that now I have the
22   stolen car.
23       Q   Okay.  And so you -- from the moment you exit
24   your vehicle and make eye contact to shots fired is a

Page 121

1    matter of seconds?
2        A   Correct.
3        Q   And when you observe Marco pulling the
4    vehicle forward, you begin firing your weapon, is
5    that correct?
6        A   Once the vehicle starts coming at me, yes,
7    that's correct.
8        Q   How many shots did you fire?
9        A   Total of four shots.
10       Q   Were you aware in the moment that you shot
11   four shots or is that something that you know because
12   afterwards it was determined with certainty?
13       A   I know I fired more than one shot.  At the
14   time I did not know until later that I shot four
15   shots.
16       Q   And why were you -- why did you fire four
17   shots?
18       A   I fired --
19       MS. REICH:  Objection, speculation.
20           You can answer.
21       MS. YARUSSO:  Q   Okay, I'll rephrase.
22           Why did you fire as many shots as you did?
23       A   I fired until my brain told me the threat was
24   no longer a threat to me.

DANIEL MILLER                                        March 27, 2019

Page 122

1    Q    And what information or what observation did
2  you make that made you perceive that there was no
3  longer a threat?
4    A    Once my brain told me to stop pulling the
5  trigger, I stopped pulling the trigger.  I would
6  assume that when my brain processed the fact that the
7  car -- I was no longer in front of the car, I stopped
8  pulling the trigger.  That's why I only shot four
9  shots.
10   Q    Did you see Marco react in any way to any of
11 the shots you fired?
12   A    No.  It happened too fast.
13   Q    Could you see him while you were shooting?
14   A    I was pointing my gun at him, so I was -- I
15 mean, I'm sure I was seeing him.  I don't have
16 knowledge of what he was doing or I can't recall.
17   Q    But you were looking right at him and aiming
18 your gun at him, correct?
19   A    Correct, and giving him commands.
20   Q    Were you aiming for a particular part of his
21 body?
22   A    Not that I recall.  Just the center mass,
23 which would be the center of the chest.
24   Q    Did you observe Marco doing anything with the

Page 123

1  car, like steering in a certain direction as he's
2  traveling forward?
3    MS. REICH:  Objection, foundation.
4        You can answer.
5    THE WITNESS:  I did not have a chance to.  It was
6  -- it happened too fast.  If you're asking me if I
7  saw him turn the wheel or, no, I don't recall any of
8  that, seeing any of that.
9    MS. YARUSSO:  Q    Did you observe the vehicle
10 driving past you?
11   MS. REICH:  Objection, foundation.
12       You can answer.
13   THE WITNESS:  Yeah, I'm sort of -- I mean, I know
14 the vehicle eventually went past me, so I guess,
15 yeah, it drove past me at some point.
16       Again, I don't know, I think I stated
17 earlier, I don't know if I moved my feet to get out
18 of the way at the same time as firing and him coming
19 forward or if he was able to do such a sharp turn to
20 avoid clipping my feet.
21       I just know that as soon as the car came at
22 me and I wasn't in the center -- I believe I -- I
23 know I was in the front of the car that my brain told
24 me to fire, and I fired my weapon in self defense.

Page 124

1    MS. YARUSSO:  Q    If -- based on your training
2  and experience as a police officer, in the use of
3  excessive force and vehicle pursuits and use of
4  deadly force, would you agree that it is prohibited
5  to use deadly force purely to stop a fleeing suspect
6  whether they're in a vehicle or on foot?
7    MS. REICH:  I'm going to object to the form of
8  the question, foundation and incomplete hypothetical.
9        You can answer.
10   THE WITNESS:  I think the dic -- I think each
11 situation dictates a certain response, and I have to
12 abide by the policy, but more importantly, I have to
13 abide by Court decisions that are made to set law.
14   MS. YARUSSO:  Q    And what is your understanding
15 of that -- those things, the Court decisions as well
16 as the policy that -- on whether you're allowed to
17 use deadly force on a fleeing suspect to prevent
18 their escape?
19   A    So a way to prevent their escape?
20   Q    Yes.
21   MS. REICH:  I'm going to object to the foundation
22 as well --
23   THE WITNESS:  Again, it depends --
24   MS. REICH:  Incomplete hypothetical.

Page 125

1        You can answer.
2    THE WITNESS:  Sorry.
3        Again, it would depend on the situation if
4  anyone is in danger.
5    MS. YARUSSO:  Q    So in what circumstance -- is
6  there a circumstance that would be allowed to use
7  deadly force to prevent a fleeing suspect from
8  escaping?
9    A    Yes.
10   Q    In what situation?
11   A    I'll give you a court case.  Guy is driving
12 recklessly, speeding at high rates of speed on a
13 highway, and a police sharp shooter sat on top of a
14 bridge and shot through the windshield to stop the
15 car, stop him from fleeing because of the manner he
16 was driving the vehicle.
17   Q    Is that the reason that you shot Marco Gomez?
18   A    No.  I shot Marco Gomez because he tried to
19 run me over and kill me or maim me.
20   Q    And you base that claim that Marco Gomez was
21 trying to run you over and kill you or maim you based
22 on your observation that he moved the vehicle forward
23 once you had placed yourself at the front --
24   A    That he changed the gear.

DANIEL MILLER                                          March 27, 2019

Page 126

1    Q   -- driver headlight, correct?
2    A   I apologize, I thought you were done.
3        I based my conclusion on the fact that he
4  decided to do that based on him having to take the
5  gear shifter and move it from reverse to drive, put
6  his foot from the brake to the gas pedal as I'm
7  giving commands, as I'm in front of the car, as I'm
8  pointing my gun at him.  He only cared about escaping
9  with a stolen vehicle at that time.
10   Q   At -- prior to -- let me ask this.
11       At the point that you're planted and bladed
12 with your gun out, is your heart racing?
13   A   I am sure it is.  I just sprinted, and I'm
14 involved in a critical incident, starting to become a
15 critical incident at this point.  My heart races any
16 time I'm involved in anything extraordinary for my
17 duties.
18   Q   Did you make any attempt -- let me ask this.
19       You've already testified that you
20 specifically put yourself in front of Marco Gomez's
21 vehicle as part of your strategy to prevent his
22 escape, correct?
23   A   That's correct.
24   Q   Did you ever attempt to get out of the way of

Page 127

1  Marco Gomez's vehicle?
2    A   Again, I don't know if once the vehicle was
3  coming at me if I did move my feet or if I did not
4  move my feet.
5    Q   You don't know one way or the other?
6    A   Correct.  I just know that I was close enough
7  where I believed I was in danger of getting run over,
8  dragged or lose a limb, and my brain told me as a
9  response to that is to fire.
10       I need to, I need to take a minute break.
11 Sorry.
12       THE VIDEOGRAPHER:  Off the record at 12:49 p.m.
13       (Brief recess taken.)
14       THE VIDEOGRAPHER:  Back on the record at 1:05
15 p.m.
16       MS. YARUSSO:  Q   Okay.  So returning to the
17 sequence of events, you fire a number of shots that
18 you now know to be four shots, correct?
19   A   Correct.
20   Q   And you've testified that you stopped
21 shooting when your brain registers that you're no
22 longer in imminent danger, correct?
23   A   Correct.
24   Q   And what's the next thing that you do?

Page 128

1    A   I go around the vehicle still playing my --
2  I'm sorry, the vehicle comes it a stop.  At the time
3  I believe that the vehicle came to a stop because it
4  crashed into -- that intersection has traffic sticks,
5  I guess you want to call them, some type of
6  reflective stick that regulates the turn, the traffic
7  turn.
8        At that time I didn't know if those were
9  concreted in or I didn't know, so the way the car
10 stopped, it looked like it stopped in the middle of
11 the turn intersection.  I believed that it stopped
12 due to being struck -- striking the pole.
13   Q   Okay.  You're -- I guess you're making a
14 point or a distinction that you aren't sure the
15 condition of the occupant, of the driver?
16   A   Correct, so I don't know if I've struck
17 Mr. Gomez or if I have not struck Mr. Gomez.  I'm --
18 at the time I thought that the car stopped based on
19 the fact that it hit some -- it hit the --
20   Q   And you now know it stopped because Marco
21 Gomez was fatally shot and no longer operating the
22 vehicle or not?  I mean, I'm trying -- you're saying
23 at the time you knew this, and now you have a
24 different understanding of why it stopped?

Page 129

1    A   Yes.
2    Q   And what is that understanding?
3        I think I fixed my form objection.
4    A   My understanding is the vehicle stopped
5  because it hit another vehicle.
6    Q   Okay.  When you're shooting and aiming your
7  gun at Marco Gomez in the vehicle, are you seeing how
8  the shots are penetrating the vehicle?
9    A   No.  There's not time.  It happened too fast.
10   Q   And at the moment you stopped shooting, the
11 vehicle is proceeding past you in some form, correct?
12       MS. REICH:  Objection, argumentative.
13       THE WITNESS:  As I stopped shooting, the vehicle
14 is continuing to roll, travel in the street, yes.
15       MS. YARUSSO:  Q   Past you?  You remain here, and
16 the vehicle goes on?
17   A   Yes.  At some point and somehow I end up on
18 the passenger side of the vehicle, but yes, the
19 vehicle -- I'm at the back end of the vehicle now,
20 from the front to the back.
21   Q   So when you say somehow someway you end up on
22 the passenger side of the vehicle, you don't know how
23 you got to be in that position?
24   A   I moved --

DANIEL MILLER                                    March 27, 2019

Page 206

1  hit and run, stolen vehicle fleeing Chicago toward
2  Oak Park.
3      Q   Okay.  When you shot Marco Gomez, was he
4  doing anything in that moment that threatened death
5  or great bodily harm to a member of the public?
6      MS. REICH:  Objection, speculation.
7      THE WITNESS:  At that moment, he was only -- at
8  that exact moment, he was only putting me in harm's
9  way.  If he would have escaped, he would possibly be
10 putting the public at risk based on his driving.
11     MS. YARUSSO:  Q   Well, did you believe that you
12 would have been justified in shooting him dead to
13 prevent his escape?
14     MS. REICH:  Objection, mischaracterizes his
15 testimony and argumentative.
16         You may answer.
17     THE WITNESS:  I'm not -- if I wasn't in front of
18 the vehicle and I wasn't at risk, no, I probably
19 would not have shot at the vehicle for him fleeing,
20 but I believe that him fleeing would have put people
21 at risk.
22     MS. YARUSSO:  Q   And separate question, whether
23 you probably would or wouldn't have, do you believe
24 you would have been justified in doing so?

Page 207

1      MS. REICH:  Objection, incomplete hypothetical.
2      MS. YARUSSO:  Q   Let me ask the question too
3  because now my question doesn't have the information
4  in it.
5          But for you -- your claim that you were in
6  front of the vehicle and, therefore, Michael Gomez
7  put you in fear of death or great bodily harm --
8  strike that.  Well, let's ask this.
9          If you hadn't put yourself in front of the
10 vehicle and Marco had proceeded to start driving off,
11 do you believe you would have been justified in
12 shooting him?
13     MS. REICH:  Objection, incomplete hypothetical.
14         You can answer.
15     THE WITNESS:  I -- whether I'm justified or not,
16 I wouldn't be able to make a determination.  I think
17 that's a legal question.
18         Would I have shot him, my answer is no
19 specifically, especially with the way that we police
20 today, the answer is -- and the way the public is
21 that I would say no, I would not have shot, and I
22 would be way more concerned of the legalities of that
23 shooting if I did, in fact, shoot him.
24     MS. YARUSSO:  Q   And putting aside legalities

Page 208

1  and whether something constitutes criminal conduct or
2  constitutional law because actually, this
3  interrogatory is about the policies and procedures of
4  the police department, it would have been -- and you
5  learn about excessive force in the police department,
6  you're trained on it in the academy, you have various
7  general orders and policies that tell you how to
8  determine what reasonable force is in a given
9  situation because you have to do that not only
10 because of the constitution, but also to be in
11 compliance with your police department's procedures,
12 training and policy, correct?
13     MS. REICH:  Sorry, can you read that back,
14 please?
15     MS. YARUSSO:  Q   I'm just going to have to do
16 this the longer way.
17         Okay, you were trained, you were trained in
18 the academy on the use of reasonable force and
19 excessive force, correct?
20     A   That's correct.
21     Q   And you also -- there are also Forest Park
22 Police Department general orders and policies and
23 continued training on using reasonable force and not
24 using excessive force, correct?

Page 209

1      A   That's correct.
2      Q   And they give you guidance along a use of
3  force continuum about what sort of force is
4  reasonable in certain circumstances from along a
5  continuum from the lowest amount of force all the way
6  up to deadly force, correct?
7      A   Yes, there's a policy that dictates -- or
8  there's policies in place that talk about least --
9  less lethal force moving up to lethal force.
10     Q   And then there's also the constitution, the
11 Fourth Amendment that requires officers not to commit
12 an unreasonable seizure on a citizen which includes
13 excessive force, which you know about?
14     A   Correct.
15     Q   Okay.  And then there's criminal law that has
16 its own standard as to what could be the crime of
17 murder or a policeman's conduct or a number of other
18 things that could fall under some sort of criminal
19 statute that could lead to a criminal charge,
20 correct?
21     A   Correct.
22     Q   Okay.  Based on your training and experience
23 as a police officer as to what constitutes excessive
24 force, in particular the use of deadly force, would

DANIEL MILLER                                            March 27, 2019

Page 210

1  you have been justified, would it have been
2  reasonable force to shoot Marco Gomez as he drove
3  past you if you were not in front of the vehicle?
4       A   I would say no.  I wouldn't have shot Marco
5  Gomez if I wasn't in front of the vehicle.
6       Q   And it would have been excessive force to
7  shoot Marco Gomez as you stood there to prevent his
8  escape, correct?
9       MS. REICH:  I'm going to object to the incomplete
10  hypothetical.
11      THE WITNESS:  Yeah, I can't, I can't say that's
12  correct because someone above me would have to review
13  his actions and what I knew at the time and determine
14  if they thought that a police officer believed that
15  Mr. Gomez was putting the public at safety -- public
16  at risk based on his driving.
17          I'm saying personally, dealing with stolen
18  cars in the past that flee from me, I would not shoot
19  at a moving stolen motor vehicle even if he has
20  already crashed the car if I was not in harm's way or
21  if he wasn't in the process of running over or
22  hurting a civilian or a pedestrian or purposely
23  ramming another vehicle, I would not shoot
24  personally.

Page 211

1       MS. YARUSSO:  Q   Did -- and if you look at
2  question 15, which is asking about Forest Park police
3  procedures and policies, stopping and arresting
4  people in moving vehicles and individuals attempting
5  to flee, your answer references the Vehicular Pursuit
6  Policy General Order 104 and Patrol Operations 118.
7          What is your understanding of what the
8  Vehicular -- those two general orders require or the
9  policies articulated in those general orders
10  regarding stopping, arresting individuals in moving
11  vehicles and individuals fleeing or attempting to
12  flee?
13      A   I'm sort of confused on the question, to be
14  perfectly honest with you.
15      Q   Okay.
16      A   Are you asking me what the Vehicle, are you
17  asking me what the Vehicle Pursuit Policy says again?
18      Q   Yes.
19      A   I am to only pursue a motor vehicle with my
20  motor vehicle when it's a forcible felony and the
21  person is believed to be armed and/or placing the
22  public at grave, I don't know the exact word that
23  they use, grave risk and also taking into
24  consideration if the offender is known, time of day,

Page 212

1  the traffic, the streets, the weather conditions,
2  et cetera.
3       Q   And is it your understanding that that policy
4  doesn't apply if you're on foot?
5       A   Correct.
6       Q   And it's your understanding that there is no
7  policy if you're on foot?
8       A   Correct.
9       Q   So is it your understanding that your pursuit
10  of Marco Gomez on foot while he was at least
11  initially attempting to flee from you in his vehicle
12  -- strike that.
13          On February 5th, 2017, as you approached
14  Marco Gomez on foot, you understood that he was
15  attempting to flee, correct?
16      MS. REICH:  Objection.  It was the 3rd.
17      THE WITNESS:  Yeah, I was going to say that.
18      MS. YARUSSO:  What did I do?
19      MS. REICH:  You said the 5th.
20      MS. YARUSSO:  Q   Oh.  On February 3rd, 2017,
21  when you got out of your vehicle and began pursuing
22  Michael Gomez, based on your observations and all of
23  the information you had up to that point, you already
24  testified you thought he was trying to flee, correct,

Page 213

1  reversed his car, and you thought he was trying to
2  get away?
3       A   Yes, ma'am.
4       Q   And is it your understanding that when you
5  pursued him on foot at that point, that there was no
6  Forest Park Police Department policy that governed
7  your pursuit of him on foot?
8       MS. REICH:  I'm going to object to the form of
9  the question, speculation, competence.
10      THE WITNESS:  You want my response?
11      MS. YARUSSO:  Q   Yes.
12      A   My answer is that I don't believe that the
13  Vehicle Pursuit Policy other than -- is what caused
14  me to get out of my car and not try to make a normal
15  traffic stop on Mr. Gomez's car had anything to do
16  with the actions I took, the actions I took to try to
17  apprehend Mr. Gomez.
18          Use of force obviously still takes
19  precedent, but as far as the Vehicle Pursuit Policy,
20  I don't believe that it even -- other than that's
21  what made me determined to try to box -- get the car
22  boxed in, the positioning -- or my positioning of my
23  squad car, I don't believe that that policy has
24  anything to do with me running after Mr. Gomez's car

# EXHIBIT 2

 

# ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s): | ID# | | Dictated/LEAD #: |
|---|---|---|---|---|---|
| 17-10653PI | 02/17/17 | Parker, Martinez | 5421, 9533 | | |

| Title: | Case Agent: ID# | | Office: | Typed by: | Date: |
|---|---|---|---|---|---|
| Marco A. Gomez | Parker | 5421 | Z-1/PITF | jmp | 02/21/17 |

**Purpose:**

To document the interview of Forest Park Police Officer Daniel Miller #251

On Friday, February 17, 2017, at approximately 1:22 PM, I, Special Agent Jonathan Parker #5421, along with Inspector Carlos Martinez #9533, spoke to Forest Park Police Department (FPPD) K-9 Officer DANIEL MILLER #251, in the Forest Park Council chambers board room, 517 Desplaines Avenue, Forest Park, Illinois. Also present were Fraternal Order of Police Attorney John R. Roche, Jr., Attorney Nicholas J. Lagattuta, and FPPD Detectives Nick Petrovic #230 and Robert Bryant #250. The purpose of the interview was question MILLER on the events surrounding the fatal shooting of Marco A. Gomez (M/W DOB: 05/14/90). On Friday, February 3, 2017, at approximately 6:19 PM, MILLER was stopped at the traffic light while west bound on Jackson Boulevard at Harlem Avenue, Oak Park, Illinois, when he observed a silver Volkswagen behind him which matched a description of a stolen vehicle that was broadcast on a radio band that FPPD shared with Oak Park Police Department (OPPD). MILLER exited his squad car in an attempt to question the driver, later identified as Gomez. In an attempt to flee, Gomez drove in reverse, and then attempted to perform a "three-point turn" by driving at MILLER. MILLER, who was in fear for his life, fired his duty weapon multiple times at Gomez, fatally wounding him.

Investigator Martinez and I introduced ourselves to MILLER, and I explained the role of the Illinois State Police (ISP) Public Integrity Task Force (PITF) to MILLER. I also asked MILLER if he voluntarily agreed to be interviewed, to which he stated "Yes." Prior to starting the interview, at approximately 1:13 PM, MILLER was allowed to view the surveillance video from the Jiffy Lube service station, 215 South Harlem Avenue, Oak Park, Illinois. Once MILLER was finished, the interview began.

MILLER advised us that he has been a FPPD Officer for approximately ten (10) years, and a K-9 Officer since 2011. MILLER's K-9 partner is named "Killian." MILLER's normal shift is 2:45 PM to 10:45 PM, and he didn't recall his last day off prior to the incident in question. I asked MILLER to verify the type of duty weapon he carried, to which MILLER stated he carried a Glock 21 .45 caliber semi-automatic pistol. MILLER advised us that he loads his magazines to capacity (13 rounds), and that once he chambers a round, he replaces the round in the magazine for a total of fourteen (14) rounds in his pistol. MILLER also stated on the night in question, he was dressed in full FPPD uniform with an outer ballistic vest carrier with FPPD patches attached, and he was assigned to drive a fully marked FPPD squad car. MILLER also advised us that he has never been involved in s shooting prior to this incident.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL493-0117

ISP 4-3 (08/96)




17-10653PI
Parker #5421
02/03/17
Page 2

MILLER stated that on Friday, February 3, 2017, he had just order food at a Thai restaurant on Madison Avenue in Forest Park, Illinois, when he heard a transmission over a radio band shared with OPPD advising that Chicago Police Department (CPD) officers observed a stolen vehicle last seen traveling west bound on Jackson Boulevard toward Oak Park, Illinois. According to MILLER, the vehicle was described as a silver Volkswagen. MILLER entered his squad car and began to travel east on Madison Street toward the last known location of the Volkswagen. According to MILLER, OPPD had broadcast the Volkswagen's license plate number, which MILLER admitted that he originally ran the wrong plate. MILLER asked for the plate again via his FPPD radio and received the correct plate. MILLER then performed a computer inquiry on the license plate which revealed that the vehicle was a silver Volkswagen stolen from Glendale Heights, Illinois.

MILLER related since the last known location of the vehicle was west bound Jackson Boulevard, he turned around on Madison Street at Wisconsin Avenue, Oak Park, Illinois, to travel west on Madison. MILLER then turned south on Maple Avenue, and the turned right on Jackson Boulevard heading west. MILLER stopped in the left turn lane at the red traffic light at Harlem Avenue. MILLER advised that was considering turning into an apartment complex parking lot on the south side of Jackson, east of Harlem, to wait for the stolen vehicle. At that point, MILLER looked in his rearview mirror and saw traffic pulling up and stopping behind him. MILLER stated he then looked in his rearview mirror or his passenger side mirror, and saw an older model silver Volkswagen to the right of his squad car. MILLER didn't recall if the Volkswagen had a front license plate, but the vehicle matched the description of the stolen car.

Thinking that the Volkswagen was "boxed in" by stopped traffic, MILLER exited his squad car and approached the vehicle. MILLER recalled making eye contact with the driver, later identified as Gomez, who MILLER described as being a white or Hispanic male. At that point, Gomez began to drive in reverse "recklessly," possibly "squealing" the vehicle's tires while doing so. At this point, MILLER stated that he may have drew his weapon. Based on Gomez's actions, MILLER now believed that this was the stolen Volkswagen CPD observed earlier. MILLER ordered Gomez to stop and began to run after the vehicle. MILLER continued to yell, "Stop! Police!" Gomez then attempted to make a "three point turn" and accelerated toward MILLER. MILLER stated that he was in fear that the vehicle was going to hit him. MILLER advised us that he immediately recalled a recent incident in which MILLER applied a tourniquet on a pedestrian who lost a leg after being struck by a car. MILLER stated he then discharged his weapon at Gomez. MILLER stated that initially he thought he was moving and shooting at the same time, however, after seeing the Jiffy Lube surveillance video, he knows that was not the case. MILLER stated that he didn't know how many rounds he fired, but he stopped firing when he was no longer in front of the car. MILLER stated he advised FPPD dispatch via his portable radio of "Shots fired!"

MILLER gave Gomez numerous commands to show his hands and to exit the vehicle, however Gomez didn't respond. MILLER stated he didn't know if Gomez was struck by the gunfire and the vehicle had stopped at this point, but MILLER wasn't sure what caused the vehicle to stop moving. MILLER used his left hand to open the driver's side door and once it was opened, MILLER saw blood on Gomez, who was slumped over to the left. MILLER also saw that Gomez was wearing black gloves. MILLER attempted to pull Gomez out of the vehicle, however Gomez was "stuck." MILLER thought that Gomez was wearing a seatbelt, so MILLER holstered his weapon and reached

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL493-0117                                                                                          ISP 4-3 (08/96)

P0098



17-10653PI
Parker #5421
02/03/17
Page 3



inside the vehicle to release the seatbelt. MILLER then realized that Gomez wasn't wearing a seatbelt and it was just Gomez's position inside the vehicle that prevented Miller from pulling him out. MILLER repositioned Gomez and pulled him out of the vehicle onto the ground, face-down. MILLER placed Gomez in handcuffs, "flipped" Gomez over onto his back, and began chest compressions without first searching Gomez for weapons or putting on latex gloves. MILLER stated when he turned Gomez on his back, he observed Gomez's eyes were open, but he wasn't breathing. At some point during pulling Gomez out of the vehicle and beginning chest compressions, he advised FPPD dispatch that shots were fired and that Gomez was shot and needed an ambulance.

While speaking to MILLER regarding his attempt to resuscitate Gomez, MILLER recalled the incident in which he applied a tourniquet to the pedestrian who was struck by a car. MILLER advised us he didn't have latex gloves in that incident, and it was because of that he began to carry them, but he forgot he had them.

MILLER further related that while he was performing chest compressions, he heard Gomez "gasp." MILLER continued to perform compressions while other officers were arriving. MILLER recalled that FPPD Detectives Pater and Hickey arrived, and that someone asked if Gomez was searched and if anyone was in the car. Someone also asked MILLER if he need to be relieved, to which MILLER advised, "No." MILLER continued with compressions, but then became "winded" and asked Detective Hickey to take over.

Once Detective Hickey took over chest compressions, MILLER stepped away from the area and noticed he had blood on his hands and on his portable radio microphone. FPPD Sergeant Adams was on scene, and MILLER advised him that Gomez tried to run him over. MILLER was then escorted to and placed into a Dodge Charger squad car, where he and other officers were trying to figure out what to do with Killian, who was still inside MILLER's squad car. MILLER was then transported across the street to the Thorton's gas station where he waited for an ambulance to transport him to the hospital. Eventually an Oak Park Fire Department ambulance arrived on scene and transported him to Rush Oak Park Hospital.

I asked MILLER if he experienced any physical ailments after the incident and he advised us that after he was released from the hospital and brought back to FPPD, his heart began to "pound" and he felt nauseous. MILLER stated he was "dry heaving" in the FPPD Detective's Bureau restroom and then later that night at home.

I also asked MILLER if there was anything else that came to mind that he didn't already mention, and MILLER stated that FPPD Detective Pater #249 collected his duty weapon while at the hospital.

MILLER did not have any further information and the interview ended at approximately 2:13 PM.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL493-0117

ISP 4-3 (08/96)

P0099

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF MARCO GOMEZ, | ) | |
| Deceased, by DAISY PEREZ, | ) | |
| Independent Administrator, | ) | |
| | ) | No. 18 C 910 |
| Plaintiff, | ) | |
| | ) | Judge John F. Kness |
| vs. | ) | |
| | ) | Magistrate Judge Sheila Finnegan |
| VILLAGE OF FOREST PARK, | ) | |
| DANIEL MILLER, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JEREMY BAUER**

I, Jeremy Bauer, do declare the following to be true and correct:

1.      I am an expert retained by the Plaintiff in this case.

2.      I authored a report in this case dated May 12, 2020, which is attached to this Declaration as Attachment A.

3.      In conjunction with the report, I created a 3D video reconstruction which is titled "BauerForensics_GOMEZ_VIDEO_20200512" and is attached to this Declaration as Attachment B.

4.      I authored a supplemental and rebuttal report in this case dated January 14, 2021, which is attached to this Declaration as Attachment C.

5.      The statements and opinions provided in my reports are complete, true and accurate to reasonable degree of scientific certainty.

6.      My testimony at trial would be consistent with these reports.

1

7.    Moreover, the video, prepared as described in my report, is complete and accurate to a reasonable degree of scientific certainty as to the locations of Officer Miller, Mr. Gomez, the vehicle he was driving, and the other included physical details, based on the evidence and information provided to me.

8.    I have read the foregoing paragraphs, have personal knowledge as to these matters, am competent to testify, and would so testify at the trial in this case.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this date: 5/14/2021        By: _____
                                            Jeremy Bauer

2



**BAUER DECLARATION
ATT. A**

Jeremy J. Bauer, Ph.D.
**Bauer Forensics, LLC**
2610 11th Ave. E.
Seattle, WA 98102
503.912.8660
jjb@bauerforensics.com
www.bauerforensics.com

May 12, 2020

Mr. Andrew M. Stroth
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606

Re:     *GOMEZ v. Village of Forest Park et al.*

Dear Mr. Stroth:

1.      At your request, and in compliance with Rule 26 of the Federal Rules of Civil Procedure, I am giving you my opinions regarding the above-referenced matter. My opinions are based on a reasonable degree of scientific and biomechanical certainty and founded on my professional education and on my academic and consulting experience in the fields of biomechanics, anatomy, visibility analysis and shooting incident reconstruction. If called as a witness, I could and would competently testify as to the opinions set forth in this summary. I reserve the right to amend or supplement these opinions should additional information become available.

### Qualifications

2.      I am the owner of Bauer Forensics, LLC. I am also a certified accident reconstructionist, as recognized by the Accreditation Commission for Traffic Accident Reconstruction (ACTAR #2763) and a Certified Forensic Photographer as recognized by the International Association for Identification (IAI). In addition, I am a member of ASTM E30 on Forensic Sciences, E58 on Forensic Engineering and Committee F13 on Pedestrian/Walkway Safety. I graduated with a B.S. in Physical Education (Biomechanics Emphasis) in 1997 from Boise State University and then an M.S. in Human Performance (Biomechanics Concentration), with a minor in Zoology in 2000 from Oregon State University and a Ph.D. in Human Performance (Biomechanics Concentration) in 2006 from Oregon State University. As an undergraduate and graduate student, I took advanced math and physics courses as well as courses in engineering mechanics/dynamics and anatomy and physiology and thus have extensive training in the fundamental scientific principles upon which injury reconstructions, ballistics and shooting reconstructions and biomechanical analyses are based. While a graduate student at Oregon State University, I worked as a graduate research assistant on research funded by the National Institutes of Health aimed at biodynamic study and simulation of human movement and relating forces from landings and falls to changes in skeletal tissue. I have published research in peer-reviewed journals and have presented at major conferences. I have more than 20 years of research and consulting experience in fields ranging across ballistics/shooting reconstruction, accident/collision reconstruction, slip, trip and fall dynamics, injury biomechanics, human functional anatomy, orthopaedics and visibility analysis. I have testified in both State and Federal court, in matters ranging from visibility analysis (what could the person have seen at the time of the incident), evidence documentation, 3D scene reconstruction and officer involved shootings. I have been retained to conduct shooting reconstructions at the request of both families of victims and law enforcement. I have conducted shooting reconstructions across the United States, including many high-profile cases on behalf of the United States Department of Justice. Based upon my education, training and experience, I am familiar with the underlying theory and

Page 2

the applications of ballistics and shooting incident reconstruction, visibility analysis and injury biomechanics that are raised in this case.

3.　　Please find attached a copy of my curriculum vitae (Exhibit 1) and a Bauer Forensics, LLC fee schedule (Exhibit 2).

### Case Materials Reviewed

4.　　Deposition of Daniel Miller (03/27/2019); Photos of Marco Gomez (P01091-1096); Forest Park 17-186; Forest Park 187-231; ISP P0006-0332; ISP Subpoena Response - Disc 1 of 9 - CSI Photos of VW; Disc 2 of 9 - In Squad Videos Disk 1 of 2; Disc 3 of 9 - In Squad Videos Disk 2 of 2; Disc 4 of 9 - Jiffy Lube; Disc 5 of 9 - CS 8 Ofc; Disc 6 of 9 – Autopsy; Disc 7 of 9 - Oak Park 911; Disc 8 of 9 - Audio_911 Disc 1 of 2; Disc 9 of 9 - Audio_911 Disc 2 of 2.

### Background

5.　　According to an Illinois State Police Investigative Summary (P0008), on February 3, 2017, at approximately 6:19 PM, Forest Park Police Officer, Daniel Miller, was stopped in his squad car at a red traffic light in the west-bound lane of Jackson Boulevard at Harlem Avenue (Figure 1) in Oak Park, Illinois, when he observed a silver 2001 Volkswagen Jetta (VIN: 3VWRS29M51M068809) behind him in traffic. The Volkswagen matched the description of a stolen vehicle from Glendale Heights that had been broadcast over a police radio band that Forest Park Police Department (FPPD) shared with Oak Park Police Department (OPPD). Officer Miller exited his squad car to question the driver, later identified as Marco A. Gomez (HT: 5'9"; WT: 180 lbs; DOB: 05/14/17).  Mr. Gomez put the car in reverse, and backed up, heading east on Jackson Boulevard. Officer Miller ran toward Mr. Gomez, who stopped the vehicle and then accelerated forward (northeast).  Officer Miller then fired four shots at Mr. Gomez, evidenced by the presence of four bullet holes in the Volkswagen (Figure 2) and the identification of four shell casings at the scene.  The front end of the Volkswagen then struck a green 2001 Nissan Altima and came to rest. Mr. Gomez was transported to Loyola Medical Center in Maywood, Illinois, and pronounced dead at 6:48 PM (P0255).



Figure 1.  Google Earth image taken on April 7, 2017, two months after Mr. Gomez was shot and killed by Officer Miller, annotated with the area where the shooting occurred and the position of the surveillance camera mounted to the southeast corner of Jiffy Lube.  The yellow lines represent the approximate field-of-view of the camera.



Figure 2.  Photograph taken on February 3, 2017, by Illinois State Police Crime Scene Investigator, Jon Foster, showing bullet holes in the 2001 Volkswagen Jetta Mr. Gomez was driving when he was shot and killed by Officer Miller.  Two bullets penetrated the driver's side of the front windshield and two bullets penetrated the driver's side window.

6.       On February 4, 2017, an autopsy was performed on Mr. Gomez by Cook County Assistant Medical Examiner, Kristin C. Escobar-Alvarenga, MD.  Dr. Escobar reported, "*A single gunshot wound perforates the body.*" (P0217).  She concluded, "*The cause of death of this 26-year-old white male, MARCO A GOMEZ. Is GUNSHOT WOUND OF CHEST.*" (P0222). Specifically, she wrote:

   a.   "*ENTRANCE: A gunshot wound of entrance is on the lateral left side of the chest, centered 17 inches below the top of the head, 8 inches left of the posterior midline, and 1 inch posterior to the midaxillary region on the left. The wound is a 1/2 inch circular defect with an eccentric, up to 1/8 inch margin of abrasion along the 4 o'clock to 9 o'clock positions. A 1/18 inch red-purple circular to irregular abraded contusion is centered 1/4 inch from the edge of the wound at 11 o'clock. No soot or stippling is on the skin surrounding the entrance wound.*" (Figure 3; P0217-0218).

   b.   "*EXIT: A gunshot wound of exit is on the upper right side of the chest, centered 11-3/4 inches below the top of the head and 5 inches right of the anterior midline. The wound is a ½ x ¼ inch roughly oval defect. The wound edges are slightly abraded and easily re-approximate.*" (Figure 3; P0218)

   c.   "*DIRECTION: The trajectory of the projectile is left to right, back to front, and upward.*" (P0218).

Page 4



Figure 3. Photographs taken on February 4, 2017, showing the entry wound (LEFT) on the left side of Mr. Gomez's lateral chest and the exit wound (RIGHT) on the upper right side of his chest.

7.　　On February 17, 2017, Special Agent Parker, with the Illinois State Police Public Integrity Task Force, interviewed Officer Miller regarding the incident. SA Parker summarized the interview in a Forest Park Police Department incident report (Forest Park 223). According to the report, "*Officer Miller advised he exited his squad car and approached the front of the Volkswagen, and made eye contact with the Volkswagen's driver. Officer Miller said the Volkswagen's driver immediately put his car in reverse and recklessly backed his auto in "full reverse" and the auto's tires may have squealed while in reverse. Officer Miller advised he now knew that this auto was the stolen Volkswagen, at which time Officer Miller advised he started to repeatedly yell "Stop" at the driver. Officer Miller advised he started to chase after the auto, while continuously yelling "Stop Police" in case the driver would flee on foot. Officer Miller said the driver then started to make a three-point-turn and the driver accelerated towards him, at which time Officer Miller said he felt as if the driver was going to run him over or drag him. Officer Miller said he, in fearing for his life and safety, had fired his service weapon towards the Volkswagen's driver through the windshield.*" The report further stated, "*Officer Miller also could not recall if he was moving or stationary when he had discharged his weapon, but advised he stopped discharging his weapon when the Volkswagen was no longer in front of him posing a threat to his safety.*"

8.　　On March 27, 2019, Officer Miller was deposed. Regarding his pursuit of the Volkswagen, Officer Miller was asked, "*So your plan was to continue to pursue the vehicle on foot because it would eventually slow down in trying to navigate the S-turn?*" (Miller Deposition – 95:19). Officer Miller testified, "*…my intention of running after him is to have him stop the car, which that's why I was screaming stop, and have him either surrender peacefully or flee on foot from the motor vehicle.*" (Miller Deposition – 96:7). He continued, "*When we made eye contact, he looked like a deer in headlights, and the car immediately*

Page 5

went into reverse, and then when I got in front of the car, I told him to stop, show me his hands, and the car became drive -- his car began drive -- he put the car in drive and started the car coming at me." (Miller Deposition – 97:12).  Officer Miller later testified, "*I shot Marco Gomez because he tried to run me over and kill or maim me.*" (Miller Deposition – 125:18).  Finally, when asked, "*And what information or what observation did you make that made you perceive that there was no longer a threat?*"  Officer Miller testified, "*Once my brain told me to stop pulling the trigger, I stopped pulling the trigger. I would assume that when my brain processed the fact that the car -- I was no longer in front of the car, I stopped pulling the trigger. That's why I only shot four shots.*" (Miller Deposition – 122:1).

**Analysis**

9.      It is my understanding that there are both constitutional and local state legal limitations on the use of deadly force. There is also a requirement to employ less than lethal methods of detention, especially for those individuals who appear to be suffering from mental illness and to de-escalate police encounters with individuals who appear hostile, impaired, emotionally or mentally disturbed. It is also my understanding that officers must avoid the use of deadly force unless necessary to protect against immediate danger of death or serious injuries to officers or others. In view of these requirements and based on the rationale above, an overriding, broad question raised by this case is whether there is credible, objective scientific evidence that Marco Gomez, on the evening of February 3, 2017, posed an imminent threat of death, or serious physical injury to Officer Miller at the time deadly force was employed.  Thus, the specific questions analyzed, to a reasonable degree of scientific and biomechanical certainty, were: 1) Was there objective, scientific evidence observed, or subsequently found at the scene, that Officer Miller placed himself in front of Mr. Gomez's car, or that Mr. Gomez tried to run over Officer Miller? and 2) Where was Officer Miller standing with respect to Mr. Gomez when the fatal bullet was fired? The fundamental objective of the analysis presented here is to address this dispute on the basis of objective facts and reliable scientific methods, to a reasonable degree of scientific and biomechanical certainty.  Thus, to address these questions, I reviewed the surveillance video from Jiffy Lube, the case materials listed above and inspected and measured the scene.  I then used the video and measurements of the scene to determine the locations of Officer Miller and the vehicle operated by Mr. Gomez during the incident.

10.      *Video Review.*  A camera mounted on the southeast corner of the Jiffy Lube (Figure 4) located at 215 Harlem Avenue, Oak Park, IL 60304, recorded the incident, including the locations of the Volkswagen and Officer Miller when Officer Miller fired at Mr. Gomez.   The footage ("ch10_20170203180344.mp4"; 43:03 seconds) was reviewed using forensic video analysis software (iNPUT-ACE v. 2.4.1, Occam Video Solutions LLC, Spokane, WA 99201).  The footage shows Mr. Gomez stopped on Jackson Blvd. in front of Jiffy Lube, then reversing the car while being pursued by Officer Miller. The video then shows Officer Miller standing between the camera and the car, to the side of the car near the left front tire before the car moves forward and away from Officer Miller.   A more detailed review follows.  Note, the video frames have been cropped to improve the visibility of the movement of both the Volkswagen and Officer Miller:

Page 6



Figure 4.  Screen capture from Google Street View showing the location of the camera that recorded the incident.

## A

**Mr. Gomez stopped in the Volkswagen, facing west, on Jackson Blvd.**



## B

**Officer Miller, with gun drawn, evidenced by the gun light illuminating the street, pursuing Mr. Gomez. The Volkswagen is nearly stopped and is pointed northeast.**



C

**Officer Miller continues to pursue Mr. Gomez. The Volkswagen is stopped and is pointed northeast.**



D

**The Volkswagen is stopped. Officer Miller is standing near the left front tire, blocking the wheel from the view of the camera.**



E

**The Volkswagen is stopped. This is one frame before the car begins to move forward. Officer Miller shifted to his left and is standing with his right foot north of and to the side of, the left front tire. His hips are obscuring the side of the left-front headlight from the camera.**



F

**The Volkswagen is moving forward, away from Officer Miller. Officer Miller is standing to the side of the car, near the driver's side window.**



G

**The Volkswagen is stopped.**



Page 8

11.     *Scene Inspection and Investigation*.  On April 24, 2019, I conducted an inspection of the scene where Mr. Gomez was shot and killed by Officer Miller.  Aerial photographs of the scene were taken using a drone (DJI Mavic Pro Platinum Model:M1X, SN:08QUEASP0100HG, Shenzhen, China, 518057).  Each photograph taken by the drone was saved with the GPS position of the drone when the photo was taken. The geometry of the scene was recorded using a 3D Laser Scanner (Figure 5; FARO Focus[3D] M70, FARO, Lake Mary, FL 32746).  The 3D scanner has a range of 0.6 m to 70 m [2' - 230'] and a range (distance) accuracy of 3 mm [0.1"] at 10 m [33'] and 25 m [82'].  These instruments are widely used and accepted for documenting vehicles and scenes (2,6).  The scanner works much like a laser range finder one can buy at a hardware store for measuring distances, but instead of measuring a single distance, the 3D scanner records the position of objects in a 360º arc around its vertical axis (like a 360º panorama) and from -60º to 90º (straight up) with respect to the horizontal plane, creating a point cloud.  Scans of the scene were taken from seven positions along Jackson Blvd.  Several photographs were taken to document the relative locations of the scanner. The scans were imported into Autodesk Recap Pro (v. 4.2.1.7, Autodesk, Inc., San Rafael, CA 94903) and registered (aligned and combined) for measurement and analysis (Figure 6)(Figure 7).

Page 9



Figure 5. Photograph taken on April 24, 2019, showing the laser scanner on the south side of Jackson Blvd., near the area where Mr. Gomez was shot by Officer Miller.  The surveillance camera that recorded the incident is visible on the southeast corner of Jiffy Lube.

Page 10



Figure 6. Screen capture from laser scan processing software (Autodesk Recap v. 6.0) showing an oblique view of the aligned laser scans. Five of the seven laser scan positions are shown. This perspective matches the perspective in Figure 5.



Figure 7. Screen capture from laser scan processing software (Autodesk Recap v. 6.0) showing a top view of the aligned laser scans.

Page 11

12. *Ballistics/Wound Mapping*. One of the foundational precepts of a shooting reconstruction is that the injuries/wounds themselves serve as a signature to the orientation of the body containing the wound with respect to the source of the projectile[bullet](4). The same principle applies for objects, such as vehicles, struck by bullets. Haag & Haag (2011) wrote, "*The reconstructive value of bullet paths through people cannot be understated...the path of a gunshot wound is...useful in evaluating the position of a gunshot victim at the moment the causative bullet arrived.*" The paths of the bullet that passed through Mr. Gomez was marked on a 3D surrogate for Mr. Gomez (Figure 8), created based on Mr. Gomez's height of 69" (Autodesk Character Generator v.2015.2, Autodesk, San Rafael, CA 94903). Two spherical markers were placed on the surrogate at the specific anatomic locations where the entry and exit wounds were identified in the autopsy report.



Figure 8. Screen captures from 3D visualization software showing the entry and exit wounds mapped to a 3D surrogate for Mr. Gomez. The yellow line represents the bullet path. Consistent with the autopsy report, the direction of the bullet was "*...left to right, back to front, and upward.*" (P0218).

13. *Camera Matching*. The laser scan data, 3D surrogate for Mr. Gomez and a 3D model of a 2001 Volkswagen Jetta were imported into 3D visualization software (3DS Max v.2020, Autodesk, San Rafael, CA 94903). The software is widely accepted in the peer-reviewed literature as a tool for measuring scene dimensions and recreating the relative position of a camera with respect to the scene being photographed or recorded with video(1,3). The 3D model of a Volkswagen Jetta was downloaded from Hum3D.com. Use of models from databases are well-accepted in the accident reconstruction

Page 12

community(5,7). The vehicle was scaled to real-world units based on its specifications. A virtual camera that matched the perspective and position of the Jiffy Lube camera was placed in the 3D scene where the camera was documented by the laser scanner. Additionally, a 3D surrogate for Officer Miller was imported into the software. Next, the Camera Match Overlay Tool built into the forensic video analysis software (iNPUT-ACE v. 2.4.1, Occam Video Solutions LLC, Spokane, WA 99201) was used to integrate the video evidence into the 3D scene to recreate the relative positions of the Volkswagen and Officer Miller during the incident (Figure 9). The Overlay Tool was then used to remove lens distortion from the video such that the 3D positions of background objects in the laser scan data (e.g. sidewalk, driveway, tree, fence, etc.) matched the relative screen position of the same objects recorded by the surveillance camera mounted outside Jiffy Lube. Once alignment was confirmed, the model of the Volkswagen and surrogate for Officer Miller were be positioned at key points to determine where Officer Miller was standing when the car began to pull forward (Figure 10) and when Officer Miller was standing when he shot Mr. Gomez (Figure 11).



Figure 9. Screen captures from Camera Match analysis showing agreement between the observed positions of the Volkswagen and Officer Miller in the surveillance video and in the reconstructed 3D scene. (TOP) The Volkswagen is stopped on Jackson Blvd., facing west; and (BOTTOM) The Volkswagen is stopped after reversing and is facing approximately northeast. Officer Miller is standing between the camera and the left front end of the car.



Figure 10.  Screen capture from 3D visualization software showing the relative position of Officer Miller with respect to the Volkswagen before the car began to move forward.  The position is consistent with the surveillance footage and consistent with the bullet hole evidence on the driver's side of the front windshield. Mr. Gomez was never standing in front of the Volkswagen.

Page 14





Figure 11. Screen captures from 3D visualization software showing the orientation of Mr. Gomez's body and the relative location of Officer Miller when Mr. Gomez was fatally shot. The bullet that struck Mr. Gomez was fired through the driver's side window and was likely the last shot fired by Officer Miller. When Mr. Gomez was shot, he was turned to his right and leaning away from Officer Miller as the car drove past Officer Miller.

14.     Officer Miller testified, "-- *his car began drive -- he put the car in drive and started the car coming at me.*" (Miller Deposition – 97:12). Officer Miller later testified, "*I shot Marco Gomez because he tried to run me over and kill or maim me.*" (Miller Deposition – 125:18). Finally, he testified, "*…when my brain processed the fact that the car -- I was no longer in front of the car, I stopped pulling the trigger. That's why I only shot four shots.*" (Miller Deposition – 122:1). However, there is clear, objective scientific evidence that Officer Miller never put himself in front of the Volkswagen. First, the video clearly shows that Officer Miller was always along the side of the car, between the camera and the car. Second, all four shots fired by Officer Miller were fired from the left side of the car. The orientation of the holes in the driver's side of the front windshield as well as the orientation of trajectory rods placed in the holes and photographed by Illinois State Police Crime Scene Investigators clearly demonstrates that the holes originated from someone standing along the side of the car and not in front of the car. Further, the holes in the driver's side window clearly demonstrate that Officer Miller did not stop shooting when he "*…was no longer in front of the car…*" Instead, Officer Miller shot directly into the driver's side window, killing Mr. Gomez.

Page 15



Figure 12. Photographs taken on February 6, 2017, by Illinois State Police Crime Scene Investigator, Jose Juarez, showing trajectory rods in all four bullet holes having a left to right (driver's side toward passenger side) direction. Thus, no shots were fired from in front of the car. These trajectory rods are consistent with the video evidence, which places Officer Miller along the left side of the car during the incident and not in front of the car at any point during the incident.

## Opinions

15.     Based on my review of the case materials and shooting reconstruction analysis and on my background, education and training in the fields anatomy, physics, injury biomechanics, forensic photography and shooting incident reconstruction, I conclude, to a reasonable degree of scientific and biomechanical certainty, that: 1) There is objective, scientific video evidence that demonstrates Officer Miller never placed himself in front of Mr. Gomez's vehicle and thus was never at risk of being run over by Mr. Gomez, contrary to Officer Miller's testimony; 2) Officer Miller was positioned along the left side of the car when all four shots were fired; 3) Officer Miller fired the fatal bullet as Mr. Gomez drove by Officer Miller, contrary to Officer Miller's testimony that he stopped firing when he was "*...no longer in front of the car...*"

16.     Please note that I reserve the right to supplement these opinions should additional information become available to me. Thank you for the opportunity to review this case. Please let me know if I can provide any further information.

Respectfully Submitted,

Jeremy J. Bauer, Ph.D.
Bauer Forensics, LLC

Page 16

## References

1.  Campbell III, A and Friedrich, R. 1993. Adapting Three-Dimensional Animation Software for Photogrammetry Calculations. SAE International.

2.  Coleman, C, Tandy, D, Colborn, J and Ault, N. 2015. Applying Camera Matching Methods to Laser Scanned Three Dimensional Scene Data with Comparisons to Other Methods. SAE Technical Paper Series.

3.  De Angelis, D, Sala, R, Cantatore, A, Poppa, P, Dufour, M, Grandi, M and Cattaneo, C. 2007. New method for height estimation of subjects represented in photograms taken from video surveillance systems. Int J Legal Med 121:489-492.

4.  Haag, L and Haag, M. 2011. Chapter 11: Determining bullet track ('trajectory') in gunshot victims. Shooting Incident Reconstruction. San Diego, CA: Academic Press; pp. 191-206.

5.  Rucoba, R, Duran, A, Carr, L and Erdeljac, D. 2008. A Three-Dimensional Crush Measurement Methodology using Two-Dimensional Photographs. SAE International.

6.  Tandy, DF, Coleman, C, Colborn, J, Hoover, T and Bae, J. 2012. Benefits and Methodology for Dimensioning a Vehicle Using a 3D Scanner for Accident Reconstruction Purposes. SAE Technical Paper Series.

7.  Untaroiu, C, Darvish, K, Crandall, J, Deng, B and Wang, JT. 2005. A finite element model of the lower limb for simulating pedestrian impacts. Stapp Car Crash J 49:157-181.



**BAUER DECLARATION
ATT. B**

**Jeremy J. Bauer, Ph.D.**
**Bauer Forensics, LLC**
2610 11th Ave. E.
Seattle, WA 98102
503.912.8660
jjb@bauerforensics.com
www.bauerforensics.com

January 14, 2021

Mr. Andrew M. Stroth
Ms. Amanda Yarusso
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606

Re:     *GOMEZ v. Village of Forest Park et al.*

Dear Mr. Stroth and Ms. Yarusso:

1.      Since completing my previous report, I have received for review:  Report of John Ryan (09/29/2020); Report of Michael DiTallo (09/29/2020); Inspection Photos taken by Michael DiTallo (270 Photos); Report of Thomas Martin (09/30/2020); Deposition of Thomas Martin (11/11/2020); and Deposition of Michael DiTallo (11/25/2020).

2.      At your request, and in compliance with Rule 26 of the Federal Rules of Civil Procedure, I am writing this report to address questions I was asked during my deposition regarding the application of the science of Perception Reaction Time to this matter and to respond to the opinions of John Ryan, Michael DiTallo and Thomas Martin.  My opinions are based on a reasonable degree of scientific and biomechanical certainty and founded on my professional education and on my academic and consulting experience in the fields of biomechanics, human performance, anatomy, visibility analysis and shooting incident reconstruction.  If called as a witness, I could and would competently testify as to the opinions set forth in this summary.  I continue to reserve the right to amend or supplement these opinions should additional information become available.

3.      During my July 17, 2020, deposition, I was questioned regarding the application of Perception Reaction Time (PRT) to this case, given Perception Reaction Time was not addressed in my May 12, 2020, report.  By way of background, as an undergraduate studying physical education, with an emphasis in biomechanics and graduate student studying human performance, I took courses that specifically addressed cognitive and neurologic factors that influence perception-response time using both academic materials and practical demonstrations with simple and complex tasks.  Motor learning, motor control and the physiological basis for the development of specific, planned responses to stimuli were fundamental building blocks of my education.  Further, those building blocks of my education are routinely used and have been routinely used in my over 20 years of working in the fields of injury biomechanics, accident/collision reconstruction, shooting reconstruction and trip, slip and fall reconstruction.  Thus, I am uniquely suited to address Perception Reaction Time in this matter.

4.      Before Officer Miller could have been expected to respond to an action made by Mr. Gomez, Officer Miller would have entered a cognitive reaction phase called Perception Reaction Time (PRT).  PRT is the interval between the appearance of an object, or some dangerous condition, in a person's field-of-view and the initiation of a response. The interval starts, for example, when a perceived threat appears and ends when the person observing the perceived threat responds, in this case by firing at the perceived threat(3).  The time to pull the trigger and for the bullet to travel to the threat is not included in perception-reaction time but is instead calculated separately, considering the time required to pull the trigger. Components of perception-reaction time include: 1) Detection; 2) Identification; 3) Decision; and 4)

Page 2

Response. *Detection* involves the person observing the perceived threat developing a conscious awareness that a hazard is present. In this case, detection begins when the vehicle begins to move. *Identification* is the acquisition of sufficient information to be able to reach a decision as to what action, if any, is required. The *Decision* phase involves deciding what action is appropriate. During the *Decision* phase, the person plans and prepares for the movement. Regarding the *Decision* phase, Keele *et al.* (1981) wrote, "*...even for well-practiced programs[movements], considerable planning for a movement occurs in the interim between a signal to respond and the beginning of the movement itself.*" Summers and Anson (2009)(5) wrote, "*The well-documented finding that the time prior to the initiation of a sequence of movements is sensitive to the number and nature of the elements in the forthcoming sequence provides strong support for a planning or preparatory process prior to movement onset.*" Finally, *Response* involves issuing commands from the motor center of the brain to the appropriate muscle groups to carry out the actions that were planned in the *Decision* phase. Human perception-reaction time studies have been published in the fields of accident reconstruction and shooting reconstruction. Olson (1996)(3) summarized the peer-reviewed literature on driver perception-reaction time. He wrote that, "*The values from 0.75 to 1.5 seconds provide a basis for estimating what a reasonably alert driver should be capable of doing.*" Seymour *et al.* (1995)(4) studied the perception-reaction times of 58 male and female police officers engaging in simulated high-threat situations. The "fire-time" for a high-threat scenario with a single stimulus for 33 males was $0.4 \pm 0.2$ seconds.

5.     Using the same forensic video analysis software (iNPUT-ACE v. 2.6.1, Occam Video Solutions LLC, Spokane, WA 99201) described in my May 12, 2020, report, I quantified Officer Miller's Perception Reaction Time and quantified the duration of the incident from the initiation of movement of the car to the likely time at which the last shot was fired. The timecode for the first frame in which the vehicle is observed moving forward with Officer Miller standing near the left front corner is 28.625 seconds. Officer Miller's first motion after the observed initial motion of the car is at timecode 29.031. Thus, the time from the first observed forward movement of the car to the first observed response from Officer Miller was approximately 0.4 seconds. Officer Miller's PRT in this matter was therefore 0.4 seconds, consistent with the study cited above by Seymour *et al.* (1995). Note, the car drove approximately $1.0 - 1.3$ feet in this 0.4 seconds. The timecode showing Officer Miller next to the driver's door, when the last shot was likely fired, is 29.625. Thus, the entire event, from initial motion of the car, to Officer Miller's last shot, took place in approximately 1.0 second.

6.     An evaluation of Officer Miller's Perception Reaction Time was not considered in my May 12, 2020, report because the analysis did not have any bearing on the task I was asked to perform, namely the determination of Officer Miller's position relative to the vehicle and Mr. Gomez before the vehicle started moving and at the time the four shots were fired. However, the line of questioning I received during my deposition regarding Officer Miller's Perception Reaction Time and the three separate Perception Reaction Time discussions provided in the three expert reports produced by Defendants elucidates important aspects of Officer Miller's actions during this incident. First, given Officer Miller's position near the left front tire of the Jetta before the vehicle moved and given the approximate 0.4 second delay between the initial motion of the vehicle and Officer Miller's reaction, had any part of Officer Miller been standing in front of the vehicle when it started moving, the part of Officer Miller that was in front of the Jetta would likely have been struck by the vehicle. Given Officer Miller was not struck by the vehicle, he was not in front of the vehicle when the vehicle started moving. Second, the first two shots fired by Officer Miller had a front to back, left to right trajectory in the front windshield. The second two shots had a left to right trajectory, approximately perpendicular to the long axis of the car and likely downward. To achieve these distinctly different bullet paths between the first two shots fired and the second two shots fired, Officer Miller had to rotate to his left, tracking Mr. Gomez with his gun, as the car proceeded forward and to the right. Further, Officer Miller was observed in the video side stepping in the direction the vehicle was moving. Thus, Officer Miller clearly changed his position and the direction of his aim in response to the vehicle movement during the 1.0 second over which the stimulus (car moving) was presented and the last shot was fired. The significance here is that the sequence of motions (firing, tracking Mr. Gomez, side-stepping) executed by Officer Miller

Page 3

was planned in the 0.4 seconds it took for Officer Miller to recognize the stimulus (car moving) and initiate the response. Therefore, Officer Miller's actions, based on his planned response, provide objective biomechanical evidence that he anticipated that the vehicle was going to drive by him and not over him.

7.        Upon reviewing the additional materials received since completing my May 12, 2020, report, my opinions remain unchanged. I will address Mr. Ryan's, Mr. DiTallo's and Mr. Martin's opinions generally here, then separately below. None of the defense experts conducted a reconstruction of the incident. One of the foundational precepts of a shooting reconstruction is that the injuries/wounds themselves serve as a signature to the orientation of the body containing the wound with respect to the source of the projectile[bullet](2). The same principle applies for objects, such as vehicles, struck by bullets. Haag & Haag (2011) wrote, "*The reconstructive value of bullet paths through people cannot be understated…the path of a gunshot wound is…useful in evaluating the position of a gunshot victim at the moment the causative bullet arrived.*" Not one of the defense experts used Mr. Gomez's fatal bullet wound and the bullet evidence in the windows to determine Officer Miller's position relative to Mr. Gomez when Mr. Gomez was shot and killed.

8.        Defense experts rely on witness statements and testimony of Eric Meunier. It is my understanding that Mr. Meunier lived at 715 S. Maple Ave. in Oak Park, IL on the date of the incident. According to an Investigative Report by the Cook County State's Attorney's Office Investigations Bureau, "*Mr. Meunier looked out his living room window onto Jackson Boulevard and saw a man fire a handgun four (4) times at the driver of another vehicle in the street.*" (P0163). "*Mr. Meunier stated that the man he saw firing the gun had shot the weapon at what looked to be point blank range. Mr. Meunier further said that the vehicle that the subject was in appeared to be fleeing and had just turned around from backing up.*" (P0164). According to a Forest Park Police Department report, "*Meunier looked out of his living room window, which faces Jackson Boulevard, and observed a white colored Volkswagen Jetta accelerating toward someone who was on foot in the median area of Jackson Boulevard. Meunier advised the person's back was facing his living room window. Meunier advised the Jetta was in the process of going to hit the person who was in the street, at which time the person fired a handgun into the Jetta's front windshield and driver's side window.*" (P0301). While there is no question Mr. Meunier could have witnessed some, or all of the event, his characterization and description of the physical locations of Officer Miller with respect to the vehicle is subject to misinterpretation, given his perspective and given physical obstructions between Mr. Meunier and the scene. Given Mr. Meunier's position north of the vehicle, the angle of the vehicle and Officer Miller's position next to the left front wheel of the Jetta, Mr. Meunier would not have been able to determine whether Officer Miller was directly in the path of the vehicle, or whether the vehicle was "*…in the process of going to hit…*" Officer Miller. While it may have appeared as though the vehicle was moving toward Officer Miller, given Officer Miller was between Mr. Meunier and the car, the objective video evidence and Officer Miller's lack of injuries demonstrate that the vehicle was instead, moving forward and to its right, away from Officer Miller, when the shots were fired. Additionally, Mr. Meunier's view of the event was substantially obscured by vegetation growing along the southern border of his house, just north of the sidewalk (Figure 1). Photographs taken after the incident, when the Jetta was at its final position of rest, show tall vegetation in front of the window(s) Mr. Meunier looked out at the time of the incident. Further, given the position of the Jetta moments before it started to move and while it was driving forward and to the right, Mr. Meunier would had to have looked around and through the vegetation on his property to witness the incident.

Page 4



Figure 1.  (LEFT) screen capture from 3D visualization software showing the relative locations of Mr. Muenier's windows and the Jetta, just before the Jetta started moving forward; and (RIGHT) A photograph taken on the evening of the incident showing vegetation between Mr. Meunier's house windows and the scene. Mr. Meunier's view of the incident would have been obstructed/partially obstructed by the vegetation.

## Opinions of John Ryan

9.      I have reviewed Mr. Ryan's report and disagree with his characterization regarding Mr. Gomez's driving direction and with his commentary regarding Perception Response Time (PRT). Specifically, in paragraph 155 of his report, Mr. Ryan wrote, "*...whatever Gomez's subjective intention was when he ultimately drove forward at Officer Miller is not relevant to a proper use of force analysis.*"  There is no objective evidence demonstrating that Mr. Gomez "*drove at*" Officer Miller.  In fact, the opposite is true.  Had Officer Miller been standing in front of Mr. Gomez when the Jetta accelerated forward and to the right, Officer Miller would not have had time to get out of the way and would have been struck by the front left bumper of the vehicle. In paragraph 158 of his report, Mr. Ryan wrote, "*...the video makes clear, as does the testimony of the independent witness Meunier, that when Gomez drove forward, he posed an immediate threat of serious bodily harm or death to Miller.*"  In paragraph 159, Mr. Ryan alleged, "*In accord with the objective video evidence, it is noted that Mr. Gomez decided to reverse through traffic and drive toward Officer Miller, thereby escalating this event.*" However, the video does NOT make clear that Mr. Gomez posed an immediate threat to Officer Miller when the car pulled forward.  Mr. Ryan did not conduct an independent, scientific analysis to determine Officer Miller's position relative to the vehicle.  Contrary to Mr. Ryan's claim, the objective video evidence demonstrated that Officer Miller was to the side of the vehicle and that the vehicle moved forward and to the vehicle's right, away from Officer Miller.  The vehicle did NOT move toward Officer Miller.  Mr. Ryan mischaracterized the video evidence in his report.  Had Officer Miller indeed positioned part of his body, or his left leg, in front of the vehicle at any time during the incident, he would have given himself practically NO defensive strategy to avoid harm to himself from the vehicle.  In other words, had Officer Miller been positioned partially in front of the vehicle, he would have given himself no "Reactionary Gap".  According to Boulton and Cole (2016)(1), a reactionary gap is, "*...enough distance between themselves[armed officers] and the suspect to enable effective defensive behavior in response to any potential threat posed by the suspect, full focus on the threat posed to self, and addressing that threat.*"

Page 5

10.     At the beginning of paragraph 162, Mr. Ryan wrote, "*Law enforcement has recognized that average human reaction to a perceived threat is approximately 0.75 to point 0.8.[7] I would note that in this case, Officer Miller's initial perception/reaction time was 0.6 of a second.*"  I generally agree with the numbers Mr. Ryan cited.  However, he does not state how he calculated Officer Miller's PRT of 0.6.  Further, he does not put this information into context, or ascribe any meaning to these numbers.  The rest of Mr. Ryan's paragraph 162, with the exception of the last sentence, relates to Officers' training regarding how long it takes a fleeing person with a gun to turn and fire at an officer.  This discussion has no relevance to the incident involving Mr. Gomez, given Mr. Gomez was unarmed, in a car, and driving away from Officer Miller.  At the end of the paragraph, Mr. Ryan wrote, "*As noted, the threat and the changes in positioning are generally even more pronounced when dealing with a moving vehicle.*"  Mr. Ryan did not distinguish between an officer responding to a fleeing car on foot versus responding to an armed suspect fleeing on foot.

11.     Finally, in paragraph 170 of his report, Mr. Ryan wrote, "*…while it is suggested that the Village of Forest Park was deficient by not having a policy related to officers pursuing vehicles while on foot, in auditing agencies nationwide for nearly two decades I have not seen a policy on this topic in any of the agencies I have audited. In teaching policy development classes nationwide, I have never had this topic come up in any class.*"  Mr. Ryan's comments raise an important point.  From a purely biomechanical perspective, a human body is insufficient to stop a fleeing car.  Thus, there is certainly a valid, biomechanical, rationale for not pursuing vehicles on foot.  Additionally, from a physics and ballistics standpoint, firing bullets at a car presents a significant risk to the public for at least two reasons.  First, there is the potential for ricochet where stray bullets could strike innocent bystanders, especially in a suburban neighborhood surrounded by houses and open businesses.   Second, should the officer successfully shoot the driver of a fleeing vehicle, the public is then exposed to the dangers of an uncontrolled, 3000 lb car, as occurred in this matter.  An additional concern regarding Mr. Ryan's statement is that a simple internet search reveals that the issue of shooting a moving vehicle has been prevalent for over 40 years (https://www.policeforum.org/assets/guidingprinciples1.pdf).  While I am not opining on Officer Miller's use of force, it is important to point out that there is literature describing the pitfalls of attempting to stop a vehicle by shooting the driver.  This logic can be taken one step further to demonstrate that policies regarding pursuing a vehicle on foot and firing at that moving vehicle are not as elusive as Mr. Ryan suggests in his report.

**Opinions of Michael DiTallo**

12.     I have reviewed Mr. DiTallo's report and deposition testimony and generally disagree with his opinions regarding Officer Miller's location prior to shooting and killing Mr. Gomez and his application of Perception Reaction Time in this matter.  Specifically, while Mr. DiTallo performed an independent inspection of the scene and collected his own data, he did not perform a reconstruction of the event.  Mr. DiTallo did not consider the bullet paths in his independent analysis.  When asked during deposition, "*Did you disagree with the direction of the bullet paths demonstrated by the trajectory rods and the photographs taken by the ISP CSI agent?*" (DiTallo Deposition – 54:10), Mr. DiTallo testified, "*I didn't analyze it for opinions in that area. That's not my area.*"  Further, Mr. DiTallo did not independently determine Officer Miller's relative position to the vehicle, though he had the tools to perform such an analysis.  It is commonly accepted practice for reconstructionists to use video evidence together with 3D scene geometry to determine the relative 3D locations of objects, people, and vehicles from a two-dimensional image, or series of images (video).  The process of making such positional determinations and measurements from photographs, or video frames is called photogrammetry.  I used the science of photogrammetry to conduct my reconstruction in this matter.   Note, Mr. DiTallo agreed with my reconstruction of the position of the Jetta in the roadway, before the shooting took place and agreed with the general distance I calculated between Officer Miller and the Jetta before the Jetta began moving forward and to the right.  I determined these positions using photogrammetry.  Mr. DiTallo testified, "*I was able to do the analysis with great bases laid out in the video analysis, and I didn't even think about photogrammetry analysis.  I'm not even sure it*

*would be possible due to the pixilation issued of the video, but I did not do one.*" (DiTallo Deposition – 66:9).

13.     On page 14 of Mr. DiTallo's report, he presented two screen captures from the Jiffy Lube surveillance video and described them as, "*Screenshot showing Officer Miller's left leg blocking the right (passenger) headlight*" (Michael DiTallo 14).  The resolution of the video is too low to distinguish between the left and right front headlights.  Further, the long axis of the car is nearly parallel to the camera, which would largely prevent view of the right passenger headlight.  Thus, Mr. DiTallo's claim regarding Officer Miller's left leg blocking the right headlight is not supported by the evidence.

14.     On page 16 of his report, Mr. DiTallo wrote, "*The video shows Mr. Gomez then accelerated forward and was turning to the right. Contrary to the testimony of Dr. Bauer, a vehicle turning right must also move forward as its turn radius is a function of how much steer angle has been input by the driver and it is limited by the steering geometry of the vehicle.*" (Michael DiTallo 16).  There is no contradiction between my testimony and the motion of the vehicle observed in the video.  Additionally, on page 16 of his report, Mr. DiTallo wrote, "*…in the video Officer Miller never moved back to the right before Mr. Gomez started his forward motion.*"  Mr. DiTallo's observation, consistent with my own observation, demonstrates that Officer Miller was not in the path of the vehicle when the vehicle started moving forward and to the right and also demonstrates that Officer Miller did not make any obvious movements to get out of the path of the vehicle.  Instead, Officer Miller is seen moving roughly in the direction the car was moving.  Officer Miller's actions, or inactions, are not consistent with someone that is trying to avoid being run over.  Instead, Officer Miller shuffled his feet to his left, and rotated his body to track Mr. Gomez's body with his gun, as he planned during his Perception Reaction response.

15.     On page 17 of his report, Mr. DiTallo wrote, "*This is consistent with Officer Miller being in front of the driver headlight when the Volkswagen began moving as he stated in his testimony.*"  Again, the evidence demonstrates that Officer Miller was not in front of the headlight when the vehicle started moving.  Had any part of Officer Miller been in front of the headlight, or in the path of the headlight, when the vehicle started moving forward, he would have been hit by the vehicle.

16.     On page 24 of his report, Mr. DiTallo wrote, "*…the Volkswagen's front wheels would have been turned to the left as he backed in order to stop in the position he was in the roadway. Officer Miller's approach was right as this backing maneuver finished and it is likely the wheels were still turned to the left. Officer Miller's testimony is that he was focused on Mr. Gomez once he reached the vehicle and he quickly started moving towards the front corner and would not likely have paid attention to the wheel. Recall that the Volkswagen backed for a short time (three-point turn) which is likely when the front wheels were either straightened or turned to the right. During this time, the gun light from Officer Miller was raised and he had focused on Mr. Gomez rather than how the wheel was facing.*"  Mr. DiTallo neglected to acknowledge that, while Officer Miller was shining his light on Mr. Gomez, Officer Miller clearly would have been able to see Mr. Gomez turning the steering wheel to the right.  Mr. Gomez's hands and the steering wheel would have been within only a few degrees of Officer Miller's central field of view, accepting that Officer Miller was focused on Mr. Gomez's face and hands.  Thus, while Officer Miller may not have seen the left front tire turning on the ground, he would certainly have seen Mr. Gomez turning the steering wheel to the right.  It is likely that Officer Miller's observation of Mr. Gomez turning the steering wheel to the right informed Officer Miller's prepared and planned response (side-step and track Mr. Gomez) to the initial movement of the vehicle.

17.     On page 25, Mr. DiTallo wrote, "*Dr. Bauer is critical of Officer Miller firing two rounds through the side window and seems to imply Officer Miller should have been able to instantaneously stop shooting once the vehicle was driving past him. This stands in opposition of published scientific research.*"  Mr. DiTallo's statement is unfounded and without support, or justification.  The purpose of my reconstruction was to determine the relative positions of the involved parties at the time the four shots were fired and compare the objective evidence to witness testimony (i.e. Does Officer Miller's recollection

match the objective evidence?). There is no criticism of Officer Miller in my May 12, 2020, report, nor is there an implication that Officer Miller should have been able to instantaneously stop shooting once the vehicle was driving past him. The purpose of the report and testimony is to, "*…help the trier of fact to understand the evidence or to determine a fact in issue…*" Regarding the topic of shots fired into the windows and the timing of those shots, there is clear, irrefutable evidence that the two shots through the front windshield were created when Officer Miller was positioned near the left front quarter panel of the car and that the two shots in the driver's side window were created when Officer Miller fired his gun into the driver's side window, while he was facing and standing near the driver's side door. My analysis, based solely on the physical evidence collected and documented by the Illinois State Police, demonstrates that NONE of the four shots were fired when Officer Miller was in front of the car. Further, there is no objective evidence that Officer Miller was ever in front of the car.

### Opinions of Thomas Martin

18.     I have reviewed Mr. Martin's report deposition testimony and generally agree with his description of the timing of events as shown in the video and the location of Officer Miller with respect to the vehicle when all four shots were fired, but disagree with his descriptions of Mr. Gomez driving the vehicle toward Officer Miller and disagree with conclusions he derived from a discussion regarding "Perception – Reaction Time".

19.     On page 20, of his report (Thomas Martin 20), under a section titled, "*Pertinent Case Facts Contained within the Investigative File*", Mr. Thomas wrote, "*Mr. Gomez however, disregarded Officer Miller's commands to stop, and instead began to unlawfully[1],[2] move the stolen vehicle forward toward Officer Miller while Officer Miller was positioned 'in front of the vehicle' by the driver's front corner/headlight; an area in which he was clearly in danger of being struck or run over by Mr. Gomez.*" As discussed previously, there is no objective evidence demonstrating Mr. Gomez moved the "*…vehicle forward toward Officer Miller while Officer Miller was positioned 'in front of the vehicle'…*" Defense experts have not demonstrated that Officer Miller was ever actually in the front of the vehicle such that he was in the path of the vehicle. Their collective opinions are speculative at best. For example, Mr. Martin included a statement in his report that was non-committal. He wrote, "*At one point in the video, it appears that Officer Miller's left leg moves forward of the driver's side corner of the bumper in front of the headlight.*" (Thomas Martin 21). Given the observed location of Officer Miller's right leg with respect to the vehicle, had Officer Miller's left leg been standing even partially in front of the vehicle when Mr. Gomez moved forward and to the right, the vehicle would have struck Officer Miller before Officer Miller could have moved out of the way. Thus, the evidence clearly demonstrates that Mr Gomez did NOT drive at Officer Miller such that Officer Miller had to get out of the way to avoid being run over. Further, there is no evidence to demonstrate that Officer Miller was physically in the path of the vehicle. The objective evidence in this case, including the video, lack of injuries to Officer Miller, documented bullet paths both through the vehicle and Mr. Gomez, and the position of the vehicle immediately before the shooting and after the vehicle came to rest, demonstrate that Mr. Gomez drove the vehicle away from Officer Miller.

20.     On page 19 of his report, Mr. Martin wrote, "*The trajectories of the two projectiles that are observed in the windshield indicate an origination area that was generally located forward of the windshield and slightly off the driver's side of the Volkswagen Jetta, in the general area of the driver's side headlight and the driver's side fender. The trajectories of the two projectiles observed in the driver's window indicate an origination area that was generally located outside the driver's window. These projectiles track from the driver's side of the vehicle toward the passenger side of the vehicle.*" Mr. Martin later reiterates his opinions regarding the direction the bullets were fired. On page 24 of his report, he wrote, "*The trajectories of the two projectiles that are observed in the windshield of the Volkswagen Jetta indicate an origination area that was generally located forward of the windshield and slightly off the driver's side of the vehicle in the general area of the driver's side headlight and driver's side fender. The trajectories of the two projectiles observed in the driver's window indicate an origination area that was generally located outside the driver's window. These two projectiles track from the front driver's side of the vehicle toward the front passenger*

*side of the vehicle.*" (Thomas Martin 24). However, Mr. Martin's subjective commentary regarding Officer Miller's aim during this sequence of shots is incorrect and contradicts his conclusions regarding the bullet paths. On page 23 of his report, Mr. Martin wrote, "*If Officer Miller fired his service weapon at Mr. Marco Gomez at the same time that the vehicle is moving forward, Officer Miller would not be required to make any appreciable change to his position or the general direction of his aim, as the vehicle's forward movement is contributing to the sequence of the shots moving from left to right from the windshield near the driver's side A-Pillar to the driver's window. The defects in the windshield and the driver's window, as viewed in photo ISP CSI photo 251, demonstrate the sequence of fire from left to right. All four defects are observed to be at a consistent height from the ground. It's not as if Officer Miller is pausing his fire, changing his position and aim, and then firing again.*" Finally, in his "*Conclusions and Opinions*", Mr. Martin wrote, "*Since the Volkswagen Jetta was moving forward at the same time that the shots were being fired, Officer Miller's position and direction of fire would not change any appreciable degree as he is firing.*" (Thomas Martin 25). This is false and contrary to the physical evidence and the analysis performed by CSI Juarez with the Illinois State Police, regarding the directions the bullets traveled. Mr. Martin acknowledged that the first two shots have a front to back, left to right trajectory in the front windshield. He further acknowledged that the second two shots had a left to right trajectory. To achieve these distinctly different bullet paths between the first two shots fired and the second two shots fired, Officer Miller had to rotate to his left as the car proceeded forward and to its right. Thus, Officer Miller clearly changed his position and the direction of his aim, contrary to Mr. Martin's claim that Officer Miller did not need to change his aim. Had Officer Miller not rotated to follow the vehicle as it moved forward and to the right, the two shots in the driver side window would have likely instead been into the B-Pillar (near Mr Gomez's seatbelt), or into the left, rear passenger window and been oriented front to back and left to right. Further, there is clear, objective video-based evidence showing Officer Miller changing his position 0.4 seconds after the car is first observed moving. Officer Miller's actions of side-stepping, tracking and firing 4 shots provide clear objective evidence that he anticipated Mr. Gomez's actions and planned accordingly.

**Opinions**

21.     Based on my review of the materials received since filing my May 12, 2020, report and based on my background, education and training in the fields human performance, physics, injury biomechanics, forensic photography and shooting incident reconstruction, I continue to conclude, to a reasonable degree of scientific and biomechanical certainty, that: 1) There is objective, scientific video-based evidence that demonstrates Officer Miller never placed himself in front of Mr. Gomez's vehicle and thus was never at risk of being run over by Mr. Gomez, contrary to Officer Miller's testimony; 2) Officer Miller was positioned along the left side of the car when all four shots were fired; 3) Officer Miller fired the fatal bullet as Mr. Gomez drove by Officer Miller, contrary to Officer Miller's testimony that he stopped firing when he was "*…no longer in front of the car…*"; 4) Officer Miller side-stepped to his left and rotated his body to track Mr. Gomez with his gun as Mr. Gomez drove forward and to his right; and 5) Officer Miller's tracking of Mr. Gomez as Mr. Gomez drove forward and to the right provides objective evidence that Officer Miller anticipated Mr. Gomez's actions and objective evidence that Officer Miller did NOT anticipate being run over by Mr. Gomez.

22.     Please note that I reserve the right to supplement these opinions should additional information become available to me. Thank you for the opportunity to review this case.

Respectfully Submitted,

Jeremy J. Bauer, Ph.D.
Bauer Forensics, LLC

Page 9

**References**

1.  Boulton, L and Cole, J. 2016. Adaptive Flexibility: Examining the Role of Expertise in the Decision Making of Authorized Firearms Officers During Armed Confrontation. Journal of Cognitive Engineering and Decision Making 10:291-308.

2.  Haag, L and Haag, M. 2011. Chapter 11: Determining bullet track ('trajectory') in gunshot victims. Shooting Incident Reconstruction. San Diego, CA: Academic Press; pp. 191-206.

3.  Olson, PL. 1996. Driver Perception-Response Time. Forensic Aspects of Driver Perception and Response: Lawyers & Judges Publishing Co.; pp. 171-195.

4.  Seymour, GO, Stahl, JM, Swann, GB and Ross, D. 1995. Use of a computer-controlled firearms training simulator in perception response time experiments. Behavior Research Methods, Instruments & Computers 27:148-151.

5.  Summers, JJ and Anson, JG. 2009. Current status of the motor program: revisited. Hum Mov Sci 28:566-577.

**BAUER DECLARATON ATT. C**

**VIDEO FILE - DIGITAL UPLOAD**