# EXHIBIT 4

JOSE JUAREZ                                           June 17, 2019

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3    ESTATE OF MARCO GOMEZ,          )
     Deceased, by DAISY PEREZ,       )
4    Independent Administrator,      )
                                     ) No. 18 C 910
5                    Plaintiff,      )
                                     ) Judge Robert W.
6        vs.                         ) Gettleman
                                     )
7    VILLAGE OF FOREST PARK,         ) Magistrate Judge
     DANIEL MILLER,                  ) Sheila Finnegan
8                                    )
                     Defendants.     )
9

10

11

12              The deposition of JOSE JUAREZ, called by

13    the Plaintiff for examination, pursuant to notice

14    and pursuant to the Rules of Civil Procedure for

15    the United States District Courts, taken before

16    Suzanne Thalji, CSR and Notary Public in and for

17    the County of Cook and State of Illinois, on

18    June 17, 2019, at 1:27 p.m., at 191 North Wacker

19    Drive, Suite 2300, Chicago, Illinois.

20

21

22

23

24

JOSE JUAREZ                                                    June 17, 2019

Page 22

1  paramedics and police officers.  So they switch
2  six months as police officer and six months as
3  paramedics.  So that was one of the police
4  departments that I wanted to get into, which was,
5  you know -- would service both sides of the field.
6      Q.   Okay.  And then prior to becoming a
7  paramedic, did you have regular employment?
8      A.   Yes.  If I remember correctly, I was
9  still working for Superior as a basic, EMT basic,
10  and then prior to that I worked at -- either
11  volunteer at Skokie Rush NorthShore Hospital, a
12  patient care technician, and then maybe around
13  high school or college, I worked at Abt.
14      Q.   The home security system?
15      A.   No, Abt, the electronic store.
16          MS. BRUCH:  Abt.
17          THE WITNESS:  Abt, yes, the fancy
18      place.
19  BY MS. YARUSSO:
20      Q.   Appliances?
21      A.   Yes.
22      Q.   So when did you graduate from high
23  school?
24      A.   I graduated '01.

Page 23

1      Q.   And what high school did you attend?
2      A.   Niles North.
3      Q.   Niles North?
4      A.   Yes.
5      Q.   What years did you attend DePaul?
6      A.   Oh, my gosh.  So since I graduated up
7  to maybe 2006 roughly.  I can't remember exactly.
8      Q.   So you attended DePaul right after
9  graduating from high school?
10      A.   Yes, yes.
11      Q.   And you have a bachelor's of science
12  from there?
13      A.   A bachelor of arts, I think it counts
14  as, yeah.
15      Q.   And then it sounds like you have some
16  additional credit hours or post-bachelor's
17  education?
18      A.   I retook chemistry and maybe -- some
19  other courses that I took.  I can't remember
20  exactly, but for sure I retook chemistry at Oakton
21  Community College.
22      Q.   You were doing that to fulfill
23  requirements for a nursing program?
24      A.   To boost my GPA in order to get into

Page 24

1  medical school or into -- become a physician
2  assistant.
3      Q.   Okay.  And so for the present time, you
4  plan to continue your work with the Illinois State
5  Police, the law enforcement route?
6      A.   Yes, yes.
7      Q.   Okay.  For the CSI unit, did you need
8  to complete some training in order to do that kind
9  of work?
10      A.   Yes.  Actually, the regular training
11  is -- well, the training is six months on-the-job
12  training.  My understanding was that before they
13  would send you to Springfield to take some
14  classes, but they changed that, and they made it
15  like on-the-job training.  And you had either
16  somebody that was assigned as your FTO, training
17  officer, and he would guide you and tell you.
18          So you would first go, watch, you know,
19  learn how to take photographs, see how is the
20  initial process of processing a crime scene, and
21  then little by little they let you do little
22  things, like swabbing for DNA or like -- you go to
23  classes in -- I went to classes in Springfield to
24  dust for prints, or, if not, we processed our

Page 25

1  squad cars.  We put our handprints on the car, and
2  we dusted and practiced taking photographs,
3  dusting for prints, swabbing for DNA.
4          And eventually as you got good on
5  the basic techniques, you move on to, you know,
6  blood spatter or like bullet trajectory or, you
7  know, just start with crimes against property.
8  And then once you get better and you keep moving
9  up, you get released and once you get -- I guess
10  you can call it you get the blessing to process
11  your own crimes against persons, and death
12  investigations is like the final test, I guess you
13  could say.
14      Q.   Okay.  And is that the final steps at
15  the end of the six-month on-the-job training?
16      A.   Yes, yes.
17      Q.   Did you complete specific courses in
18  bullet trajectory, evidence collection?
19      A.   Yes, yes.  They were given by the
20  Illinois State Police.  I can't remember the name
21  of the sergeant who now is a master sergeant who
22  taught the class for bullet trajectory, but I do
23  remember driving a few miles away to take that
24  training.

U.S. Legal Support, Inc.
(312) 236-8352

JOSE JUAREZ                                                    June 17, 2019

1  call them projectiles.  So, yes, they are bullets.
2  The bullet for me consists of the casing and the
3  bullet put together.  That's how I see it.
4        Q.    Okay.
5        A.    The projectile is the actual part that
6  comes out of the -- the primer being struck to the
7  back of the bullet, the live round, which causes
8  an explosion and propels the projectile to come
9  out through the handgun or rifle, which leaves
10 specific markings or grooves as it's going
11 barreling out of the handgun.  And then depending
12 what type of surface it strikes, the projectile is
13 deformed.  The projectile is usually made out of a
14 copper, I guess you could say, jacket followed by
15 a metal interior type thing.
16       So that's why when you look at the
17 projectile, you see like the copper outside and
18 then like a metal silver-ish on the inside, the
19 core, I guess you could say.
20       Q.    What does it indicate on Exhibit 301,
21 defect, that's checked no?
22       A.    Let's see.  So defect, because we are
23 not able to -- we are not able to accurately or
24 for sure say that this projectile came from that

1  hole.  We don't know which -- where the bullet --
2  that bullet specifically entered.
3        Q.    So the no means you can't match it to
4  the hole --
5        A.    Right.
6        Q.    -- in layman's terms?
7        A.    Exactly, yes.
8        Q.    Okay.  And that's because this one was
9  just laying underneath the front seat.  It wasn't
10 embedded?
11       A.    Correct.
12       Q.    And then with the other two, you
13 actually extracted the bullets.  They were
14 embedded, and you describe where they were
15 embedded?
16       A.    Yes.
17       Q.    Okay.
18       A.    And then I marked also that there was a
19 defect, you know, lining it up to, you know --
20       Q.    Let me ask you some questions
21 about photos.  So I am tendering you a Group
22 Exhibit 2, and then each individual photo in here
23 is 2-A, 2-B, et cetera.  And they are just photos
24 that I happened to select out of the larger group

1  of photos.
2        A.    Yes.
3        Q.    If you could just quickly page through
4  for the purpose of -- so that I could ask you if
5  you recognize these photos.
6        A.    You made two double copies?
7        Q.    Is there a duplicate in there?
8        A.    Yes.  2-B and maybe 2-G look the same
9  to me.
10       Q.    You may be right.  I don't know.
11       A.    Okay.  It looks to be like a double
12 set.
13       Q.    Okay.  You have a good eye.  But, in
14 any event, do you recognize these as the photos
15 that you -- I would just leave them in order for
16 now even if there is a double because it is just
17 going to --
18       A.    Yes.  There are some that have doubles
19 and some that don't.
20       Q.    Okay.  And I don't know.  It also may
21 have been the printer, the person who printed for
22 me.
23       A.    No problem.
24       Q.    But do you recognize this collection

1  and are they -- first of all, the exhibit you have
2  is 2-A through 2-M; is that right?
3        A.    Yep, yes.
4        Q.    Okay.  Do you recognize these as some
5  of the photos that you took when you processed the
6  car on I think it was February 6, 2017?
7        A.    Yes.
8        Q.    Okay.  So if you look at 2-A, first of
9  all --
10       A.    Okay.
11       Q.    -- what is that a photo of?
12       A.    This is a photo of the vehicle involved
13 in the officer-involved shooting.  This is the
14 front, the driver's side.  In this photo you see
15 the front of passenger's -- I'm sorry, the front
16 driver's side window has two small circular
17 defects, is damaged.  You also see that there is
18 blood at the bottom of the driver's side door and
19 some rust, and it looks like the front bumper is
20 missing.
21       Q.    And can you tell by looking at 2-A
22 whether those are entry or exit defects?
23       A.    Not from this photo.
24       Q.    Okay.  2-B, do you recognize that

JOSE JUAREZ                                        June 17, 2019

Page 62

1   photo?
2        A.   Yes.  This is the front windshield.
3        Q.   Okay.  Can you tell from this photo
4   whether those are entry or exit?
5        A.   I would say there are coming from the
6   outside into the car.
7        Q.   Okay.  Meaning the defects indicate
8   that the shots were fired into the car?
9        A.   Yes.
10       Q.   And can you tell anything else about
11  where the shots were coming from by looking at the
12  defects photographed in 2-B?
13       A.   Can you be more clear?  Like what do
14  you mean, like direction?
15       Q.   Well, look at the defect that's further
16  right in the photo, closer to the -- I guess where
17  the frame is.
18       A.   Oh, are you --
19       Q.   And you see the shape of it.  It's kind
20  of oblong rather than perfectly circular.  Would
21  you agree?
22       A.   Yes.  It is possible that if the
23  vehicle was in motion -- it all depends on where
24  the officer was standing and if the car was in

Page 63

1   motion.  From the looks of this picture -- if I
2   may, I guess you could say, like stand and show
3   you?
4        Q.   Sure.
5        A.   Let's say this is the driver's side and
6   the officer was standing here.  If he fired one
7   shot, that could have been -- I'm thinking maybe
8   this one.  And then as the car continued to move
9   through, the second shot might have been more of
10  an angle.  I guess you could say it depends who
11  was moving or if the car was moving or if the
12  officer was moving towards the pillar, I guess you
13  could say (indicating).
14       Q.   Correct.  And I am just going to
15  attempt to describe what you just did, which is
16  you got up and you stood at the corner of the
17  conference room table kind of using -- to simulate
18  it and using the conference room table as the car.
19  And you were at an angle to the corner of the
20  conference room table.
21            So kind of demonstrating that -- would
22  you agree that the appearance of these indicates
23  that the shots were coming at an angle?  Whether
24  it's because the officer was moving or the vehicle

Page 64

1   is moving, you're not sure?
2        A.   Yes.
3        Q.   But is it fair to say that you can tell
4   by looking at these that they were not direct as
5   in these shots did not come from --
6        A.   Like in front of the car?
7        Q.   Directly in front of the vehicle.
8        A.   I would say no.  Due to the bullet
9   trajectory, when I lined it up, it does not look
10  like the officer was standing in front of the
11  vehicle.
12       Q.   Okay.  And with the shot -- especially
13  the shot closest to the window frame here, does
14  the shot shape also indicate that in that it's
15  oval rather than more perfectly round, or is that
16  not something you can tell by looking at it?
17       A.   Let me take a look here.  I'm not
18  basing this on I guess -- I guess you could say
19  the shape but -- because when I put the rods --
20  and my understanding is that that's where like
21  possibly the shots could have come from, but,
22  yeah, I guess maybe that's the circular defect --
23  let me rephrase.
24            When you put the rods through, it gives

Page 65

1   you a better perspective, I guess you could say,
2   if the officer was moving or if the car was
3   moving, unknown direction, whether away or towards
4   or whatever.  So it was either one of the two had
5   to be moving.
6        Q.   Right.  But, in any event, the
7   trajectory piece gives you an indication of the
8   angle --
9        A.   Yes.
10       Q.   -- that the shots came in?
11       A.   Yes.
12       Q.   And you can't necessarily come to a
13  conclusion just by looking at the defect?
14       A.   I would say no.  You will have to take
15  the overall picture of the bullet trajectory and
16  the location of where the bullet holes are, yes.
17       Q.   Okay.  So let's turn to 2-C.  And
18  that's where you've got -- we see these rods in
19  this picture, right?
20       A.   Yes.
21       Q.   So you're the one that put those rods
22  in there?
23       A.   I did, yes.
24       Q.   And three of the rods are just





# EXHIBIT 5

Cook County State's Attorney's Office
Investigations Bureau





# INVESTIGATIVE REPORT

| FILE/CONTROL#: 2017 IB 02- 0013 | DOCKET#: | REPORT#: 17-10653 PI |
|---|---|---|
| SUBJECT: Forest Park P.D. Officer Involved Shooting | | DATE DRAFTED: 03/01/17 |

| SYNOPSIS OF REPORT: Witness Interview | PERIOD COVERED: 02/03/17 | INVESTIGATOR(S): Lambert #335/Payonk #4805 |
|---|---|---|

Person Interviewed: Eric M. Meunier 01/23/88 715 S. Maple Oak Park, Illinois (608)393-3598

Date & Time: 02/03/17 6:30 PM

Persons Present: Ashley Meunier 08/12/88/ Inv. Paul Lambert/ ISP Special Agent Eileen Payonk

Location: 715 S. Maple Oak Park, Illinois

RI and S.A. Payonk interviewed Eric Meunier regarding his witness to the Officer Involved shooting that occurred on Jackson Boulevard in front of his residence on 02/03/17. Mr. Meunier stated that he was on the couch in his living room with his wife and infant son when he heard yelling outside his home, accompanied by squealing tires and a horn and the sound of a vehicle crash. Mr. Meunier looked out his living room window onto Jackson Boulevard and saw a man fire a handgun four (4) times at the driver of another vehicle in the street. Mr. Meunier ushered his wife and son into the basement and called 911. Two (2) to three (3) minutes later he heard sirens and police units arrived at the scene. Mr. Meunier was in his yard and was told by the Police to stay on his property. A second Police Officer asked him if he was a witness and he acknowledged that he was.

1

P0163

17-10653PI

Mr. Meunier stated that the man he saw firing the gun had shot the weapon at what looked to be point blank range. Mr. Meunier further said that the vehicle that the subject was in appeared to be fleeing and had just turned around from backing up.

Mr. Meunier said he saw the paramedics wheel the subject away and he appeared to be of Latino descent with a larger build and in his late 30's to 40 years of age.

Ashley Meunier, who was present during the interview, but did not witness the shooting, agreed to all that her husband stated in his witness report.

INVESTIGATOR(S) _____     DATE 3/1/17

SUPERVISOR'S APPROVAL _____     DATE 3/1/2017

This document is the property of the Cook County State's Attorney's Office Investigations Bureau.
It and its contents are confidential and may not be disseminated outside your agency without authorization.

P0164
17-10653PI
17-10653PI

# EXHIBIT 6

# Cook County State's Attorney's Office
# Investigations Bureau





## INVESTIGATIVE REPORT

| FILE/CONTROL#: | DOCKET#: | REPORT#: |
|---|---|---|
| 17IB02-0013 | | |
| **SUBJECT:** | **TYPE OF CASE:** | **DATE DRAFTED:** |
| PITF-Forest Pak P.D | Officer Involved Shooting | February 21, 2017 |
| **SYNOPSIS OF REPORT:** | **PERIOD COVERED:** | **INVESTIGATOR(S):** Daniel Creamer #402 |
| Interview | February 3, 2017 | Terrence Sheehan #509 |

**Person Interviewed:**     Andrea Siegler   F/W   03/27/69
809 Home Ave., Oak Park, IL 60304
847-912-6198

**Date/Time**
**Location of Interview:**      February 7, 2017/4:10pm
809 Home Ave
Oak Park, IL 60304

**Personnel Present:**       Investigator Daniel Creamer #402
Investigator Terrence Sheehan #509

Reporting Investigators, (R/I's), were assigned to interview Andrea Siegler in regards to an Officer Involved Shooting that occurred on February 3, 2017 by the Forest Park Police Department. The following is a summary of the information provided by Siegler and not verbatim.

## INTERVIEW:

Siegler stated her and her husband Craig Siegler had just dropped their son off at a neighbor's house at approximately 6:20pm and were on their way out for the night. Siegler stated her husband was driving and she was in the front passenger seat of their minivan. Siegler stated they were traveling westbound on Jackson within the S curve at Maple. Siegler stated she heard a pop noise and thought it was fireworks. Siegler stated she looked up and saw a dark figure in what she thought was a leather jacket or some kind of uniform. Siegler stated the dark figure was in a shooting stance position and she saw the dark figure was holding a gun. Siegler stated she did not hear yelling or shouting.

Siegler stated she then saw the dark figure move toward the car and shoot at least 3 more times into the car. Siegler stated she saw the car being fired into lurch forward, and then stop. Siegler stated at this point her husband was pulling away from the scene and as he did Siegler stated she saw the dark figure walking toward their position.

R/I's ended the interview and any additional information obtained will be filed under a subsequent report.

Page 1

17-10653PI

P0193

_____    2-21-17
INVESTIGATOR (S)                            DATE

_____    2/23/2017
SUPERVISOR'S APPROVAL                       DATE

This document is the property of Cook County State's Attorney's Office Investigations Bureau.
It and its contents are confidential and may not be disseminated outside your agency without authorization.

Page 2

17-10653PI

P0194

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF MARCO GOMEZ, | ) | |
| Deceased, by DAISY PEREZ, | ) | |
| Independent Administrator, | ) | |
| | ) | No. 18 C 910 |
| Plaintiff, | ) | |
| | ) | Judge John F. Kness |
| vs. | ) | |
| | ) | Magistrate Judge Sheila Finnegan |
| VILLAGE OF FOREST PARK, | ) | |
| DANIEL MILLER, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF BRIAN LANDERS**

I, Brian Landers, do declare the following to be true and correct:

1.      I am an expert retained by the Plaintiff in this case.

2.      I authored a report in this case dated May 14, 2020, which is attached to this Declaration as Attachment A.

3.      I authored a supplemental and rebuttal report in this case dated January 14, 2021, which is attached to this Declaration as Attachment B.

4.      The statements and opinions provided in my reports are complete, true and accurate to reasonable degree of scientific certainty.

5.      My testimony at trial would be consistent with these reports.

6.      I have read the foregoing paragraphs, have personal knowledge as to these matters, am competent to testify, and would so testify at the trial in this case.

1

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this date:  May 14, 2021

By: _____

                                              Brian Landers

# LANDERS DECLARATION
# ATT. A

Estate of Marco Gomez v. Village of Forest Park &

Daniel Miller, 18 C 910

## EXPERT WITNESS REPORT BY BRIAN L. LANDERS
May 14, 2020

**Table of Contents**

Introduction                          3
Qualifications of Expert              4
Scope of Service                      8
Report                                9
References                           17
Publications Addendum               18
Media Addendum                      19
Expert Experience Addendum          21

Introduction

I have been retained by Action Injury Law Group in the case of Estate of Marco Gomez v. Village of Forest Park and Daniel Miller. I understand that Action Injury Law Group is representing the plaintiff in this case. I understand the Village of Forest Park (IL) and Daniel Miller, are the defendants. This report will provide my summary opinion on an incident that occurred on February 3, 2017 in the Village of Oak Park, State of Illinois, United States of America.

Expert Qualifications of Brian Landers

**Employment**
At the time of this report, I am the owner of LandersCRT, LLC, a consulting firm that specializes in consulting, research, and training specific to areas of public safety and police use of force. I started LandersCRT in 2013, and previously worked as a consultant and trainer with BlueboardIT, LLC, which I co-owned. BlueboardIT,LLC was a company that offered web-based learning management systems to public and private clients who wanted to train employees via a web-based application. Part of my duties with BlueboardIT was also to consult with law enforcement agency clients on training initiatives, policy development, and remediation training.

As the sole owner of LandersCRT, I have provided services to both public and private entities. I have been admitted and testified as an expert witness in the U.S. District Court of both the Eastern and Western District of Wisconsin in use of force-related cases and have provided other depositions in federal cases. I have also consulted and prepared cases for expert testimony in varying circuit courts in Wisconsin. I have provided these services to both plaintiffs and defendants in both criminal and civil proceedings. I have been a keynote speaker at state and national conferences on the topics of workplace violence, personal safety protocols, use of force issues, drone usage for public and private services, and critical incident events. I have prepared curriculum and training policies and protocols for my clients on the application of use of force decision-making, use of force options, weapons, self-defense, mitigation of harm to self and others, after care of use of force, and documentation.

I also am employed full time as a criminal justice lead faculty member with Madison College, based in Madison, Wisconsin. I have been employed by Madison College since 2002, starting as a part-time instructor in the law enforcement academy. I was hired in 2010 as a full-time instructor and promoted to a program director position by 2011. As a program director, I assisted with the scheduling, curriculum, instructor management, and student issues in the Criminal Justice Department. I administered both the State of Wisconsin 520-hour Basic Law Enforcement Academy, the 720-hour Basic Law Enforcement Academy, and the 160-hour Basic Jail Academy in my role as the Academy Director for Madison College from 2011-through 2016. I currently teach numerous courses in the Criminal Justice Program.

As a faculty member, my employment has included routine instruction in both degree and non-degree offerings. In the degree credit Criminal Justice Program, I instruct courses such as Juvenile Law, Community Policing Strategies, Report Writing, Criminal Investigations, Intro to Corrections, Constitutional Law, Criminology, Professional Development, College Success, Professional Communications, Criminology, Traffic Theory, Criminal Investigation Theory, and Emergency Management. In non-degree offerings, I serve as a Master Instructor for Defensive And Arrest Tactics (DAAT), and Master Instructor for Scenario-Based Training. I was also responsible for coordinating and assisting instructors in the delivery of all basic, advanced, and specialized training in force-related training. This includes training from the basic law enforcement academy, to advanced hands-on and weapons training for current law enforcement, correctional officers, and security officers. I estimate that I have personally trained

4

several thousand law enforcement and private security employees on force-related topics. I have also designed specific curricula for Madison College on courses such as "Supervisory Investigation of Force Incidents", "Use of Force Review", "Split Cell Active Shooter Response", "Ground Defense", and "Force Transition Training." These are all currently being routinely offered by Madison College for current law enforcement, correctional officers, and private security officers.

I possess a general law enforcement topic instructor status with the Wisconsin Dept. of Justice Training and Standards Bureau, as well as tactical instructor status in tactical areas of Vehicle Contacts, Firearms, and Tactical Response. I am certified by the Wisconsin Technical College System to teach in criminal justice degree programs and general credit/liberal arts degree programs.

I have also instructed and directed training on the topic of vehicle contacts and traffic law enforcement to police academy recruits and seasoned officers alike for over twenty years. My vehicle contacts and traffic law instruction are soundly based on the concepts and procedures developed specifically for Wisconsin law enforcement officers by the Wisconsin Department of Justice. The curriculum is designed to provide instruction and guidance on not only knowledge of traffic law, but also Constitutional Law and use of force tactics.

**Experience**

My law enforcement experience began in 1992 when I was hired as a police officer for the City of Wisconsin Dells Police Department. I completed the law enforcement basic training academy in Madison in 1993. In 1995 I was promoted to K-9 Handler, where I handled a dual-purpose police K-9 trained in apprehension, tracking, drug detection, and building/area searches. In 2003, I was promoted to Sergeant, and in 2008 I was promoted to Lieutenant. During my career at the police department I received numerous commendations for exemplary service and three life-saving awards. I also served as the commander of the drug unit, search warrant execution team, honor guard, and lead agency trainer. Working for the City of Wisconsin Dells I have been exposed to a high variety of police calls for service, community issues, and situations which required an application of force. My patrol experience also included specific traffic enforcement details to include drug interdiction, operating while intoxicated targeted patrol, traffic direction and enforcement at special events, and motorcycle unit patrol.

Considering the City of Wisconsin Dells has over 6 million visitors per year from a wide range of locations, this experience allowed me to learn from varying cultures, diverse backgrounds, and work through social barriers of the people I served. This experience has provided me further understanding of the role force applications has on an officer, agency, and community. I was assigned to review all use of force issues and complaints for the Wisconsin Dells Police Department, as well as being requested as an outside agency consultant for numerous other agencies during my time of service. I retired from police service in 2010 in excellent standing as I made a career change to Madison College full time employment.

5

**Appointments**

My skills and commitment to law enforcement training was recognized through my appointments to several state committees. I was appointed by the Wisconsin Department of Justice to the Law Enforcement Ethics Advisory Committee in 2000, and helped develop the first state-approved ethics and decision-making curriculum to be used by all Wisconsin law enforcement academies and agencies. In 2003, I was appointed by the Wisconsin Department of Justice Tactical Advisory Committee, which developed training protocols and curriculum for all force-related law enforcement training in Wisconsin to include Defensive Tactics, Tactical Response, and Firearms. I also served on the curriculum development team for the Wisconsin Department of Justice on expanding tactical response curriculum to unify police response to active shooter events in our state. Lastly, I was honored to serve the State of Wisconsin Legislature on a special advisory committee on 911 and emergency telecommunications, which resulted in expanding funding and required training for 911 centers throughout Wisconsin.

**Elected Official Experience**

I have also served two positions as an elected official. I was elected to the Columbia County (WI) Board of Supervisors, representing District One of the City of Wisconsin Dells in 2006, 2008, and 2010. As a county board supervisor, I was appointed to the Recycling and Solid Waste Committee (2006-2008), Management and Information Services Committee (2006-2011), and Human Resources Committee (2008-2011). I resigned from the Board in good standing in January 2011, when my teaching duties at Madison College conflicted with daytime board meetings.

In 2011, I was elected Mayor of the City of Wisconsin Dells, and was re-elected in 2013, and 2015. As Mayor I provide leadership on all goals, policies, and objectives of the city. I also had statutory authority over the police and fire departments, and served on the Finance Committee, Public Safety Committee, Legislative Committee, Public Works Committee, Dells-Delton EMS Committee, Dells-Delton Sewerage Committee, and chaired the City's Personnel Committee and Parking Committee. I chose not to run for a fourth term as Mayor to spend more time with my family and to expand my consulting business. My mayoral term concluded on April 17, 2018.

**Education**

My education includes being a 1989 graduate of Wisconsin Dells High School and then entering two years of associate degree studies in Police Science at Madison College. I later graduated summa cum laude from Mount Scenario College with a Bachelor's of Science in Criminal Justice and a minor in Pre-Law (2002). I earned my Master's Degree with honors from American Military University in 2017 in Public Administration with an emphasis on Organizational Management. My capstone thesis was on the relationships between ministerial use of force de-escalation policies and its effect on officer safety. This thesis has been published and received national acclaim for its investigative research and finding.

**Affiliations**

My professional affiliations include membership to the International Association of Chiefs of Police, the International Law Enforcement Educators and Trainers Association, Wisconsin Law Enforcement Trainer's Association, and the American Association of Educators. Through my elected position as Mayor, I also held membership with the Wisconsin League of Municipalities. I hold no other professional, political, or personal affiliations that would create a conflict of interest or bias.

**Scope of Service**

I have been retained by Action Injury Law Group to review and provide a summary opinion to the following issues regarding this case:

1. Were the actions and subsequent use of force used by Officer Daniel Miller necessary and reasonable in accordance with professional standards, policies, and expectations?

2. Were the policies, practices, and training in place by the Village of Forest Park sufficient to guide police actions on force decisions on occupants inside a motor vehicle?

**Declaration of Service Terms**

I declare that the opinions stated in this report are my own and based on the materials I was provided for review and documented in this report. I was not directed at any time to frame or alter my opinion either for or against any party in this case. I declare I had no contact with anyone in this case except for general communications with the attorneys of Action Injury Law Group. I am being compensated $150 for case review, and $300 for testimony, which is my standard rate for expert services. I also have no personal or professional knowledge or experience with any of the defendants, plaintiff, or witnesses identified to me in this case.

**Declaration of Summary**

Due to time constraints, I was only asked to provide a summary opinion and base this opinion on the materials provided to me thus far, along with my professional experience. I reserve the right to provide supplements to this report, which may contain additional materials to enhance, alter, or change my summary opinion.

8

# REPORT

**ISSUE 1:** Were the actions and subsequent use of force used by Officer Daniel Miller necessary and reasonable in accordance to professional standards, policies, and expectations?

**Opinion**: No.

REASONING FOR OPINION

Supporting Facts That Contact with Vehicle Was Outside of Standards.

Officer Miller was on duty and in uniform on the date of this incident. He was made aware of a stolen vehicle from the Chicago area that was possibly headed in the direction of his jurisdiction. Officer Miller traveled to intercept the stolen vehicle, but did so while entering another police jurisdiction. During that time, he observes a vehicle matching the description of the stolen vehicle. Officer Miller testified that he saw the vehicle "boxed in heavy traffic". (Daniel Miller Deposition, 2019) (Page 86 Lines 8-16).

Officer Miller's response was to exit his patrol vehicle and run towards the suspect vehicle with his gun drawn (Daniel Miller Deposition, 2019) (Pages 91-94). From my experience as a former law enforcement officer and current law enforcement educator and trainer, this is contradictory to what officers are trained to do when observing a stolen vehicle. This also violates Forest Park's policy on investigating a possible stolen automobile without back-up (FPPD 4299-4314, 2010).

From my experience and training, stolen vehicles may present a danger to officers and officers are trained to arrest the occupants of such using prescribed methods of vehicle contacts that utilize the presence of other officers, a controlled environment, and methodical approach to control the vehicle's occupants and subsequent search. To rush towards a suspect stolen vehicle on foot that is "boxed in" heavy traffic with a gun drawn shows utter disregard for officer safety, the safety of everyone else around, and the safety of the vehicle's occupants.

Police agencies in the United States are also very sensitive to the issue of the danger that police pursuits present to the general public, officers, and fleeing suspects. Many agencies have abandoned the used of police pursuits with rare exceptions when the risk of having a dangerous person flee is greater than the risk of the pursuit itself. I am going to paraphrase the Forest Park Police Department's pursuit policy that mandates its officers not to pursue a vehicle unless the occupants of the vehicle pose an imminent threat, or have committed very serious or dangerous actions (FPPD 4293-4298, 2010).

A reasonable officer should understand that approaching a stolen vehicle, either with a patrol vehicle or on foot, may cause the operator to flee. Therefore, approaching possible stolen vehicles on foot is not a trained technique in any modern police training course or manual I know of. That said, a reasonable officer would need to apply the same guidance and restrictions outlined in Forest Park Police Department's vehicle pursuit language if trying to approach a stolen auto on foot. In essence, a reasonable officer would need to weigh the "risk vs reward" mentality these policies imply.

In this case, Officer Miller only knew the vehicle to be a suspected stolen vehicle with possible knowledge at the time of his contact that the vehicle may have been involved in a property damage hit and run. (FPPD 0243-0388, 2017) (Daniel Miller Deposition, 2019). The suspected driver of the vehicle was not known or confirmed by Officer Miller at the time he engaged the vehicle, so there was no reported knowledge by Officer Miller that Mr. Gomez was a danger to anyone at the time. While operating a stolen vehicle is a felony property crime, it is not a dangerous felony that would warrant the seemingly extreme actions of Officer Miller rushing towards the vehicle with his weapon drawn, in a crowded area, without back up, and risking all involved. Officer Miller even testified in his deposition that there were multiple other vehicles in the area, a CTA line, and most likely pedestrians around. (Daniel Miller Deposition, 2019) (Pages 94-96).

Officer Miller seemingly should have known his pursuit policies have ministerial expectations not to put the public at risk for the simple reward of an arrest. A reasonable officer should apply the same logic in any situation, and specifically approaching a boxed-in stolen vehicle on foot likewise creates a tremendous amount of risk for the simplicity of making an arrest for a property crime. Officer Miller reiterated these safety considerations during his deposition (Daniel Miller Deposition, 2019)(Pages 112-117). I professionally opine these actions by Officer Miller to be outside of the scope of policy, training, and professional standards. Police practices at the time of this incident, and still presently in place, would expect a reasonable officer to follow the vehicle in his or her own squad car, until proper resources and safe locations for a controlled stop could be done. If this same vehicle attempted to flee while officers were following or during any attempt to stop in a squad car, the pursuit would need to be terminated as described in Forest Park's policy and also in the realm of professional standards. Officer Miller failed to make the correlation that the same would reasonably apply to an officer on foot.

<u>Supporting Facts That Deadly Force Was Not Necessary and Reasonable.</u>

Next comes the issue that Officer Miller fired several rounds from his pistol at the driver of the vehicle, Mr. Gomez. Officers are trained in the United States that their force actions must be objectively reasonable (Graham v. Connor, 1989). *Graham's* test of reasonableness includes factors of the seriousness of crime, the imminent threat to the officer or others, and the continued resistance or attempt to flee. The Objectively Reasonable standard and *Graham* case is also cited in the Forest Park policy on "Response to Resistance and Aggression" that was in place and cited in Forest Park's internal investigation after the shooting (FPPD 0243-0388, 2017).

Officer Miller testified in his deposition that his intent was to effectuate an arrest of the driver of the stolen vehicle, a property crime (Daniel Miller Deposition, 2019). While this is a legitimate lawful objective of any reasonable officer, I have already opined that his actions do not appear to be reasonable in his unorthodox methods to do effect the arrest. Officer Miller also testified that at the onset of his attempt to arrest the driver, he was not faced with any imminent threat (Daniel Miller Deposition, 2019).

Officer Miller now found himself in a situation in which his verbally commands, foot pursuit, and a pointed firearm did not cause Mr. Gomez to comply as the vehicle started to back away from him. Officer Miller also testified that he had knowledge of the area and that the vehicle's driver would need to make several backward maneuvers to flee if it did not give up. (Daniel Miller Deposition, 2019) (Pages 95, 96)

10

(Pages 111-115). I read this that Officer Miller had the mindset at the time that he was trying to force the situation to end right there, and did not consider the option to just allow the vehicle to leave. He also testified that the driver would need to crash, flee, or stop. His testimony reflects on a subjective mindset that did not allow the consideration to just let the vehicle go, that it was in his own power to stop his own actions to avoid the potential for a serious consequence considering this was only a stolen auto arrest.

Officer Miller testified, and the video shows, that the vehicle had backed up, with Officer Miller in foot pursuit. (Daniel Miller Deposition, 2019) (Key Video, 2017). Officer Miller testified multiple times that he felt the vehicle was trying to flee. This leads back to the Graham standard to help determine if Officer Miller's actions were objectively reasonable. What we know thus far is that the vehicle is stolen, there is no known dangerous act of serious bodily harm to others committed by the driver, and the vehicle is moving away from Officer Miller, who is pursuing this vehicle on foot with his weapon out. There is no reported or stated imminent threat to Officer Miller, and it appears on the video that the driver, Mr. Gomez, is indeed driving away and not towards the officer. Officer Miller next testified that the vehicle was making backing and turning maneuvers to go the opposite direction of him (Daniel Miller Deposition, 2019)(Pages 113-115). At this time, a reasonable officer should be assessing both their legal need to use force and their physical options in doing so. A reasonable officer would know that the legal necessity to catch a driver of the stolen vehicle is not great. A reasonable officer would self-assess that chasing a stolen vehicle driving backwards with other people around with your weapon drawn is also not practical. The weight of the need for government intervention and authority does not supersede all the potential risks involved and the abandonment of proper training protocols.

By watching the video, the vehicle backs up approximately two car lengths and then turns while traveling backwards to begin to face the opposite direction (Time on Video 6:04:06) (Key Video, 2017). At 6:04:08, Officer Miller is seen running to the front quarter panel of the vehicle and stopping near the right front tire of the vehicle. The vehicle's motion is paused at this point. At 6:04:09, the vehicle actually backs up slightly, and Officer Miller appears to position himself on the front driver's side corner of the vehicle, but not in front of the vehicle. This is an important time frame of this incident as this is the approximate time when Officer Miller justifies his use of deadly force (Daniel Miller Deposition, 2019)(Page 100-103). Officer Miller testified he is now standing near the front of the vehicle, with his weapon out and pointed at Mr. Gomez, and the vehicle's motion is paused (Daniel Miller Deposition, 2019)(Page 100-103). It is also imperative to note that Officer Miller testified that up to this point, he is observing and considering the vehicle's actions are to turn around and flee (Daniel Miller Deposition, 2019) (Pages 113-115). The video also shows a telephone pole or tree that partially obstructs the view of the exact location of Officer Miller. At this critical time, the following must be considered at this exact moment:

- The seriousness of the crime is a property crime, a routine stolen auto.
- The driver has not demonstrated an imminent threat to Officer Miller or anyone else to this point (Daniel Miller Deposition, 2019) .

11

- Forest Park's policies mandate a risk vs. reward understanding in similar situations (FPPD 4293-4298, 2010) .
- Forest Park's policies require force be objectively reasonable (FPPD 0243-0388, 2017).
- Professional standards, research, and training warn of the risk of pursuing vehicles. (U.S. Department of Justice, 2017). (Reaves, 2017).
- Officer Miller is a seasoned officer, and presumably trained to the state and agency's minimum requirements. (FPPD 0389-0474, 2020).

In less than a half of a second, the vehicle begins to move forward, which was anticipated by Officer Miller (Daniel Miller Deposition, 2019)( Pages 113-115). This is also another critical moment of time as Officer Miller is still partially obstructed by the tree/pole. However, as the vehicle moves forward at 6:04:10, it does not appear that Officer Miller moved or took any evasive action. Meaning, the vehicle was able to move forward as Officer Miller was not in front of the vehicle but off to its side. Further reconstruction of the scene and video supplied to me by Action Injury Law Group, and created by Bauer Forensics (Bauer Forensics, 2019), clearly shows that Officer Miller was never directly in front of the vehicle. It also shows the lower half of Officer Miller in what I would describe as a classic tactical shooting stance as the vehicle begins to drive forward and away from Miller (6:04:11), with Officer Miller clearly not being in the direct path of the vehicle at this time. The reconstruction actually shows Officer Miller paralleling the path of the fleeing vehicle. As the vehicle moves forward, Officer Miller appears to be moving with it (6:04:11) which would be impossible if he was truly in front of the vehicle. The reconstruction video added a component of camera matching, which demonstrates that Officer Miller was never in front of the Gomez vehicle when he shot at Mr. Gomez as he testified (Bauer Forensics, 2019). The shots appear to have come from the front left quarter panel area and the side window as the vehicle was passing Officer Miller.

Based on the information I have seen, it is my opinion that Officer Miller created a degree of jeopardy by his actions for everyone in the area that evening. He risked putting others at risk, including himself, by not following proper training and procedures. He then justified his deadly force as a situation in which he faced imminent threat by being directly in front of a moving vehicle; however, that has shown to be false. I opine, based on my professional experience and education, that Officer Miller's deadly force actions upon Mr. Gomez were not necessary, reasonable, or in compliance with police practices.

**Issue # 2**: Were the policies and training in place by the Village of Forest Park sufficient to guide police actions on force decisions on occupants inside a motor vehicle?

**Opinion**: No.

REASONING FOR OPINION

Supporting Facts That Forest Park Police Department's Guidance and Training Were Inadequate

In reviewing the documents supplied to me in this case, I opine there was a lack of

training and policy guidance to prepare Forest Park police officers to make decisions in similar situations. A primary part of many law enforcement duties includes working in and around traffic. Officers make traffic stops, investigate crashes, and even search for and arrest people for stealing stolen vehicles. Officers will inevitably face a situation at some point in their careers in which people in vehicles will attempt to flee from them. While Forest Park Police did have a policy in place on vehicle pursuits, it lacked a specific policy at the time to guide officers on vehicles who flee while the officers are on foot, or out of their squad cars. These are common incidents, as officers deal with people inside vehicles on a very frequent basis. Therefore, the chances for an officer to be faced with situations of considering force options on vehicle occupants is not only possible, but highly probable.

The best evidence of the department's failure to train and provide policy direction is that of Officer Miller's testimony to his mindset regarding this incident. To paraphrase, Officer Miller testified that pursuing a stolen motor vehicle while in his squad car for that reason alone creates too much potential risk to the public, the officer, and the subject (Daniel Miller Deposition, 2019; EX006 Miller Deposition, 2019)(Pages 114-119). Yet, he failed to correlate the same assessment and acknowledge the same potential risks also apply if he is pursuing a person or vehicle on foot. There is a distinct failure by the Forest Park Police Department to focus on the concepts and limitations of force in an arrest attempt in these situations.

Forest Park's Policy on Pursuits, section 11.01.05 (FPPD 4293-4298, 2010), clearly state that the firing at or into a moving vehicle is prohibited unless the officer can articulate deadly force was needed in defense of a human life. As a law enforcement trainer and educator, I find this policy too vague in nature. There are a number of professional journals, studies, and warnings that shooting at or into a moving vehicle is dangerous. (Fairley, 2018) (Police Executive Research Forum, 2016) (De Lucca, 2017) (U.S. Department of Justice, 2017). The bullet's trajectory can be altered by the vehicle's structure, leading to unintended injury or death. The driver could be incapacitated and cause a serious or deadly crash to others. The officers may find themselves in a crossfire situation if they surround a vehicle. There are simply many reasons why this issue is hotly contested and needs to be addressed thoroughly in agency policy and training. There are very few and rare exceptions that do exist, and supporting cases in which the rare tactic of shooting at moving vehicles was used (De Lucca, 2017).

I have also reviewed a document dated after the shooting incident with Forest Park Police Department's name on it, "Policy 300 Response to Resistance and Aggression" (FPPD 16-21, 2018). According to a 2018 copyright on this document, it was originated by Lexipol, a company that provides policies and accreditation to police agencies. However, it is was not documented if this policy was adopted and enacted by the Forest Park Police Department, or trained to its officers. This policy does have language that provides officers some direction on shooting at motor vehicles or its occupants, but again the language is vague and lacks procedures or exigent situations to provide officers with a clear message about shooting at or into vehicles. The policy should have included procedures and examples to avoid confusion.

It appears Forest Park's policies and trainings have failed to define and frame when extreme exigent circumstances present themselves that would justify the shooting at a motor vehicle in accordance with professional standards and training. This is especially crucial because of the already stated frequency that officers find themselves

in dealing with people in motor vehicles. In short, an officer should have been guided through policy and supported with training that:

- There is a high frequency of officer contacts and environments with motor vehicles.
- Officers need to be aware of their surroundings and escape routes when around motor vehicles.
- Officers must not create "officer-created jeopardy" by intentionally or recklessly placing themselves in the path of a motor vehicle.
- Shooting at motor vehicles may cause unintended harm through bullet dynamics.
- Shooting at motor vehicles may cause unintended harm through a loss of vehicle control.
- Shooting at a motor vehicle may create situations of cross fire, friendly fire, and mistake of fact shooting outcomes.
- Shooting at a motor vehicle to prevent an escape is prohibited.
- Use of deadly force must be a last resort by any officer.
- Shooting into or at a motor vehicle should only be considered when the officer or other person has zero escape routes from the threat of a motor vehicle/ or occupant that poses a significant articulable known risk of great bodily harm or death, such as if the officer or other person was pinned by the vehicle.

The above bullet points are common training and policy points in law enforcement agencies to reduce or eliminate the situations in which officers fire at or into motor vehicles. Forest Park's policies are just too vague to presumably frame an officer's mindset well before an incident occurs. Their ability to train on these situations was also not represented to me at the time of this report. Forest Park's lack of a combination of a concise policy with strict ministerial duties, along with both static and scenario-based training, demonstrates a continual indifference to the probability of these situations.

Supporting Facts of Poorly Documented Review/Culture of Indifference

It is professionally expected in deadly force investigations that there are at least two investigations. The primary investigation is typically conducted by an outside agency that submits finding to a prosecutor to determine if any criminal wrongdoing occurred. The secondary investigation is conducted by the agency's internal affairs or administration to determine any wrongdoing of actions or policy by the officer that are not criminal in nature, but may lead to disciplinary actions or improvements. Forest Park did conduct an internal/secondary investigation of this shooting incident (FPPD 0243-0388, 2017).

I found concerning trends in Forest Park's investigation. While witnesses were contacted, there were no actual statements from the witnesses themselves(FPPD 0243-0388, 2017). The statements made by witnesses were paraphrased by the investigators. I would have expected the internal investigation report to include actual copies of the witness statements, audio recordings, and potential video recordings. Paraphrasing a witness account of an officer-involved shooting investigation leads to speculation of inaccuracies and inconsistencies in the facts. If these materials do exist, they were not presented to me at the time of this report.

There was also a Board Review (FPPD 1279-1291, 2017) of the shooting incident by Forest Park that looks into specific needs to change policies, training,

14

and equipment (FPPD 0243-0388, 2017) (FPPD 1279-1291, 2017). I reviewed the Forest Park Police Department's Board Review and found the following concerns:

1. Forest Park's internal review board did not document their findings in accordance with professional standards. The board's review form was completed using hand written notes and bullet points, with very few details and many comments being unreadable. Considering this event cost Mr. Gomez his life and now places Officer Miller's career into question, I would think the Forest Park Department could have presented a more professional, in-depth, and legible review.

2. Several of the comments were conflicting in nature. Some of the review board members, all of which are Forest Park officers, found no issues with current policies, while others suggested modifications or additional policies on stolen cars, shooting at vehicles, and slight "re-wording" of current policy without more details. To me, this demonstrates a lack of clear expectations in these situations by all officers of the agency.

3. Several comments regarding training needs listed refreshers on use of force, approach to vehicles, and shooting standards as being needed. Yet again, no specifics were provided and the comments were hand-written on a boilerplate form. One comment regarding training issues that rose from this incident suggested that stolen vehicles lead to other crimes and that experience shows having a weapon out and a lack of seeing hands is a training need, but did not elaborate on why or reasoning for that logic.

4. There was no documentation as to what these recommendations produced. Were any changes implemented? Were any trainings conducted as a result of these reviews? Forest Park Police's own policy on conducting internal investigations includes a specific purpose to "correct procedural problems" (FPPD 1279-1291, 2017). Procedural problems appeared to have been documented by the Review Board. If changes were made, they were not produced to me at time of this report.


Lastly, documents availed to me of past conduct, training performance reports, civil suits, internal investigations, and citizen complaints against Officer Miller should have been weighed by Forest Park Police administration as to the continued employment of Officer Miller or at minimum a strong need for further supervision and training prior to this incident. Officer Miller was engaged in acts of sexual harassment, reckless driving, leaving his jurisdiction without authorization, poor performance at training due to "being out" the night before, an incident at a bar involving the stabbing of a fellow officer, and a number of documented complaints of excessive force (FPPD 0476-0568, 2020). To not take these prior actions into account, and failure to properly perform or document the corrective actions against Officer Miller demonstrates a culture of indifference by the agency's administration and the Village of Forest Park. Many of these incidents occurred before the date of the shooting. (FPPD 0476-0568, 2020) (FPPD 0389-0474, 2020) (Appollo v Stasinopoulos et al, 2018) ( (Schmidt v. Village of Forest Park, et al, 2010) (Johnson v. Becker, et al, 2009) (*Edwards* case) (FPPD 3176-3180, 2020).

**Conclusion**

The use of deadly force by an officer is the most scrutinized act by any single governmental employee. The immense amount of authority and discretion our law enforcement officers have is only as good as the character, training, and decision-making of each officer. Should any of these characteristics be compromised, it will be a recipe for avoidable incidents. In this case, I have opined that Officer Miller's training and decision-making were compromised. His training, through his agency's failure to provide proper direction and policy led to him chasing a stolen vehicle on foot in an ill-conceived idea that he could affect an arrest in this matter. His decision-making was also compromised by his own failure to understand that despite his agency's lack of guidance through policy and training, that his own actions were reckless and unnecessary. In the end, Officer Miller ignored his training, professional standards, and a strong degree of common sense in his determination to stop the vehicle and arrest the driver. The end result was the unnecessary shooting and killing of Mr. Gomez.

*The opinions in this report are based on the documents and videos provided to me and cited throughout the report and in the reference page up to the date of this report. I reserve the right to provide a supplement that may amend or alter my opinion in the future if more information is made available to me. My opinions are made based on a reasonable degree of professional certainty based on my experience, education, and training in law enforcement and specifically in use of force, training, and professional standards.*

**Report By:**

Brian L. Landers
Owner, LandersCRT, LLC.

# Materials Used for Opinion

Appollo v Stasinopoulos et al, 1:18-cv-06475 (US District Court Northern Illinois 2018).

Bauer Forensics. (2019). Fatal Shooting of Marco Gomez Video.

Daniel Miller Deposition. (2019). *Daniel Miller Deposition 03/27/19.* U.S. District Court- Northern District of Illinois.

De Lucca, D. W. (2017). President's Message Use of Force Issues: Warning Shots and Shots Discharged At Moving Vehicles. *International Chief's of Police Journal.*

EX006 Miller Deposition. (2019). Exhibit 006.

Fairley, S. R. (2018). Police Encounter with a Fleeing Motorist: Dilemma or Debacle? *UC Davis Law Review.*

FPPD 0243-0388. (2017). Forest Park Internal Investigation 0243-0388.

FPPD 0389-0474. (2020). Daniel Miller's Training Records.

FPPD 0476-0568. (2020). Daniel Miller Discipline and Commendations Files. *Daniel Miller Discipline and Commendation Files.*

FPPD 1279-1291. (2017). *Forest Park Police General Order 535- Internal Affairs.* Forest Park.

FPPD 16-21. (2018). Forest Park Police General Order 300.

FPPD 3176-3180. (2020). Daniel Miller NEMRT Training.

FPPD 4293-4298. (2010, July). General Order # 104 Vehicular Pursuit. Forest Park, IL: Village of Forest Park.

FPPD 4299-4314. (2010). *General Order 118 Patrol Operations.* Forest Park Police.

Graham v. Connor, 490 U.S. 386 (United States Supreme Court 1989).

Johnson v. Becker, et al, 1:09-cv-07292 (US District Court- Northern Illinois District 2009).

Key Video. (2017). "Key Video"-ch10_20170203180344.mp4. Action Law Group.

PERF. (2016). *Guiding Principles on Use of Force.* Police Executive Research Forum. Washington, DC: PERF.

Police Executive Research Forum. (2016). 30 Guiding Principles on Use of Force.

Reaves, B. A. (2017). *Police Vehicle Pursuits, 2012-2013.* US Dept.of Justice .

Schmidt v. Village of Forest Park, et al, 1:10-cv-00899 (US District Court- Northern District of Illinoi 2010).

U.S. Department of Justice. (2017). *Investigation of the Chicago Police Department.* U.S. DOJ- Civil Rights Division.

17

Publication Credits Addendum

- "Research Indicates De-escalation Policies Place Officers At More Risk." *Law Officer Magazine*. 08/16/2017.

- "Are De-escalation Policies Dangerous?" *Police Magazine.* 10/14/17.

- "Research study: De-Escalation Policies Increase Attacks on Police." www.bluelivesmatter. 08/16/17.

- "Research shows de-escalation policies place officers at higher risk for injury, death." *LEO Affairs*. 08/16/17.

- "An Analysis of A Nation-Wide Use of Force De-Escalation Policy and The Impact On Officer Safety. *American Public University System*. 08/03/17.

- "The Facts About Officer-Involved Shootings" *Law and Order Magazine*. May, 2015.

- "Put Statistics to Work" *Law and Order Magazine*. October, 2016.

- Defensive and Arrest Tactics. A Training for Law Enforcement. Wisconsin Department of Justice. (2007)

- Defensive and Arrest Tactics Instructor Manual. Wisconsin Department of Justice. (2008)

- Electronic Control Device, A Training Guide for Law Enforcement Officers. Wisconsin Department of Justice. (2010)

- Ethics and Decision-Making. A Training Guide for Law Enforcement Officers. Wisconsin Department of Justice (2004).

- Firearms. A Training Guide for Law Enforcement Officers. Wisconsin Department of Justice (2010)

- Firearms Instructor Manual. Wisconsin Department of Justice. (2012)

- Tactical Response, A Training Guide for Law Enforcement Officers. Wisconsin Department of Justice. (2012).

Media Addendum

ABC News Affiliates:
11/06/13: Television interview on the dangers of driving selfies.
09/13/14: Television interview on body-worn cameras pro's and con's.
04/14/15: Special feature on police unmanned aerial vehicle training.
05/07/15: Special report on less lethal devices attachments to live police firearms.
05/21/15: Television interview on ACLU phone app to record police contacts.
08/13/15: Television interview on advancements of body-worn cameras.
02/01/17: Television interview on state-wide use of force policy proposal.

NBC News Affiliates
12/12/14: Television interview on the unrest of Ferguson, MO.
05/07/15: Television interview on stresses of police recruit training.

CBS/Fox News Affiliates
08/19/13: Television interview on "Tasers not the only option".
03/12/14: Special segment on home invasions and personal preparedness.
05/07/14: Special segment on force simulator technology in police training.
05/08/14: Special segment on law enforcement interaction and training for persons with special needs.
08/21/14: Television interview on the militarization of law enforcement and armored vehicles.
10/09/14: Television interview on the frequency of violent bank robberies.
11/18/14: Television interview on the Ferguson, MO incident.
11/27/14: Special feature on police unmanned aerial vehicle training.
08/21/14: Television interview on military vehicles used by law enforcement.
12/15/14: Television interview on "lone wolf" terrorism attacks in the United States.
03/10/15: Television on deadly force decision making.
05/23/15: Television interviewed on anti-police sentiment and effect on police recruitment.
03/27/16: Television interview on terrorist attacks in Brussels.
04/11/16: Television Interview on less lethal vs. lethal force options for police.
05/11/16: Television interview on the reduction of police applicants nationally.
06/08/16: Television interview on the use of police consultants for municipalities.
02/24/16: Television interview on state-wide use of force policy proposal.
02/24/17: Television interview on state use of force policy proposals.
04/12/17: Television interview on use of drones for manhunt.
08/15/17: Television interview on de-escalation policies.
02/27/18: Television interview on active shooter tactics.
03/14/18: Television interview on security officer training.

Wisconsin Public Radio

09/02/13: Radio interview on traffic-related incidents and holiday travel.
09/11/15: Radio interview on growing anti-police sentiment and effect on police recruitment.

Wisconsin Radio Network
01/27/15: Radio interview on the trauma of officer-involved shootings.

Blue Lives Radio Network
09/01/17: Radio Interview on police de-escalation policies.

The Clarion- Madison College Student Newspaper
11/11/14: "Incidents harming trust of law enforcement." (Marisa Comeau-Kerege).

The Austin American Statesman Newspaper- Austin, Texas.
01/16/18: "Viewpoints: de-escalation policy could help mend community trust."

Expert Witness Testimony and Case Preparation Addendum (2012-Present)

Michael B. Kingsley v. Stan Hendrickson, et al., Case No. 12-3639
I prepared and testified as an expert witness for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force and Taser use on Mr. Kingsley.

State of Wisconsin v. Charles J. Fabry. Case: 2013CF000609
I prepared for testimony as an expert witness in Wisconsin Circuit Court (Brown County) for the Defendant, in a case related to the use of force and Taser use on Mr. Fabry. The case was settling just prior to trial.

State of Wisconsin v. Jeremy J. Imhoff. Case: 2014CM000026, 2015CF000096
I prepared for testimony as an expert witness in Wisconsin Circuit Court (Dane County) for the prosecution, in a case involving the resistance of Mr. Imhoff and injuries sustained to the arresting deputy. The case was settled just prior to trial.

Michael B. Kingsley v. Stan Hendrickson et al., Case No 3:10-cv-00832
I prepared and testified as an expert for the plaintiff, Michael Kingsley, in US District Court (Western Wisconsin) in a case related to the use of force and Taser use on Mr. Kingsley. The original trial was successfully appealed by the plaintiff to the United States Supreme Court and was remanded down back to the original court of jurisdiction.

Katie Austin v. United States of America et al., Case No 15-CV-1207.
I am retained as a consultant and expert witness for the defense in the US District Court (Eastern Wisconsin) in a case related to the use of force by contracted security officers on Ms. Katie Austin. I testified for the defense in a deposition on May 3, 2017. The matter was eventually settled prior to trial.

Estate of Christopher Davis v. Juan Ortiz, Walworth County, et al. AI2:18-CV-01846. I was retained by the plaintiff in a case involving a passenger in a vehicle that was shot and killed by a deputy during a drug investigation. I testified in a deposition on July 26, 2019.

Jimmy L. Harris v. City of Milwaukee, et al. 14CV1002. I was retained by the plaintiff in a case involving the improper stop, detention, frisk, and use of force on a motorist in the City of Milwaukee. I testified in the jury trial that commenced on March 3, 2020.

21

**LANDERS DECLARATION**
**ATT. B**

Estate of Marco Gomez v. Village of Forest Park & Daniel Miller, 18 C 910

REBUTTAL OF EXPERT WITNESS JOHN RYAN
BY BRIAN L. LANDERS
January 14, 2021

Introduction

I have been retained by Action Injury Law Group in the case of Estate of Marco Gomez v. Village of Forest Park and Daniel Miller. I understand that Action Injury Law Group is representing the plaintiff in this case. I understand the Village of Forest Park (IL) and Daniel Miller, are the defendants. This report will provide my rebuttal of opinions offered by defendant's expert, John Ryan, based on Mr. Ryan's report dated September 29, 2020. I reserve the right to alter my opinions and reports if further information and evidence is disclosed to me prior to trial.

**Challenge of Ryan's Implicit Assumptions to Justify Necessity**

Mr. Ryan's report incorrectly attempts to create a foundation of fact that Mr. Gomez was a "threat to the public" (Ryan, 2020), which he opined would justify Officer Miller's actions that day. This is articulated by Mr. Ryan through his foundational statements that offer presumptions that Officer Miller knew that the vehicle driven by Mr. Gomez was more than just a stolen auto. Mr. Ryan's report seems to focus heavily on Mr. Gomez's driving behaviors observed by Chicago Police officers and insinuations that Mr. Gomez was also involved in a hit and run. To persuade a foundation as fact, Mr. Ryan has relied on deposition statements of the two Chicago officers who made the first attempt to contact the vehicle driven by Mr. Gomez. In his report, Mr. Ryan writes:

· *Sullivan testified that he thought the gray vehicle may have struck another car. (15). Sullivan testified that he does not recall if there were people on the sidewalk. (16).*

· *Sullivan testified that he drove up to the car that he thought the gray vehicle had hit and when he pulled up next to them they drove away. (16-17).*

· *Sullivan testified that the driver of the Volkswagen was driving erratically and dangerously. (21). Sullivan testified that he did not recall the exact number of stop signs that the Volkswagen went through, but estimated it to be three stop signs. (21-22). Sullivan testified that he was concerned for the safety of the public. (22)*

· *Cuevas testified that the gray Volkswagen did not strike any other cars. (20). Cuevas testified that he does not recall any pedestrians trying to get out of the way of the Volkswagen. (20).*

(Ryan, 2020)(Pgs. 17-20)

These statements by Chicago Police officers are seemingly being used by Mr. Ryan to provide implicit assumptions about the decision-making process and the extreme necessity to stop Mr. Gomez demonstrated by Officer Miller. When in fact, this information was not known by Officer Miller and is thus irrelevant to his decision-making. It has been articulated by the police reports and depositions that there is no substantiation that Mr. Gomez's vehicle struck another auto or person. Officer Miller mentioned in his deposition that he overheard radio traffic that the vehicle was possibly involved in a hit and run, but also that was not a priority

concern of his at the time. (Miller Deposition, March 27, 2019) (Pgs. 70-74) It was confirmed by the original Chicago officers that there was no hit and run, or even an investigation into the possibility:

* *Cuevas testified that the gray Volkswagen did not strike any other cars. (20). Cuevas testified that he does not recall any pedestrians trying to get out of the way of the Volkswagen. (20).*

* *Cuevas testified that he personally did not communicate any information to Oak Park or Forest Park Police. (43). Cuevas testified that he is not aware that Sullivan communicated any information to Oak Park or Forest Park. (43). Cuevas testified that to his knowledge dispatch communicated information to Oak Park and Forest Park police officers. (43-44). (Ryan, 2020)(Pg. 17-20)*

Ryan's opinion seems to rely heavily on Mr. Gomez's operating a stolen vehicle and actions of speeding, driving erratically, and not stopping for stop signs, and an attempt to make the possible hit and run to be a grave danger to the public, all as a foundation for the force yet to come by Officer Miller. Ryan states in his report:

*"Officer Miller was faced with a number of offenses that included a stolen vehicle broadcast as well as information that the subject had already posed a threat to other motorists through a hit and run accident" (Ryan, 2020)(Pg. 37).*

Yet Officer Miller did not know any of this information at the time he rushed towards Mr. Gomez, with the exception that Mr. Gomez was operating a stolen auto and possibly involved in a hit and run, which again he testified that the hit and run was not his priority in his mind (Miller Deposition, March 27, 2019) (Pgs. 70-74). Even if Officer Miller did have specific knowledge of the other violations, these are traffic offenses and would not constitute a reasonable officer running at the alleged driver of these violations with his weapon drawn, readied to use deadly force. It should also be noted here that the traffic violations Mr. Ryan describes as dangerous to the public, were immediately observed by two Chicago Police officers, which did not even rise to a concern by them to give chase beyond their initial attempt to stop Mr. Gomez. This represents a stark difference in discretion and restraint demonstrated by the actions of the Chicago officers, compared with the eventually rushed actions of Officer Miller.

4

\*      *Cuevas testified that he and Sullivan ceased pursuing the Volkswagen because they lost sight of it and did not see which direction the Volkswagen went.*

\*      *Cuevas testified that he recalls the driver of the Volkswagen violating three traffic laws by going through two stop signs and speeding.*

\*      *Cuevas testified that he and Sullivan ceased pursuing the Volkswagen because they lost sight of it and did not see which direction the Volkswagen went.*

(Ryan, 2020) (Pg. 17-19)

I have documented in this rebuttal that Mr. Ryan attempts to create a legal foundation for the eventual deadly force used by Officer Miller through actions observed but not relayed by Chicago Police officers as pre-event knowledge that aids in the fleeing felon rule. To demonstrate this, I submit this section of Mr. Ryan's report:

*"Additionally, the testimony of the two Chicago officers, who originally observed Gomez, going through stop signs and driving around vehicles, possibly on the sidewalk makes clear that Gomez was a threat to the public before ever driving into Oak Park. Officers throughout the United States are trained that their attempt to stop a vehicle that poses a threat to the public is consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.*

*Additionally, once Gomez drove his vehicle at Miller, Miller would have had probable cause to believe that Gomez committed a violent felony involving the infliction or threatened infliction of serious bodily harm or death. Law enforcement training throughout the United States recognizes and trains personnel that where an officer has probable cause to believe that a subject has committed a violent felony involving the infliction or threatened infliction of serious bodily harm or death; the officer's use of deadly force to prevent escape would consistent with legal mandates. Many agencies specifically outline this justification for deadly force by policy." (Ryan, 2020)(Pg. 42)*

Ryan also testified in his deposition, "So again, there is no question historically that the information, the collective information to law enforcement is this guy is already a threat to the motoring public before this Officer Miller even comes in contact with him." (John Ryan Deposition, November 20, 2020) (Pgs. 33, 34). I find this testimony to be misleading as it paints Officer Miller has having specific knowledge that he did not have, but it also provides conjecture of a wild, fleeing, and dangerous threat to the public. I would think if that was indeed the case, there would have been more effort by Chicago Police to relay this as well as accompanied documentation of 911 calls or reports from witnesses.

Ryan's report also states, "*Officer Miller was faced with a number of offenses that included a stolen vehicle broadcast as well as information that the subject had already posed a threat to other motorists through a hit and run accident.*" This is simply not true, as Miller testified in his deposition that he sought to arrest Mr. Gomez for driving a stolen auto and had no knowledge of him being a danger to anyone. (Miller Deposition, March 27, 2019). Officer Miller's additional concern of property damage hit and run was only mentioned during his deposition and with the targeted questioning of his agency's attorney. In the Internal Affairs Investigation done soon after the shooting, Officer Miller was interviewed and never mentioned he knew that Mr. Gomez was involved in a hit and run (Keating, 2017) (Pgs. 18-19).

I could also could not find documentation by the Chicago officers that they observed, had knowledge, or radioed information that this vehicle was involved in a hit and run or even posed a threat to anyone. It appears there is a substantial effort by the defense to draw attention to a possible hit and run by Mr. Gomez to allege or argue that this figured into Officer Miller's decision-making to use deadly force. Yet, in the immediate investigation after the shooting, it was not documented at all that Officer Miller had any knowledge or concerns of a hit and run, driving behaviors, or any possible dangerous actions at all by Mr. Gomez.

In 2017, there were 19,974 auto thefts reported in the Chicagoland metropolitan area (Federal Bureau of Investigations, 2018). A reasonable officer working in the Chicago metropolitan area would thus expect by experience alone that they would one day come across a stolen automobile. A reasonable officer would also need to recognize that autos are stolen for a variety of reasons to include theft of parts, insurance fraud, and even joy-riding by teens. While investigating a stolen auto requires caution by an officer, it is not tactically sound to rush

6

towards one with a weapon drawn, especially when the vehicle is surrounded by other traffic and motorists.

Despite Ryan's attempt to lump all actions by Mr. Gomez as dangerous and part of Officer Miller's decision to use deadly force, it is clearly established that Officer Miller's only articulated legal reason to attempt a seizure of Mr. Gomez was based on suspicion of him driving a stolen automobile. Mr. Ryan's report echoes statements made by Officer Miller that his goal was to effectuate an arrest of Mr. Gomez for operating a stolen automobile. Mr. Ryan appears to try to put words in Officer Miller's mouth, or perhaps more appropriately a concept that Officer Miller had concerns about Mr. Gomez that he never had. Officer Miller never relayed such concerns expressed by Ryan during the immediate shooting investigation, or through his deposition. Officer Miller even testified in his deposition that at the time he rushed towards Mr. Gomez, he did not have any justification to use deadly force. (Miller Deposition, March 27, 2019) (Pg. 94)


**2. Alternative Theory to Ryan's That Gomez intended to Use His Vehicle to Assault Miller**

Ryan further states in his report that Miller was justified multiple times in using deadly force based on his proximity to Gomez trying to flee. Ryan states, "with a subject initially attempting to flee from him in reverse, through traffic would recognize that when the subject drove forward toward the officer, the subject was committing a violent assault with the vehicle." (Ryan, 2020)(Pg. 38). However, Officer Miller testifies that he did not perceive Mr. Gomez's actions of reversing his car as an imminent threat. (Miller Deposition, March 27, 2019) (Pg. 94). I am not sure how Mr. Ryan can make a claim that is contrary to the shooting officer's own threat perception and testimony.

One must objectively analyze this statement as well as the video of the incident to question the intent of Mr. Gomez as well as what guides an officer to make decisions on fleeing persons. I agree with Mr. Ryan's observations, that Mr. Gomez was "attempting to flee" as he stated. However, we opine differently as to the intent and need for deadly force after this initial statement. Thus, I offer a contrary explanation to the actions of Mr. Gomez than Mr. Ryan's: From the video, it is clear that Mr. Gomez had two distinct options when Officer Miller rushed

towards him. The first would be to go into reverse to flee Officer Miller, which he did. The second would have been to drive at Officer Miller, which he didn't.

Officer Miller also testified in his deposition that he had a mindset to the actions and options available to Gomez as he rushed towards him. Miller testified in his deposition that

- "At the time I didn't know what he·was doing other than trying to escape by going in reverse." (Miller Deposition, March 27, 2019) (Pg. 107)
- "Yes, I believe he -- I believe his only intention -- I mean, where else can he go? · He's trying to flee the police to get away. " (Miller Deposition, March 27, 2019) (Pg. 107, 108) Officer Miller testified that based on his knowledge at that moment in time, Mr. Gomez was trying to flee. Officer Miller is thus professionally and ethically bound to consider these actions, as well as his own, as to the necessity of force needed to stop Mr. Gomez. Keep in mind that Officer Miller already has his weapon drawn at this point, which would suggest he is already contemplating the use of deadly force to prevent an escape of a person operating a stolen vehicle. This is also substantiated by his own words when testified:

*"I physically put myself in harm's way by going in front of the vehicle pointing my gun at Mr. Gomez ordering him to show me his hands and get out of the car." Officer Miller noted that he put himself in front of the vehicle to prevent the vehicle from escaping. (Miller Deposition, March 27, 2019) (Pg. 111-112) (Ryan, 2020)(Pg. 22).*

Officer Miller created a line in the sand, and in essence, gave Mr. Gomez two options, give up or get shot. I again reflect on Mr. Ryan's opinion report in citing the *Graham* standard on use of force:

*"The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally, whether the subject is actively resisting or attempting to evade arrest by flight." (Ryan, 2020) (Pg. 29).*

Nowhere under *Graham* does it permit an officer to create their own jeopardy under the imminence factor or the fleeing factor. In fact, and rightly so, it creates the standard for the officer to know when to use force and not presume compliance by the subject in question.

In Ryan's deposition, he has made it clear that he trains potentially thousands of officers annually. Yet he testifies to instructing a level of recklessness that would be both tactically incorrect and presumptuous to the authority an officer has on specific situations.

"So in a case -- and we can use this case as an example,  I would train them that in a case like this where the officer perceives that the person is blocked in by traffic, that the best practice would be to approach the vehicle while it's blocked in, so as to avoid any kind of pursuit" (John Ryan Deposition, November 20, 2020) (Pages 31-32).

If this is indeed the manner in which Ryan trains, it does not take into account the potential risk of the officer, subject, and surrounding persons and property by forcing either a compliance or high level of force by these tactics. Ryan's testimony mischaracterizes police training and seems to limit an officer's options to only be concerned with the potential of a pursuit.

Through Mr. Ryan's testimony and report, he routinely contradicts his own logic and training advisement when he states that an officer who sees a stolen automobile boxed in by surrounding vehicles, that officer should approach and attempt the arrest on foot to avoid a pursuit. Yet on page 58 of his deposition, Mr. Ryan recalls events in his own career in which he was almost struck or dragged by vehicles and advocates that an officer should use time when they have it. (John Ryan Deposition, November 20, 2020) (Pg. 58). Again, at the time Officer Miller exited his squad car with his weapon drawn, and rushed towards Mr. Gomez, he stated and testified that there was no immediate threat against him, his intent was to arrest Gomez for a stolen auto, and he expected Gomez to try to flee (Miller Deposition, March 27, 2019) (9094). Through Miller's own statements, this appears to be a calculated police action intended to provoke a deadly force encounter.

A reasonable officer does not attempt to force an arrest of a person inside a running and operable vehicle without extreme circumstances and necessity. Whenever an officer  abandons the protection of their squad car, when faced with suspects inside their own vehicle, they also limit their ability to follow or pursue, and create an extreme limit of force options and time to consider those options should the subject not comply. Anyone who advocates for this type of response by an officer is blind to both the tactical and ethical applications of force training that

mandates officers think clearly and always put themselves in positions of advantage to control a situation.

Ryan seems to disregard and contradict these components in his training and ultimately his justification in this case that Officer Miller was correct to rush in. The proper reaction for Officer Miller would be to radio for assistance, and attempt a controlled stop with additional resources and environment to do so. If those do not present themselves, there is simply no necessity needed to arrest for a stolen auto alone.

With due respect to Mr. Ryan's extensive resume and training audience, I find this mentality of training to be irresponsible and disregarding of human life. If this is indeed the type of force response he is suggesting to his audience of officers and administrators, it will no doubt lead to more officers using deadly force needlessly and the potential for innocent civilians to be harmed as well as the officer and the suspect in similar situations.

There is no exception or permission, especially under *Graham* for an officer to exacerbate a situation, but rather a reliance on the officer to use force that is objectively reasonable under the circumstances. Officer Miller unreasonably and deliberately created a do (comply) or die (be shot) ultimatum by his actions, one that a reasonable officer would not create under similar circumstances.

Additionally, under the landmark Supreme Court case, *Tennessee v. Garner*, it was ruled un-Constitutional to use deadly force for the sole purpose of preventing the escape of a fleeing felon:

> Apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. To determine whether such a seizure is reasonable, the extent of the intrusion on the suspect's rights under that Amendment must be balanced against the governmental interests in effective law enforcement. This balancing process demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. Pp. 7-12.
> (Tennessee v. Garner, 1985)

10

I have opined and must reiterate my original opinion in this rebuttal, that the actions by Gomez to deliberately back away and maneuver his car to another direction was not an action aimed at assaulting Officer Miller or actions consistent with persons demonstrating intentions to assault an officer with a motor vehicle. Rather, it appears that Gomez was trying to flee arrest and Officer Miller testified to the same perception. Miller even gave descriptive forethoughts on the exact routes Mr. Gomez would use to flee. (Miller Deposition, March 27, 2019) (Pgs. 97-98, 107-113).

Mr. Gomez had a lawful duty as a citizen to not flee when ordered by Officer Miller. Yet persons who violate the law do not always obey an officer's commands. Contrary, the officers our society trust to make split-second decisions are held to much higher standards and expectations than the criminal element. When persons attempt to flee, we expect our officers to use force within the ethical, professional, and legal limits to stop them, and only use extreme measures to stop them when there is a necessity to do so.

As *Tennessee v. Garner* defined, there is a balancing test an officer must use on the necessity and level of force used to prevent the escape vs. the risk to the general public. It is incumbent upon Officer Miller to apply this test, not Mr. Gomez. Keep in mind when Officer Miller first observed Mr. Gomez he was complying with all traffic rules around him and not engaged in any dangerous driving behaviors or actions at all. I just do not see any necessity proven in this case that Mr. Gomez was an extreme danger to the public that would warrant a deadly force response by Officer Miller.


**3. Mr. Ryan's Sources to Justify Officer Miller's Need to Use Deadly Force were Outdated, Obscure, and Misinterprets Police Training and Function**


I respectfully dispute Mr. Ryan's report that offers to explain certain police training methods and knowledge as widespread and common knowledge. I also found the external resources used by Mr. Ryan to lend credibility to Officer Miller's actions, in this case, to be obscure.

Mr. Ryan's external sources to justify Miller's actions and threat perception were close to, or over twenty years old. There is a historical aspect to Mr. Ryan's sources. If we roll back

the clock twenty years, law enforcement was engaged in an era of growing militarized weapons, tactics, and training born from the ongoing drug enforcement efforts, the growth of active shooters in schools, and the pressing concern of terrorism on domestic soil. (Lawson, 2018)

As a former officer who served through those times, I can personally attest that topics about reactionary times and reactionary gaps were popular training topics to support the concept that domestic law enforcement missions and objectives related to drug offenses, terrorism, and the growing active shooter events needed military tactics intervention. Reactionary times are the times in which an officer may recognize a threat. A reactionary gap is a term used to describe the delay between an officer's response to a threat or a cease of force after the threat has ended. Thus, concepts such as Ryan's reference to the "OODA Loop" (Ryan, 2020) (Pg. 39) was common in training aimed at responding to active shooters and raiding drug houses, and were often in conjunction with reactionary time and gap trainings.

It is important to know that while these military-style training opportunities were popular, they did not replace the foundations of police basic training and expectations of civilian policing. Ryan's report attempts to pass off some of these training concepts as common knowledge and practice in policing, which is not accurate. There are commonalities in police training across the states, which has always put a strong emphasis on performing duties safely while mitigating risk and controlling situations, not thrusting oneself into them. Ryan wrongly suggests in his report that Mr. Gomez was the one in control of the situation, which contradicts police use of force training that reminds officers that control is not a 50/50 proposition.

Police officers are trained to either escalate or disengage their encounters based on the need for their use of force and the safety of everyone involved, thus making the officer in control of the situation. Officers must be trained and readied to escalate their force options or disengage temporarily to re-assess and deploy other alternatives to maintain control, but they must maintain control. Mr. Ryan's concept that the suspect is in control is just wrong and would be incredibly detrimental for officers to have that view.

To emphasize these points, including the concepts of de-escalating and disengaging, police training over the past two decades has been aided greatly by the use of scenario-based training with a focus on threat assessment, discretion, and articulating force actions by officers. This is proven by an ongoing assessment and report of police academy curriculums in all fifty

12

states provided by a survey by the Bureau of Justice Statistics. (Hickman, 2005) (Reaves, 2016) The use of scenario-based training, along with impulse control techniques has been steadily offered and increased in police academies across the country. (Hickman, 2005) (Reaves, 2016)

*Impulse Control/Attention to Safety* "involves taking proper precautions and avoiding impulsive and/or unnecessarily risky behavior to ensure the safety of oneself and others. It includes the ability and inclination to think before acting—to keep one's impetuous, knee-jerk reactions in check, and instead behave in conscious regard for the larger situation at hand" (Daniel M. Blumberg, 2019). An officer's impulse control is also directly tied to their mental readiness for stressful situations. "When they were anxious, the officers had a stronger expectation of threat, which caused them to shoot earlier and make more mistakes." (Daniel M. Blumberg, 2019)

In a 2015 conference of leading police administrators, trainers, and scholars, the consensus was that use of force incident reviews must also compare with the training being offered to ensure officers are using deadly force as a last resort. (Police Executive Research Foundation, 2015). To reduce deadly force encounters, police are being exposed to a wider range of de-escalation techniques, training, policies, and provided more problem-solving skills to avoid putting themselves in situations where they feel compelled to use force when it is not necessary to do so.

In my professional opinion, police culture will almost always trump training. If the basic foundations of threat-assessment and deadly force decision-making is not kept up through agency training and policy throughout an officer's career, an officer may fail when placed in a difficult situation and asked to make split-second decisions. This is touched on in Mr. Ryan's report when he recites sections of Chief Aftanas's testimony about whether or not Forest Park conducts scenario-based training. While the chief recalls some form of training, he is uncertain to its name or frequency (Ryan, 2020)(Pg. 30). There has also been no curriculum provided to me in my initial review to suggest Officer Miller was provided reinforced concepts on deadly force decision-making and threat assessment during his employment at Forest Park Police Department. An agency committed to such training would minimally at least know the name of the training and provide details of its objectives.

13

Mr. Ryan also states, "fundamental principle of officer survival and use of force is the fact that action beats reaction every time." (Ryan, 2020)(Pg. 39) While I dispute this as being a fundamental concept, I agree that there are circumstances and training scenarios designed to demonstrate this to officers. However, the concept of personal reaction times and action vs. reaction is used to teach officers not to rush into situations that put them in positions of disadvantage. Rather, these concepts are used in training situations to teach officers to carefully think of their positioning, tactics, weapon choice, legal intent, and desirability of their actions.

As a long-time use of force trainer and expert, I have been cautious about the exact science and "average times" associated with personal reaction time studies. Mostly because these studies are conducted in a controlled environment and do not add the actual stress, environmental factors, and real-life variables of independent sensing and reaction to danger. These studies should not be applied as gospel to actual deadly force encounters as they have no proven application to a specific situation.

In his opinion report, it appears to me that Mr. Ryan is attempting to use very obscure reaction time studies to convey that this is how Officer Miller was trained, which was never documented or articulated by Officer Miller. Furthermore, there appears to be an attempt by Mr. Ryan to use these obscure studies to even create a mindset for Officer Miller to use deadly force based on his positioning and perceptions, stating:

*"In taking such research into account, it is recognized that the officer's assessment of the continuing threat and his response to such threat would be enveloped by a reactionary gap that may cause the timing of the shot; the trajectory of the actual shot; and the positioning of all involved to appear to occur in a time sequence giving a false perception that the actual threat had passed at the time of the decision to use deadly force." (Ryan, 2020)(Pg. 40).*

To support this statement, Mr. Ryan dives into studies of personal reaction time. One of Ryan's key resources is a 2001 published study by Ernest J. Tobin and Marvin L. Fackler (Ernest J. Tobin, 2001) This study tested only seventeen police officers in a controlled firing range at a secure federal police training facility, by showing three scenarios on a shooting simulator with the officers knowing that one of the scenarios would be a "shoot" situation. The officers were also allowed to stand ready with their training weapons unholstered and their fingers on the

14

triggers as they watched each scenario. Their "reaction time" was then measured by the time it took for officers to fire their weapon when the "shoot" situation in that scenario was played.

Ryan did not indicate in his report that the authors of this study admitted that their research does not match the intensity and variables of a real-life incident. The authors noted about their research, "the end of a real-life shooting incident are not like the end of the shooting tests reported here." (Ernest J. Tobin, 2001)

Ryan uses a second study by Tobin and Fackler to justify Officer Miller firing his weapon at Mr. Gomez when Mr. Gomez's vehicle was moving past and away from Officer Miller. In this study, the authors again used police officers in a controlled setting to fire at a target using an audible tone to distinguish start and stop times. (L. Fackler, 2001) This study only tested twenty officers on a controlled firing range at a secure law enforcement training facility. The instructions were to have officers face a target five yards away, with their weapons drawn and their fingers on the trigger. At the sound of a tone, officers were instructed to fire as many rounds as possible until the second tone. At the sound of the second tone, which was two seconds past the start tone, the officers were to ceasefire. The study concluded that several officers still fired after the second tone, thus trying to demonstrate a reactionary gap between threat and reaction to it and demonstrating an "average time" that Officer Miller fit into.

It was interesting to note that some details in this study were omitted by Mr. Ryan. In this specific study by Tobin and Fackler, the findings reported that three officers did not fire after the second tone at all. And officers who fired 4 or fewer rounds total did not fire more than one round greater than .05 of a second past the timer. (L. Fackler, 2001). This would indicate that some officers possessed the self-control and competency not to fire after the simulated threat. In comparison, Officer Miller fired a total of four rounds as well and had a reaction time documented in Ryan's report of .06 (Ryan, 2020) (Pg. 40), thus presenting an argument that Officer Miller could stop firing after any arguably perceived threat had passed.

Mr. Ryan portrays these and other obscure studies to be widely known and accepted by law enforcement, going so far as to say, "*Law enforcement has recognized that average human reaction to a perceived threat is .075-.08"*. (Ryan, 2020)(Pg. 40) While studies may be good talking points, a reasonable researcher and expert must concede that these studies do not take

15

into consideration individual factors of the officers such as age, size, physical and mental fitness, experience levels, training levels, and overall competency with a firearm.
It should also be noted that Fackler, a retired Army Colonel, is the owner of the company the journal publication originates from and has also offered questionable advice in his other writings that appear to be strongly pro-firearm and use of force. One of his editorials suggests to respond to possible airline hijackers in the United States, airline companies should solicit police, military, and even civilian conceal carry holders to fly armed. (Fackler, 2001) Fackler's study was also not peer-reviewed or supported by any major university, law enforcement organization, or agency.

Ryan further claims in his report that, "*Common defensive tactics programs offered to law enforcement as well as law enforcement related texts indicate that even a subject running from an officer can turn and fire two shots before the officer would be able to react.*" (Ryan, 2020)(Pg. 41). Again, as a use of force, firearms, and defensive tactics trainer, I am not familiar with this philosophy or any standardized curriculum taught in my thirty years of criminal justice education and experience that would support Ryan's claim.

To find the source for this claim, Ryan cited this example from a 2001 publication by John Michael Callahan (Callahan, 2001), who in turn cited a 1996 study by the FBI conducted and reported by FBI Agent John C. Hall (Hall, 1996). In this study, the FBI used recruits in a controlled environment using training weapons to demonstrate the concern of officers placing themselves in dangerous situations without cover (things that would stop a bullet).

I offer that Ryan used this report out of context to falsely portray a national understanding of reaction time and to suggest that police training and tactics must be more offensive than defensive. Again, studies of reaction times prove very little since they are always done in controlled environments, but they do lend credibility to ethical force training to avoid reckless situations when you are forced to deploy reactionary tactics where mistakes are bound to happen.

Mr. Ryan's source, FBI Agent and author John C Hall wrote that the extensive focus on this FBI experiment was to relay expectations of the newly created federal deadly force requirement and to emphasize the importance of decision-making and necessity when it comes to using deadly force on fleeing felons. (Hall, 1996) Agent Hall clarified the intent of this

16

experiment in a nationally published law enforcement article that said, "The training provided to FBI agents with the outline and accompanying scenarios lays the foundation for further training throughout their law enforcement careers. The propriety of using deadly force is the most serious decision facing a law enforcement officer. Consequently, preparing officers to make these decisions is the gravest responsibility of a law enforcement agency." (Hall, 1996).

Conclusion

As Mr. Ryan states in his report, "*The ultimate desire or goal of every citizen and law enforcement contact is for cooperation, compliance, and control without injury or harm to anyone.*" (Ryan, 2020) (Pg. 38). That is not always possible, but the decisions driving the outcomes of these interactions between suspects and officers are assumed to be the responsibility of the ethical, well-trained, and duty-bound officer. As a citizen of this nation, I would opine that any officer who confesses that they placed themselves in harm's way to stop a stolen automobile who they anticipated and calculated the flight of, did not act in a manner to end contact with cooperation, compliance, and control without injury or harm to anyone but rather provoked a deadly force incident.

These statements and opinions are made to a reasonable degree of professional certainty based on my training, education, and experience. I also reserve the right to amend or alter my opinions should more information regarding this case be made available to me.

Submitted by:

Brian Landers

17

# Citations

Callahan, J. M. (2001). Deadly Force, Constitutional Standards, Federal Policy Guidelines, and Officer Survival. Flushing, NY: Looseleaf.

Daniel M. Blumberg, M. D. (2019). New Directions in Police Academy Training: A Call to Action. *International Journal of Environmental Research and Public Health*.

Ernest J. Tobin, M. L. (2001). Officer Decision Time In Firing A Handgun. *Journal of the International Wound Ballistics Association Vol 5 (2)*, 3.

Fackler, M. L. (2001). Gun Ban Promotes Hijacking. *Journal of the International Wound Ballistics Association*.

Federal Bureau of Investigations. (2018). *Uniform Crime Reports Table 5.* Washington, D.C.: United States Department of Justice.

Hall, J. C. (1996). FBI Training on the New Federal Deadly Force Policy. *FBI Bulletin*, 25-36.

Hickman, M. (2005). *State and Local Law Enforcement Training Academies 2002.* Washington DC: Bureau of Justice Statistics.

John Ryan Deposition. (November 20, 2020). *No. 18 C 910.* U.S. District Court for the Northern District of Illinois, Eastern Division.

Keating, M. (2017). *Forest Park Police Internal Affairs Report IA-#17-001.*

L. Fackler, E. J. (2001). Officer Reaction-Response Time Delay at the End of a Shot Series. *Journal of the International Wound Ballistics Association*.

Lawson, E. (2018). Trends: Police Militarization and the Use of Lethal Force. *Political Research Quarterly*, 177-189.

Miller Deposition. (March 27, 2019). *Daniel Miller Deposition.* Federal District Court-Northern District of Illinoi.

Police Executive Research Foundation. (2015). *Re-Engineering Training of Police Use of Force.* Washington, DC: PERF.

Reaves, B. (2016). *State and Local Law Enforcement Training Academies, 2013.* Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Ryan, J. (2020). *Expert Report of John J. Ryan.*

Tennessee v. Garner, 83-1035 (United States Supreme Court March 27, 1985).

18